RECORD NO. 13-4955

# IN THE

# 𝔘nited 𝔖tates 𝔒ourt of 𝔄ppeals

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSE JOAQUIN MORALES,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE

### JOINT APPENDIX - VOLUME I OF III
### (Pages 1 - 446)

Jonathan S. Zucker
LAW OFFICE OF JONATHAN ZUCKER
Suite 202
1350 Connectivut Avenue, NW
Washington, DC 20036
(202) 624-0748
jonathanzucker@aol.com

Sandra Wilkinson
Martin J. Clarke
OFFICE OF THE UNITED
STATES ATTORNEY
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4800 Telephone
sandra.wilkinson@usdoj.gov
marty.clarke@usdoj.gov

*Counsel for Appellant*

*Counsel for Appellee*

## <u>TABLE OF CONTENTS</u>

Page

*Volume I of III*

District Court Docket Sheet (1:12-cr-00480-RWT-1) ............................................... 1

Indictment
    Filed September 11, 2012 [dkt1] ........................................................................ 19

Email from Ms. Wilkinson to Mr. Zucker with attachment
    Dated July 16, 2013 ......................................................................................... 20
        Att.:      Redacted Drug Enforcement Administration Form
                (Introduced at Discovery is Included in the Appendix by
                Agreement of Counsel) .................................................................. 21

Transcript Excerpts of Motions Hearing
    Before The Honorable Roger W. Titus
    On September 20, 2013 ...................................................................................... 24

Transcript Excerpts of Trial Proceedings
    Before the Honorable Roger W. Titus
    On September 24, 2013 ...................................................................................... 30
        Opening Statement by Ms. Wilkinson ......................................................... 32

Exhibits B & D to Notice of Filing Redacted Governments Disclosure of
Anticipated Attorney Testimony against the Defendant and Response to
Defendants Motion in Limine to Resolve Evidentiary Issues Regarding
Attorney-Client Privilege
    Filed September 25, 2013 [dkt122]:
        Ex. B:    Hand Written Proffer Agreement dated 10/13/10 [dkt122] .......... 60
        Ex. D:    Proffer Letter by the U.S. Attorney's Office
                dated 2/16/11 [dkt122] ................................................................... 61

Transcript Excerpts of Trial Proceedings
    Before the Honorable Roger W. Titus
    On September 25, 2013 ...................................................................................... 64
        ***Testimony of Jonathan Glazerman***
                Direct Examination by Mr. Clarke ......................................... 65
                Cross Examination by Mr. Proctor ......................................... 82

i

*Testimony of Ana Rubio*
    Direct Examination by Mr. Proctor ....................................................... 84
*Testimony of Tyrone Boykins*
    Direct Examination by Ms. Wilkinson ................................................ 112
*Testimony of Harry White*
    Direct Examination by Ms. Wilkinson ................................................ 118


Transcript Excerpts of Trial Proceedings
    Before the Honorable Roger W. Titus
    On September 26, 2013 ........................................................................ 199
    *Testimony of Steven Sunderland*
        Direct Examination by Ms. Wilkinson ............................................... 200
    *Testimony of Edward Ericson*
        Direct Examination by Mr. Clarke ...................................................... 243
    *Testimony of Patricia White*
        Direct Examination by Ms. Wilkinson ............................................... 256
    *Testimony of Robert Kemper*
        Direct Examination by Ms. Wilkinson ............................................... 275


Transcript Excerpts of Trial Proceedings
    Before the Honorable Roger W. Titus
    On September 27, 2013 ........................................................................ 327
    *Testimony of Dustin Ray*
        Direct Examination by Mr. Clarke ...................................................... 328
    *Testimony of Katie O'Hara*
        Direct Examination by Mr. Clarke ...................................................... 353
    *Testimony of Enrique Pabon*
        Direct Examination by Ms. Wilkinson ............................................... 412
        Cross Examination by Mr. Zucker ...................................................... 433
        Redirect Examination by Ms. Wilkinson ........................................... 442
    Proceedings re: Motion for Sanctions ................................................. 443


*Volume II of III*


Transcript Excerpts of Trial Proceedings
    Before the Honorable Roger W. Titus
    On October 1, 2013 ............................................................................. 447
    *Testimony of Garrett Huling*
        Direct Examination by Ms. Wilkinson ............................................... 448
        Cross Examination by Mr. Proctor ...................................................... 487

**_Testimony of Stanley Needleman_**
    Direct Examination by Ms. Wilkinson ................................................... 490
    Cross Examination by Mr. Zucker......................................................... 583

Transcript Excerpts of Trial Proceedings
  Before the Honorable Roger W. Titus
  On October 2, 2013 ........................................................................... 587
    **_Testimony of Stanley Needleman_**
      Cross Examination by Mr. Zucker....................................................... 588
    **_Testimony of Marshawn Stokes_**
      Direct Examination by Mr. Clarke ...................................................... 593

Transcript Excerpts of Trial Proceedings
  Before the Honorable Roger W. Titus
  On October 3, 2013 ........................................................................... 619
    **_Testimony of Michael Herrold_**
      Direct Examination by Mr. Clarke ...................................................... 621

Transcript Excerpts of Trial Proceedings
  Before the Honorable Roger W. Titus
  On October 4, 2013 ........................................................................... 635
    **_Testimony of Mark Royka_**
      Direct Examination by Ms. Wilkinson ................................................. 637
    **_Testimony of Judge Joseph Murphy_**
      Direct Examination by Mr. Clarke ...................................................... 720
      Cross Examination by Mr. Zucker....................................................... 728

Transcript Excerpts of Trial Proceedings
  Before the Honorable Roger W. Titus
  On October 8, 2013 ........................................................................... 732
    Proceedings re:    Jury Instructions ............................................. 733
                    Closing Argument by Mr. Clarke................... 743
                    Closing Argument by Mr. Zucker................... 791
                    Rebuttal by Ms. Wilkinson .......................... 840

Judgment in a Criminal Case
  Entered December 12, 2013 [dkt155]........................................................ 862

Notice of Appeal
  Filed December 13, 2013 [dkt157] ................................................................ 868

*Volume III of III – Sealed*

Transcript of Special Grand Jury Proceedings
    On February 16, 2011 ........................................................ 870
    ***Testimony of Jose Joaquin Morales***
        Examination by Ms. Wilkinson ........................................... 872

APPEAL,CLOSED

# U.S. District Court
## District of Maryland (Baltimore)
### CRIMINAL DOCKET FOR CASE #: 1:12-cr-00480-RWT-1

Case title: USA v. Morales

Date Filed: 09/11/2012
Date Terminated: 12/12/2013

Assigned to: Judge Roger W Titus

Appeals court case number: 13-4955
USCA

**Defendant (1)**

| | |
|---|---|
| **Jose Joaquin Morales**<br>*TERMINATED: 12/12/2013* | represented by **Gary Edward Proctor**<br>Law Offices of Gary E Proctor LLC<br>Eight E Mulberry St<br>Baltimore, MD 21202<br>14104441500<br>Fax: 18662304455<br>Email: garyeproctor@gmail.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: CJA Appointment*<br><br>**Jonathan Seth Zucker**<br>Law Office of Jonathan Zucker<br>1350 Connecticut Ave NW Ste 202<br>Washington, DC 20036<br>12022640784<br>Fax: 12022237005<br>Email: jonathanzucker@aol.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: CJA Appointment* |

**Pending Counts**

18:1958(a) USE OF INTERSTATE
COMMERCE FACILITY IN THE
COMMISSION OF A MURDER FOR
HIRE AND DEATH RESULTS

**Disposition**

LIFE Imprisonment, 5 Years Supervised
Release With Conditions, $100.00 Special
Assessment

(1)

### Highest Offense Level (Opening)

Felony

### Terminated Counts                                    Disposition

None

### Highest Offense Level (Terminated)

None

### Complaints                                           Disposition

None

---

### Plaintiff

USA                                     represented by   **Sandra Wilkinson**
                                                         Office of the US Attorney
                                                         36 S Charles St Fourth Fl
                                                         Baltimore, MD 21201
                                                         14102094800
                                                         Fax: 14109620716
                                                         Email: sandra.wilkinson@usdoj.gov
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Martin Joseph Clarke**
                                                         Office of the United States Attorney
                                                         36 S Charles St Fourth Fl
                                                         Baltimore, MD 21201
                                                         14102094800
                                                         Fax: 14109623124
                                                         Email: marty.clarke@usdoj.gov
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Rod J Rosenstein**
                                                         Office of the United States Attorney
                                                         Do Not Mail
                                                         Baltimore, MD 21201
                                                         14102094800
                                                         Email: rod.rosenstein@usdoj.gov

**2**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/11/2012 | 1 | INDICTMENT as to Jose Joaquin Morales (1) count(s) 1. (apl, Deputy Clerk) (Entered: 09/12/2012) |
| 09/12/2012 | 3 | NOTICE OF ATTORNEY APPEARANCE Martin Joseph Clarke appearing for USA. (Clarke, Martin) (Entered: 09/12/2012) |
| 09/13/2012 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jose Joaquin Morales. Name of Counsel for Defendant(s): Unknown at this Time. PLEASE NOTE: Defendant is in custody. A writ was requested on 9/13/2012. A come up was requested on 9/13/2012. An interpreter will not be needed. Initial Appearance set for 10/30/2012 01:30 PM in Courtroom 3A, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Magistrate Judge Jillyn K. Schulze. (Wilkinson, Sandra) (Entered: 09/13/2012) |
| 09/25/2012 | 4 | NOTICE OF ATTORNEY APPEARANCE: Gary Edward Proctor as CJA Appointment appearing for Jose Joaquin Morales (Proctor, Gary) (Entered: 09/25/2012) |
| 09/28/2012 | 5 | CJA 30: Appointment of Attorney Gary E. Proctor for Jose Joaquin Morales in Death Penalty Proceedings as to Jose Joaquin Morales. signed by Clerk on 09/25/2012. (Attachments: # 1 CJA 31) (ba, Deputy Clerk) (Entered: 10/01/2012) |
| 09/28/2012 | 6 | CJA 30: Appointment of Attorney Jonathan Seth Zucker for Jose Joaquin Morales in Death Penalty Proceedings as to Jose Joaquin Morales. Signed by Clerk on 09/25/2012. (Attachments: # 1 CJA 31) (ba, Deputy Clerk) (Entered: 10/01/2012) |
| 10/11/2012 | 7 | Discovery Material by USA (Wilkinson, Sandra) (Entered: 10/11/2012) |
| 10/31/2012 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jose Joaquin Morales. PLEASE NOTE: Defendant is in custody. A writ was requested on 9/13/2012. A come up was requested on 10/31/2012. An interpreter will not be needed. Arraignment set for 11/2/2012 03:00 PM in Courtroom 3A, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Magistrate Judge Jillyn K Schulze. Initial Appearance set for 11/2/2012 03:00 PM in Courtroom 3A, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Magistrate Judge Jillyn K Schulze. (Wilkinson, Sandra) (Entered: 10/31/2012) |
| 11/02/2012 | 8 | Consent MOTION House Defendant in the District of Maryland pending trial in this matter by Jose Joaquin Morales. Responses due by 11/19/2012 (Attachments: # 1 Text of Proposed Order)(Proctor, Gary) (Entered: 11/02/2012) |
| 11/02/2012 | 9 | Initial Appearance as to Jose Joaquin Morales (Defendant informed of Rights.) held on 11/2/2012, Arraignment as to Jose Joaquin Morales (1) Count 1 held on 11/2/2012, Plea entered by Jose Joaquin Morales (1) Count 1. by Jose Joaquin Morales Not Guilty on counts 1 of the Indictment. before Magistrate Judge Jillyn K Schulze. (Hatcher, 3A.) (chs, Deputy Clerk) (Entered: 11/02/2012) |
| 11/02/2012 | 10 | ORDER OF DETENTION BY AGREEMENT as to Jose Joaquin Morales. Signed by |

| | | |
|---|---|---|
| | | Magistrate Judge Jillyn K. Schulze on 11/02/2012. (chs, Deputy Clerk) (Entered: 11/02/2012) |
| 11/02/2012 | 11 | ORDER granting 8 Request for Defendant to remain in custody in the District of Maryland as to Jose Joaquin Morales (1). Signed by Magistrate Judge Jillyn K. Schulze on 11/02/2012. (chs, Deputy Clerk) (Entered: 11/02/2012) |
| 11/02/2012 | 12 | Memorandum Order as to Jose Joaquin Morales scheduling a four (4) to six (6) week Jury Trial for January 8, 2013 9:00 AM in Courtroom 2C, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Judge Roger W Titus; All pretrial motions to be filed on or before November 19, 2012; Telephone Status conference to be held November 20, 2012 at 5:00 p.m., counsel for the government is to initiate call. Signed by Judge Roger W. Titus on 11/2/2012(chs, Deputy Clerk) (Entered: 11/02/2012) |
| 11/07/2012 | 13 | Sealed Document - CJA Funding (Attachments: # 1 Cover Letter)(bas, Deputy Clerk) (Entered: 11/09/2012) |
| 11/07/2012 | 14 | Sealed Document - CJA Funding (Attachments: # 1 Cover Letter)(bas, Deputy Clerk) (Entered: 11/09/2012) |
| 11/09/2012 | 15 | LETTER/ORDER Status Conference has been scheduled for Tuesday, November 20, 2012 at 1:00 p.m. to be held in Courtroom 2C. The Telephone Status Conference set for November 20, 2012, is CANCELLED, as to Jose Joaquin Morales. Signed by Judge Roger W Titus on 11/09/2012. (bas, Deputy Clerk) (Entered: 11/09/2012) |
| 11/13/2012 | 16 | MOTION to Seal by Jose Joaquin Morales. Responses due by 11/30/2012 (Proctor, Gary) (Entered: 11/13/2012) |
| 11/13/2012 | 17 | **PROPOSED SEALED DOCUMENT** (Proctor, Gary) (Entered: 11/13/2012) |
| 11/14/2012 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jose Joaquin Morales. PLEASE NOTE: Defendant is in custody. A writ was requested on 9/13/2012. A come up was requested on 11/14/2012. An interpreter will not be needed. Status Hearing set for 11/20/2012 01:00 PM in Courtroom 2C, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Judge Roger W Titus. (Wilkinson, Sandra) (Entered: 11/14/2012) |
| 11/19/2012 | 18 | Correspondence re: In-Court Scheduling Conference on November 20, 2012 (Attachments: # 1 Attachment)(Wilkinson, Sandra) (Entered: 11/19/2012) |
| 11/20/2012 | 19 | Status/Scheduling Conference as to Jose Joaquin Morales held on 11/20/2012 before Judge Roger W Titus. (Court Reporter: Bankins (2C) (esp, Deputy Clerk) (Entered: 11/20/2012) |
| 11/20/2012 | 20 | MOTION to Exclude *Time Pursuant to the Speedy Trial Act* by USA as to Jose Joaquin Morales. Responses due by 12/7/2012 (Attachments: # 1 Text of Proposed Order)(Wilkinson, Sandra) (Entered: 11/20/2012) |
| 11/21/2012 | 21 | ORDER Granting 20 Motion to Exclude Time Pursuant to the Speedy Trial Act as to Jose Joaquin Morales (1). Signed by Judge Roger W Titus on 11/20/2012. (bas, |

| | | Deputy Clerk) (Entered: 11/21/2012) |
|---|---|---|
| 01/16/2013 | 22 | MEMORANDUM/ORDER RESCHEDULING the Telephone Status Conference from 2/7/2013 to 1/28/2013 at 5:00 p.m. as to Jose Joaquin Morales. Signed by Judge Roger W. Titus on 1/15/2013. (rss, Deputy Clerk) (Entered: 01/16/2013) |
| 01/16/2013 | 23 | - [FILED IN ERROR]- MEMORANDUM/ORDER RESCHEDULING the Telephone Status Conference from 2/7/2013 to 1/28/2013 at 5:00 p.m. as to Jose Joaquin Morales. Signed by Judge Roger W Titus on 01/15/2013. (bas, Deputy Clerk) Modified on 1/16/2013 (bas, Deputy Clerk). (Entered: 01/16/2013) |
| 01/29/2013 | 24 | ORDER as to Jose Joaquin Morales SCHEDULING a Telephone Status Conference for 4/3/2013 at 5:00 p.m. The call shall be initiated by counsel for the Government. Signed by Judge Roger W Titus on 1/28/2013. (rss, Deputy Clerk) (Entered: 01/29/2013) |
| 02/08/2013 | 25 | ORDER for Interim Payments to Appointed Counsel as to Jose Joaquin Morales. Signed by Judge Roger W Titus on 01/22/2013. (bas, Deputy Clerk) (Entered: 02/08/2013) |
| 02/08/2013 | 26 | Sealed Document(bas, Deputy Clerk) (Entered: 02/08/2013) |
| 02/08/2013 | 27 | Sealed Document (bas, Deputy Clerk) (Entered: 02/08/2013) |
| 02/15/2013 | 28 | RESPONSE re 17 Proposed Sealed Document filed by USA. Replies due by 3/4/2013. (Wilkinson, Sandra) (Entered: 02/15/2013) |
| 03/01/2013 | 29 | MOTION to Seal by Jose Joaquin Morales. Responses due by 3/18/2013 (Attachments: # 1 Text of Proposed Order)(Zucker, Jonathan) (Entered: 03/01/2013) |
| 03/01/2013 | 30 | Motion in Limine to Resolve Evidentiary Issues related to Attorney-Client Privilege (Zucker, Jonathan) Modified on 9/26/2013 (bas, Deputy Clerk)(Change title of Document bca) (Entered: 03/01/2013) |
| 03/08/2013 | 31 | NOTICE by USA *Notification of Decision Not to Seek Death Penalty* (Wilkinson, Sandra) (Entered: 03/08/2013) |
| 03/11/2013 | 32 | MEMORANDUM/ORDER a telephone status conference is hereby SCHEDULEDfor Wednesday, March 13, 2013, at 5:15 p.m., and shall be initiated by counsel for the Government as to Jose Joaquin Morales. Signed by Judge Roger W Titus on 03/08/2013. (bas, Deputy Clerk) (Entered: 03/11/2013) |
| 03/12/2013 | 33 | MEMORANDUM/ORDER the telephone status conference presently set for Wednesday, March 13, 2013, at 5:15 p.m. is hereby RESCHEDULED for Wednesday, March 20, 2013, at 4:30 p.m. The call shall be initiated by counsel for the Government as to Jose Joaquin Morales. Signed by Judge Roger W Titus on 03/12/2013. (bas, Deputy Clerk) (Entered: 03/12/2013) |
| 03/18/2013 | 34 | Sealed Document (Attachments: # 1 Sealed Document, # 2 Sealed Document)(bas, Deputy Clerk) (Entered: 03/19/2013) |

| 03/20/2013 | | Telephone Status Conference as to Jose Joaquin Morales held on 3/20/2013 before Judge Roger W Titus. (hbm, Deputy Clerk) (Entered: 04/05/2013) |
|---|---|---|
| 03/21/2013 | 35 | ORDER All deadlines relating to death penalty motions and the hearing on death penalty motions set for August 27, 2013, are CANCELLED in light of the Governments decision not to seek the death penalty in this case, see ECF No. 31; the deadline for the Governments response to Defendants non-death penalty motion(s) is EXTENDED from March 22, 2013, to April 15, 2013; the deadline for Defendant to file any reply in support of any non-death penalty motion(s) is EXTENDED from April 5, 2013, to April 30, 2013, no later than 5:00 p.m.; and the time allotted for the trial scheduled to commence on October 1, 2013, is modified from six weeks to four weeks as to Jose Joaquin Morales. Signed by Judge Roger W Titus on 03/20/2013. (bas, Deputy Clerk) (Entered: 03/21/2013) |
| 04/01/2013 | 36 | MOTION for Speedy Trial by Jose Joaquin Morales. Responses due by 4/18/2013 (Zucker, Jonathan) (Entered: 04/01/2013) |
| 04/01/2013 | 37 | Amended MOTION for Speedy Trial by Jose Joaquin Morales. Responses due by 4/18/2013 (Zucker, Jonathan) (Entered: 04/01/2013) |
| 04/02/2013 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jose Joaquin Morales. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 4/2/2013. An interpreter will not be needed. Hearing on Pending Motions set for 5/6/2013 09:00 AM in Courtroom 2C, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Judge Roger W Titus. (Wilkinson, Sandra) (Entered: 04/02/2013) |
| 04/03/2013 | | Telephone Status Conference as to Jose Joaquin Morales held on 4/3/2013 before Judge Roger W Titus. (hbm, Deputy Clerk) (Entered: 04/05/2013) |
| 04/04/2013 | 38 | MEMORANDUM/ORDER a telephone status conference is hereby SCHEDULED for Thursday, April 25, 2013, at 5:00 p.m., The call shall be initiated by counsel for the Government as to Jose Joaquin Morales. Signed by Judge Roger W Titus on 04/03/2013. (bas, Deputy Clerk) (Entered: 04/04/2013) |
| 04/18/2013 | 39 | MOTION to Seal by USA as to Jose Joaquin Morales. Responses due by 5/6/2013 (Attachments: # 1 Text of Proposed Order)(Wilkinson, Sandra) (Entered: 04/18/2013) |
| 04/18/2013 | 40 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Wilkinson, Sandra) (Entered: 04/18/2013) |
| 04/25/2013 | | Telephone Status Conference as to Jose Joaquin Morales held on 4/25/2013 before Judge Roger W Titus. (hbm, Deputy Clerk) (Entered: 04/30/2013) |
| 04/26/2013 | 41 | ORDER Granting 39 Motion to Seal as to Jose Joaquin Morales (1); Granting 16 Motion to Seal as to Jose Joaquin Morales (1); Granting 29 Motion to Seal as to Jose Joaquin Morales (1); Denying as Moot 36 Motion for Speedy Trial as to Jose Joaquin Morales (1); Denying 37 Amended Motion for Speedy Trial as to Jose Joaquin Morales (1). Signed by Judge Roger W Titus on 04/26/2013. (bas, Deputy Clerk) (Entered: 04/26/2013) |

| 04/29/2013 | 42 | MOTION to Seal by Jose Joaquin Morales. Responses due by 5/16/2013 (Attachments: # 1 Text of Proposed Order)(Zucker, Jonathan) (Entered: 04/29/2013) |
| 04/29/2013 | 43 | SEALED DOCUMENT (Zucker, Jonathan) Modified on 7/16/2013 (bas, Deputy Clerk) (Removed proposed from docket text, bca)). (Entered: 04/29/2013) |
| 05/03/2013 | 44 | -SEALED- MOTION to Seal by USA as to Jose Joaquin Morales. Responses due by 5/20/2013 (Attachments: # 1 Text of Proposed Order)(Wilkinson, Sandra) (Entered: 05/03/2013) |
| 05/03/2013 | 45 | SEALED DOCUMENT (Attachments: # 1 Exhibit A)(Wilkinson, Sandra) Modified on 7/16/2013 (bas, Deputy Clerk)(Removed proposed from docket text, bca) (Entered: 05/03/2013) |
| 05/06/2013 | 46 | Motion Hearing as to Jose Joaquin Morales held on 5/6/2013 re 44 -SEALED- MOTION to Seal filed by USA, 42 MOTION to Seal filed by Jose Joaquin Morales before Judge Roger W Titus. (FTR GOLD 2C) (hbm, Deputy Clerk) (Entered: 05/06/2013) |
| 05/06/2013 | 47 | MOTION HEARING EXHIBIT LIST by USA as to Jose Joaquin Morales (hbm, Deputy Clerk) (Entered: 05/06/2013) |
| 05/15/2013 | 48 | MOTION to Seal by Jose Joaquin Morales. Responses due by 6/3/2013 (Attachments: # 1 Text of Proposed Order)(Zucker, Jonathan) (Entered: 05/15/2013) |
| 05/15/2013 | 49 | SEALED DOCUMENT (Zucker, Jonathan) Modified on 7/16/2013 (bas, Deputy Clerk)(Removed proposed from docket text bca) (Entered: 05/15/2013) |
| 07/15/2013 | 50 | MOTION Requesting Notice of Alibi by USA as to Jose Joaquin Morales. Responses due by 8/1/2013 (Attachments: # 1 Exhibit A)(Wilkinson, Sandra) (Entered: 07/15/2013) |
| 07/16/2013 | 51 | ORDER Granting 42 Motion to Seal as to Jose Joaquin Morales (1). Signed by Judge Roger W Titus on 07/16/2013. (bas, Deputy Clerk) (Entered: 07/16/2013) |
| 07/16/2013 | 52 | ORDER Granting 44 Motion to Seal as to Jose Joaquin Morales (1). Signed by Judge Roger W Titus on 07/16/2013. (bas, Deputy Clerk) (Entered: 07/16/2013) |
| 07/16/2013 | 53 | ORDER Granting 48 Motion to Seal as to Jose Joaquin Morales (1). Signed by Judge Roger W Titus on 07/16/2013. (bas, Deputy Clerk) (Entered: 07/16/2013) |
| 07/17/2013 | 54 | NOTICE by USA *of Intention to Use Statements Against Defendant Jose Morales* (Wilkinson, Sandra) (Entered: 07/17/2013) |
| 07/17/2013 | 55 | Sealed Document (bas, Deputy Clerk) (Entered: 07/17/2013) |
| 07/17/2013 | 56 | Sealed Document (bas, Deputy Clerk) (Entered: 07/17/2013) |
| 07/19/2013 | 57 | MOTION in Limine *to Admit Decedent's Statements* by USA as to Jose Joaquin Morales. Responses due by 8/5/2013 (Wilkinson, Sandra) (Entered: 07/19/2013) |

| | | |
|---|---|---|
| 07/26/2013 | 58 | MOTION to Suppress *Statements Made in Texas* by Jose Joaquin Morales. Responses due by 8/12/2013 (Proctor, Gary) (Entered: 07/26/2013) |
| 08/01/2013 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jose Joaquin Morales. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 8/1/2013. An interpreter will not be needed. Jury Trial set for 9/24/2013 09:00 AM in Courtroom 2C, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Judge Roger W Titus. (Wilkinson, Sandra) (Entered: 08/01/2013) |
| 08/01/2013 | 59 | Scheduling Conference as to Jose Joaquin Morales held on 8/1/2013 before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Entered: 08/01/2013) |
| 08/01/2013 | 60 | ORDER scheduling a hearing on all pending motions for 9/20/2013 at 09:00 AM. Signed by Judge Roger W Titus on 8/1/2013. (nss, Deputy Clerk) (Entered: 08/02/2013) |
| 08/07/2013 | 61 | MOTION to Seal by USA as to Jose Joaquin Morales. Responses due by 8/26/2013 (Attachments: # 1 Text of Proposed Order)(Wilkinson, Sandra) (Entered: 08/07/2013) |
| 08/07/2013 | 62 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Wilkinson, Sandra) (Entered: 08/07/2013) |
| 08/08/2013 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jose Joaquin Morales. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 8/8/2013. An interpreter will not be needed. Hearing on Pending Motions set for 9/20/2013 09:00 AM in Courtroom 2C, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Judge Roger W Titus. (Wilkinson, Sandra) (Entered: 08/08/2013) |
| 08/09/2013 | 63 | Sealed Document (bas, Deputy Clerk) (Entered: 08/12/2013) |
| 08/09/2013 | 64 | Sealed Document (bas, Deputy Clerk) (Entered: 08/12/2013) |
| 08/13/2013 | 65 | MOTION in Limine *regarding Contact with Represented Persons* by USA as to Jose Joaquin Morales. Responses due by 8/30/2013 (Attachments: # 1 Exhibit) (Wilkinson, Sandra) (Entered: 08/13/2013) |
| 08/16/2013 | 66 | ORDER Granting Defendant access to the Law Library at the Correctional Treatment Facility as is allowed by the rules in place at the Institution as to Jose Joaquin Morales. Signed by Magistrate Judge William Connelly on 08/15/2013. (bas, Deputy Clerk) (Entered: 08/19/2013) |
| 08/21/2013 | 67 | Sealed Document (bas, Deputy Clerk) (Entered: 08/22/2013) |
| 08/21/2013 | 68 | Sealed Document (bas, Deputy Clerk) (Entered: 08/22/2013) |
| 08/21/2013 | 69 | Sealed Document (bas, Deputy Clerk) (Entered: 08/22/2013) |
| 08/21/2013 | 70 | Sealed Document (bas, Deputy Clerk) (Entered: 08/22/2013) |

| 08/22/2013 | 71 | MOTION for Court Order by Jose Joaquin Morales. Responses due by 9/9/2013 (Attachments: # 1 Envelope)(bas, Deputy Clerk) (Entered: 08/22/2013) |
| 08/24/2013 | 72 | -SEALED- MOTION to Seal by Jose Joaquin Morales. Responses due by 9/12/2013 (Proctor, Gary) (Entered: 08/24/2013) |
| 08/24/2013 | 73 | SEALED DOCUMENT (Attachments: # 1 Text of Proposed Order, # 2 Exhibit) (Proctor, Gary) Modified on 9/4/2013 (bas, Deputy Clerk). (Entered: 08/24/2013) |
| 08/27/2013 | 74 | RESPONSE in Opposition by Jose Joaquin Morales re 65 MOTION in Limine *regarding Contact with Represented Persons* (Zucker, Jonathan) (Entered: 08/27/2013) |
| 08/27/2013 | 75 | MOTION for Emergency Hearing by Jose Joaquin Morales. Responses due by 9/13/2013 (Attachments: # 1 Envelope)(bas, Deputy Clerk) (Entered: 08/28/2013) |
| 08/29/2013 | 76 | Sealed Document (bas, Deputy Clerk) (Entered: 08/29/2013) |
| 08/29/2013 | 77 | Sealed Document (bas, Deputy Clerk) (Entered: 08/29/2013) |
| 08/30/2013 | 78 | RESPONSE to Motion by USA as to Jose Joaquin Morales re 58 MOTION to Suppress *Statements Made in Texas* Replies due by 9/16/2013. (Wilkinson, Sandra) (Entered: 08/30/2013) |
| 09/03/2013 | 79 | SECOND MOTION for Emergency Hearing by Jose Joaquin Morales. Responses due by 9/20/2013 (Attachments: # 1 Envelope)(bas, Deputy Clerk) (Entered: 09/03/2013) |
| 09/04/2013 | 80 | ORDER Granting 72 Motion to Seal as to Jose Joaquin Morales (1). Signed by Judge Roger W Titus on 09/03/2013. (bas, Deputy Clerk) (Entered: 09/04/2013) |
| 09/05/2013 | 81 | MOTION to Unseal Document by USA as to Jose Joaquin Morales. Responses due by 9/23/2013 (Attachments: # 1 Text of Proposed Order)(Wilkinson, Sandra) (Entered: 09/05/2013) |
| 09/05/2013 | 82 | Consent MOTION to Amend/Correct *Typographical Error In Indictment* by USA as to Jose Joaquin Morales. Responses due by 9/23/2013 (Attachments: # 1 Text of Proposed Order)(Wilkinson, Sandra) (Entered: 09/05/2013) |
| 09/06/2013 | 83 | ORDER Granting 82 Motion to Amend/Correct Typographical Error In Indictment as to Jose Joaquin Morales (1). Signed by Judge Roger W Titus on 09/06/2013. (bas, Deputy Clerk) (Entered: 09/06/2013) |
| 09/08/2013 | 84 | -SEALED- MOTION to Seal by Jose Joaquin Morales. Responses due by 9/26/2013 (Proctor, Gary) (Entered: 09/08/2013) |
| 09/08/2013 | 85 | SEALED DOCUMENT (Attachments: # 1 Text of Proposed Order, # 2 Exhibit) (Proctor, Gary) Modified on 9/10/2013 (bas, Deputy Clerk). (Entered: 09/08/2013) |
| 09/10/2013 | 86 | MOTION in Limine *to Direct the Government to Provide Notice of its Intention to Rely on Other Crimes, Wrongs, Acts and Misconduct Evidence and to Address Admissibility Issues Pretrial* by Jose Joaquin Morales. Responses due by 9/27/2013 (Zucker, Jonathan) (Entered: 09/10/2013) |

| 09/10/2013 | 88 | ORDER Granting 84 Motion to Seal as to Jose Joaquin Morales (1). Signed by Judge Paul W. Grimm on 09/10/2013. (bas, Deputy Clerk) (Entered: 09/10/2013) |
| 09/10/2013 | 89 | Sealed Document (bas, Deputy Clerk) (Entered: 09/10/2013) |
| 09/10/2013 | 90 | Sealed Document (bas, Deputy Clerk) (Entered: 09/10/2013) |
| 09/10/2013 | 91 | ORDER REFERRING MOTION to Magistrate Judge William Connelly for Disposition as to Jose Joaquin Morales 75 MOTION for Hearing filed by Jose Joaquin Morales, 79 MOTION for Hearing filed by Jose Joaquin Morales. An ATTORNEY INQUIRY hearing will be held on Monday, September 16, 2013 at 4:00 PM. Signed by Judge Roger W Titus on September 10, 2013. (kdm, Chambers) (Entered: 09/10/2013) |
| 09/11/2013 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jose Joaquin Morales. *Attorney Inquiry Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 9/11/2013. An interpreter will not be needed. Hearing set for 9/16/2013 04:00 PM in Courtroom 3B, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Magistrate Judge William Connelly. (Wilkinson, Sandra) (Entered: 09/11/2013) |
| 09/14/2013 | 92 | RESPONSE re 86 MOTION in Limine *to Direct the Government to Provide Notice of its Intention to Rely on Other Crimes, Wrongs, Acts and Misconduct Evidence and to Address Admissibility Issues Pretrial* filed by USA. Replies due by 10/3/2013. (Wilkinson, Sandra) (Entered: 09/14/2013) |
| 09/16/2013 | 95 | Sealed Document (bas, Deputy Clerk) (Entered: 09/16/2013) |
| 09/16/2013 | 96 | Sealed Document (bas, Deputy Clerk) (Entered: 09/16/2013) |
| 09/16/2013 | 97 | Sealed Document (bas, Deputy Clerk) (Entered: 09/16/2013) |
| 09/17/2013 | 99 | ORDER for Correctional Treatment Facility in Washington, DC to grant defendant daily grooming prior to transportation to Court during trial as to Jose Joaquin Morales. Signed by Magistrate Judge William Connelly on 09/17/2013. (c/s USMS 9/17/2013) (chs, Deputy Clerk) (Entered: 09/17/2013) |
| 09/17/2013 | 100 | -SEALED- Request for Rule 17 Subpoena by Jose Joaquin Morales (Attachments: # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit)(Proctor, Gary) (Entered: 09/17/2013) |
| 09/17/2013 | 101 | Proposed Voir Dire by USA as to Jose Joaquin Morales (Wilkinson, Sandra) (Entered: 09/17/2013) |
| 09/17/2013 | 102 | Joint Correspondence re: Joint Proposed Verdict Form (Wilkinson, Sandra) (Entered: 09/17/2013) |
| 09/17/2013 | 103 | MOTION to Produce *Presentence Reports of Cooperating Witnesses for In Camera Review by the Court* by Jose Joaquin Morales. Responses due by 10/4/2013 (Proctor, Gary) (Entered: 09/17/2013) |

| 09/18/2013 | 104 | Sealed Document (bas, Deputy Clerk) (Entered: 09/18/2013) |
|---|---|---|
| 09/18/2013 | 105 | Sealed Document (bas, Deputy Clerk) (Entered: 09/18/2013) |
| 09/18/2013 | 106 | MOTION for Protective Order ( Responses due by 10/7/2013) by USA as to Jose Joaquin Morales. (Attachments: # 1 Report 1, # 2 Report 2, # 3 Report 3, # 4 Text of Proposed Order)(Clarke, Martin) (Entered: 09/18/2013) |
| 09/18/2013 | 107 | Sealed Document (bas, Deputy Clerk) (Entered: 09/18/2013) |
| 09/18/2013 | 108 | Sealed Document (bas, Deputy Clerk) (Entered: 09/18/2013) |
| 09/18/2013 | 109 | Sealed Document (bas, Deputy Clerk) (Entered: 09/18/2013) |
| 09/18/2013 | 110 | Sealed Document (bas, Deputy Clerk) (Entered: 09/18/2013) |
| 09/19/2013 | 111 | Sealed Document (bas, Deputy Clerk) (Entered: 09/19/2013) |
| 09/20/2013 | 112 | Motion Hearing as to Jose Joaquin Morales held on 9/20/2013 re 57 MOTION in Limine *to Admit Decedent's Statements* filed by USA, 50 MOTION Requesting Notice of Alibi filed by USA, 86 MOTION in Limine *to Direct the Government to Provide Notice of its Intention to Rely on Other Crimes, Wrongs, Acts and Misconduct Evidence and to Address Admissibility Issues Pretrial* filed by Jose Joaquin Morales, 81 MOTION to Unseal Document filed by USA, 103 MOTION to Produce *Presentence Reports of Cooperating Witnesses for In Camera Review by the Court* filed by Jose Joaquin Morales, 82 Consent MOTION to Amend/Correct *Typographical Error In Indictment* filed by USA, 58 MOTION to Suppress *Statements Made in Texas* filed by Jose Joaquin Morales before Judge Roger W Titus.(Written order to be entered by the Court) (Court Reporter: Lisa Bankins) (hbms, Deputy Clerk) (Entered: 09/20/2013) |
| 09/20/2013 | 113 | MOTION HEARING EXHIBIT LIST by USA as to Jose Joaquin Morales (hbms, Deputy Clerk) (Entered: 09/20/2013) |
| 09/20/2013 | 114 | MOTIONS HEARING EXHIBIT LIST by Jose Joaquin Morales (hbms, Deputy Clerk) (Entered: 09/20/2013) |
| 09/20/2013 | 115 | Stipulation re: Return of Motions Hearing Exhibits to Counsel (hbm, Deputy Clerk) (Entered: 09/20/2013) |
| 09/23/2013 | 116 | Proposed Jury Instructions by USA as to Jose Joaquin Morales (Attachments: # 1 Attachment A)(Wilkinson, Sandra) (Entered: 09/23/2013) |
| 09/23/2013 | 117 | MOTION to Continue *Trial and For Immediate Medical Treatment* by Jose Joaquin Morales. Responses due by 10/10/2013 (Proctor, Gary) (Entered: 09/23/2013) |
| 09/23/2013 | 119 | ORDER Denying as Moot 17 Defendant's SEALED Document; Denying as Moot 50 Motion Requesting Notice of Alibi as to Jose Joaquin Morales (1); Granting without prejudice to object at trial 57 Motion in Limine to Admit Decedent's Statements as to Jose Joaquin Morales (1); Denying 58 Motion to Suppress Statements Made in Texas as to Jose Joaquin Morales (1); Granting 61 Motion to Seal as to Jose Joaquin Morales (1); Granting 62 Plaintiff's SEALED Document; Granting 81 Motion to Unseal |

| | | Document as to Jose Joaquin Morales (1); Denying without prejudice <u>86</u> Motion in Limine to Direct the Government to Provide Notice of its Intention to Rely on Other Crimes, Wrongs, Acts and Misconduct Evidence and to Address Admissibility Issues Pretrial as to Jose Joaquin Morales (1); Denying without prejudice to Review at Trial <u>103</u> Motion to Produce Presentence Reports of Cooperating Witnesses for In Camera Review as to Jose Joaquin Morales (1) . Signed by Judge Roger W Titus on 09/23/2013. (bas, Deputy Clerk) (Entered: 09/24/2013) |
|---|---|---|
| 09/24/2013 | <u>118</u> | Motion Hearing as to Jose Joaquin Morales held on 9/24/2013 re <u>117</u> MOTION to Continue *Trial and For Immediate Medical Treatment* filed by Jose Joaquin Morales before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Entered: 09/24/2013) |
| 09/24/2013 | | ORAL ORDER as to Jose Joaquin Morales re "DENYING" <u>117</u> MOTION to Continue *Trial and For Immediate Medical Treatment* filed by Jose Joaquin Morales for reasons stated on the record entered by Judge Roger W Titus on 09-24-2013. (hbm, Deputy Clerk) (Entered: 09/24/2013) |
| 09/24/2013 | <u>120</u> | Jury Trial - Day 1 as to Jose Joaquin Morales held on 9/24/2013 before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Entered: 09/24/2013) |
| 09/25/2013 | <u>121</u> | Jury Trial Day 2 as to Jose Joaquin Morales held on 9/25/2013 before Judge Roger W Titus. (Court Reporter: Bankins- 2C) (jcs, Deputy Clerk) (Entered: 09/26/2013) |
| 09/25/2013 | | Document unsealed as to Jose Joaquin Morales. <u>30</u> Motion in Limine to Resolve Evidentiary Issues related to Attorney-Client Privilege (bas, Deputy Clerk) (Entered: 09/26/2013) |
| 09/25/2013 | <u>122</u> | NOTICE of Filing Redacted Governments Disclosure of Anticipated Attorney Testimony Against the Defendant and Response to Defendants Motion In Limine to Resolve Evidentiary Issues Regarding Attorney-Client Privilege by USA re <u>40</u> Sealed Document (bas, Deputy Clerk). (Entered: 09/26/2013) |
| 09/25/2013 | <u>123</u> | NOTICE of Filing Redacted Governments Supplemental Disclosure and Reply to Defendants Response to Governments Disclosure of Anticipated Attorney Testimony by USA re <u>45</u> Sealed Document (bas, Deputy Clerk) (Entered: 09/26/2013) |
| 09/25/2013 | <u>124</u> | NOTICE of Filing Redacted Memorandum Opinion by USA re <u>55</u> Sealed Document (bas, Deputy Clerk) (Entered: 09/26/2013) |
| 09/26/2013 | <u>125</u> | Jury Trial Day 3 as to Jose Joaquin Morales held on 9/26/2013 before Judge Roger W Titus. (Court Reporter: Bankins - 2C) (jcs, Deputy Clerk) (Entered: 09/27/2013) |
| 09/27/2013 | <u>126</u> | Jury Trial - Day 4 as to Jose Joaquin Morales held on 9/27/2013 before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Entered: 09/27/2013) |
| 09/30/2013 | <u>127</u> | Court's Revised Jury Instructions as to Jose Joaquin Morales (hbm, Deputy Clerk) (Additional attachment(s) added on 10/2/2013: # <u>1</u> Corrected Copy of Jury Instructions) (hbms, Deputy Clerk). (Entered: 09/30/2013) |
| 09/30/2013 | <u>128</u> | MOTION to Suppress *and Preclude Testimony of Marshawn Stokes* by Jose |

| | | |
|---|---|---|
| | | Joaquin Morales. Responses due by 10/18/2013 (Proctor, Gary) (Entered: 09/30/2013) |
| 10/01/2013 | 129 | Jury Trial - Day 5 as to Jose Joaquin Morales held on 10/1/2013 before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Entered: 10/02/2013) |
| 10/02/2013 | 130 | Motion Hearing as to Jose Joaquin Morales held on 10/2/2013 re 128 MOTION to Suppress *and Preclude Testimony of Marshawn Stokes* filed by Jose Joaquin Morales before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Entered: 10/02/2013) |
| 10/02/2013 | | ORAL ORDER as to Jose Joaquin Morales "DENYING" 128 MOTION to Suppress *and Preclude Testimony of Marshawn Stokes* filed by Jose Joaquin Morales. Signed by Judge Roger W Titus on 10-02-2013. (hbm, Deputy Clerk) (Entered: 10/02/2013) |
| 10/02/2013 | 131 | Motion Hearing EXHIBIT LIST by USA as to Jose Joaquin Morales re: 128 . (hbm, Deputy Clerk) (Additional attachment(s) added on 10/2/2013: # 1 Corrected Exhibit List) (hbm, Deputy Clerk). (Entered: 10/02/2013) |
| 10/02/2013 | 132 | Jury Trial - Day 6 as to Jose Joaquin Morales held on 10/2/2013 before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Entered: 10/03/2013) |
| 10/03/2013 | 133 | Jury Trial - Day 7 as to Jose Joaquin Morales held on 10/3/2013 before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Additional attachment(s) added on 10/3/2013: # 1 Corrected Minutes) (hbm, Deputy Clerk). (Entered: 10/03/2013) |
| 10/04/2013 | 134 | Jury Trial - Day 8 as to Jose Joaquin Morales held on 10/4/2013 before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Entered: 10/04/2013) |
| 10/04/2013 | 135 | MOTION to Exclude *Statements of Probable Cause* by Jose Joaquin Morales. Responses due by 10/21/2013 (Proctor, Gary) (Entered: 10/04/2013) |
| 10/07/2013 | 136 | Jury Instructions as to Jose Joaquin Morales (ba, Deputy Clerk) (Entered: 10/07/2013) |
| 10/08/2013 | 137 | Jury Trial - Day 9 as to Jose Joaquin Morales held on 10/8/2013 before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Additional attachment(s) added on 10/9/2013: # 1 Corrected Minutes) (hbm, Deputy Clerk). (Entered: 10/09/2013) |
| 10/08/2013 | 138 | FINAL Jury Instructions as to Jose Joaquin Morales (hbm, Deputy Clerk) (Entered: 10/09/2013) |
| 10/08/2013 | 139 | TRIAL EXHIBIT LIST by USA as to Jose Joaquin Morales (hbm, Deputy Clerk) (Entered: 10/09/2013) |
| 10/08/2013 | 140 | TRIAL EXHIBIT LIST by Jose Joaquin Morales (hbm, Deputy Clerk) (Entered: 10/09/2013) |
| 10/08/2013 | 141 | Stipulation re: Certification of Exhibits Submitted to the Jury (hbm, Deputy Clerk) (Entered: 10/09/2013) |

| 10/09/2013 | 142 | Jury Trial - Day 10 as to Jose Joaquin Morales held on 10/9/2013 before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Entered: 10/09/2013) |
| 10/09/2013 | 143 | Jury Note #1. (hbm, Deputy Clerk) (Entered: 10/09/2013) |
| 10/09/2013 | 144 | JURY VERDICT Signed (hbm, Deputy Clerk) (Entered: 10/09/2013) |
| 10/09/2013 | 145 | JURY VERDICT as to Jose Joaquin Morales (1) "Guilty" on Count 1. (hbm, Deputy Clerk) (Entered: 10/09/2013) |
| 10/09/2013 | 146 | Stipulation re: Return of Exhibits to Counsel (hbm, Deputy Clerk) (Entered: 10/09/2013) |
| 10/28/2013 | 150 | Correspondence from Defendant (Attachments: # 1 Envelope)(bas, Deputy Clerk) (Entered: 10/29/2013) |
| 11/12/2013 |  | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Jose Joaquin Morales. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 11/12/2013. An interpreter will not be needed. Sentencing set for 12/9/2013 10:30 AM in Courtroom 2C, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Judge Roger W Titus. (Wilkinson, Sandra) (Entered: 11/12/2013) |
| 12/05/2013 | 151 | MEMORANDUM/ORDER Sentencing Hearing has been SCHEDULED for Monday, December 9, 2013, at 10:30 a.m. as to Jose Joaquin Morales. Signed by Judge Roger W Titus on 10/09/2013. (bas, Deputy Clerk)(ORDER originally received on 10/09/2013 bca) (Entered: 12/05/2013) |
| 12/09/2013 | 152 | Sentencing as to Jose Joaquin Morales held on 12/9/2013 before Judge Roger W Titus. (Court Reporter: Lisa Bankins) (hbm, Deputy Clerk) (Entered: 12/09/2013) |
| 12/09/2013 | 153 | FILED IN ERROR - COUNSEL WILL REFILE Correspondence re: Sentencing (Exhibit 1 at Hearing) (Wilkinson, Sandra) Modified on 12/9/2013 (cags, Deputy Clerk). (Entered: 12/09/2013) |
| 12/09/2013 | 154 | Correspondence re: re: Sentencing (Wilkinson, Sandra) (Entered: 12/09/2013) |
| 12/12/2013 | 155 | JUDGMENT as to Jose Joaquin Morales (1), Count(s) 1, LIFE Imprisonment, 5 Years Supervised Release With Conditions, $100.00 Special Assessment. Signed by Judge Roger W Titus on 12/12/2013. (bas, Deputy Clerk) (Entered: 12/13/2013) |
| 12/13/2013 | 157 | NOTICE OF APPEAL by Jose Joaquin Morales re 155 Judgment Fee Status: CJA. (Zucker, Jonathan) (Entered: 12/13/2013) |
| 12/17/2013 | 158 | Transmission of Notice of Appeal and Docket Sheet as to Jose Joaquin Morales to US Court of Appeals re 157 Notice of Appeal - Final Judgment (krc, Deputy Clerk) (Entered: 12/17/2013) |
| 12/19/2013 | 159 | USCA Case Number 13-4955 as to Jose Joaquin Morales for 157 Notice of Appeal - Final Judgment filed by Jose Joaquin Morales. Case Manager - Richard Sewell. (krc, Deputy Clerk) (Entered: 12/19/2013) |

| 12/19/2013 | 160 | ORDER of USCA "APPOINTING" Jonathan S. Zucker to represent Jose Joaquin Morales re 157 Notice of Appeal - Final Judgment (krc, Deputy Clerk) (Entered: 12/19/2013) |
| 01/03/2014 | 162 | TRANSCRIPT ORDER Acknowledgment of USCA establishing a deadline to 2/10/14 for filing the elctronically-recorded motions hearing held on 5/6/13 as to Jose Joaquin Morales re 157 Notice of Appeal - Final Judgment (krc, Deputy Clerk) (Entered: 01/06/2014) |
| 01/06/2014 | 161 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Jose Joaquin Morales for proceedings held on 9/24, 10/9/13; 12/13/13; 9/2013; 9/24 - 27/13; 10/1 - 10/5/13, 10/8 and 10/9/13 before Judge Titus, re 157 Notice of Appeal - Final Judgment - Transcript due by 2/18/2014. (Court Reporter: Lisa Bankins)(sls, Deputy Clerk) (Entered: 01/06/2014) |
| 02/07/2014 | 163 | Sealed Document (krcs, Deputy Clerk) (Entered: 02/10/2014) |
| 02/14/2014 | 164 | ORDER of USCA "GRANTING" court reporter Lisa Bankins to 2/24/14 to file the transcript as to Jose Joaquin Morales re 157 Notice of Appeal - Final Judgment (krc, Deputy Clerk). (Entered: 02/14/2014) |
| 02/24/2014 | 165 | ORDER of USCA "GRANTING" court reporter Lisa Bankins to 3/3/14 to file the transcript without sanctions as to Jose Joaquin Morales re 157 Notice of Appeal - Final Judgment (krc, Deputy Clerk) (Entered: 02/24/2014) |
| 03/01/2014 | 166 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 09/24/2013 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 3/24/2014. Redacted Transcript Deadline set for 4/1/2014. Release of Transcript Restriction set for 5/30/2014. (lkb, Court Reporter) (Entered: 03/01/2014) |
| 03/01/2014 | 167 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 09/25/2013 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 3/24/2014. Redacted Transcript Deadline set for 4/1/2014. Release of Transcript Restriction set for 5/30/2014. (lkb, Court Reporter) (Entered: 03/01/2014) |
| 03/01/2014 | 168 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 09/26/2013 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court |

| | | Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 3/24/2014. Redacted Transcript Deadline set for 4/1/2014. Release of Transcript Restriction set for 5/30/2014. (lkb, Court Reporter) (Entered: 03/01/2014) |
|---|---|---|
| 03/01/2014 | 169 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 09/27/2013 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 3/24/2014. Redacted Transcript Deadline set for 4/1/2014. Release of Transcript Restriction set for 5/30/2014. (lkb, Court Reporter) (Entered: 03/01/2014) |
| 03/01/2014 | 170 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 10/01/2013 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 3/24/2014. Redacted Transcript Deadline set for 4/1/2014. Release of Transcript Restriction set for 5/30/2014. (lkb, Court Reporter) (Entered: 03/01/2014) |
| 03/01/2014 | 171 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 10/02/2013 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 3/24/2014. Redacted Transcript Deadline set for 4/1/2014. Release of Transcript Restriction set for 5/30/2014. (lkb, Court Reporter) (Entered: 03/01/2014) |
| 03/03/2014 | 172 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 10/03/13 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 3/24/2014. Redacted Transcript Deadline set for 4/3/2014. Release of Transcript Restriction set for 6/2/2014. (lkb, Court Reporter) (Entered: 03/03/2014) |
| 03/04/2014 | | Transcript deadline updated for Lisa K. Bankins. Transcript due 3/7/14 as to Jose |

| | | Joaquin Morales re 157 Notice of Appeal - Final Judgment (krc, Deputy Clerk) (Entered: 03/04/2014) |
|---|---|---|
| 03/07/2014 | 173 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 10/04/2013 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 3/28/2014. Redacted Transcript Deadline set for 4/7/2014. Release of Transcript Restriction set for 6/5/2014. (lkb, Court Reporter) (Entered: 03/07/2014) |
| 03/07/2014 | 174 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 10/08/2013 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 3/28/2014. Redacted Transcript Deadline set for 4/7/2014. Release of Transcript Restriction set for 6/5/2014. (lkb, Court Reporter) (Entered: 03/07/2014) |
| 03/07/2014 | 175 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 10/09/2013 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 3/28/2014. Redacted Transcript Deadline set for 4/7/2014. Release of Transcript Restriction set for 6/5/2014. (lkb, Court Reporter) (Entered: 03/07/2014) |
| 03/07/2014 | 176 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 12/09/2013 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 3/28/2014. Redacted Transcript Deadline set for 4/7/2014. Release of Transcript Restriction set for 6/5/2014. (lkb, Court Reporter) (Entered: 03/07/2014) |
| 03/07/2014 | 177 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Jose Joaquin Morales for dates of 09/20/2013 before Judge Titus, re 157 Notice of Appeal - Final Judgment Court Reporter/Transcriber L. Bankins, Telephone number 301-344-3912. Transcript may be viewed at the court public terminal or purchased through the Court |

| | | |
|---|---|---|
| | | Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 3/28/2014. Redacted Transcript Deadline set for 4/7/2014. Release of Transcript Restriction set for 6/5/2014. (lkb, Court Reporter) (Entered: 03/07/2014) |
| 03/14/2014 | 178 | Transcript Redaction Request in case as to Jose Joaquin Morales re 171 Transcript - Appeal,, 168 Transcript - Appeal,, 170 Transcript - Appeal,, 167 Transcript - Appeal,, 166 Transcript - Appeal,, 174 Transcript - Appeal,, filed by attorney Jonathan Seth Zucker (Zucker, Jonathan) (Entered: 03/14/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/27/2014 14:34:40 | | |
| **PACER Login:** | ld0043 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:12-cr-00480-RWT |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

USCA4 Appeal: 13-4955    Doc: 34-1    Filed: 06/16/2014    Pg: 24 of 451

USAO 2011R00631

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * CRIMINAL NO. *12 - 0480 - RWT* |
| | * |
| v. | * (Use of Interstate Commerce Facility in the |
| | * Commission of a Murder-for-Hire and Death |
| JOSE JOAQUIN MORALES, | * Results, 18 U.S.C. § 1958(a)) |
| | * |
| *Defendant* | * |
| | ******* |

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

### INDICTMENT

SEP 1 1 2012

### COUNT ONE
### (Use of Interstate Commerce Facility
### in the Commission of a Murder-for-Hire)

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

The Grand Jury for the District of Maryland charges:

From on or about March 18, 2008 until on or about March 24, 2008, in the District of Maryland, the

defendant,

### JOSE JOAQUIN MORALES,

used a facility in interstate commerce, to wit, a cellular telephone, bearing number (443) 277-2961, with

intent that the murder of Robert Long be committed in violation of the laws of the State of Maryland and the

United States, as consideration for the receipt of, and as consideration for a promise and agreement to pay

something of pecuniary value, to wit, a sum of United States currency, which offense resulted in the death

of Robert Long.

18 U.S.C. § 1958(a)

Rod J. Rosenstein
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

9/11/12
Date

**From:** Wilkinson, Sandra (USAMD)
**To:** Jonathan Zucker (jonathanzucker@aol.com); Gary Proctor (gary_proctor@verizon.net)
**Cc:** Clarke, Marty (USAMD)
**Subject:** Discovery
**Date:** Tuesday, July 16, 2013 5:43:00 PM
**Attachments:** r_01-03-11 DEA-6 phone call from Compton.pdf - Adobe Acrobat Pro.pdf

Enclosed please find a DEA-6 documenting further statements by your client.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 3

| 1. Program Code | 2. Cross File | Related F~~~ | 3. File No | 4. G-DEP Identifier |
|---|---|---|---|---|
| | | | | YNC1B |

| 5. By: Joseph S O'Keefe, SA | |
|---|---|
| At: Baltimore DO | |

| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | 8. Date Prepared 01-07-2011 |
|---|---|

9. Other Officers:

10. Report Re: Telephone call from Lt. Darin Compton, USP Canaan on January 03, 2011

### SYNOPSIS

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

### DETAILS

1. On January 03, 2011, SA Joseph S. O'Keefe received a telephone call from Lt. Daren Compton from USP Canaan. ███████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

| 11. Distribution: Division | 12. Signature (Agent) Joseph S O'Keefe, SA | 13. Date 01-10-2011 |
|---|---|---|
| District | 14. Approved (Name and Title) James E. Perry, Jr. GS | 15. Date 01-10-2011 |
| Other SARI | | |

DEA Form     - 6
(Jul. 1996)

**DEA/SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File No. ▮▮▮▮▮▮ | 2. G-DEP Identifier<br>YNC1B |
|---|---|---|
| | 3. File Title<br>▮▮▮▮▮▮▮▮ | |
| 4.<br>Page  2  of  3 | | |
| 5. Program Code | 6. Date Prepared<br>01-07-2011 | |

2. Compton also informed SA O'Keefe that he received a note from Jose MORALES.  Compton stated that MORALES wrote that he wanted Compton to get in touch with SA O'Keefe because he wanted to tell SA O'Keefe about the two people who had actually murdered Rob Long.  MORALES requested that the interview take place utilizing a proffer letter.

3. On January 04, 2011, SA O'Keefe received a telephone call from Special Investigative Agent Enrique Pabon of USP Canaan.  Pabon asked SA O'Keefe if he had spoken to Compton about MORALES.  SA O'Keefe informed Pabon that he had spoken with Compton recently.  SA O'Keefe went on to explain to Pabon that he was going to request that Compton ask MORALES some questions.  Pabon stated that he could do that and SA O'Keefe provided Pabon with the questions.

4. SA O'Keefe received a telephone call from Pabon later on January 04, 2011  Pabon informed SA O'Keefe that he had spoken with MORALES. Pabon stated that he informed MORALES that SA O'Keefe had stated that MORALES had not been entirely truthful during previous interviews and that SA O'Keefe needed some proof that MORALES had evidence and information about Long's murder.  Pabon stated that MORALES informed him of the following:MORALES had given SA O'Keefe the name Theodore but the name is actually Troy Last name unknown (LNU).  Troy is Jr's, first name unknown (FNU) LNU, brother.  Troy LNU used a small caliber weapon and had kept it.  Rob Long used coke but not by using needles.  Jr and Troy LNU had shot Long in the head twice and were paid to do it.  Troy and Jr shot Long by the rail road tracks. MORALES had received a call from Troy LNU minutes after they shot Long.

5. SA O'Keefe identified Troy LNU as Troy LUCAS of 1328 Sargeant St. Baltimore, MD. A database search for handguns associated with LUCAS and his address revealed the following:  Troy LUCI was a co-defendant

DEA Form      - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

*(Continuation)*

| | 1 File No. | 2. G-DEP Identifier YNC1B |
|---|---|---|

4.
Page 3 of 3

| 5. Program Code | 6. Date Prepared 01-07-2011 |
|---|---|

of Jennifer BUSS who was arrested for CDS Violation in Baltimore, MD on 02/07/2009. Seized from BUSS were two shotguns that were not purchased by BUSS. BUSS' address is listed as 1328 Sargeant St. Baltimore, MD. Troy LUCI was identified thru toll records for MORALES' cellular telephone number 443-708-8313. A database search revealed that the telephone number is associated with Troy LUICA at 1328 Sargeant St. Baltimore, MD. A telephone call was received by MORALES on his cellular telephone from 443-708-8313 at 10:56 PM on March 23, 2008. Long was murdered the morning of March 24, 2008.



DEA Form      - 6a
(Jul 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

```
 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA       Criminal No.  RWT-12-0480

 4        v.                        Greenbelt, Maryland

 5   JOSE JOAQUIN MORALES,          September 20, 2013

 6           Defendant.             9:00 a.m.

 7   --------------------------/

 8                TRANSCRIPT OF MOTIONS HEARING
             BEFORE THE HONORABLE ROGER W. TITUS
 9                UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Government:    United States Attorney's Office
                            By: SANDRA WILKINSON, ESQUIRE
12                              MARTIN CLARKE, ESQUIRE
                            36 South Charles Street
13                          Baltimore, Maryland 21201

14   For the Defendant:     Law Offices of Gary E. Proctor, LLC
                            By: GARY E. PROCTOR, ESQUIRE
15                          Eight East Mulberry Street
                            Baltimore, Maryland 21202
16
                            Law Office of Jonathan Zucker
17                          By: JONATHAN S. ZUCKER, ESQUIRE
                            1350 Connecticut Avenue, NW
18                          Suite 202
                            Washington, D.C. 20036
19

20
     Court Reporter         Lisa K. Bankins RMR
21                          United States District Court
                            6500 Cherrywood Lane
22                          Greenbelt, Maryland 20770

23

24   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.
25
```

1

&ast; &ast; &ast;

1    he wasn't.  He's a busy practitioner in a high active drug

2    practice where he comes in and he represents some guy for

3    three weeks who has a terrible criminal history, who's

4    already confessed and now he wants to come in and talk

5    about his lawyer.

6           So Mr. Jarvis got him the opportunity to appear

7    before that AUSA, an AUSA who really wasn't interested in

8    him otherwise and let him come in and talk about that

9    lawyer.  And the statement that he gave is not true.

10          So whether or not Mr. Jarvis was -- if nobody

11   was there or if the government promised not to use

12   truthful information against him makes no difference in

13   this case.  Because at the end of the day, the analysis is

14   an easy one.  Mr. Morales told the judge that he lied in

15   those statements.  And it's the statement that he makes

16   about Mr. Needleman related to this murder that he does

17   not implicate himself in, does not implicate himself in

18   that the government seeks to use in this case.  And it's

19   very clear there's no Miranda warning at all for the

20   reasons that the Court just analyzed.

21          THE COURT:  All right.  Anything further.?

22          MR. PROCTOR:  No, sir.

23          THE COURT:  All right.  I'm going to deny the

24   motion.  First of all, I found the witness in front of me

25   to be credible.  He was given the statement made by

65

**25**

1    Mr. Morales at his sentencing about being -- allegedly

2    having told this witness to make up a story and denied

3    that.  I find that denial credible.  Any officer of the

4    court telling a client to make up a story is not going to

5    have a very long career.

6             It is apparent from the totality of his

7    testimony that Mr. Morales was very anxious to spin a tale

8    about misconduct by his then Maryland lawyer in order to

9    help him out of a great big predicament he was in.  I

10   don't find anything said or done by this lawyer in Texas

11   was below the Strickland standards of representation of

12   this client.  This was a client that was very articulate.

13   He indicated he was one of the smartest clients he had,

14   very much wanting to manage the ship of state in terms of

15   his representation.  And I don't find that there was any

16   deficiency in his representation.  Rather he had a client

17   who wanted to tell a tale and ultimately admitted at his

18   sentencing that he had told a tall tale and tried to put

19   the blame on this lawyer.  And I found this lawyer's

20   denial of the suggestion that he had told Mr. Morales to

21   make up a tall tale, I find this lawyer to be credible and

22   I find it incredible that this lawyer instructed him to

23   make up this tall tale.  So the motion is denied.

24            All right.  We now have -- well, the one that

25   may be something more significant to take on is the

                        *    *    *

                                                          66

**26**

1    most of the trial will be made corroborating those

2    witnesses statements about what Mr. Morales said.  And I'm

3    happy to write it down for the Court before we start so

4    that you have what our purported testimony will be about

5    that.  But I don't think it's required under the law for

6    us to re-do our order of proof.

7              THE COURT:  I wasn't saying that.  I was talking

8    in terms of whether any preliminary showing needs to be

9    made outside the presence of the jury.  I'm not so sure

10   that that's required at all.

11             MS. WILKINSON:  Right.

12             THE COURT:  But to the extent that it is, it

13   could readily be solved by having some preliminary

14   testimony before you put in the statements of Mr. Long.

15             MS. WILKINSON:  I will certainly consider

16   calling one of the witnesses.  He's coming from out of

17   state.  He's the Correctional Officer Pabon --

18             THE COURT:  Well, based on the government's

19   representations in its motion as to what it intends to

20   prove, I'm going to grant the motion and allow you to

21   admit Mr. Long's statements.  But I believe in fairness to

22   the defendant, I would like to see some testimony that

23   shows the existence of a basis for this coming in before

24   Long's statements actually come in.  Not a lot.  I mean I

25   don't need to have you completely put upside down your

                              *    *    *

                                                              71

```
 1   right.
 2              Now what else do we have because I have a civil
 3   case that's ready to start in a few minutes here.
 4              MS. WILKINSON:  Your Honor, I think the last
 5   motion just is with regard to the proffer statements and
 6   we have been discussing in great detail what might open
 7   the door, not open the door to Mr. Morales' confession in
 8   this case.
 9              THE COURT:  Right.
10              MS. WILKINSON:  And I have spoken to both
11   counsel about it.  And we'll continue to work that out,
12   Your Honor.  There are a couple of little issues.  The
13   bottom line to our motion was that we didn't want counsel
14   arguing something in opening statements that would open
15   that door and --
16              THE COURT:  Which motion is this?
17              MS. WILKINSON:  This is Docket Number 62.
18              THE COURT:  62.  Let me put it in front of me
19   here.
20              MS. WILKINSON:  And I think the main thing for
21   the Court though is that we attached the proffer statement
22   because the Court hadn't seen that yet.  So the Court will
23   know what Mr. Morales told us about the murder in very
24   explicit detail including who did it.  And if they take
25   the position and argue something outside that, the
```

90

**28**

1    government is going to contend that they've opened the

2    door and I know that they're aware of that.  This is just

3    about the argument at this point and we will continue to

4    talk about it.  Have I represented that fairly, counsel?

5    Mr. Proctor?

6            MR. PROCTOR:  Yes.

7            MR. ZUCKER:  I guess the difference is there is

8    probably a difference of opinion frequently about what is

9    opening the door and we will continue to try and work that

10   out.

11           THE COURT:  Well, try to work it out because

12   what I'd like to do is have you steer away from this in

13   opening statements.  And then if it turns out that

14   something would be appropriate, it may end up being proper

15   for closing argument depending on what the evidence is at

16   trial.

17           MR. ZUCKER:  Understood.  But I guess the point

18   is where there is a difference of opinion, it would be

19   helpful to the parties if the Court would entertain

20   motions in limine, i.e., we believe this would not open

21   the door, they believe it would.  If we get a ruling from

22   the Court --

23           THE COURT:  Tell me what motion you entertain.

24           MS. WILKINSON:  I'll give you an example.  A

25   witness -- a shooting happened behind a park in Baltimore

                    *    *    *

1     UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF MARYLAND
2       SOUTHERN DIVISION

3 UNITED STATES OF AMERICA   Criminal No. RWT-12-0480

4    v.       Greenbelt, Maryland

5 JOSE JOAQUIN MORALES,    September 24, 2013

6    Defendant.    9:00 a.m.

7 ------------------------/

8        TRANSCRIPT OF TRIAL
     BEFORE THE HONORABLE ROGER W. TITUS
9   UNITED STATES DISTRICT JUDGE, and a jury

10 APPEARANCES:

11 For the Government:  United States Attorney's Office
         By: SANDRA WILKINSON, ESQUIRE
12          MARTIN CLARKE, ESQUIRE
         36 South Charles Street
13         Fourth Floor
         Baltimore, Maryland 21201
14

15 For the Defendant:  Law Offices of Gary E. Proctor, LLC
         By:  GARY EDWARD PROCTOR, ESQUIRE
16         Eight East Mulberry Street
         Baltimore, Maryland  21202
17

18         Law Office of Jonathan Zucker
         By:  JONATHAN SETH ZUCKER, ESQUIRE
19         1350 Connecticut Avenue, NW
         Suite 202
20         Washington, D.C. 20036

21

22 Court Reporter    Lisa K. Bankins RMR
         United States District Court
23         6500 Cherrywood Lane
         Greenbelt, Maryland 20770
24

25 Proceedings recorded by mechanical stenography,
 transcript produced by notereading.

                  1

*    *    *

1    in this case just as you would in any important matter

2    where you're trying to decide if a person is truthful,

3    straightforward and accurate in his or her recollection.

4         During this trial, you will hear the testimony

5    of law enforcement officials and persons who are or were

6    defense attorneys or other type of attorney.  The fact

7    that a witness may be employed as a law enforcement

8    official or is or was a defense or other type of attorney

9    does not mean that his or her testimony is necessarily

10   deserving of more or less consideration or greater or

11   lesser weight than an ordinary witness.

12        Do any of you have strong feelings for or

13   against law enforcement officials or attorneys that would

14   make it difficult for you to follow this instruction?

15   That's what I propose to give.

16        MR. PROCTOR:  We can live with that.

17        THE COURT:  All right.  The --

18        MS. WILKINSON:  Your Honor, perhaps we should

19   add correctional officers, too.  They're really law

20   enforcement, but they're not.

21        THE COURT:  They're law enforcement.

22        MS. WILKINSON:  But there will be probably four

23   correctional officers testifying in this case.

24        MR. ZUCKER:  We're not objecting to her request.

25        THE COURT:  You want me to add in correctional

*    *    *

36

**31**

1    I don't think it's fair that they get to hear the evidence

2    and then testify. You'll say denied when I stop talking.

3            THE COURT: I will permit the case agent to

4    attend as a representative of the government. Overruled.

5            MR. PROCTOR: And why don't you while we're at

6    it deny my request for a reasonable doubt instruction?

7            THE COURT: Your request is made and duly noted.

8    I agree with you. However, the Fourth Circuit does not

9    and overruled.

10           MR. PROCTOR: Thank you.

11           THE COURT: The Public Defender's Office used

12   one of my cases as a vehicle to take that issue to the

13   Supreme Court which decided not to decide it. So the

14   objection is made and overruled.

15           (Recess.)

16           (Jury present.)

17           THE COURT: You may proceed.

18           MS. WILKINSON: Thank you, Your Honor.

19           May it please the Court and counsel. Ladies and

20   gentlemen of the jury, let's get to work. You have just

21   been selected as jurors in this murder for hire case.

22   Judge Titus used that phrase in the course of jury

23   selection that this was a murder for hire case. But let's

24   be clear about what the defendant, Jose Morales, is

25   charged with in this case. He is charged with having

1    another human being murdered and paying that person to do

2    it.  It's a murder for hire case.

3          As jurors in this case, you just took an oath to

4    listen and pay attention to the evidence before you fairly

5    and impartially.  That's the most that we can all ask for

6    in this jury system.  I think you'll find the next couple

7    of weeks to be really very interesting.  But most

8    importantly, taking your jurors' oath and your

9    responsibility to listen to the evidence because at the

10   end of the trial, let there be no doubt, we are going to

11   ask you to go back there and deliberate with one another

12   and find Mr. Morales guilty of this horrible crime.

13         This is the victim.  This is the man that Mr.

14   Morales paid to kill.  His name is Robert Wayne Long.  And

15   you are going to hear his name throughout this trial.  He

16   was 36 years old at the time of his death.  He grew up in

17   Maryland, spent most of his time in Baltimore.  Mom,

18   sisters, father, a little girl named Hannah.  At the time

19   of his death, he worked from time to time as a laborer.

20   He struggled with a very serious cocaine addiction.

21         That's Mr. Morales over there with his

22   attorneys.  In March of 2008, this was Mr. Morales.  This

23   is what he looked like.  He owned a small masonry company

24   called ABR Construction.  If you look carefully, you can

25   see it there on his t-shirt.

61

**33**

1         In March of 2008, Mr. Morales was looking at

2    going to jail.  He was facing charges in Baltimore City

3    for three cases that were interrelated with one another.

4    Mr. Long was his co-defendant in the case.  Together they

5    had been charged, for example, with stealing a large

6    scaffolding equipment, thousands of dollars worth of

7    scaffolding equipment that Mr. Morales had directed

8    Mr. Long to steal.  And Mr. Long occasionally worked for

9    Mr. Morales as a laborer in his company.

10        On March 10, 2008, Mr. Long made a fateful

11   decision.  He decided that he would talk to the police

12   about the instructions that Mr. Morales had given him to

13   steal the construction equipment.  He allowed himself to

14   be debriefed by the police.  He was subject to a video

15   interview that you'll actually get to see in the course of

16   this trial.  He picked Mr. Morales out of a photo spread.

17   He explained how Mr. Morales had him steal the expensive

18   construction equipment.

19        With that information, the information that

20   Mr. Long provided on March 18th of 2008, the police

21   obtained a search and seizure warrant for Mr. Morales'

22   home in southern Maryland.  They executed that warrant the

23   same day.  And at his house in the backyard, they found

24   that stolen scaffolding equipment.

25        Six days later, Mr. Long was murdered.  He was

**34**

1    shot to death in a field in west Baltimore in an area

2    known as the lumber yard behind park called Traci Atkins

3    Park.  He was shot at close range in the back of his head

4    and through his eyebrow.  Crumbled to the field, trash

5    laden, barren, destitute field.  And he died at the

6    hospital soon thereafter.

7          There are no known eyewitnesses to the crime

8    against Mr. Long.  The gun, the small caliber gun that was

9    used to murder him was never found.  And here we are five

10   years later, almost six years later and the answer to

11   Mr. Long's murder lies in the very simple question of who

12   wanted him dead.  And that person is Jose Joaquin Morales.

13   And Mr. Morales did not only want Mr. Long dead, he did

14   something about it.  He hired a gang member from a gang

15   called D.M.I.  You're going to hear about in the course of

16   this trial Dead Man, Inc.  And he made sure that Mr. Long

17   would not testify against him in the city cases.

18         The chronology and you're going to hear about it

19   many times in the course of this case is very simple.

20   March 10th, Mr. Long made the decision to cooperate.  He

21   came in for a debriefing the next day.  March 18th, the

22   search warrant at Mr. Morales' home.  March 24th, the

23   murder of Rob Long.

24         Now as Judge Titus told you in the course of

25   jury selection, my name is Sandy Wilkinson.  Sandra

63

**35**

1    Wilkinson is my formal mother given name.  And with me at

2    counsel table is Martin Clarke.  We're both federal

3    prosecutors.  Sitting next to him is Special Agent Mark

4    Royka.  He's with the Drug Enforcement Administration, the

5    D.E.A.  He is what's known as the case agent.  Three of us

6    are responsible for making sure that the evidence is put

7    before you in the next couple of weeks and that we do so

8    within the rules of law as Judge Titus decides and rules

9    of evidence.

10            Opening statement, as Judge Titus told you, is

11   our opportunity to talk to you and give you information

12   about what you're going to hear in the coming weeks, what

13   we believe the evidence will show in connection with this.

14   Just by the length of the trial, I can tell you I'm not

15   going to be able to give you all the details of what

16   you're about to hear.  My intention is to give you an

17   overview so that you can put into context what you're

18   going to hear over the next couple of weeks.

19            I'm going to start, if I may, with what Judge

20   Titus just talked about and that is with what the charge

21   is in this case.  A one count indictment, that's the

22   charging document, and Mr. Morales is charged with

23   committing a violation of Title 18, United States Code,

24   Section 1958 also known as the murder for hire statute.

25   What we must prove first is that Mr. Morales used a

1    facility of interstate commerce.  That the use of the

2    interstate facility was done with the intent that a murder

3    be committed in violation of the laws of the state or the

4    United States.  And that the murder in question was

5    intended to be committed as consideration for the receipt

6    of anything of value, for money.

7         An interstate facility is nothing more, in this

8    case nothing more than a cellular telephone and you're

9    going to hear about Mr. Morales' use of his cellular

10   telephone from the time that he found out about that

11   March 18th search warrant until Mr. Long was laying dead

12   as a door nail in that field in Baltimore City on

13   March 24th.  And you're going to hear about his telephone

14   number constantly.  (443) 277-2961.  That is the facility

15   of interstate commerce that Mr. Morales used in connection

16   with this case, this hit.

17         Before I go on, I want to talk to you a minute

18   about how he used that cellular telephone because he used

19   that cellular telephone to communicate information that he

20   needed about this murder for hire.  He used it to confirm

21   and corroborate that Mr. Long was in fact a witness.  He

22   used it to plot and plan.  He used it to confirm what had

23   happened.  He used it to talk to his lawyer.  He used it

24   to talk to his associates.  That is the use that's charged

25   in connection with this case.

65

**37**

1           Now as I sit here and talk about the elements of

2    the crime, it sounds pretty straightforward.  Yes.  It's a

3    one count indictment, three elements of the crime.  Mr.

4    Morales is charged with causing a man's murder, a murder

5    for hire and using his cellular telephone.  Well, simple

6    and straightforward is kind of a, probably not the right

7    term to use in connection with this particular case.

8           Putting together a murder trial or murder for

9    hire trial, particularly one five years after it happened,

10   is not that easy.  I would say sometimes I compare my job

11   to being a movie director.  Lot of moving parts behind

12   here, trying to get our witnesses and their calendars and

13   their schedules all together to make sure that as soon as

14   we finish with one witness, the next one comes forward.

15   Marking all of our exhibits and our evidence so you guys

16   can see it.  Most importantly, trying to collect all of

17   this information together so that it tells a story to you

18   because before you walked into this courtroom, you had

19   never heard of Jose Morales.  You had never heard of

20   Robert Long.  None of you have ever been a juror in a

21   murder for hire case.  So that's the task that's before

22   myself and Mr. Clarke and Agent Royka and I.  Our

23   intention is to try to tell you its story.  And that story

24   is told in part so the first witness won't necessarily

25   know what the last witness is going to say and gradually,

66

**38**

1    you're going to have those a-ha moments how everything

2    starts to connect to one another.

3          And we have laid forth our order of proof and we

4    hope to have our witnesses come in the way that we have

5    scheduled them.  But things inevitably happen.  Before I

6    know one witness had a house settlement that he had and

7    another witness that we had has a possible conflict with

8    travel.  And we try to work all that together.

9    Occasionally, we might have to call a witness out of turn.

10   You'll know it right away because it won't have made sense

11   from the witness that you just heard.  But I hope that you

12   bear with us as we try to tell you a story of what

13   happened when Mr. Long was murdered on March 24, 2008.

14         We intend to start with the murder itself.  Kind

15   of the where, what and when.  So the first witnesses that

16   you'll hear tomorrow are the first responder from the

17   police after the gunshots were fired.  You'll hear from

18   the crime scene technician, Ms. Moore.  She's going to

19   come in and show you the pictures that were taken of the

20   field and give you an idea where the bullet casings were

21   found.  Dr. Rubio from the medical examiner's office,

22   you're going to hear from her as one of the first

23   witnesses.  And so the first part of the trial is really

24   going to be just the essence of what happened to Mr. Long.

25   The where?  Traci Atkins Park.  The when?  March 24, 2008.

67

**39**

1   Shots fired 9:41 a.m. And get a sense generally of what

2   we're talking about here.

3         In connection with that, in connection with

4   knowing exactly where this murder happened and when it

5   happened, you're going to see this chart that I have up on

6   the computer quite a lot. We have a big blowup of it.

7   But we are going to bring it in front of the jurors and

8   that's so because you're sitting here in this courtroom,

9   you can't go to the crime scene. You can't look at it.

10   And our job is to make you feel like you were there when

11   all this happened, that you can see what people saw. You

12   can get a sense of what the witnesses are talking about

13   and put this all in context. And we intend to do it

14   through maps such as the aerial photograph here, which

15   you'll get many opportunities to look at and the

16   photographs of the crime scene itself as well as

17   photographs from other scenes or other things that

18   happened with these witnesses. So you can kind of get a

19   picture in your mind of what people are talking about.

20         For example, up here next to the red X, that's

21   where Mr. Long's body was found. You're going to see a

22   little pool up by that green dot right there. That pool

23   is kind of a frame of reference for you. That's Traci

24   Atkins Park. And you can see when you look to the left of

25   that pool down where the red X is, some railroad tracks.

68

**40**

1    That's the area called the lumber yard that you're going

2    to hear about. And people that are associated with this

3    case know the streets around this and you're going to hear

4    about Ramsay Street. You're going to hear about Sargent

5    Street and McHenry Street and you're going to get a real

6    sense of the area that we're talking about where this

7    murder took place.

8            After you get a sense of the murder itself and

9    what happened to Mr. Long, we're going to spend the next

10   part of the trial on the why and how, the where, what and

11   when and then we're going to talk about the why.

12           Why? Why did Mr. Morales want Mr. Long dead?

13   And the answer to that is probably as simple as it could

14   possibly be. He wanted him dead because he was going to

15   be a witness against him. This is a witness murder case.

16   Mr. Morales did not want Mr. Long to be a witness against

17   him and it's as simple as it could possibly be.

18           When Mr. Morales was facing these charges, they

19   started sometime back in 2006 and continued into 2007.

20   The trial kept getting postponed and then eventually these

21   three cases that he was facing were all consolidated and

22   brought together in the Circuit Court for Baltimore City.

23   And he had gone to his go-to lawyer, a man by the name of

24   Stanley Needleman. The person you're going to hear from

25   in the course of this trial, Mr. Needleman was somebody

69

**41**

1   that had represented Mr. Morales previously.  And in fact

2   they had known each other for at least eight or so years

3   and Mr. Needleman had represented him in other matters.

4   And in fact, Mr. Needleman got a lot of referrals from

5   Mr. Morales.  He provided him the names of other clients

6   and people who had criminal defense issues and

7   Mr. Needleman represented them.

8          Mr. Long needed a lawyer, too.  And so what

9   Mr. Needleman did was recommend a lawyer, a young lawyer

10  that worked in his office to represent Mr. Long.  This

11  lawyer's name was Alex Liekus.  You're going to hear about

12  him during the course of this trial, too.

13         Mr. Needleman is older.  He's been practicing

14  for 30, 40 years.  Somewhat of a staple or stalwart there

15  in Baltimore City.  Had been doing criminal defense work

16  for a very long time.  Mr. Leikus was not.  He was fresh

17  out of the State's Attorney's Office.  This was one of

18  his, beginning of his clients.  He rented office space in

19  there with Mr. Needleman and Mr. Needleman himself with

20  cash out of his pocket paid Mr. Leikus to represent

21  Mr. Long.  And once Mr. Leikus was representing Mr. Long,

22  it was insured and assured that Mr. Morales and

23  Mr. Needleman would be in the loop, so to speak.  If

24  Mr. Long would simply plead guilty to being the thief of

25  this scaffolding equipment, perhaps Mr. Morales didn't

1    have to be brought into it.  After all, he was the owner

2    of the company and he was the one that had the financial

3    incentive with regard to the scaffolding equipment.  But

4    maybe they could keep his name out of it if Mr. Long would

5    just go along with this and take the charges, if you will.

6           So here we are in 2008 and Mr. Long is being

7    represented by Mr. Leikus and Mr. Needleman is

8    representing Mr. Morales and the case is coming up for

9    trial.  And that trial was scheduled to be on April 17th

10   of 2008.  I put up here that date because that's a date

11   that you're going to hear about in the course of this

12   trial on very many occasions and that is the date that the

13   trial against Mr. Morales was scheduled to begin in

14   Baltimore City for those three cases that I talked to you

15   about, coming about three weeks after the death of

16   Mr. Long.  The state was scheduled sometime in February

17   because the trial had been postponed.

18          Now let's go back to what happened after

19   Mr. Leikus was put in place to represent Mr. Long in March

20   of 2008.  Mr. Long, remember what I told you, he made this

21   decision that he was going to -- he was going to come

22   forward against Mr. Morales and then Mr. Morales were

23   having disagreements with one another.  You're going to

24   hear about that from his friends.  They were not getting

25   along with one another.  Mr. Long did not want to go to

1    prison for Mr. Morales and he made the decision that he's

2    going to go tell the police the truth about what happened.

3    He's going to tell them how Mr. Morales directed him to

4    steal that scaffolding equipment.

5         And so what he did was he called the detectives

6    directly instead of Mr. Leikus and you're going to hear

7    testimony about that because Mr. Long, he was not happy

8    with the lawyer that Mr. Morales had put in place for him.

9    He didn't want to be represented by Stanley Needleman's

10   young lawyer that worked in the same office.  It made him

11   uncomfortable.  He wanted to have his own lawyer that was

12   representing him.

13        And so when he called the detectives and the

14   state attorneys to let them know he wanted to come in, he

15   asked that don't tell my lawyer, I don't need my lawyer,

16   I'm just going to come in and tell you what happened.  But

17   the way the system works, so to speak, is that when

18   somebody is represented by an attorney, it is the law that

19   that attorney is to be told if you are going to have

20   contact with that person.  And that's what happened in

21   this case.  The Assistant State's Attorney decided, well,

22   you know, Mr. Long, I can't just meet with you alone.  I

23   have to let your attorney be involved because you're

24   represented, he entered his appearance for you.  And so

25   she did that and she let Mr. Leikus know that Mr. Long was

72

**44**

1    coming in for this debriefing.

2            And you're going to see that debriefing on

3    March 11, 2008 and you're going to see Mr. Leikus sitting

4    there and Mr. Leikus looked very uncomfortable because you

5    know what?  This is not what was supposed to happen.

6    Mr. Long in there telling everything about Mr. Morales.

7    And Ms. O'Hara, the State's Attorney, she's going to come

8    in here and testify how after this happened, she was very

9    concerned about Mr. Long's safety and she had taken steps

10   to make sure that he was safe in the time that this had

11   happened.

12           But in that interim period, that interim period

13   we're talking about right after the debriefing, the police

14   had to act quickly to find the stolen scaffolding

15   equipment in Mr. Morales' backyard and that's when they

16   went about getting that search warrant that I told you

17   about earlier.

18           Now can you imagine what happened on March 18,

19   2008 when the police went to Mr. Morales' home and found

20   all that stolen equipment?  You are going to hear

21   testimony about how Mr. Morales responded to that fact and

22   there is only one person that could tell them where that

23   stolen scaffolding equipment was and Mr. Morales was

24   furious.  He was enraged.  You are going to hear testimony

25   about him calling and calling and calling and calling and

73

**45**

1   calling looking for Mr. Long.  How Mr. Long's best friend,

2   a man by the name of Harry White, who is one of the first

3   witnesses who's going to come in and testify.  Where is

4   he?  What's his phone number?  I need to talk to him.

5   Where is he?  And Mr. White, you don't have his phone

6   number, I'm not giving you his phone number, I'm not

7   telling you that, Jose.  Where is he?  I want to talk to

8   him.  Furious about what happened.  Told Mr. White, listen

9   I was having problems with my wife.  She's mad.  The

10  police are in here.  Where is he?  I need to talk to him.

11  Calling and calling and calling.

12         Mr. Morales knew.  He knew.  He knew that

13  Mr. Long was possibly cooperating, but he needed that last

14  link in the chain.  And so do you know what he did?  He

15  called up his lawyer, Mr. Needleman.  Stanley, you need to

16  find out for me.  Did he do it?  Did he really go tell the

17  police?  Is that how they found the stolen scaffolding

18  equipment?  Mr. Needleman puts him on hold.  Calls up the

19  State's Attorney's Office to find out.  The State's

20  Attorney's Office did not confirm what happened, that

21  Mr. Long had been debriefed.  But that call told

22  Mr. Needleman, an experienced defense attorney, exactly

23  what he needed to know because her reaction told him that

24  Mr. Long had in fact, Mr. Long had in fact been debriefed.

25         So then that wasn't good enough even.  Mr.

```
1    Morales wanted to know whether or not Mr. Leikus would
2    confirm it and Mr. Needleman called up Mr. Leikus and
3    found out yes, in fact Mr. Long had been debriefed by the
4    police and this was on March 20th and 21st.  And you're
5    going to hear from Mr. Needleman about Mr. Morales'
6    reaction to that piece of news, too, on March 21, 2008.
7    Because if you thought he was mad when they stole the
8    scaffolding, you hear how mad he was when he found out the
9    man that had worked with him, someone I suppose at some
10   point was possibly even a friend had told the police where
11   to find that stolen scaffolding.  And now we're inching
12   closer to that date when Mr. Long was found dead in Traci
13   Atkins Park at the lumber yard just a couple of days after
14   that confirmation meeting with his lawyer, Stanley
15   Needleman.  Now that's the why.
16          Let's go back now for a minute and talk about
17   what was Mr. Long doing after he agreed to be debriefed by
18   the police.  Mr. Long, as I told you at the beginning, had
19   some -- I have to pay attention to the clock here, Your
20   Honor -- that Mr. Long had some problems in this
21   timeframe.  He was using drugs.  He was struggling with a
22   cocaine addiction.  He was sleeping at Mr. White's house,
23   his friend, Harry.  Harry was married, had five or six
24   kids, five or six little girls.  And he and his wife, Sug.
25   Her name is Patricia, but everybody calls her Sug was
```

75

**47**

1    letting Rob stay there with them and that's where Rob

2    would lay his head at night.  Time to time he was working.

3    Sometimes he worked with Harry and that's where he was

4    staying in this March 2008 timeframe.

5              On March 18th however, he was found out from the

6    detective that, okay, we did the search warrant and, you

7    know, you might want to lay low a little bit, Mr. Long.

8    So what Mr. Long decided to do is go stay at his sister's

9    house that weekend.  Coincidentally, Mr. and Mrs. White,

10   Harry and Sug had decided to go on their own trip that

11   weekend.  They were going up to West Virginia to, I don't

12   know, work on some kind of driveway for her mother or

13   something like that.  And coincidentally, Mr. Morales

14   loaned Mr. White a truck that he could use to help fix

15   this gravel up in West Virginia.  So Harry and Sug and

16   their family packed up their stuff and they left for the

17   weekend.  And Mr. Long didn't stay at Harry and Sug's

18   house that night.  He went to stay with his sister, a

19   woman named Carol.  And you'll hear her come in and

20   testify about the last time she saw her brother alive

21   because he spent the night with her that weekend.  He

22   spent there Friday night, Saturday night and into Sunday.

23             Then on Sunday morning, it was Easter Sunday,

24   Mr. Long was ready to go back home to Harry and Sug's

25   house.  He was ready to get back to his regular routine.

**48**

1    And so he called his friend, Harry and Sug up, they were

2    up in West Virginia.  And they said, oh, you know, we're

3    coming back.  We're coming back.  We're going to have

4    dinner at a family's house and then we'll come around and

5    pick you up.  So he stayed at Carol's house.  He got a

6    chance to see his little girl that day and you'll hear a

7    little bit about that through their testimony.

8            And then when he got to Mr. White's -- when he

9    got to Mr. White's house, he couldn't find his cell phone.

10   And his cell phone was in the name of Mr. White.

11   Mr. White had a cell phone that Mr. Long could use and he

12   didn't have it with him all weekend.  So the first thing

13   that happens when he gets home is he checks his voice

14   mail.  And these phone records that I've put up for you to

15   look at is the kind of phone records you're going to see

16   during the course of this case.  It provides kind of a

17   chronology of things that happened, to help people

18   remember what happened.  And at 9:13, Mr. Long got his

19   cell phone and he checked his voice mail.  Right above

20   that, you are going to see that Harry called Rob and

21   that's because Rob couldn't find his cell phone and he did

22   one of those things where you ring it in the house and you

23   try to hear where it is and they found it in the couch.

24           As soon as they found it, Mr. Long called his

25   voice mail and check on things, what was going on and then

**49**

1    he had some plans to go out that night. And you can see

2    what Mr. Long did. He got a call from a phone number.

3    We're going to call it the 8048 number. You're going to

4    hear a lot about it during the course of this trial. And

5    Rob calls the 8048 number and then the 8048 number calls

6    Rob. That 8048 number we are going to prove to you

7    belongs to a man by the name of Clyde Lucas also known as

8    Junior.

9            After that 8048 number calls Rob, Mr. Morales

10   called Harry and Harry is going to tell you that was about

11   the truck that he had borrowed over the weekend. Mr.

12   Morales wanted to know whether or not the truck had been

13   brought back. At that point, Rob calls that 8048 number

14   and then you will hear testimony that based on his phone

15   calls, he left the house that night. Someone came to pick

16   him up. And we will prove to you that that somebody was

17   Clyde Lucas, the person that used the 8048 number. And as

18   soon as, as soon as Harry -- as soon as Rob leaves Harry's

19   house, Mr. Morales himself has contact with that 8048

20   number. And the next person to call Mr. Morales is

21   Junior's brother, a man by the name of Troy Lucas.

22           Now the Lucas brothers, who the government

23   contends and will prove to you were involved in the murder

24   of Mr. Long. They are who Mr. Morales hired to make sure

25   that Mr. Long would not be a witness against him. I put

1    pictures up here so you can see the two people, Troy

2    Lucas, goes by the name also of Troy Madron and Clyde

3    Lucas also known as Junior.

4            Now what you're going to hear about after Rob

5    left with Clyde that night is that he went to get high.

6    He went to get high. His friend, Troy, had some cocaine,

7    an ounce, a half ounce of cocaine and they met up at an

8    area north of where this red X is. It's a couple of

9    streets up. A place called McHenry Street. And it's

10   there that Rob sat with Junior and with Troy getting high

11   on this cocaine. And at some point, another man joins

12   them. A man by the name of Bobby Kemper. Mr. Kemper is

13   also going to testify in connection with this case and

14   he's going to tell you that he sat in the back of the car

15   while Troy and Rob and he used this cocaine and got high

16   that night.

17           At some point, Junior left in the middle of the

18   night. He's going to tell you the circumstances about

19   that and he's going to tell you how they sat there doing

20   their thing until the early morning hours of the dawn.

21   And in fact Mr. Kemper is going to tell you he didn't

22   leave because he uses his drugs and he sat there with them

23   while they used drugs.

24           And at around dawn, the three men left that area

25   on McHenry Street and you're going to hear testimony of

79

**51**

1   how he, Mr. Kemper, Bobby and Rob walked down to Troy's

2   house on Sergeant Street, not too far away, about ten or

3   so blocks.  And they stayed there for a little while I

4   think doing some work inside the house.  Maybe fixing a

5   door or something like that.  And then Troy had had enough

6   of Mr. Kemper being there and he told Bobby, listen, we

7   don't have any more drugs.  Why don't you go over this way

8   to the left and me and Rob, we're going to go over here on

9   the right and I'll meet you later up top.  Let's go see if

10  we can find a drug dealer by the name of Mary.

11  Mr. Kemper, he had to think about that, but okay, yeah,

12  I'll go over and do that and they came out of that Sargent

13  Street address.  And he's going to testify to you about

14  how he turned to the left and Rob and Troy turned to the

15  right with the idea that they would circle back around

16  what they call up top this area called Ramsay Street on

17  the map right here.

18          So Bobby shuffles along.  Goes up, takes a left

19  on Sargent Street, heads up on Carey Street, describes a

20  bridge that he went under and he starts walking up Ramsay

21  Street.  And as he's walking up Ramsay Street, we'll prove

22  to you that was around 9:36 a.m.  And the way we will

23  prove it to you is because you will see him on a pole

24  camera that's indicated here in green that was on the

25  Baltimore City street running on March 24, 2008.  And as

80

**52**

1    Mr. Kemper came up around 9:36 in the morning and didn't

2    see Troy and Rob, he continued on his way.  I think he

3    went to go look to have a beer somewhere and see if he

4    would run up with Troy later on that day.

5             So where did Troy and Rob go?  They turned right

6    and they walked up the street called Bayard Street.  And

7    at 9:41, shots rang out.  And you will know that because

8    there were some community workers in that Traci Atkins

9    pool area that I told you about and you'll see how they

10   responded to the gunshots.  Heard them and of course, all

11   pandemonium breaks loose.  As I'm sure the police come

12   flying in there about four or five minutes later

13   definitively establishing the time of the shooting in this

14   case at or about 9:41 a.m.  And Mr. Kemper will tell you

15   that the last person, the last person that he saw Rob

16   alive with was Troy Lucas.  Mission accomplished.

17            Going through the chronology again.  Mr. Long is

18   debriefed.  The search warrant at Morales' home.

19   March 20th and 21st, the confirmation, the corroboration

20   by Attorney Stanley Needleman.  9:41 a.m., the murder of

21   Rob Long.  Mission accomplished.

22            Words you will hear from Mr. Morales,

23   co-defendant ain't around no more, co-defendant ain't

24   around no more.

25            I submit to you, ladies and gentlemen, and I

81

**53**

1  know Mr. Clarke will talk about this in closing argument

2  later that the sequence of events in this case is powerful

3  and compelling evidence of Mr. Morales' motive to kill or

4  have killed Mr. Long back in March of 2008.

5          But the evidence doesn't stop there.  What you

6  will learn in the course of the trial is that Mr. Morales

7  had said things about this murder.  And you're going to

8  hear the things that he has said about the murder in the

9  course of this trial.

10         First of all, perhaps the greatest irony in this

11  entire case that you will hear is that Mr. Morales was

12  going to be a witness, too.  He was going to cooperate,

13  too, and in August of 2008, a mere four months after

14  Mr. Long was dead and buried, Mr. Morales was arrested far

15  away in McAllen, Texas at a private airport, charged with

16  drug trafficking cocaine.  And the first words out of his

17  mouth were to tell the police about everybody that was

18  involved in drug trafficking with him.  But more

19  importantly, what he told the police was that his lawyer,

20  Stanley Needleman, was involved in criminal activity with

21  him.  And you can imagine that's explosive information.  A

22  lawyer being involved in criminal activity with the likes

23  of Jose Morales.

24         So what did the law enforcement authorities do

25  that day in August when they heard Mr. Morales'

82

**54**

1    information about Mr. Needleman being involved in criminal

2    activity with him?  Well, they set up a meeting with him

3    to debrief him, to ask him, tell us, tell us what you know

4    about this information about this lawyer who was involved

5    in criminal activity with you.  And do you know what he

6    told them?  He told them that there was this murder of his

7    co-defendant up in Baltimore, Maryland and that it was a

8    D.M.I. murder.  That his lawyer said Jose, don't worry

9    about these charges that are pending against you and this

10   witness.  I'll, I'll, Mr. Needleman, I'll take care of him

11   for you, I'll take care of him for you.  That's what he

12   told the agents in August of 2008.

13          Well, the words didn't almost come out of his

14   mouth, boom, when no one believed that he was telling the

15   truth.  And in fact, in December of 2009 when Mr. Morales

16   is sentenced for those very charges, he stood up and told

17   the judge that, boy, did he tell a whopper.  I'm

18   paraphrasing.  Boy, did he lie that day?  And he explained

19   his lie about Mr. Needleman by saying that he wanted to

20   get out on bail and he thought he should tell the biggest

21   story that he could and that's what he told the judge down

22   there.  But ladies and gentlemen, that lie that Mr.

23   Morales told proved to be a fateful mistake for him

24   because what that lie did was open a door for

25   Mr. Needleman to waive the privilege that Mr. Needleman

1    had about things that Mr. Morales had told him.

2            At some point Mr. Morales writes to his brother,

3    I hope you don't think no less of me, I decided to talk to

4    the feds.  I hope you don't think no less of me, I decided

5    to talk to the feds.

6            Let me tell you what happened with

7    Mr. Needleman.  And what you'll hear in the course of this

8    trial.  Mr. Needleman was prosecuted by this office for

9    felony tax evasion.  He was prosecuted in spring of 2011.

10   And as agents were searching his house and his home for

11   evidence of tax evasion, money laundering, the press were

12   reporting on it because Mr. Needleman was a criminal

13   defense attorney in Baltimore City, someone who had been

14   practicing there for 40 years.  And what happened at that

15   point proved to be a pivotal moment and something that

16   you'll hear about in the course of the trial because when

17   the press started to report on the investigation of

18   Mr. Needleman, they published that sentencing transcript

19   of Mr. Morales talking about his cooperation against

20   Mr. Needleman the year before.  Mr. Needleman had no

21   knowledge that Mr. Morales had put him in criminal

22   activity there before.  But now he did.  Now he did.

23           And two months later, with lawyers by his side,

24   he came in and he told what he'll tell you which is that

25   on April 17, 2008, the day his trial was scheduled to

1    begin with his co-defendant, Rob Long, Mr. Morales tapped

2    him on the shoulder at the courthouse steps there as they

3    waited to go into the courtroom and told him no worries, I

4    had Mr. Long murdered.  I paid D.M.I. $20,000 to do it.

5    And Mr. Needleman's ability to come here and testify and

6    tell you that story is because Mr. Morales waived his

7    privilege that day in August of 2008 when he falsely

8    implicated Mr. Needleman in this very murder.

9            Interesting, huh?  I told you at the beginning

10   that I think you will find the evidence in this case quite

11   interesting.  But as you listen, that you have to listen

12   to all the evidence in the case, all the witnesses as the

13   story unfolds before you about Mr. Morales' involvement in

14   this murder for hire because it isn't only Mr. Needleman

15   that he spoke to.  And as you hear other witnesses come in

16   here who have spoken to Mr. Morales about this murder of

17   Rob Long, it will become ever more clear to you what

18   happened that day in March of 2008.

19           You will hear things such as who is Troy Lucas?

20   Was he D.M.I. as Mr. Morales told Mr. Needleman that he

21   had D.M.I. kill him?  Yes.  You're going to hear a ton of

22   evidence that Mr. Lucas was a member of that prison gang,

23   D.M.I.  Are you going to hear about phone records that

24   corroborate the witnesses that come here and testify about

25   calls they had with Mr. Morales?  Yes.  You're going to

85

**57**

1   see those phone records and look at those phone records.
2   All of this information that will come before you, all of
3   the witnesses that are going to come in and testify with
4   you will give you that little piece of the story so that
5   from beginning to end, you will know that Mr. Morales had
6   mission accomplished here.  Co-defendant ain't around no
7   more.
8           Ladies and gentlemen, I did make the reference
9   earlier that sometimes our job is kind of like a movie.
10  You know, we're back there getting all these witnesses and
11  moving pieces together.  But I really don't mean to be
12  flip about it.  This ain't a movie.  This is about as real
13  as it gets.  This is information you are going to hear
14  from numerous witnesses coming in here about a not too
15  nice part of Baltimore where a man was killed for the
16  simple crime "of going to the police and telling the
17  truth" about his role in a series of construction
18  equipment theft.  This ain't no movie.  This is serious
19  and this is real.
20          Mr. Morales had a witness murdered.  Another
21  human being, 36 years old, shot at close range.  Never
22  stood a chance.  Never testified against Mr. Morales and
23  here we are today.  And let there be no doubt, you will
24  hear the witnesses that do come in here and testify
25  against Mr. Morales and there are a number, that we will

86

58

1    ask you to go back there and deliberate and find him

2    guilty of the crime charged in this case and that is using

3    his cellular telephone to plot, plan, confirm,

4    corroborate, encourage, hire, whatever you want to call it

5    Troy Lucas and his brother, Clyde, to ensure that Rob Long

6    never testified.  Thank you.

7            THE COURT:  All right.  Defense?

8            MR. ZUCKER:  Can we approach for a second,

9    judge, given the hour?

10           THE COURT:  Excuse me?

11           MR. ZUCKER:  Can we approach for a second?

12           THE COURT:  Come up.

13           (Bench conference:)

14           MR. ZUCKER:  I don't like to break up the

15   openings.  But given the hour, I'm concerned.  I think --

16           THE COURT:  You got 45 minutes.  I'll go late.

17           MR. ZUCKER:  All right.

18           (In open court:)

19           MR. ZUCKER:  Good afternoon, ladies and

20   gentlemen.  The first rule of trial advocacy is never be

21   the lawyer that keeps a jury from going home, that keeps

22   them late and it appears that I have already broken that

23   rule or will break that rule this afternoon because we're

24   starting a little bit late.

25           But I want to assure you of one thing.  That I

                  *    *    *

10-13-10

Dae Mr. Morales,
   The Box 4
   1. We will Not Introduce proffer
information directly against you in any
criminal trial unless
      a) You withhold information or
         lie
      b) If you ever testify and
         say some thing different
         than what is in your
         proffer

   2. We may make derivative use of
The information you provide us in the proffer.

            Yours Truly,

            Sandra Wilkinson

            Asst U.S Attorney


         Jc O'Keefe  10-13-10

              10-13-10

M-000044

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

| | | |
|---|---|---|
| *Rod J. Rosenstein*<br>*United States Attorney*<br><br>*Sandra Wilkinson*<br>*Assistant United States Attorney* | *36 South Charles Street*<br>*Fourth Floor*<br>*Baltimore, Maryland 21201* | *DIRECT: 410-209-4921*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-3091*<br>*TTY/TDD: 410-962-4462*<br>*Sandra.Wilkinson@usdoj.gov* |

February 16, 2011

BY HAND
Jose Joaquin Morales

    Re:     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Dear Mr. Morales:

    You have advised me that you wish meet with law enforcement representatives to provide a voluntary proffer and, if called to do so, grand jury testimony in connection with the March 24, 2008 homicide of Robert Long.  Statements made and information provided by you during the proffer and grand jury testimony are referred to in this agreement as "proffer information." We agree to obtain proffer information from you on _February 16, 2011 with the following terms and conditions.

    1.    The Government will not introduce proffer information directly against You in any criminal trial, except under the following circumstances:

        a.    Your complete truthfulness and candor are express material conditions to the undertakings set forth in this letter. Therefore, if you knowingly withhold material information from the Government or otherwise are not completely truthful and candid during the proffer, the Government may use proffer information against you for any purpose, including a prosecution for perjury or obstruction of justice.

        b.    If you are a witness in any proceeding and give testimony that is materially different from any proffer information, the attorney for the Government or other opposing party may use proffer information in cross-examination or rebuttal.

        c.    If you are prosecuted for any crime and any evidence

1

M-000045

or the testimony of any witness offered on you's behalf is materially different from any proffer information, the attorney for the Government may use proffer information in cross-examination or rebuttal.

d.    If you are convicted of any crime and are before the court for sentencing, and any evidence or argument used in support of you is materially different from any proffer information, the Government may use proffer information in cross-examination, rebuttal or argument.

e.    In any judicial proceeding held to determine whether the above exceptions apply, the Government may use proffer information and shall be required to prove the circumstances by a preponderance of the evidence.

2.    The Government may make derivative use of proffer information.    That is, the Government is free to use proffer information to pursue this or any other investigation.

This agreement and any proffer meetings conducted pursuant to it do not constitute or reflect plea discussions, and you hereby waive any right to argue that proffer information is governed by Federal Rule of Criminal Procedure 11(f) or Federal Rule of Evidence 410.  The Government makes no representations or promises to you beyond those in this letter and is not obligated to enter into any future plea bargain or agree to any sentencing reduction under 18 U.S.C. § 3553(f) or otherwise.  You are not required to make any statements or provide any information and are free to cancel or end the meeting or any grand jury testimony at any time.

The understandings set forth above extend to the continuation of this meeting on the dates that appear below.

By signing below, you and you acknowledge that you have fully discussed, understand and agree to each provision of this agreement.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By _____
Sandra Wilkinson
Assistant United States Attorney

2

M-000046

62

USCA4 Appeal: 13-4955     Doc: 34-1     Filed: 06/16/2014     Pg: 68 of 451

Accepted:

_____     DATE: 2-16-11
Jose Joaquin Morales

_____     DATE: 02-16-11
Witness

Dates of Continuation          Initials of Counsel, Client, AUSA, Witness

_____          _____  _____  _____  _____

_____          _____  _____  _____  _____

_____          _____  _____  _____  _____

_____          _____  _____  _____  _____

3

M-000047

**63**

1
    UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF MARYLAND
2
    SOUTHERN DIVISION

3   UNITED STATES OF AMERICA        Criminal No.  RWT-12-0480

4        v.                         Greenbelt, Maryland

5   JOSE JOAQUIN MORALES,           September 25, 2013

6            Defendant.             9:30 a.m.

7   --------------------------/

8                       TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ROGER W. TITUS
9       UNITED STATES DISTRICT JUDGE, and a jury

10  APPEARANCES:

11  For the Government:    United States Attorney's Office
                          By: SANDRA WILKINSON, ESQUIRE
12                             MARTIN CLARKE, ESQUIRE
                          36 South Charles Street
13                        Fourth Floor
                          Baltimore, Maryland 21201
14

15  For the Defendant:     Law Offices of Gary E. Proctor, LLC
                          By:  GARY EDWARD PROCTOR, ESQUIRE
16                        Eight East Mulberry Street
                          Baltimore, Maryland 21202
17

18                        Law Office of Jonathan Zucker
                          By:  JONATHAN SETH ZUCKER, ESQUIRE
19                        1350 Connecticut Avenue, NW
                          Suite 202
20                        Washington, D.C. 20036

21

22  Court Reporter         Lisa K. Bankins RMR
                          United States District Court
23                        6500 Cherrywood Lane
                          Greenbelt, Maryland 20770
24

25  Proceedings recorded by mechanical stenography,
    transcript produced by notereading.

DIRECT EXAMINATION OF GLAZERMAN

* * *

1    Q    Did you ultimately give them a report of what

2    you saw when you initially arrived on the scene?

3    A    Yes.

4    Q    And who wrote that report?

5    A    Detective Donovan wrote -- I'm sorry.  Officer

6    Donovan wrote the initial report and Detective Hohman

7    wrote the investigative report.

8    Q    Okay.  Have you had an occasion -- first of all,

9    when you're -- when you get a call and you're responding

10   on your radio, are some of those radio broadcasts

11   recorded?

12   A    All of them are.  Yes.

13   Q    And sometimes are they maintained?

14   A    Yes.

15   Q    All right.  And have you had an occasion to

16   listen to some of the audio or radio broadcasts that

17   happened that morning on March 24, 2008 around 9:40, 9:45?

18   A    Yes.

19   Q    And I will be playing Government's Exhibit

20   Number L-2 which contains three audio tracks, Tracks 3, 4

21   and 5.  Sir, have you listened to those particular tracks?

22   A    Yes.

23   Q    Why don't we -- I know the fidelity isn't the

24   best.  Why don't we listen to it first?  And then I'm

25   going to ask you what was said.  These are very short and

DIRECT EXAMINATION OF GLAZERMAN

1   then we will get the jury to listen to it again very

2   briefly.

3        A    Okay.

4             MR. CLARKE:  So if we can listen to Track 4?

5   Track 3.  I'm sorry.  Track 3.

6             (The audio was played.)

7             BY MR. CLARKE:

8        Q    So what's going on there, sir?

9        A    I'm 33.  I'm answering as 33.  I've notified

10   that I've located the body in the park by the tracks and a

11   witness heard two shots.  I've identified that there's one

12   person down, not conscious and not breathing.  KGA or our

13   dispatcher has asked if the fire department was on the

14   scene.  I've identified they have not been on the scene

15   yet.  I have asked our dispatcher to notify 2100 which is

16   what we call our homicide unit and notify them so that

17   they can respond out.  And I've also notified that the

18   best description of the location is Stricker Street by

19   Cole Street in the park area right by the railroad tracks.

20        Q    If we could play that again?

21             (Audio was played.)

22             BY MR. CLARKE:

23        Q    Sir, you sound out of breath there.

24        A    Yes.

25        Q    And were you in fact out of breath?

131

**66**

DIRECT EXAMINATION OF GLAZERMAN

1    A    Yes.

2    Q    And why was that?

3    A    We were trying to run up to the location to see

4    if -- to confirm the information that we were told.

5         (The audio was played.)

6         BY MR. CLARKE:

7    Q    All right.  And that ambulance in the

8    background, you hadn't called for an ambulance yet.

9    Correct?

10   A    We had not called for an ambulance.

11   Q    That's not the ambulance for this particular

12   crime?

13   A    Correct.  They may have been -- they were

14   probably notified at the same time we were when the call

15   came into 911.

16   Q    We are going to see when the ambulance arrives.

17   Correct?

18   A    Yes.

19   Q    And it wasn't at this time.

20   A    Correct.

21   Q    You are still walking up to the scene or running

22   up to the scene?

23   A    Correct.

24        (The audio was played.)

25        BY MR. CLARKE:

132

**67**

DIRECT EXAMINATION OF GLAZERMAN

1    Q    And do you recall what time dispatch was

2  approximately?

3    A    Dispatch time was 9:48.

4    Q    All right.  So that means that the call

5  obviously went out at some time prior to that?

6    A    Yes.

7    Q    And that also means, of course, that shots, the

8  shooting would have happened even before that.  Correct?

9    A    Yes.

10    MR. CLARKE:  All right.  Let's play Track 4,

11  please.

12    (The audio was played.)

13    BY MR. CLARKE:

14    Q    Okay.  What's going on there?

15    A    30 answers up, who is the acting sergeant and

16  identifies that he is on the way from the station and he

17  has crime scene tape.  Unit 3897, who is a district

18  detective unit, he answers up and notifies that he's

19  responding.  Someone who's on the scene that was not me

20  also helps with the location to identify that the body was

21  located off of the 400 block of Norris Street and our

22  dispatch asks if he would like us to notify crime lab to

23  have them respond.

24    Q    We heard the number 2100.

25    A    Yes.

133

**68**

DIRECT EXAMINATION OF GLAZERMAN

1    Q    What is that a reference to?

2    A    2100 is the extension to homicide.  That any

3   time we refer to a homicide, it's just commonly referred

4   to as 2100.

5    Q    You're just trying to pinpoint the location and

6   the parties to arrive.  Correct?

7    A    Yes.

8    Q    All right.  And you mentioned Norris Street.  Is

9   that this area here?  Is that this area here?

10   A    Yes.

11   Q    So you responded down here.  Is that correct?

12   A    Correct.

13   Q    And did other units also respond down to this

14  area?

15   A    Yes.

16   Q    You were also suggesting another way to come

17  down would be north?

18   A    That is correct.

19        MR. CLARKE:  And we'll play Track 5.

20        (The audio was played.)

21        BY MR. CLARKE:

22   Q    What's going on there, sir?

23   A    Again, I asked to make sure the crime lab was

24  notified.  Our dispatcher advised that 2100 or homicide is

25  on the landline and wanted to confirm that we wanted them

134

**69**

DIRECT EXAMINATION OF GLAZERMAN

1   to respond.  09, who is our acting lieutenant that day,

2   got on the radio and had any available units who were not

3   actively handling an incident to respond up to help with

4   an area canvass and to help locate witnesses and then

5   subsequently transport those witnesses to our homicide

6   section.

7        Q    And is that what an area canvass means, to help

8   look for witnesses?

9        A    Help look for witnesses, help look for a

10  possible suspect if they're still in the area and help

11  with the crime scene to locate evidence.

12            MR. CLARKE:  Let's just play that one last time

13  to kind of cement it in our minds.

14            (The audio was played.)

15            BY MR. CLARKE:

16       Q    Officer Glazerman, you were there the entire

17  time from the time of your arrival until the time that

18  Mr. Long was being worked on by the paramedics?

19       A    Yes.

20       Q    And you were there after the paramedics

21  determined that they should try and attempt to resuscitate

22  him to take him to Shock Trauma?

23       A    Yes.

24       Q    Does Baltimore use a closed circuit T.V. cameras

25  sometimes referred to as CCTVs to help the police

135

DIRECT EXAMINATION OF GLAZERMAN

1   department conduct surveillance and if so, in what kind of
2   neighborhoods?
3       A    Yes.  They have them in various neighborhoods
4   throughout the city.  I don't know their rhyme or reason
5   to which neighborhoods and when they are installed in
6   which neighborhoods.  But yes, they are installed
7   citywide.
8       Q    And if they are installed in a neighborhood or
9   near a business or a public institution or something,
10  where are they normally placed?  Where are they located?
11      A    They are normally located on top of light poles
12  attached with a blue flashing light.
13      Q    And are you familiar with the operation of these
14  types of surveillance cameras in Baltimore City?
15      A    Yes.
16      Q    And how is it that you're familiar with how
17  these cameras work?
18      A    From time to time, I've operated the cameras in
19  the district.
20      Q    Do these cameras also record?
21      A    Yes.  All of them record.
22      Q    And is there someone always operating each one
23  of these cameras?
24      A    No.
25      Q    So if someone is not operating these cameras,

136

**71**

DIRECT EXAMINATION OF GLAZERMAN

1   how are these cameras serving your surveillance purposes?

2       A    If the cameras are not actively operated in a

3   specific timeframe, I don't know if it's five, ten or

4   fifteen minutes, the cameras will go into an automatic

5   set -- preset pattern and will continuously zoom in, zoom

6   out, rotate all 360 degrees in this preset approximate

7   ninety-second pattern.

8       Q    And that pattern is based upon someone's

9   determination of what are areas that would like to be

10  surveilled?

11      A    Yes.

12      Q    And do you know if there was a pole CCTV camera

13  located in the area of Ramsey and South Stricker Street?

14      A    Yes.

15      Q    And have you been able to determine that it was

16  right here at the very corner of that street?

17      A    Yes.

18      Q    So the green dot on this map is where the pole

19  camera was?

20      A    Correct.

21      Q    And in this instance, was it on top of a pole?

22      A    Yes.

23      Q    All right.  And have you had a -- well, let me

24  ask you this.  From that vantage point where that pole was

25  located, is it able to look east and west on Ramsey

137

**72**

DIRECT EXAMINATION OF GLAZERMAN

1    Street?

2        A    Yes.

3        Q    And is it also able to look north and south on

4    South Stricker Street?

5        A    Yes.

6        Q    All right.  Have you had a chance to review some

7    of the recordings that were made using this CCTV camera on

8    Easter morning at the corner of Ramsey and South Stricker

9    Street?

10       A    Yes.

11       Q    What I'd like to do -- counsel has been provided

12   with this 15-minute recording.  I'd like to start playing

13   it.  But before we do, I want to note -- apparently, I

14   said Easter morning.  It's Easter Monday morning.  You

15   said it was March 24, 2008.  Correct?

16       A    Correct.

17       Q    All right.  For the record we're going to be

18   playing Government's Exhibit L-3 which is noted as Pole

19   Camera First Responders Clip on March 24, 2008.  Sir,

20   you've had a chance to review that full 15 minutes on more

21   than one occasion.  Is that correct?

22       A    Yes.

23       Q    Let me show you, special agent.  I hate to

24   trouble you.  Could you put this back?  I'm going to show

25   you a screen shot because there's a little glitch when we

DIRECT EXAMINATION OF GLAZERMAN

1   play this on the court system.  I'm showing you

2   Government's L-3-A.  What is that, sir?

3       A    That's a screen shot at 9:41:41 seconds in the

4   morning of the pole camera from Stricker and Ramsey.

5       Q    And you know that because it's down there on the

6   corner.  Is that correct?

7       A    Yes.

8       Q    Let me just show that to the jurors.  And

9   there's a running time on this recording.  Is that

10  correct?

11      A    Yes.

12      Q    And as we play the tape, you can see the time

13  going by?

14      A    Correct.

15      Q    All right.  On the screen shot that they have,

16  it appears to cut off that corner and all they're going to

17  be able to see are the seconds.  You'll have it back

18  during the deliberations.  So we'll have to help them with

19  the times.  Okay?  But this begins at 9:40 a.m. on Easter

20  Monday.  Is that correct?

21      A    Yes.

22      Q    All right.  And the time that these cameras

23  record as they're recording events, have you found that

24  they are always linked up or that they accurately

25  correspond with dispatch or with your cell phone?  Is

139

**74**

DIRECT EXAMINATION OF GLAZERMAN

1    there some difference between the three sources of time?

2        A    It's actually the exact opposite.  They have

3    never been synced up exactly to dispatch.  They're always

4    anywhere from two, three minutes to ten and even we've

5    seen it twenty minutes off.

6        Q    Okay.  In this case, are they a few minutes off

7    in this particular case?

8        A    They appear to be approximately four minutes.

9        Q    All right.  And why don't we play, start playing

10   it and I'm going to ask you some questions about it.  For

11   the record, which direction are we looking at right now?

12       A    The video is currently looking westbound down

13   the 1500 block of Ramsey.

14       Q    All right.  It just shifted.

15       A    To southbound on the 400 block of Stricker and

16   into the Tracy Atkins Park.

17       Q    Now where is it looking?

18       A    Right into the playground at Tracy Atkins Park.

19       Q    For the record, it's showing a little picnic

20   area and there's some child playground equipment.  Is that

21   correct?

22       A    Yes.

23       Q    For the record, it zooms in and out and then it

24   begins to rotate again.  Correct?

25       A    Yes.

DIRECT EXAMINATION OF GLAZERMAN

1        Q    Looking back down --

2        A    Back down the 400 block of South Stricker.

3    That's eastbound in the 1400 block of Ramsey Street.  This

4    is back to westbound 1500 block of Ramsey Street.

5        Q    So we just made a complete circle.  Is that

6    correct?

7        A    Yes.

8        Q    And approximately how long does that take?

9    About a minute and a half?

10       A    Yes, sir.

11       Q    I'm going to ask the agent to pause this just a

12   second.  Okay.  Now right here it shows about 9:41 in the

13   morning and 45 seconds.  What are these individuals doing

14   in the park area, sir?

15       A    Some of them are just congregating in the area.

16   Others appear to be picking up trash in the area.

17       Q    Okay.  If we could go a couple of frames?  And

18   what's going on in the pool area that we're going to see?

19       A    It appears there are a couple more people

20   picking up trash.

21       Q    Okay.  Let's go back to 9:41:42.  Have you had

22   an occasion to look closely at the individuals in these

23   film clips to see what if anything happens around 9:41:42?

24       A    Yes.

25       Q    And what are we going to see -- we're going to

141

**76**

DIRECT EXAMINATION OF GLAZERMAN

1    play it a few times.  But what should we be looking for?

2         A    It appears that there's some type of reaction by

3    just about everyone in the park looking into the area by

4    the railroad tracks.

5         Q    Okay.  What I'm going to do is I'm -- why don't

6    we concentrate on the individual that's in the pool first

7    and then we'll play it back and then we'll concentrate on

8    the individuals near the basketball court.  All right.  Go

9    ahead.

10             All right.  Okay.  Let's go back to 9:41:42

11   and play it again and this time let's concentrate on the

12   people by the basketball court.  And after they turn in

13   that direction, what do they do?

14        A    They turn and they look for a couple of seconds.

15   They try and see what's going on and then they go right

16   back to what they were doing.

17        Q    All right.  One last time so we can kind of look

18   at both of them at the same time.  The woman in the pool,

19   the two individuals near the basketball court and the

20   individuals a little bit further in the basketball court.

21             If you can pause it right there, please?

22   The area that's above the playground apparatus, what is

23   that area back there?

24        A    There are a couple of trees back there and then

25   there's a fenced-in area and there's a hole in the fence

142

**77**

DIRECT EXAMINATION OF GLAZERMAN

1    where you get over to the -- on the other side of the

2    fence is the railroad track that is part of the B & O

3    Railroad Museum.

4         Q    Okay.  Keep going.  That's a better shot of it?

5    Is that the area back there beyond the trees?

6         A    Yes.

7         Q    It's the open area where we saw the railroad

8    tracks near the big X is; is that correct, on Government's

9    L-1?

10        A    Yes.

11        Q    All right.  We can keep playing it.  Now is

12   there a time when you arrive on the scene and you're

13   captured on the video?

14        A    Yes.

15        Q    Why don't we go to about 9:44?  Who is that,

16   sir?

17        A    That's me.

18        Q    Okay.  And as you said, you're pulling south on

19   South Stricker Street.  Is that correct?

20        A    Yes.  Correct.

21        Q    And as you noted earlier, there are no other

22   police cars at the end of that street.  You're the first

23   one to arrive?

24        A    Correct.

25        Q    All right.  And there are more cars arriving.

143

**78**

DIRECT EXAMINATION OF GLAZERMAN

1  Correct?

2      A    Yes.

3      Q    For the record the police officers are getting

4  out of their vehicles?

5      A    Yes.

6      Q    And where are they all going?

7      A    They're all going in the direction of the

8  basketball court where we were directed to go further

9  towards the train tracks.

10     Q    In essence, they're following you?

11     A    Yes.

12     Q    And if we could go to 9:46:50?  And what's

13  happening there, sir?

14     A    The first fire department personnel is arriving

15  on the scene.

16     Q    Are those paramedics?

17     A    Either paramedics or EMTs.  They're primarily

18  fire suppression units.

19     Q    It wasn't a fire there, was it?

20     A    Correct.

21     Q    They're there to assist?

22     A    Yes.

23     Q    And did there come a time when an ambulance

24  arrives?

25     A    Yes.

144

**79**

DIRECT EXAMINATION OF GLAZERMAN

1    Q    If we could go to 9:40 -- 9:50?  What's going on
2  there?
3    A    It appears that the fire truck -- I'm sorry.
4  The ambulance which is Medic 1 along with a paramedic
5  supervisor both showed up on the scene around the same
6  time.
7        MR. CLARKE:  Okay.  If we could go back to
8  9:41:45 and just freeze it once you get there?  That's
9  good.
10        BY MR. CLARKE:
11    Q    All right.  I'm going to do some math here.  The
12  camera clock shows what you've described as reaction by
13  the people in the park at about 9:41:42 to 9:41:50 or 59.
14  Is that correct?
15    A    Correct.
16    Q    So that's about 15, 20 seconds of reaction?
17    A    Yes.
18    Q    And then you arrive at 9:44:40.  Is that
19  correct?
20    A    Correct.
21    Q    So you physically arrive on the scene how many
22  minutes after you noted a reaction by the people in the
23  park?
24    A    Approximately three minutes.
25    Q    That's pretty good reaction time, isn't it?

145

DIRECT EXAMINATION OF GLAZERMAN

```
 1        A    Yes.

 2             MR. ZUCKER:  Objection.  Withdrawn.

 3             MR. CLARKE:  Can he have that, Your Honor?

 4             BY MR. CLARKE:

 5        Q    It was a pretty good reaction time, wasn't it?

 6        A    Yes.

 7        Q    All right.  Thank you.  Okay.  And to help

 8   folks' memories with those times, I'm showing you L-3-A

 9   which is three pages of screen shots.  The first one,

10   memorialized what you just testified to, contains the

11   woman you've identified looking up in that direction and

12   the two individuals looking and the folks back here.

13   Correct?

14        A    Correct.

15        Q    And the time in the corner of that is

16   9:41:46 a.m.  Page 2 of Government's L-3-A reflects your

17   arrival on South Stricker Street and the time there is

18   9:44:54.  Correct?

19        A    9:44:44.

20        Q    44.  I stand corrected.  And the third page of

21   L-3-A reflects the screen shot when the fire department

22   arrived.  Correct?

23        A    Yes.

24        Q    And the time there is 9:46:54?

25        A    Correct.
```

\*    \*    \*

146

CROSS-EXAMINATION OF GLAZERMAN

1    Q    And to emphasize that point, were you looking

2    closer at this particular photograph this morning?

3    A    Yes.

4    Q    And you noticed something in this photograph?

5    A    In the bottom left corner, there appears to be a

6    white styrofoam container and right next to it, there

7    appears to be a needle.

8    Q    And you didn't take this photograph, did you?

9    A    No.

10    Q    Is that the red object there in the photograph?

11    A    Reddish-orange, yes.

12         MR. CLARKE:  I have no further questions of this

13    witness, Your Honor.  Thank you, officer.

14         THE COURT:  Cross?

15         MR. PROCTOR:  Briefly.

16                    CROSS-EXAMINATION

17         BY MR. PROCTOR:

18    Q    Good morning, sir.

19    A    Good morning.

20    Q    I just have a few questions for you.  You

21    testified that you responded to the general area 150

22    times, something like that?

23    A    Yes.

24    Q    And it's fair to say a lot of crime happens in

25    that region of the city.  Right?

152

**82**

CROSS-EXAMINATION OF GLAZERMAN

```
1        A    Yes.

2        Q    You've probably investigated assaults?

3        A    Yes.

4        Q    Many, many drug cases?

5        A    Yes.

6        Q    Other murders?

7        A    Yes.

8        Q    Attempted murders?

9        A    Yes.

10       Q    Robberies?

11       A    Yes.

12       Q    And in fact that's why there's a pole camera

13   there.  Right?

14       A    Correct.

15       Q    Baltimore City Police doesn't have unlimited or

16   some might say any funds.  Right?

17       A    Correct.

18       Q    So they try and concentrate their resources in

19   high crime areas?

20       A    Correct.

21       Q    And this is one?

22       A    Um-hum.  Yes.

23       Q    And so -- I'm sorry.  I've lost my train of

24   thought.  It happens a lot.  Does everyone in the

25   neighborhood know about that pole camera?
```

           *  *  *

DIRECT EXAMINATION OF RUBIO

1    Q    It's just lying there?

2    A    -- lying there.  Yes.

3    Q    It's lying there?

4    A    Right.

5    Q    But it's a catheter to put an I.V., to put fluid

6    into the body?

7    A    To put fluids and medicines into the body.

8    Q    Let me jump ahead a little bit.  After you

9    conducted your autopsy and based upon your training,

10   education and experience, were you able to determine the

11   manner of death of Mr. Robert Long?

12   A    Yes.

13   Q    And what was that?

14   A    Homicide.

15   Q    Meaning killed by another individual?

16   A    Yes.

17   Q    And based upon your training, experience and

18   expertise, were you able to determine the cause of Robert

19   Long's death?

20   A    Yes.

21   Q    And what was that?

22   A    Gunshot wounds of the head.

23   Q    And I noticed you said plural.  More than one

24   gunshot wound to the head.  Is that correct?

25   A    That's correct.

DIRECT EXAMINATION OF RUBIO

1      Q    I'm showing you Government's Exhibit L-25.  And
2  can you tell us what this is a photograph of?
3      A    Yes.  This is a photograph of the face of
4  Mr. Long.  You can see at this point all the medical
5  devices have been removed, the face has been cleaned and
6  it's lying face up on the stretcher.
7           If you look at the left eye, you can see pretty
8  much on the center of the eyebrow, there's a round defect.
9  And around that on top and more easier to see on the
10  bottom on the left eyelid in this area, there are
11  multiple, small, about 1/16th of an inch, small abrasions,
12  like superficial injuries to the skin.
13          So what we are seeing here is a gunshot wound of
14  entrance and surrounded by what we call gunpowder or
15  stippling or gunpowder tattooing.
16     Q    All right.  And the stippling is spelled how,
17  ma'am?
18     A    S-T-I-P-P-L-I-N-G.
19     Q    All right.  I want to talk more about that in
20  just a second.  Would you please identify what I'm
21  pointing to there?
22     A    Yes.  You are pointing to the gunshot wound.
23  It's a round effect with a dry abrasion ring around it.
24     Q    Okay.  And would you describe these dotted --
25  these dots in this area, please?

DIRECT EXAMINATION OF RUBIO

1    A    Correct.  That is the tattooing or a stippling.

2    Q    Say again.

3    A    That is the gunpowder stippling.

4    Q    Stippling.  Okay.  Very good.  And we'll talk

5  more about that in just a second.  I'm showing you

6  Government's Exhibit L-27.  What is this a photograph of?

7    A    This is a photograph of the head and upper torso

8  of Mr. Long as he's lying face down on the stretcher.  And

9  you can see that the head is slightly turned to the left

10  side.  So you can see the right ear lobe.  But you cannot

11  see the left.

12         And in the center of the photograph, pretty much

13  you can see a very small round effect with a concentric

14  abrasion ring around.  And also in the skin surrounding

15  most of the right, it's easier to see on the right,

16  there's the same type of small abrasions and it's another

17  indication that he also had gunpowder stippling on the

18  skin around the entrance wound.

19    Q    But it wasn't as apparent as the one on the

20  front?

21    A    It was less than.

22    Q    And can you tell us what his tattoo says?

23    A    The one tattoo that he has on the back in the

24  upper back says Hannah.  H-A-N-N-A-H.

25    Q    And do you know who Hannah is, ma'am?

209

**86**

DIRECT EXAMINATION OF RUBIO

1       A     No.

2       Q     Does your autopsy report which includes these

3   photographs fairly and accurately summarize your opinion

4   and as well as the underlying facts that you relied on for

5   that opinion as to the cause and manner of death as you

6   just described; that is, homicide as a result of gunshot

7   wounds to the head?

8       A     Yes.

9       Q     All right.  How do you determine which

10  gunshot -- well, how do you determine whether a wound is a

11  distinct gunshot wound; that is, a wound caused by a

12  separate and distinct bullet?  Do you follow my question?

13  Let's use this example.  How many bullet wounds did you

14  find in Mr. Rob Long's body?

15      A     Two.

16      Q     Both in the head as you just showed us?

17      A     Correct.

18      Q     Okay.  And where did they enter?

19      A     One of them entered the left eyebrow area and

20  the other one entered the right side of the back of the

21  head.

22      Q     So you've described those as entrance wounds?

23      A     Yes.

24      Q     So we have one entrance wound above the eye,

25  just below the eyebrow and we have one in the back of the

210

87

1   head.  And did you find any exit wounds for either one of

2   those bullets?

3       A    No.

4       Q    For the purposes of our conversation here in the

5   courtroom and for the purposes of you conducting your

6   autopsy report, how do you identify these two different

7   gunshot wounds?

8       A    First of all, once an entrance wound is

9   identified, we know that each entrance wound is going to

10  have a path and either an exit or the location where the

11  projectile ends and it has to be recovered from.  So each

12  one of them is examined separately and the paths are

13  looked at separately unless they commingle and they kind

14  of get separated.  In this case, that was not a problem.

15      Q    You were able to track both pathways of both

16  bullets?

17      A    Correct.

18      Q    And what do you call the first wound?  When I

19  say first, the first one that you studied, not the first

20  one in time.  What do you call it?

21      A    Correct.  We have a way to do this.  And we

22  start from the top of the head, the front of the body and

23  we start label the wounds, A, B, C, D.  First, the front

24  and then the back.  So in this case the one I identified

25  first, which is the one on the left eyebrow, I call it A,

DIRECT EXAMINATION OF RUBIO

1   Gunshot Wound A and the one that was in the back of the
2   head is B.
3       Q    Okay.  And just so we're clear for the record,
4   the fact that you call it A, doesn't necessarily mean it
5   was the first gunshot wound in time.
6       A    Right.  I cannot say it was the first.
7       Q    All right.  And you've already talked a bit
8   about this wound just below his eyebrow.  Can you tell us
9   a little bit more now about the stippling effect?  When
10  would you expect to see a stippling effect of the type
11  that you've noted here on Gunshot Wound A just above his
12  eye?
13      A    Yes.  Gunpowder stippling is seen when the end
14  of the gun is relatively in close proximity to the target.
15  How much space is between the gun and the skin varies by
16  gun and by ammunition.  So it can be determined as
17  specifically exactly only if you have the gun and you have
18  the same ammunition and you do test firing.
19           But in general, the higher the caliber of the
20  gun, the farther away, it can be shot and still produce
21  gunpowder stippling.  And the more power the ammunition
22  has, the same thing.
23           So in general, we see gunpowder stippling when
24  the bullet has been -- when the end of the barrel is
25  within three feet from the target, we can see some

212

**89**

1   gunpowder stippling. With higher power, 40, 45, sometimes

2   it can be a little bit farther. And in smaller calibers,

3   it may be less.

4         But also looking at the density and the radius

5   or diameter of the gunpowder stippling, you can also make

6   some assumptions of how far the distance is. But as I

7   said, if you have the gun and the ammunition, you can test

8   fire and determine exactly how far it was.

9         Q    Approximately how many of your autopsies have

10  involved an examination of gunshot wounds?

11        A    Maybe 20%.

12        Q    20% of all the thousands you've done have

13  involved gunshot wounds. And have you become experienced

14  in judging the distance that various weapons will cause

15  and the amount of stippling that various weapons will

16  cause?

17        A    Yes.

18        Q    All right. And were you made aware in this case

19  that the bullets that were recovered by you and we'll get

20  to that in a second were .25 caliber bullets?

21        A    I knew they were a small caliber.

22        Q    All right. Small caliber. And based upon what

23  you knew about the size of the bullet, the radius of the

24  stippling that we see in Government's L-25 and the pattern

25  of the stippling, can you give us an opinion based upon

213

**90**

DIRECT EXAMINATION OF RUBIO

1    your training and experience about how far away the barrel

2    of the gun was in this case to cause this amount of

3    stippling for Gunshot Wound A?

4         A    Yes.  In my -- what I'm going to say would

5    require that there's no objects separating the end of the

6    barrel from the skin.  If there's clothing, hats or

7    anything like that, that could prevent some of the

8    stippling to reaching the skin.  But if we assume that

9    there is no objects in between, the density of the

10   stippling would indicate that for a small caliber

11   projectile, the end of the barrel was relatively close to

12   the skin.  I would say maximum about two feet, probably

13   much closer.

14        Q    So would you hold up your hands and show us what

15   you think two feet looks like, how far that barrel was at

16   the most?

17        A    (Indicating.)

18        Q    That's the furthest distance that that barrel

19   was to Mr. Long's face?

20        A    Correct.

21        Q    Okay.  And can you tell us a little bit about

22   the trajectory that this bullet took through his skull?

23        A    Yes.  So after entering the skin and soft

24   tissues of the eyebrow area, the bullet entered the skull

25   through the roof of the orbit.  So the eye is sitting

DIRECT EXAMINATION OF RUBIO

1   here.  It has a bony roof.  The bullet entered there.  And

2   as it entered, the eyeball ruptured and collapsed.  And so

3   then entered inside the cranial cavity.  The cranial

4   cavity you can imagine like a regular ball inside and it's

5   almost filled completely by the brain.  So as the bullet

6   entered inside the cranial cavity, the projectile entered

7   the brain itself.

8           And we have the frontal lobes here on the

9   forehead, the parietal lobes and in the back, the

10  occipital lobes.  And it followed a trajectory pretty much

11  front to back without much left, right deviation.  So it

12  was going front to back.  And closed the left side of the

13  brain, exited the brain and exited the skull on the left

14  occipital.  And the bullet ended under the skin in the

15  soft tissues of the back of the head on the left side.

16      Q    So the bullet never exited the skin on the back

17  of the head?

18      A    Correct.

19      Q    And can you explain what happened in this case

20  to his brain when that bullet entered the very front and

21  the amount of force and the size of the pathway going

22  through the brain?

23      A    So yeah.  When the bullet leaves the gun, it has

24  an amount of energy that is determined by the weight of

25  the bullet and the speed that it's going through.  As it

215

**92**

DIRECT EXAMINATION OF RUBIO

1    closes objects, it's going to lose some of the force

2    because the bone is going to stop it and the resistance of

3    the brain much less because the brain is very soft.

4              But so the bullet and the gases entered the

5    skull and produce in the brain which is the consistency of

6    the living brain is like soft, very soft like cream

7    cheese.  So very little resistance and the energy of the

8    bullet is going to create a temporary cavity that is much

9    bigger than the bullet itself.  So the damage to the brain

10   is going to be bigger than just the size of the bullet.

11   And that damage in the brain would be permanent.

12        Q    Dr. Rubio, concerning the damage that was

13   created by the bullet that entered through Gunshot Wound

14   Entrance A, how would you describe whether or not that

15   damage was fatal as to Mr. Rob Long?

16        A    So looking at the iris of the brain that it was

17   directly affected by the path of the bullet which is the

18   frontal lobe, the depth of the brain, the thalamus, which

19   is an area of consciousness and all that and then the

20   occipital lobe, there's not -- the bullet not necessarily

21   would produce immediate death, but is going to be rapidly

22   fatal without medical intervention.

23        Q    What was the adjective before fatal?

24        A    Rapidly.

25        Q    Rapidly fatal.

216

**93**

DIRECT EXAMINATION OF RUBIO

1      A    Quickly.  Yes.

2      Q    All right.  And did he ultimately die of this

3  wound?

4      A    I cannot say specifically he died of this wound.

5  He died of both gunshot wounds.

6      Q    Okay.

7      A    But if he had only received this wound, he would

8  probably die at similar time.

9      Q    And we'll talk about the second one.  But as to

10  this one, you described it as rapidly fatal?

11      A    Correct.

12      Q    At some point, he's going to die of this wound?

13      A    Yes.

14      Q    Were you able to recover the bullet that you

15  described as the one causing Gunshot Wound A?

16      A    Yes.

17      Q    I'm showing you Government's L-9.  And do you

18  recognize that, ma'am?

19      A    Yes.

20      Q    And that's your envelope and that's what you

21  created and made at your office.  Is that correct?

22      A    Correct.

23      Q    And what is this, ma'am?

24      A    This is a label envelope that we have for

25  evidence and underneath, you can see the projectile.  I

217

**94**

DIRECT EXAMINATION OF RUBIO

1    describe it as gold-colored jacketed, minimally deformed

2    projectile that I recovered from the back of the head,

3    under the skin on the left side.

4        Q    And so you described this as minimally deformed.

5    Is that correct?

6        A    Correct.

7        Q    In relatively good shape?

8        A    In relatively good shape.

9        Q    Let's move on to the next wound.  What did you

10   call this gunshot wound?

11       A    This I call, I label it Gunshot Wound B.

12       Q    All right.  And you already told us that this

13   was the entrance wound.  Did you find an exit wound?

14       A    No.

15       Q    All right.  And did you have an occasion to

16   track the path of the bullet once it went into the back of

17   the head and traveled into the cranium?

18       A    Yes.

19       Q    Where did it go?

20       A    So this bullet follow a path like parallel to

21   the previous one, but in opposite direction.  So the

22   bullet entered the back of the head on the right side.

23   And on the occipital lobe, that is the one that the other

24   bullet had exited.  So that was the entrance inside the

25   brain.  It followed in a back to front path without moving

**95**

DIRECT EXAMINATION OF RUBIO

1    much left to right, closed the entire right side of the

2    cerebral hemisphere and reached the top of the frontal

3    lobe of the brain and it kind of change direction,

4    ricochet when touched the cranium and it went down and it

5    was recovered from the top of the orbital roof on the

6    right frontal lobe of the brain.

7        Q    So if I understand you correctly, you testified

8    it went into the back, pretty much, straight across the

9    skull until it ricocheted off the front cranium and then

10   it went down?

11       A    Yes.

12       Q    And then settled just above his eye?

13       A    Yes.

14       Q    And can you based upon your review of the

15   stippling of this wound, Gunshot Wound B, which you say is

16   not adequately shown here as well as in real life, do you

17   have an opinion that you can state about how far you

18   believe the barrel of the gun was when the bullet was

19   fired that caused this entrance wound?

20       A    So not only that -- in black and white

21   photographs, it is kind of difficult to see the gunpowder

22   stippling.  Not only that the photograph doesn't show it

23   very well, it's also that the gunpowder stippling in

24   itself has less density.  So if anything we can say from

25   that is the distance maybe a few inches farther than the

219

**96**

DIRECT EXAMINATION OF RUBIO

1    previous one.

2        Q    All right.  So for Gunshot Wound A, you said no

3    more than two feet.  For Gunshot Wound B, you're saying

4    two feet and a few inches?

5        A    No.  No more than two feet either.

6        Q    Still no more than two feet.  Okay.  And

7    regarding the consequence of this injury, how would you

8    describe whether this particular gunshot was fatal or not?

9        A    The tissues that were injured were similar to

10   the wounds done on the previous Gunshot Wound A, but on

11   the opposite hemisphere of the brain.  So it will depend

12   also which one was first and which is second because the

13   second gunshot wound is going to injure tissues that may

14   have been already injured.  So depending on the older one

15   wound, it would have the effects increase in some ways.

16        But I would say that this gunshot wound is going

17   to be rapidly fatal.  So without medical attention, the

18   person will die pretty quickly and not necessarily

19   immediately fatal.  But I wouldn't be surprised if either

20   one of them makes the person dead immediately.  But I

21   cannot say just looking at the wounds.

22        Q    Okay.  And that's why you don't claim that

23   either one of these is immediately fatal.  Correct?

24        A    Correct.

25        Q    You describe it as rapidly fatal, which means

*    *    *

220

**97**

DIRECT EXAMINATION OF RUBIO

1    Mr. Robert Long?

2        A    Yes.

3        Q    And without getting again into too much science,

4    were you able to determine whether or not Mr. Long had any

5    drugs or alcohol in his system at the time of his death?

6        A    Yes.

7        Q    And what did he have and what does this report

8    reflect?

9        A    This report reflects that he had the alcohol --

10   the test for alcohol was negative.  That when you look at

11   the urine, you find something called six monosatim

12   morphine.

13       Q    Let me stop you there.  When you turn your head,

14   just move the microphone with you.  Okay.

15       A    Okay.  So what we found in the urine is

16   something we call six M-A-M, which is the nickname for

17   this metabolite.

18       Q    Is that on the first line?

19       A    Yes.

20       Q    Okay.  So the presence of that was found?

21       A    In the urine.  Yes.

22       Q    All right.  And what does that mean?

23       A    That means that that is a metabolite that is

24   produced in the body when somebody takes heroin.

25       Q    Okay.  And what about the second line where it

225

**98**

1    says cocaine and metabolites positive?  What does that

2    mean?

3         A    Yes.  That is -- you don't see it here because

4    it's to the left of the camera.  But this is another test

5    in the urine.  So when they test, when the toxicology

6    tested the urine, there was cocaine and cocaine

7    metabolites found in the urine.

8         Q    Okay.  And how about these other substances that

9    are listed here.  Procaine, positive.  Morphine, positive,

10   and I can't pronounce that one.

11        A    Diltiazem.

12        Q    What do those three things represent?

13        A    Morphine is the main ingredient of heroin.  So

14   when we have morphine in the blood or in the urine and six

15   MAM in the urine, we know that the origin of the morphine

16   is heroin.  So that's one.  The other two substance,

17   procaine and diltiazem, could be a medical treatment.  But

18   a lot of times, we found those substance in people who

19   take the cocaine or heroin because sometimes in the

20   preparation of these drugs, they are mixed as ingredients.

21        Q    Well, in this case you actually found cocaine as

22   well.  Correct?

23        A    Correct.

24        Q    All right.  So there's no doubt that Mr. Long

25   had cocaine in his body prior to dying?

                    *    *    *

226

**99**

1    please?  Thank you.

2              MS. WILKINSON:  -- involves a witness by the

3    name of Harry White, who's going to be testifying after

4    our first witness, Mr. Boykins.  Mr. White was a very dear

5    friend of Mr. Long.  He knew Mr. Morales for a long time

6    and he's going to testify particularly about a period of

7    time right before Mr. Long's murder.  Those two weeks or

8    so.

9              The day of Mr. Long's murder, however, after he

10   found out that Mr. Long was dead, he had conversations

11   with Mr. Morales.  And the government does not intend to

12   elicit any of those conversations primarily because the

13   government believes they're self-exculpatory lies based on

14   what we know about Mr. Morales.

15             I have indicated such to counsel and counsel

16   advised me they intended to elicit from Mr. White a

17   conversation in which Mr. White relates how he told Mr.

18   Morales that Long was dead, to which Mr. Morales began

19   crying and became upset.

20             And I advised Mr. Proctor who I believe is going

21   to be doing the inquiry on Mr. White that I didn't see the

22   relevance of that and I asked him to proffer the relevance

23   and perhaps he can except to show that Mr. Morales didn't

24   do it and was upset by the news that his friend had died

25   and that he didn't know that his friend had died.

233

**100**

DIRECT EXAMINATION OF RUBIO

```
 1            The sequence of events, just so the Court knows,
 2    is that, of course, Mr. Morales has confessed to us in a
 3    proffer-protected statement and I have the relevant
 4    passage here, Your Honor.  And the relevant passage
 5    here --
 6            MR. ZUCKER:  Can we approach for a second on
 7    this?
 8            THE COURT:  Why do you need to approach?
 9            MR. ZUCKER:  None of the people in the courtroom
10    are witnesses, are they?
11            MS. WILKINSON:  No.  There's no witnesses.
12    There's family members of witnesses.
13            THE COURT:  I don't see any reason to have a
14    bench conference.
15            MR. ZUCKER:  I'm sorry?
16            THE COURT:  I don't see any reason to discuss
17    anything at the bench unless you can tell me why.
18            MR. ZUCKER:  I'm concerned that things that are
19    said that are under proffer and it's agreed that aren't
20    going to come out be disseminated and that might filter
21    their way back to other people who are going to testify in
22    the trial.
23            MS. WILKINSON:  I will instruct the family
24    members in the courtroom not to discuss what happens in
25    the courtroom with their family member witness who is
```

234

**101**

DIRECT EXAMINATION OF RUBIO

1　testifying later.

2　　　　　THE COURT:  All right.

3　　　　　MR. ZUCKER:  Or with anyone else.

4　　　　　THE COURT:  Make sure they understand that.

5　　　　　MS. WILKINSON:  And just for the record these

6　are Mr. Ramsay's family members and indicate to them you

7　should not discuss with Mr. Ramsay anything that happens

8　in the courtroom prior to his testimony.

9　　　　　MR. ZUCKER:  Judge, could I ask that it not just

10　be limited to Mr. Ramsay?  It shouldn't be discussed with

11　anyone.

12　　　　　MS. WILKINSON:  Any witness.  It's a public

13　courtroom and things have happened in a public

14　courtroom --

15　　　　　THE COURT:  I got a big sign out there that says

16　that.

17　　　　　MS. WILKINSON:  Exactly.  Thank you, Your Honor.

18　　　　　THE COURT:  Now you are referring to something,

19　but I don't have anything on the screen.

20　　　　　MS. WILKINSON:  Pardon me?

21　　　　　THE COURT:  You were referring to something, but

22　I don't have anything on my screen.

23　　　　　MS. WILKINSON:  Oh, I'm going to put it up there

24　right now, Your Honor.

25　　　　　THE COURT:  All right.  Okay.

**102**

DIRECT EXAMINATION OF RUBIO

1      MS. WILKINSON:  So the relevant passage in
2  Mr. --
3      THE COURT:  If you want, I can turn the screen
4  off for the spectators.  I don't mind.
5      MS. WILKINSON:  If you'd like, Your Honor.
6      THE COURT:  Yeah.  All right.  Okay.  Show me
7  what you want to show me.
8      MS. WILKINSON:  I'm going to go to the bottom.
9  Okay.  The relative passage is paragraph 7.  Mr. Morales
10 had begun first telling us how he hired the Lucas brothers
11 to perform this murder.  And then he says at paragraph 7,
12 what telephone number Mr. Lucas used to contact him.
13 Morales did not remember either number.  But stated that
14 they, the numbers, would have been on his cell phone.
15 Morales stated that Ice took his cell phone.  And he goes
16 on to explain that.  And he said that Junior called him
17 around maybe 8 a.m. from a house where he was staying at
18 the time.  The address was 36 something, but Morales could
19 not remember the rest.  Morales stated that the residence
20 was on Caton between Wilkens and Frederick and the
21 residence was a house located behind a car lot across from
22 a lumber company.  That he was called on his cell phone by
23 Junior who said it's done and then put Lucas on the
24 telephone.  Lucas informed Morales that everything is
25 taken care of, Rob is dead.  Morales went on to state that

DIRECT EXAMINATION OF RUBIO

1    Lucas went on to tell him that he shot Long and he told

2    Lucas where to meet him later.  So that's the statement

3    that Mr. Morales made that's protected.

4         THE COURT:  What do you mean protected?

5         MS. WILKINSON:  In other words, we cannot use

6    the statement against him.  This was a proffer statement.

7         THE COURT:  Understand.  Okay.  All right.

8         MS. WILKINSON:  The proffer provides that if Mr.

9    Morales' attorneys introduce evidence that's materially

10   different from the proffer, then they open themselves up

11   to the proffer being admitted as substantive evidence on

12   rebuttal in this particular case.  Mr. Proctor would like

13   to elicit testimony that Mr. Morales cried as if Mr. White

14   was the first person telling him that Mr. Long died and

15   that Mr. Morales was I suppose upset or distraught about

16   this news.

17        Now I will proffer to the Court Mr. White is

18   going to testify and the time that he talked to Mr.

19   Morales and had -- he doesn't remember the exact time of

20   the conversation, but the time that he talked to Mr.

21   Morales right after he learned that Mr. Long himself was

22   dead so he didn't have that news, he did not talk to Mr.

23   Morales until 11:52 a.m.  That is long after Mr. Morales

24   told us that he spoke to the Lucas brothers which he

25   guessed to be around 8 a.m.  But more importantly, it's

DIRECT EXAMINATION OF RUBIO

1    long after the three calls that we attribute to the Lucas

2    brothers to contacts with Mr. Morales at 10, 10:13 and

3    10:22 a.m.

4            The government's view eliciting this evidence

5    is, first of all, inadmissible hearsay.  It's a nonverbal

6    assertion.  Number two, I don't see the relevance in it

7    other than to argue that he didn't know about the murder,

8    he was upset about the murder or that he didn't do the

9    murder.  All three of those arguments would be

10   impermissible under the proffer agreement.  And we would

11   move to limit cross-examination from any of those -- the

12   types of questions to Mr. White eliciting self-exculpatory

13   reactions or statements from Mr. Morales on March 24th.

14           THE COURT:  You said self-inculpatory.  You mean

15   self-exculpatory.

16           MS. WILKINSON:  Self-exculpatory.  Yes.  If I

17   said that wrong, I'm sorry.  Self-exculpatory.

18           THE COURT:  All right.  Let me see what the

19   defense --

20           MR. PROCTOR:  Can I have a second?

21           (Counsel conferred with his client.)

22           MR. PROCTOR:  Well, first of all, judge, we are

23   at all costs seeking not to open any doors that will

24   result in the proffer being admitted.  And so I'm glad we

25   flagged this because any court on 2255 would have a hard

238

**105**

1    time fathoming while defense counsel would open the door
2    to their client's confession coming in.
3              So with that as a backdrop, first of all, let's
4    talk about what's coming in regardless.  There is -- I
5    forget the person's name -- a correctional officer or
6    internal security or whatever the term is at the Bureau of
7    Prisons coming in to say that Mr. Morales said Troy called
8    him right afterwards and told him.  That's coming in
9    regardless.  Maybe it was Clyde.  But I think it was Troy.
10             And so and Mr. Morales' statement, it's unclear
11   to me.  He says Troy called him at 8 a.m.  We know the
12   murder didn't happen until 9:40 or so.  And so he's
13   mistaken in that.
14             And so who told him and when they told him I
15   believe is fair game.  And it's certainly fair game when a
16   correctional officer is going to say he told me Troy and
17   we're still entitled to reasonable doubt.  We're still
18   entitled to make them prove their case.  And so one
19   witness saying Mr. Morales told him Troy called right
20   afterwards would be contradicted by the testimony of
21   Mr. White that Mr. White said in the grand jury in my
22   mind, I'm the first person who told him.  Whether we get
23   into the crying and stuff afterwards --
24             THE COURT:  Well, how are we going to get into
25   that he in his mind thinks he was the first person to tell

239

**106**

DIRECT EXAMINATION OF RUBIO

1   him?  How is that going to come in?

2          MR. PROCTOR:  That's what he said in the grand

3   jury.

4          THE COURT:  I don't care what he said in the

5   grand jury.  I mean how is that admissible in a trial that

6   he thinks he was the first person unless he was with Long

7   for 24 hours and knows who talked to him for the entire 24

8   hours?

9          MR. PROCTOR:  Well, Mr. Morales --

10         THE COURT:  It's going to have to be hearsay if

11  that is what you're saying.  He is going to have to base

12  it on the fact that, you know, somebody else told him X, Y

13  or Z or that Morales told him X, Y or Z.

14         MR. PROCTOR:  Someone's reaction is not hearsay.

15  I mean we had testimony this morning those people looked

16  startled by a sudden event.  That's not hearsay.

17         THE COURT:  If I hired somebody to murder my

18  wife, the first thing I would do when somebody came to

19  tell me that she was killed would be I'd start to

20  uncontrollably cry.

21         MR. PROCTOR:  Which is closing argument.

22         THE COURT:  So what?  I mean if a person who's

23  arranged to have a friend murdered or a wife murdered

24  under my hypothetical is almost assuredly going to feign

25  sadness at the event of a death of that person.  How does

240

**107**

DIRECT EXAMINATION OF RUBIO

1    that become admissible in this case?

2              MR. PROCTOR:  Well, I guess my thrust is he told

3    him.  It was readily apparent to him that he believed Mr.

4    Morales had not heard this news before.  What his

5    reactions were --

6              THE COURT:  Well, I don't see how he can express

7    a belief that Mr. Morales had not heard it before.

8              MR. PROCTOR:  Well, he can express his belief by

9    saying how he looked, how he reacted.

10             THE COURT:  I don't know how that comes in

11   without being a problem under your proffer agreement.

12             MR. PROCTOR:  Okay.  And the Court can make its

13   ruling.  But again given the choice of the evidence coming

14   in or the proffer agreement, I take the former.  But I

15   don't think the two are inconsistent.

16             THE COURT:  Well, I'm not comfortable with the

17   notion that some of what you've described to me as being

18   testimony by this witness could come in at all.  A prior

19   exculpatory statement is not going to come in.

20             MR. PROCTOR:  That's not what he said.

21             THE COURT:  And the witness' belief that he was

22   the first person to tell him is speculation.  How does he

23   know he's the first to tell him?

24             MR. PROCTOR:  Well, he doesn't know.

25             THE COURT:  Well, if he doesn't know something

241

**108**

DIRECT EXAMINATION OF RUBIO

1  of his personal knowledge, how does it come into evidence?

2          MR. PROCTOR:  He knows through his reaction.

3          THE COURT:  I mean if he was with the defendant

4  from every minute of the day from the time of the actual

5  murder to the time when this happened and he was with him

6  and knows that nobody else told him, he could say that of

7  his personal knowledge because he was with him the entire

8  time.  But if he wasn't, it's going to either be because

9  Morales told him you're the first to tell me or it's

10  speculation.  And how does it come in?

11          MR. PROCTOR:  Well, why wouldn't the reaction

12  come in without making the inference?  He told him.  He

13  looked upset.  He started crying.  Why wouldn't that come

14  in?

15          THE COURT:  If arguendo, it comes in, why is it

16  not contrary to the plea agreement?

17          MR. PROCTOR:  To the proffer agreement?

18          THE COURT:  Excuse me.  The proffer agreement.

19  I'm sorry.

20          MR. PROCTOR:  Because what Mr. Morales said in

21  the proffer is not inconsistent with that.  He said --

22          THE COURT:  You mean it's not inconsistent

23  because under the hypothetical I gave you, I hire somebody

24  to murder my wife and when someone comes to tell me, I

25  break down and uncontrollably cry.  I mean that's

242

**109**

1    inconsistent with the fact that I confessed to somebody I

2    murdered him or I arranged my wife's murder.

3              MR. PROCTOR:  Right.  And again, someone is

4    going to come into court and say Judge Titus told me that

5    right after he murdered his wife, he got a phone call from

6    a hit man to say mission accomplished.  And the fact that

7    madam clerk saw you startled would rebut that.

8              THE COURT:  I'm not real enthused about it.  But

9    let's do this.  Let's hear the brief witness and I'll

10   think about it and make a final decision before the

11   witness takes the stand on direct.

12             MS. WILKINSON:  And, Your Honor, while you're

13   thinking about it, the difficulty -- one of the

14   difficulties the government is having with this is that

15   Mr. Proctor was still unable to tell you what he intends

16   to argue from that evidence.  And what he intends to argue

17   from that evidence is somehow that Mr. Morales was sad,

18   upset, shocked to learn about Mr. --

19             THE COURT:  And then the argument will be that's

20   inconsistent with having arranged the murder.

21             MS. WILKINSON:  Absolutely.  And if he doesn't

22   argue that, then what's the evidence relevant to?  And the

23   Court's first job is to determine what the relevance of

24   the evidence is even before getting into the fact that

25   it's hearsay, a non-verbal assertion by a witness who's

DIRECT EXAMINATION OF BOYKINS

1  not available for cross-examination.  So I don't

2  understand the relevance of that and I just put that out

3  for the Court.  Obviously, the --

4          THE COURT:  All right.  Well, let me mull it

5  over.  But let's not keep the jury waiting forever.

6  They're going to think I don't know how to tell time.

7          MS. WILKINSON:  Very well.

8          THE COURT:  What's the name of the witness, by

9  the way?

10         MS. WILKINSON:  Tyrone Boykins.  B-O-Y-K-I-N-S.

11         (Jury present.)

12         THE COURT:  Good afternoon, ladies and

13  gentlemen.  Sorry for a little late start.  I had to

14  address a couple of legal matters before you came in.  You

15  may proceed.

16         MS. WILKINSON:  Thank you, Your Honor.  The

17  government calls Mr. Tyrone Boykins.  B-O-Y-K-I-N-S.

18         THE CLERK:  Sir, if you can please face me and

19  raise your right hand?

20  Thereupon,

21                  TYRONE BOYKINS,

22  having been called as a witness on behalf of the

23  government and having been first duly sworn by the

24  Deputy Clerk, was examined and testified as follows:

25         THE CLERK:  You may have a seat at the witness

                    *    *    *

**111**

DIRECT EXAMINATION OF BOYKINS

1       A    Plumbing.

2       Q    And how far did you go in school?

3       A    I graduated from high school and went to

4   college.

5       Q    And at some point in 2008, did you live in the

6   Baltimore, Maryland area?

7       A    Yes.

8       Q    At that time in that 2008 timeframe, were you

9   using drugs?

10      A    Yes.

11      Q    Are you using drugs here today?

12      A    No.

13      Q    And what type of drugs did you use back in 2008?

14      A    Heroin.

15      Q    And back on specifically on March 24, 2008, did

16  you -- were you participating in any community service as

17  a result of a heroin arrest?

18      A    Yes.

19      Q    And tell the ladies and gentlemen of the jury

20  about that community service.

21      A    That day, we went down to Carroll Park to do

22  community service.  They was having an Easter egg hunt and

23  so we had to clean the playground up.

24           As we was -- we all gathered together.  It was

25  about nine of us reported to this lady.  I don't know the

246

**112**

DIRECT EXAMINATION OF BOYKINS

1    lady name.  I forgot.  And she took us down to the

2    playground which is on Ramsey and I think Calhoun Street.

3            And as we was going down there about -- we

4    proceeded to do our work and she told us what she wanted

5    us to do and we did.  About five minutes down there, I

6    heard a shot.

7        Q    Okay.  I'm going to stop you right there because

8    you just told us a whole lot of information and I want to

9    go back to the actual park you were at.  And I think you

10   said Carroll Park, but do you mean Tracy Atkins Park?

11       A    Yes.  I call it Carroll Park.

12       Q    Okay.  The one near Stricker and Ramsey and

13   Calhoun --

14       A    Yes.

15       Q    And the little park with the little playground?

16       A    Yes.

17       Q    So you and a number of other people were going

18   down to do community service that day?

19       A    Yes.

20       Q    And where did you start your journey from?  Were

21   you at a particular center or area?

22       A    We was at the community center place that was on

23   Calhoun Street.  I think it's on Calhoun and Harlem

24   Avenue.

25       Q    Is that where you actually met up?

                        *    *    *

DIRECT EXAMINATION OF BOYKINS

1    consider yourself particularly observant of the things

2    going on around you?

3         A    Yes.

4         Q    So as you started to pick up trash and you

5    noticed the other people, you say that you heard something

6    within five minutes of getting there?

7         A    Yes.

8         Q    Okay.  And tell them again what exactly you

9    heard.

10        A    About five minutes of getting there, I heard a

11   pop, sounded like a fire cracker.  But it sounded like a

12   little 22, you know.  And I asked several other people did

13   they hear it, too.

14        Q    Did you react when you heard it like, oh, I just

15   heard something?

16        A    Yes.

17        Q    And so you asked the people around you did you

18   hear that, too?

19        A    Yes.

20        Q    And then what happened?

21        A    They said yes and some guy said somebody down

22   there shot, got shot, you know.  So I --

23        Q    Before you go from there, tell us what happened.

24   A man came and told you what?

25        A    A man came and told us that someone down there

                    *    *    *

**114**

DIRECT EXAMINATION OF BOYKINS

1    Mr. Boykins, counsel.

2            THE COURT:  Cross?

3            (Counsel conferred with his client.)

4            MR. PROCTOR:  We have no questions for this

5    witness.  Thank you, sir.

6            THE COURT:  All right.  You may step down, sir.

7    Thank you very much.  All right.  Counsel, come to the

8    bench.

9            (Bench conference:)

10           THE COURT:  If I understand correctly, a matter

11   that the government is raising in its motion in limine to

12   preclude cross-examination on this subject is that in

13   effort to have the testimony elicited as to Mr. Morales'

14   sadness or crying upon being told the death of Long would

15   somehow be admissible without violating the proffer

16   agreement.  One of the problems I have is I don't have the

17   proffer agreement --

18           MS. WILKINSON:  I will get it.

19           THE COURT:  -- but I'm assuming that it says

20   essentially that if the defendant were to offer testimony

21   inconsistent --

22           MS. WILKINSON:  Materially different.

23           THE COURT:  -- materially different from what he

24   says in there, it could be used.  The hearsay exception

25   under 803(3) for an emotional state, that arguably would

263

**115**

1    be how this would be potentially admissible.  Under that

2    subsection, it's not hearsay if it is then-existing

3    mental, emotional or physical condition.  The examples

4    they give are a statement of the declarant's emotional

5    condition such as mental feeling, pain or bodily health.

6    I suppose that would be the basis for admitting it on

7    cross-examination.

8            But the problem I have is that the only

9    relevance of that would be to negate his involvement in

10   the murder in the sense that if he were involved in the

11   murder, he would be smiling and happy.  If he's not

12   involved in the murder, he would be unhappy and therefore,

13   it somehow negates his guilt.

14           It seems to me that arguably is admissible under

15   803(3).  But if it's to be admitted, I think there's a

16   problem under the proffer agreement.  So I think the --

17   I'm not going to exclude it because of your contract.  But

18   if the examination is undertaken with the goal of having

19   him indicate either that he was the first person to tell

20   him which is a sort of a separate matter, but more

21   importantly that he cried or had a sad reaction to the

22   news of Mr. Long's death, then it seems to me that that

23   was inconsistent with the statement made in the proffer

24   session.  So that if that kind of testimony is offered and

25   the government raises the question as to whether this has

**116**

DIRECT EXAMINATION OF BOYKINS

1    violated the proffer agreement, I would have to address

2    the question and permit the government to put the proffer

3    statement in at the appropriate time.

4              MR. ZUCKER:  Given that, we'll forego the

5    examination.

6              THE COURT:  All right.  Thank you very much.

7              MR. PROCTOR:  But please note our objection.

8              THE COURT:  Okay.  What's the name of the next

9    witness, by the way?

10             MS. WILKINSON:  Harry White.

11             THE COURT:  That's the fellow who -- all right.

12   Thank you.

13             (In open court:)

14             MS. WILKINSON:  Your Honor, the government calls

15   Harry White.

16             THE CLERK:  If you can please raise your right

17   hand?

18   Thereupon,

19                           HARRY WHITE,

20   having been called as a witness on behalf of the

21   government and having been first duly sworn by the

22   Deputy Clerk, was examined and testified as follows:

23             THE CLERK:  You may have a seat at the witness

24   stand.  Please speak directly into the microphone and

25   please state your first and last name.

**117**

DIRECT EXAMINATION OF WHITE

```
 1          THE WITNESS:  My name is Harry White.
 2          THE CLERK:  And please spell your first and last
 3   name.
 4          THE WITNESS:  H-A-R-R-Y.  And my last name is
 5   spelled W-H-I-T-E.
 6                     DIRECT EXAMINATION
 7   BY MS. WILKINSON:
 8      Q    Mr. White, I can tell you right now, I'm going
 9   to have a little trouble hearing you.  So you're going to
10   need to sit up and speak right into the microphone because
11   if I can't hear you, the ladies and gentlemen of the jury
12   can't.  All right?
13      A    Yes, ma'am.
14      Q    And if you need a glass of water, please help
15   yourself.  It's right in front of you.
16      A    Yes, ma'am.
17      Q    How old are you, sir?
18      A    35 -- 45.  I'm sorry.
19      Q    That's okay.  I always try to count myself ten
20   years younger, too.  And how far did you go in school?
21      A    I finished the eighth grade.
22      Q    The eighth grade?
23      A    Eighth.
24      Q    Are you able to read and write English?
25      A    Barely.
```

266

**118**

DIRECT EXAMINATION OF WHITE

1      Q    Have you worked in your adult life?

2      A    Yes, ma'am.

3      Q    And give the jury an idea of the types of jobs

4  and work you've done in your adult life?

5      A    Masonry construction work.  Just more or less

6  just construction.

7      Q    Have you worked for different employers in

8  masonry construction?

9      A    Yes, ma'am.

10     Q    And can you name some of the employers that

11  you've worked for say in the last ten years?

12     A    Carroll Masonry, Masons Unlimited.  I can't

13  think of no more, ma'am.  Oh, Hicks Construction.  And

14  Campotelli.

15     Q    And for those of us who don't know completely

16  what masonry is, what is it?

17     A    Stone, stone veneers on the front of buildings

18  and homes and block and brick.  Building either a building

19  or homes.

20     Q    Okay.  Back in March of 2008, where did you

21  live?

22     A    3831 Wilkens Avenue.

23     Q    You're going to have to keep your voice up.

24     A    3831 Wilkens Avenue.

25     Q    Perfect.  Wilkens Avenue.  And who did you live

DIRECT EXAMINATION OF WHITE

1    there with?

2         A    My wife.

3         Q    And what's your wife's name?

4         A    Patricia White.

5         Q    And do people call her Patricia or do they call

6    her by her nickname?

7         A    No.  They call her Shug.

8         Q    Shug.  And how do you spell that?

9         A    S-H-U-G.

10        Q    And has that pretty much been the name she's

11   been known by since the time you've known her?

12        A    Yes, ma'am.

13        Q    And how long have you and Shug been married?

14        A    We've been together for 20 something years.  But

15   only married for like 11.

16        Q    And do you have children together?

17        A    Yes, ma'am.

18        Q    And how many children do you have?

19        A    Six girls.

20        Q    Six girls?

21        A    Yes, ma'am.

22        Q    And were they all living with you back in

23   March of 2008?

24        A    Yes, ma'am.

25        Q    Now is Shug employed?

268

**120**

DIRECT EXAMINATION OF WHITE

1     A     Yes, ma'am.

2     Q     What does Shug do for a living?

3     A     Code enforcement for Baltimore City.

4     Q     And I didn't catch that first word?

5     A     Code enforcement.

6     Q     Code enforcement.

7     A     Yes.  Housing inspector.

8     Q     And has she been doing that for a long time?

9     A     Oh, yes, ma'am.

10    Q     Now I'm going to put -- there's a screen right

11    to the right of you and I'm going to put from time to time

12    some documents or photographs for you to look at,

13    Mr. White.  Showing you Government's Exhibit L-31.  Do you

14    know this man?

15    A     That's Robert, Robert Long.

16    Q     Robert Long?

17    A     Yes, ma'am.

18    Q     Can you tell the jury and go ahead and turn back

19    around and tell them how you know Mr. Long?

20    A     I known Rob since he was a little kid.

21    Q     Take your time.

22    A     He's lived with me for almost 15 years.

23    Q     And how did you first meet him?

24    A     My ex-girlfriend and his sister was camping and

25    when I went to pick her up, that's the first time I met

269

**121**

DIRECT EXAMINATION OF WHITE

```
 1    him.
 2         Q    And describe -- you're obviously emotional about
 3    this, Mr. White.  Describe your relationship with Mr. Long
 4    prior to his death.
 5         A    Like brothers.
 6         Q    Like a brother?
 7         A    Yes.
 8         Q    Can you tell us a little bit about Mr. Long?
 9    Was he married?
10         A    No.
11         Q    Did he have children?
12         A    Yes.  A little girl.
13         Q    He had a little girl.  And what was her name?
14         A    Hannah.
15         Q    And do you know how old Hannah is now or how old
16    she was when she died approximately?
17         A    She's got to be five, four or five years old.
18         Q    When he died?
19         A    No.  No.  She might have been less than a year
20    old.
21         Q    Do you know who the baby's mom is?
22         A    Yeah.
23         Q    And what's her name?
24         A    Robin Woolfort.
25         Q    Did Rob and Robin and have a relationship with
```

270

**122**

DIRECT EXAMINATION OF WHITE

```
1    one other?
2        A    Yes.  On and off.  Yes.
3        Q    On and off?
4        A    Yes.
5        Q    In March of 2008, were they together or apart?
6        A    They was apart.
7        Q    Where was Rob living in March of 2008?
8        A    My house and another co-worker's house.  He
9    stayed between both.
10       Q    And who's the other co-worker?
11       A    Joe.  I can't think of his last name.  I think
12   his last name is wheelton -- Wilton.  I'm sorry.
13       Q    Wilton?
14       A    I think that's his last name.
15       Q    So sometimes he would live with you and
16   sometimes he would live with Joe?
17       A    Yes, ma'am.
18       Q    How long had he been laying his head with you
19   and Shug in 2008?  Had it been for a period of time?
20       A    Maybe -- well, he's always stayed there, but he
21   would just stay a week or stay a couple of weeks and then
22   he would stay with -- if him and his girlfriend got back
23   together, he would stay there with her or he would stay
24   with a co-worker that we all grew up with.
25       Q    And where would he stay at your house?  Where
```

DIRECT EXAMINATION OF WHITE

1    would he sleep?

2         A    On the couch.

3         Q    Did you know anything about Rob's mom?

4         A    I know her.  Yes.  I don't know her real well,

5    but I've met her a few times.

6         Q    Where did she live?

7         A    Texas.

8         Q    And did you know if Rob had any brothers or

9    sisters?

10        A    Yes.  He's got three sisters.

11        Q    And do you know them?

12        A    Yes.

13        Q    Did they live in the Baltimore area?

14        A    Yes.  All three do.

15        Q    So have you lived in the Baltimore area most of

16   your life, if not all of your life?

17        A    Yes, ma'am.

18        Q    And what about Shug?

19        A    Yes.

20        Q    Okay.  And what area of Baltimore do you

21   consider yourself like from?

22        A    Southwest Baltimore.

23        Q    Is it known by any neighborhood term or name?

24        A    The lumber yard.

25        Q    The lumber yard?

**124**

DIRECT EXAMINATION OF WHITE

1      A     Yes.

2      Q     And what does the lumber yard refer to?

3      A     It was a lumber mill years I think in the '40's

4   it might have been or '50's.  It was a lumber mill on

5   Ramsey and Stricker.

6      Q     So they called that the lumber yard?

7      A     Yeah.  Well, they turned it into a park.

8      Q     And do you know what Pigtown is?

9      A     Yes.

10     Q     What is Pigtown?

11     A     On the other side of the Carey Street Bridge.

12     Q     The Carey Street Bridge?

13     A     Yes, ma'am.

14     Q     They would call that Pigtown?

15     A     Yes, ma'am.

16     Q     And that was a neighborhood you were familiar

17   with, too?

18     A     Yes.  Yes.

19     Q     And what about Morrell Park?

20     A     Yes.

21     Q     And what do you consider Morrell Park?

22     A     Washington Boulevard, there's a sub shop -- an

23   Italian restaurant they call Italiano's.  From there on up

24   is Morrell Park.

25     Q     And where you and Shug were living on Wilkens

DIRECT EXAMINATION OF WHITE

```
1    Avenue, what neighborhood was that?
2         A    Arbutus.
3         Q    Pardon me?
4         A    Arbutus.
5         Q    Arbutus.  So it's not one of the other three?
6         A    No, ma'am.
7         Q    But when you grew up, you were from the lumber
8    yard?
9         A    Yes.
10        Q    Mr. White, in your adult life, have you used
11   drugs?
12        A    Yes, ma'am.
13        Q    Okay.  And are you using drugs today?
14        A    No, ma'am.
15        Q    What type of drugs did you use?
16        A    PCP.
17        Q    PCP?
18        A    Yes, ma'am.
19        Q    And how long had you been a PCP user?
20        A    I've used it for quite a few years.  I don't
21   know exactly.  But for quite a few years, I did use it.
22        Q    Has that been continual use?  Have there been
23   periods of sobriety?
24        A    Yeah.  A good period of sobriety and relapsed.
25        Q    And any other types of drugs that you regularly
```

DIRECT EXAMINATION OF WHITE

1   use besides PCP?

2       A    No.  I've tried other drugs, but I didn't --

3   cocaine.

4       Q    And back in March of 2008, were you using PCP

5   then?

6       A    March of 2008?

7       Q    Um-hum.

8       A    Yeah.  Yeah.  That's when I relapsed.  I

9   relapsed in -- I think it was March.  I guess it was

10  March.

11      Q    Of 2008.  Did you relapse before Rob died or

12  after Rob died?

13      A    After.

14      Q    Had you been using drugs before Rob died?

15      A    No, ma'am.

16      Q    Sitting here today, are you on any pain

17  medication?

18      A    Yes, ma'am.

19      Q    And what type of pain medication are you on?

20      A    Percocets, Oxycontin, and just muscle relaxers.

21      Q    Does it affect your ability to hear and

22  understand what I'm saying?

23      A    No, ma'am.

24      Q    Are you able to understand what's going on here

25  in the courtroom?

275

**127**

DIRECT EXAMINATION OF WHITE

```
1      A    Yes, ma'am.

2      Q    Are those medications prescribed to you by --

3      A    Yes, ma'am.

4      Q    -- a doctor?

5      A    Yes, ma'am.

6      Q    Do you know this man over here?

7      A    Yes, ma'am.

8      Q    I'm pointing to the defendant for the record.

9  Who is that?

10     A    Jose Morales.  Jose Joaquin Morales.

11     Q    And how do you know Mr. Morales?

12     A    I've known him for years.

13     Q    Did you know him before you knew Rob or after

14 you knew Rob?

15     A    After.

16     Q    And what did you call Mr. Morales?

17     A    I called him Jose.

18     Q    And did you know whether other people called him

19 other names?

20     A    Yes.  They call him Joaquin or Joaq.

21     Q    And when you say Joaq, like an abbreviated

22 version of his middle name?

23     A    Yes.

24     Q    So I would spell that J-O-A-Q, for example?  You

25 don't know?
```

276

**128**

DIRECT EXAMINATION OF WHITE

1    A    I wouldn't have no idea, ma'am.

2    Q    But that's where it comes from, his middle name?

3    A    Yes, ma'am.

4    Q    But you called him Jose?

5    A    Yes.

6    Q    Did you ever work for Mr. Morales?

7    A    Yes, ma'am.

8    Q    When and how often?

9    A    Years ago, I worked for him pretty much every

10   day.  And after I had quit and went to work for another

11   company, I would still help him out on the weekends to

12   make extra cash or even in the evenings when I got off

13   work to make extra cash.

14   Q    Let's stick to the 2007-2008 timeframe around

15   the time when Rob was murdered.

16   A    Okay.

17   Q    Were you working for him from time to time then?

18   A    Yes, ma'am.

19   Q    And what kind of work were you doing for him?

20   A    Stone and block.

21   Q    Stone and block work?

22   A    Yes, ma'am.

23   Q    And where were these jobs that you would do for

24   him?

25   A    The last one I did was on DeSoto Road and it was

**129**

1    garage doors, expanding garage doors.

2        Q    Garage doors did you say?

3        A    Yes.

4        Q    And you said it was on DeSoto Road?

5        A    Yes.

6        Q    What area of DeSoto Road was it on?  Do you

7    remember the block or the cross street?

8        A    No.  Because it's in the middle of Washington

9    Boulevard and Wilkens Avenue.

10       Q    And Wilkens Avenue?

11       A    Yes.  It's more closer to Wilkens Avenue though.

12       Q    Could you walk there from your house?

13       A    You could.  A little walk.  But yeah, you could.

14       Q    The job that you were doing on DeSoto Road, were

15   you working that job in March of 2008 when Rob was

16   murdered?

17       A    No.  Right before Rob was murdered, I did I

18   think three doorways or four doorways it might have been.

19       Q    I'm sorry?

20       A    It was a couple of doorways.  Right before Rob

21   was murdered, I did a couple of doorways.

22       Q    Doorways?

23       A    Yes.

24       Q    For Mr. Morales.

25       A    Expanding them.  I'm sorry.

DIRECT EXAMINATION OF WHITE

1      Q    And where did you do those doorway work for him?

2      A    On DeSoto Road.

3      Q    Was there a company or a client that was there?

4      A    I don't know too much about the job.  I know

5    it's a business there now.

6      Q    And when you were working before, who were you

7    putting in doors or doing the doorway for?

8      A    For Mr. Morales.

9      Q    But I mean was it for a company?

10     A    Oh, his company.  Yes.

11     Q    It was for his company.  But I mean were you

12    building them -- were you offsite, in other words, or were

13    you doing them right in his business?  Like was his

14    business located on DeSoto Road?

15     A    No, ma'am.

16     Q    That's what I mean.

17     A    I'm sorry.

18     Q    You were working for a client?

19     A    Yes.

20     Q    And do you remember the name of the client?

21     A    Mr. Morales.

22     Q    No.  The person who was paying you to put the

23    doors.  Not Mr. Morales, but who he was working for.

24     A    Oh, I didn't get paid for doing the doors.  I'm

25    sorry.

**131**

DIRECT EXAMINATION OF WHITE

1       Q    Okay.  No problem.  I'm just checking on it.  Do

2   you remember the name of the company that Mr. Morales

3   worked under that you worked for?

4       A    I think it's Masons Unlimited.  No.  ABR.

5       Q    Did you know him to own both companies?

6       A    Yes.  Yes, ma'am.  I'm sorry.

7       Q    Tell us about that.

8       A    He owned I think it was Masons Unlimited first.

9       Q    And what happened with that?

10      A    Creditors and bankruptcy.  So that company

11  folded up and then he started ABR Construction.

12      Q    And do you know what ABR stands for?

13      A    I have no idea.

14      Q    When you got paid by Mr. Morales, did he pay you

15  in check or cash?

16      A    When I very started -- years ago, when I worked

17  for him, he paid us in check.  And then the checks got bad

18  and he just paid us cash.

19      Q    In 2007 and 2008, did you know other people that

20  worked as you did for Mr. Morales?

21      A    Oh, yes, ma'am.

22      Q    And other stone masons and laborers?

23      A    Yes.

24      Q    Okay.  And who were some of the people that

25  worked for him that you knew?

DIRECT EXAMINATION OF WHITE

1      A     The mason, it was only two other people.

2      Q     And who was that?

3      A     Rob and Mr. Rick.  He's an Italian gentleman.  I

4   don't know his -- it's a weird last name.

5      Q     And --

6      A     That's all that laid brick and block was just us

7   three.

8      Q     And did you know in March of 2008, was Rob doing

9   work for Mr. Morales in the month or so before he was

10  murdered?

11     A     No.  I think he stopped a little bit, a little

12  bit further back.

13     Q     Can you tell us the names of some of the other

14  people that worked for Mr. Morales as laborers, people you

15  knew from the lumber yard or from Pigtown or Arbutus?

16     A     Mr -- Stephen Silver, Mr. Rick.  Laborers.  I'm

17  sorry.  Chucky, Pie.  I don't know their last names.  I

18  know Steve's because it's a color.  There was some younger

19  boys that lived where he used to live that came to work,

20  but I don't know them too well.  I don't even know their

21  names to be honest with you.  If you said them, I'd

22  probably know them.

23     Q     Is it fair to say that the work force kind of

24  came and went?

25     A     Yes.  Yes, ma'am.

**133**

DIRECT EXAMINATION OF WHITE

1      Q    It was one of those kind of transient work

2  forces?

3      A    Almost like a day laborer.

4      Q    Say that again.

5      A    Almost like a day laborer.

6      Q    Come in the 2007 timeframe, was Rob staying at

7  yours and Shug's house from time to time in 2007 as well,

8  the year before he was murdered?

9      A    Yes.

10     Q    And did you come to know whether or not he was

11 facing any criminal charges?

12     A    Yes, ma'am.

13     Q    What did you know about that?

14     A    I just know he had to go to court.  I drove him

15 to court.  He had to go to court and that was --

16     Q    And did he tell you what he had to go to court

17 for?

18          MR. PROCTOR:  Objection.

19          THE COURT:  Basis?

20          MR. PROCTOR:  Hearsay.

21          MS. WILKINSON:  804(B)(6), Your Honor.

22          THE COURT:  Come to the bench.

23          (Bench conference:)

24          THE COURT:  What's your objection?

25          MR. PROCTOR:  Hearsay.

282

**134**

DIRECT EXAMINATION OF WHITE

1        THE COURT:  All right.

2        MS. WILKINSON:  I'm saying it's forfeiture by

3   wrongdoing.  That because Mr. Long can't be here, that

4   his -- because Mr. Morales caused the unavailability of

5   Mr. Long, it falls under the hearsay exception.  But more

6   importantly, it's really not offered that much for the

7   truth of the matter asserted.  It's just why he went to

8   court with him because he was facing theft charges.  And

9   it's going to come in later anyway.  But everything that

10  Mr. Long said the government intends to introduce if

11  relevant under 804(B)(6) because he's not here to tell us

12  about it himself.

13       THE COURT:  Why is it not admissible?  I haven't

14  heard the testimony, but I have --

15       MS. WILKINSON:  Subject to connecting it up.

16       MR. PROCTOR:  I guess the question was what did

17  he have to go to court for.  It could be he told me he was

18  facing -- I guess the objection was part hearsay and it

19  hasn't been linked up yet.  And part, you know, Ms.

20  Wilkinson should lead through this part.  So that

21  forfeiture by wrongdoing is a narrow exception.  It

22  doesn't open the door to the entire gamut of everything

23  Mr. Long may have said in his life.

24       THE COURT:  Well, it's pertinent to this case

25  because he's referring to the case in which he and Mr.

283

**135**

DIRECT EXAMINATION OF WHITE

1    Morales were co-defendants.  Right?

2              MR. PROCTOR:  Right.  Okay.  The fact that he

3    and Mr. Morales were co-defendants will be proven up

4    through Mr. Needleman who was there in court.  The guy

5    that drove him to court one day and --

6              THE COURT:  At this point he's simply indicating

7    that he went to court with him because he's facing some

8    charges.

9              MS. WILKINSON:  I think he's just going to say

10   there are some theft charges and he got to court and he

11   saw Mr. Morales and Mr. Needleman.  I mean you have his

12   grand jury testimony.  It's not --

13             THE COURT:  Well, the objection is overruled.

14             (In open court:)

15             BY MS. WILKINSON:

16    Q     You can answer the question, Mr. White.  Why

17   were you going to court with Mr. Long?  What did he tell

18   you?

19    A     It was a theft charge.

20    Q     A theft charge?

21    A     Yes.

22    Q     And what did he tell you about the theft charge?

23    A     He was -- he got caught stealing scaffold.

24    Q     Scaffold?

25    A     Yes.

DIRECT EXAMINATION OF WHITE

1    Q    Okay.  And did he say whether or not he was

2    facing those charges alone or with anybody?

3    A    He was facing it with Mr. Morales.

4    Q    Now when you drove to court with Mr. Long, did

5    you drive or he drive?  How did that work?

6    A    I drove.

7    Q    And was it just the two of you?

8    A    No.

9    Q    And who else was in the car?

10   A    Mr. Steve Silver.

11   Q    And what courthouse did you go to?

12   A    Patapsco Avenue.

13   Q    And did you go inside with him?

14   A    Oh, yes, ma'am.

15   Q    And do you know -- did you go into the courtroom

16   with him or just the courthouse with him?

17   A    I sat outside the courtroom.

18   Q    And did you make any observations of any other

19   people there that you knew that day?

20   A    Reporter.  No, I didn't know them.

21   Mr. Needleman was there and there was a reporter trying to

22   ask questions.

23   Q    Of who?

24   A    Mr. Morales and his attorney.

25   Q    And where did you see first Mr. Needleman and

**137**

DIRECT EXAMINATION OF WHITE

1   Mr. Morales?  Where did you see them?

2        A    On the second floor, standing outside the

3   courtroom.

4        Q    How is it that you know Mr. Needleman?

5        A    Mr. Morales.

6        Q    And when did you first meet Mr. Needleman?

7        A    About -- it's been a couple years I guess before

8   I seen him down there.  Maybe like two years.

9        Q    Did Mr. Needleman ever represent you?

10       A    No, ma'am.

11       Q    Were you ever represented by anybody that was

12   related to him or was in his office?

13       A    In his firm.  Yes, ma'am.

14       Q    Okay.  Tell us about that.

15       A    Mr. John I think it's Canter or Connor.  Canter.

16   But it's one of his associates represented me.

17       Q    Before or after Rob died?

18       A    After Rob died.

19       Q    And I'll talk to you about that in a moment.

20   Other than that, did you get represented by Mr. Needleman

21   or anybody that you knew worked in his office or for his

22   family?

23       A    His son was supposed to represent me, but he --

24   when we went in the courtroom, he didn't represent me.

25       Q    And was this for an event that happened after

286

**138**

DIRECT EXAMINATION OF WHITE

1    Rob died?

2        A    Yes, ma'am.

3        Q    The same event that the other man did?

4        A    Yes, ma'am.

5        Q    So let's go back to 2007. You're driving to the

6    courthouse. You're with Rob. You're with Mr. Silver.

7    You see Mr. Needleman. You see Mr. Morales. And I was

8    asking you about how long you had known Mr. Needleman and

9    that you said Mr. Morales had introduced you.

10       A    Um-hum.

11       Q    Yes?

12       A    Yes, ma'am. I'm sorry.

13       Q    Did you have any interactions with Mr. Needleman

14   on that day? Did you talk to him?

15       A    No, ma'am.

16       Q    Did you have any interactions with Mr. Morales

17   on that day? Did you talk to him?

18       A    No. I didn't speak to him either. He was

19   talking to Mr. Needleman.

20       Q    And you saw him with -- there was a reporter

21   there.

22       A    Yes, ma'am.

23       Q    And how did you know it was a reporter?

24       A    He was holding his paper over and was writing

25   and Mr. Long said that's the new reporter that he was

**139**

DIRECT EXAMINATION OF WHITE

1    joking with in Canton prior to that.

2         Q    So Mr. Long identified him as a reporter?

3         A    Yes.  Mr. Long did.  I'm sorry.

4         Q    Did the case get heard in the court that day or

5    did something happen to prevent it from going to court

6    that day?

7         A    They came right back out.

8         Q    And what did you learn about that?

9         A    That it was postponed.

10        Q    Postponed?

11        A    Yes, ma'am.

12        Q    Did you personally ever go to court with Rob

13   again?

14        A    No, ma'am.

15        Q    That was the first and only time?

16        A    Yes, ma'am.

17        Q    And it got postponed?

18        A    Yes, ma'am.

19        Q    And this was when it was in Patapsco Avenue?

20        A    Yes, ma'am.

21        Q    To your knowledge, did those theft charges about

22   the scaffolding, did they continue to be pending against

23   Mr. Long?

24        A    Yes, ma'am.

25        Q    And in the 2008 timeframe, specifically,

288

**140**

DIRECT EXAMINATION OF WHITE

1    probably in the month or two before Rob died, did he have

2    occasion to talk to you about his legal situation?

3        A    Yes.

4        Q    Did he talk to you about a lawyer?

5        A    Yes.

6        Q    Can you tell the ladies and gentlemen of the

7    jury what he said to you about a lawyer?

8            MR. PROCTOR:  Objection.  Judge, can I just have

9    a continuing objection to this whole line?

10           THE COURT:  You may.  You have a continuing

11   objection.  You may have.

12           MR. PROCTOR:  Thank you.

13           THE COURT:  Thank you.

14           BY MS. WILKINSON:

15       Q    You may answer.

16       A    Can you say that again?  I'm sorry.

17       Q    What did Mr. Long tell you about a lawyer and

18   his legal situation?

19       A    Yes, ma'am.  That the lawyer from Mr.

20   Needleman's office was supposed to represent him and Mr.

21   Morales was supposed to have paid the lawyer and he wasn't

22   paid.

23       Q    And did Mr. Long express any feelings about

24   that?

25       A    Yes.  He was upset.

DIRECT EXAMINATION OF WHITE

1    Q    And what do you mean by upset?

2    A    To me, it looked like his feelings were more

3    hurt than anything.  That type of upset.

4    Q    Explain.

5    A    Well, he called the attorney and asked him if

6    everything was tooken care of as far as his case goes and

7    the attorney said that he was not tooken care of yet.

8    Q    And this is Mr. Long reporting this to you?

9    A    Yes.  I was sitting right there with him when he

10   called the lawyer.

11   Q    But Mr. Long is reporting to you.  You're not on

12   the call with the lawyer?

13   A    Yes.  Yes.  Yes, ma'am.

14   Q    You are on the call with the lawyer?

15   A    No.  No.  He was.  I'm sorry.

16   Q    You're sitting next to him?

17   A    Yes, ma'am.

18   Q    And he told you what was being said?

19   A    I could hear.

20   Q    So when you said he was upset that his feelings

21   were hurt, can you give the jury an idea in this timeframe

22   what the relationship between Mr. Long and Mr. Morales

23   was?  Why were his feelings hurt?

24        MR. ZUCKER:  Objection.  Speculation.

25        BY MS. WILKINSON:

290

**142**

DIRECT EXAMINATION OF WHITE

1       Q    What did Mr. Long say about his feelings --

2            THE COURT:  Ask him if he has knowledge.  Give a

3    basis for it.

4            BY MS. WILKINSON:

5       Q    Did Mr. Long tell you why he was upset?

6       A    Yes.

7       Q    Tell us about that.

8       A    The lawyer was supposed to have been paid prior

9    to when Mr. Long called him.  And when he called him, it

10   might have been like three or four days after -- I think

11   it might have been a Monday or something like that, but it

12   was early in the week.  He called the attorney late in the

13   week and the attorney still wasn't paid.

14      Q    Now in the 15 years that you have known

15   Mr. Long -- and how long have you known Mr. Morales?

16      A    The oldest daughter is -- at least I mean 18, 19

17   years, somewheres around there.

18      Q    And how long to your observation did Mr. Long

19   know Mr. Morales?

20      A    A little less than I did.

21      Q    In that timeframe based on your observations,

22   did Mr. Morales and Mr. Long ever argue with one another?

23      A    All the time.

24      Q    And did you and Mr. Morales ever argue with one

25   another?

DIRECT EXAMINATION OF WHITE

1      A     All the time.

2      Q     And give the jury just general matter, what

3  would you argue about knowing each other for 15 years?

4  Did you argue about money?

5      A     Yes.

6      Q     Did you argue about getting paid?

7      A     Money.  Me using drugs.  Us being around one

8  another working, we couldn't work every day together.

9  Either he had to go take care of what he had to take care

10 of and I laid brick the way I was used to laying it.  When

11 he was there, to me, he wanted it done a certain way and I

12 was taught a different way.

13     Q     So you would argue --

14     A     So we would argue over it.  Yes.

15     Q     What are some of the things you argued over?

16 Did you ever argue about getting paid?

17     A     Yes.  Yes.

18     Q     And what were the nature of those arguments?

19     A     We would go and try to get our checks cashed and

20 we'd spend quite a while trying to get them cashed at

21 different places.  And he would say the money is in there,

22 but we couldn't get the checks cashed.  So we would argue.

23 Everybody would.  The whole company would argue with him.

24     Q     So was that kind of -- I don't want to kind of

25 gloss over it, but in the 15 years, was there a lot of

DIRECT EXAMINATION OF WHITE

1    that back and forth, work with me, don't work with me,

2    you're not going to get paid, all that kind of stuff?

3        A    Yes.  Yes.

4        Q    But now I want to go up into the two months or

5    so before Rob died and was there -- to your knowledge, in

6    your observations, what was the state of the relationship

7    between Mr. Morales and Mr. Long?

8        A    They were steadily feuding.

9        Q    And what was the basis for the feud?

10       A    The attorney.

11       Q    Did there ever come a time when you heard Mr.

12   Morales talk about Mr. Long's legal situation and the

13   lawyer?

14       A    Yes.

15       Q    Tell us about that.

16       A    He called me looking for Mr. Long and Mr. Long

17   wasn't there.  And he said tell him the F-ing lawyer was

18   paid, to stop crying, it's all tooken care of.

19       Q    Did you relate that to Mr. Long?

20       A    Yes, ma'am.  I got on the phone and called

21   Mr. Long right away.

22       Q    Why is it that you had to get the information

23   from Mr. Morales and you call Mr. Long?

24       A    Rob asked me not to give his phone number to Mr.

25   Morales.

DIRECT EXAMINATION OF WHITE

1      Q    Did you ever give Rob's phone number to Mr.
2   Morales?
3      A    No, ma'am.
4      Q    Do you know what Rob's phone number was?
5      A    I don't remember.  If his name was beside it, I
6   would know, of course.
7      Q    Tell us about what you know about Rob having a
8   phone during this timeframe.  Was it from you?
9      A    Yes.  Yes.
10     Q    Tell us about that.
11     A    I went up and I bought a phone from Radio Shack
12  and it was a -- they offered a Sprint plan and I had one
13  years ago and I went in to try to see if I can get another
14  phone and I did.  And they told me I was able to get one
15  more phone.  Mr. Long asked me -- I was thinking about
16  getting it for my oldest daughter, but I wasn't for sure
17  if she was responsible enough.  So he said look, let me
18  get the other phone and I'll get her prepaid phone.  That
19  way, if she's not responsible enough, she's not running
20  your bill up.  It's just a prepaid.  So when that money is
21  gone, then she's just got to get more money put on the
22  phone.  So he got my second phone in his name.  I mean it
23  was in my name.  I'm sorry.
24     Q    And that's what I was going to ask you.  So the
25  two phones that you and Mr. Long had, were they both in

294

**146**

1    your name?

2        A    Yes, ma'am.

3        Q    In the name of Harry White?

4        A    Yes, ma'am.

5        Q    And so you knew the phone number at the time?

6        A    Oh, yeah.  At the time, yes, ma'am.

7        Q    But you didn't give it to Mr. Morales?

8        A    No, ma'am.

9        Q    Did you ever give it to Mr. Morales?

10       A    No, ma'am.

11       Q    Tell the jury how many times if you can recall

12   Mr. Morales wanted to know Mr. Long's cell phone number?

13       A    Probably about 20 times.

14       Q    Within this timeframe before he died?

15       A    Yes, ma'am.

16       Q    You've described a conversation you had with Mr.

17   Morales about paying the lawyer for Mr. Long.  Did you

18   ever witness any arguments between Mr. Morales and

19   Mr. Long where you were in the middle of it?

20       A    Yes.  Yes.

21       Q    Tell the jury about that.

22       A    I'd say it was probably twice, maybe three times

23   a week, maybe a couple times a day.  They would call --

24   Jose would call or he would call the house phone and Rob

25   would answer it and asked him if the lawyer was taken care

295

**147**

DIRECT EXAMINATION OF WHITE

1   of it and Rob would call him and ask him if it was taken

2   care of and then they would just go on arguing for quite a

3   while and it would get heated.  A lot of cussing back and

4   forth I'm sure because Mr. Long was cussing.  So I'm sure

5   Mr. Morales -- well, I don't know if he was cussing or

6   not, but it was a heated argument.

7        Q    Do you remember any particularly any

8   conversation with Mr. Long at your dinner table with your

9   girls?

10       A    Yes, ma'am.

11       Q    And what timeframe was this?  If Mr. Long died

12  on March 24th and I know it's hard to guess times, but

13  give us your best estimate of when the dinner table

14  conversation happened?

15       A    Maybe two or three months.

16       Q    And tell us about that.

17       A    We was sitting down eating dinner and Mr. Long

18  asked me if I would ride him to Morrell Park to get a

19  detective's number from Pie.  And I rode him over there

20  and he got a number from Pie.

21       Q    Okay.  And who is Pie?

22       A    One of our co-workers.  One of the friends from

23  the neighborhood.

24       Q    Do you know his real name?

25       A    Yeah.  But I got a brain freeze on it.

**148**

DIRECT EXAMINATION OF WHITE

1     Q     So you got -- Mr. Long asked you to take him

2     over to get the phone number for a detective?

3     A     Yes.

4     Q     Now why is it that you remember this being at

5     the dinner table?

6     A     Because we had sat down to eat dinner.

7     Q     And what was the nature of the conversation with

8     Mr. Long?

9     A     Well, he was sitting there cussing and I told

10    him, I said Rob, the babies are there and he apologized

11    and then he started going on and on and on, getting hyper.

12    Rob is just that type of person.  He will talk about it

13    until it aggravates him so bad that he'll lose his temper

14    and he'll argue a lot.  But he asked me if I would ride

15    him over.

16    Q     And I don't mean to interrupt you, but what was

17    he getting hyper and upset about?

18    A     Mr. Morales.

19    Q     And what was getting him -- what did he tell you

20    was getting --

21    A     Said he was stringing him along.

22    Q     Stringing him along?

23    A     Yes, ma'am.

24    Q     And what did he mean by that?  What did you

25    understand him to mean by that?

**149**

DIRECT EXAMINATION OF WHITE

1      A    Yes.  Wasn't taking care of his lawyer.

2      Q    Did Mr. Long talk to you directly about going to

3 see the police about Mr. Morales?

4      A    Yes.  He did tell me he was going to see the

5 police.

6      Q    And what did he tell you about that?

7      A    Just that he was going to speak to a detective.

8      Q    Why?  What did he say about that?

9      A    Jose was trying to put him in jail and wasn't

10 taking care of his lawyer.  So he wanted to speak to a

11 detective.

12     Q    And did Mr. Long say anything about prison in

13 that regard?

14     A    He said that Jose thinks he's going to put me in

15 prison, it ain't going like that.

16     Q    And what did you understand that to mean?

17     A    That Jose was making him take the fall for

18 whatever the charges were.

19     Q    And what does that mean to take the fall for

20 whatever the charges were?

21     A    Put the blame on him.

22     Q    And what does that mean?

23     A    Take the charge.  Literally take the charge.  Go

24 to jail for it.

25     Q    And what would happen to Mr. Morales?

**150**

DIRECT EXAMINATION OF WHITE

1    A    He would be home.

2    Q    And what would happen to Mr. Long?

3    A    He would be in prison.

4    Q    And did Mr. Long relate those concerns?

5    A    Yes, ma'am.

6    Q    And did Mr. Long want that to happen?

7    A    No, ma'am.

8    Q    Do you know what the phrase, turn state's

9    evidence, is?

10   A    Just I guess when you testify against somebody.

11   Q    Did you ever hear that phrase used by Mr. Long?

12   A    I think.  I'm not sure.  I think he did say it.

13   Q    Mr. White, do you have any criminal convictions?

14   A    Convictions, no, ma'am.  Oh, yes.  Trespassing.

15   Q    For what?

16   A    Trespassing.

17   Q    And when was that?

18   A    It's been years, quite a few years.  It's been a

19   couple of years I think.

20   Q    Have you ever taken the charge for anybody?

21   A    Yeah.  I got -- I took one charge.  Two

22   actually.

23   Q    For who?

24   A    Mr. Morales.

25   Q    Tell us about that.

DIRECT EXAMINATION OF WHITE

```
1              MR. ZUCKER:  Objection.

2              THE COURT:  Basis?

3              MR. ZUCKER:  Relevance as to this case.

4              THE COURT:  Overruled.

5              BY MS. WILKINSON:

6       Q    Tell us about that.

7       A    We was coming back from working a weekend.  We

8   stayed up at Deep Creek Lake.  And he was coming down the

9   road.  His license was suspended.  And me, Mr. Morales,

10  Mr. Silver and another young guy from the neighborhood was

11  sitting in the back and he was speeding and the police got

12  behind him.  And his windows are black.  You cannot see

13  through these windows.

14              He jumps across me and shoves me in the

15  passenger seat.  And shoves a flashlight in my eyes.  I'm

16  still trying to wake up.  And the police didn't want to

17  hear nothing.  Took my license.  And I tried to talk to

18  the officer, but he must have been going awful fast

19  because I got a lot of points from it.  And the officer

20  stood there and just was yelling at me for reckless

21  driving.

22      Q    Did that result in a conviction?

23      A    I'm sorry?

24      Q    Were you convicted of that?

25      A    No, ma'am.
```

300

**152**

DIRECT EXAMINATION OF WHITE

1        Q     And so what do you mean by take the charge?

2        A     Well, he started arguing with the police when

3     I'm driving the truck the one day.  They pull me over.

4     And he kept arguing with the police.  And the police, they

5     was really nice about it, you know.  It didn't have

6     stickers on it.  They were just telling him to get it

7     straightened out.  He kept arguing with them and then I

8     got close to from both things 20-something points on my

9     driver's license.

10       Q     So when Mr. Long was talking about take the

11    charge, is that what --

12       A     More or less, yes.

13       Q     Now do you know whether or not after you took

14    Mr. Long to go see Pie, that he actually went to the

15    police?

16       A     Yeah.  He did say he went and seen the police.

17       Q     And did you have any concerns for him about

18    that?

19       A     At that time, no, ma'am.  No.

20       Q     What if anything did you say to him about going

21    to see the police?

22       A     I just asked him not to bring it around the

23    house because the children are going to ask a lot of

24    questions.

25       Q     And what did you mean by that, don't bring it

301

**153**

DIRECT EXAMINATION OF WHITE

1   around the house, the children ask a lot of questions?

2       A    Because they see the police coming to the house,

3   they're going to sit there and keep asking him, what's

4   wrong, Uncle Rob and they are going to want to know what's

5   going on.  So instead of that, meet them next door.  My

6   kids don't go next door unless there's an adult to walk

7   them.

8       Q    In preparation for your testimony, have you had

9   occasion to look at your own cell phone records,

10  Mr. White?

11      A    Yes, ma'am.

12      Q    And looking at those cell phone records, does it

13  refresh your recollection about things that happened in

14  that timeframe?  Did it refresh your memory about things

15  that happened in that timeframe?

16      A    Yes.  Yes.

17      Q    And in March of 2008, in the month or three

18  weeks or so before Mr. Long died, were there a lot of

19  contacts between your phone and Mr. Morales?

20      A    Yes, ma'am.

21      Q    Okay.  And first of all, what would you talk to

22  Mr. Morales about in that timeframe before Mr. Long died?

23      A    He would always start off is Rob around so I can

24  talk to him.  Always.  And then if Rob wasn't there, which

25  even if he was, he would say he's not there, he would talk

**154**

DIRECT EXAMINATION OF WHITE

```
 1   about his family, how him and his wife are getting along.
 2   He asked me about how me and Shug were getting along, the
 3   kids, life in general.
 4        Q    And these conversations about Mr. Long --
 5        A    Yes, ma'am.
 6        Q    -- recall as best you can the things that Mr.
 7   Morales would say about wanting to find Mr. Long?
 8        A    The day his -- like for instance, the day his
 9   house was raided or whatever?
10        Q    Well, I'm going to talk about even before then.
11        A    Okay.
12        Q    But we'll come to the time his house was raided
13   in a second.  But in that --
14        A    When he was just trying to get in touch with
15   him, he would be upset and cuss some, you know.  Little
16   F-ing crackhead ball head, he won't call me or nothing,
17   what the hell is going on, stuff like that.
18        Q    Did he ever use the word, snitch?
19        A    Yes.
20        Q    Tell us about that.
21        A    He called me up and was like real, real hyper.
22   He was like where the fuck is Rob.  Excuse me.  I didn't
23   mean to say that.  Where the F is Rob.  And I was like
24   what the hell is going on?  And he was like thanks to
25   Rob -- I thought he said thanks to y'all, but he said
```

303

**155**

DIRECT EXAMINATION OF WHITE

1    thanks to Rob, my F-ing house was raided while my wife and

2    my son was at the house or my children was at the house.

3         Q    So you are talking about the search warrant now.

4    I want to stay before that.

5         A    Okay.

6         Q    I want to specifically ask you though, the

7    occasions where you remember Mr. Morales using the word,

8    snitch.

9         A    Yes.

10        Q    Tell us about that besides the one at the time

11   of the search warrant which I'll talk about in a moment.

12        A    Real close to when he called -- it might have

13   been like just a few days before his house was raided, he

14   called a couple of times and was like what's Rob going to

15   snitch on me now because he think his lawyer ain't paid or

16   something like that.  But that's as far as it --

17        Q    And what does the word, snitch, mean to you?

18        A    Telling somebody.

19        Q    Tell who?

20        A    Tell the police on someone.

21        Q    Now you mentioned that Mr. Morales talked about

22   his wife.  What did you know about his wife?  Do you know

23   her name?

24        A    Jeanie.

25        Q    Had you met Jeanie before?

304

156

DIRECT EXAMINATION OF WHITE

```
1        A    Yes.  Yes.

2        Q    And how long had you known Jeanie?

3        A    A couple of years.

4        Q    And what else did you know about Mr. Morales?

5   Did he have any children?

6        A    Yes.

7        Q    Did he have female relationships outside Jeanie?

8        A    Yes.

9        Q    In March of 2008, what other women did you know

10  Mr. Morales to be associated with?

11       A    His first wife.  His first wife, Terry.  It was

12  Sadler.  Her maiden name is Sadler.  Tiffany.  And a

13  blonde hair stripper in a blue S.U.V.  I don't recall her

14  name.

15       Q    Had you ever been to Mr. Morales' house?

16       A    Yes.

17       Q    And in March 2008, that timeframe, did you know

18  where he was living?

19       A    Yes, ma'am.

20       Q    Where was he living?

21       A    Odenton.

22       Q    Had you been to that house before?

23       A    Yes.

24       Q    Describe it with your words.

25       A    It's a split foyer home with a large backyard
```

1    and a privacy fence all the way around the property and a

2    garage on the right hand side I think it is.

3        Q    How many times do you think you've been there?

4        A    Maybe about 10, 15 times I've been there.

5        Q    Had you done any work in the house?

6        A    Outside, yes.

7        Q    What type of work had you done in the house

8    there?

9        A    I was around the corner doing a chimney and Rob

10   had called me and asked me to come over and help him lay

11   some brick on just columns, brick columns.

12       Q    So I'm going to go now to the week before

13   Mr. Long was murdered and specifically on March 18, 2008

14   and you referenced it earlier.  Did there come a time when

15   you knew or found out that Mr. Morales' house had been

16   raided?

17       A    Yes.

18       Q    How did you find that out, Mr. White?

19       A    He called my phone.

20       Q    Who called your phone?

21       A    Jose called my phone looking for Rob.

22       Q    Okay.  Tell us as best you can recall, did you

23   have one conversation with him on March 18th or more than

24   one conversation with him on March 18th?

25       A    It was more than one.

DIRECT EXAMINATION OF WHITE

1     Q    Was it several?

2     A    I think he called several different times.  It

3  might have been three times.  It might have been two.  But

4  it was more than once.

5     Q    We can look at your phone records in a moment.

6     A    Yes, ma'am.

7     Q    But let's go to your recollections of what Mr.

8  Morales said to you about the search warrant.  Do you

9  recall your conversations with him?

10    A    The very first one.  Yes.

11    Q    Tell us about the very first conversation when

12 you found out his house had been raided.

13    A    I answered my phone and he was real hyper and

14 yelling, where the F is Rob.  Well, where the F is the

15 crackhead?  And I was like what the heck is going on?  And

16 he was like thanks to F-ing Rob or F-ing you guys or you,

17 Rob, my house was raided.  And I was like what do you mean

18 your house was raided?  And he said Jeanie and the babies

19 was in the house and the police ran up in my house and

20 raided my house because Rob told them about scaffold.

21    Q    And what did you say?

22    A    I said well, I don't know.  You know, he's not

23 here.  I said I'll try to get in touch with him, but Rob

24 is not here.

25    Q    Did you say anything about your own involvement

DIRECT EXAMINATION OF WHITE

1    in it?

2       A    I had no involvement in the scaffold.

3       Q    Did you articulate that to him?  Did you say

4    that to him?

5       A    Oh, yes.  I'm sorry.  The conversation went on

6    for a few minutes.  It wasn't just that and he hung up.

7       Q    And so when he said thanks to you all --

8       A    Yeah.  I asked -- my exact words were what the

9    hell you mean y'all and he was like, no, I didn't mean it

10   like that, Harry, what I meant to say is Rob.

11      Q    Now did you see Rob that day?

12      A    Yes, ma'am.

13      Q    Okay.  When did you see Rob that day?

14      A    Rob was sitting right there, ma'am.

15      Q    He was sitting right where?

16      A    Yes.  Well, he was getting ready to leave out

17   the door.

18      Q    So he was with you?

19      A    Yes.  Yes, ma'am.

20      Q    Based on your observations, was he present when

21   you were having this conversation with Mr. Morales?

22      A    Yeah.  He was getting ready to walk out the

23   door.

24      Q    Okay.  And where were you?

25      A    In my front room, my living room.

308

**160**

DIRECT EXAMINATION OF WHITE

1   Q    And you're where?

2   A    My living room at my house.

3   Q    So is it just you and Mr. Long?

4   A    No.  My children were there.

5   Q    And Mr. Morales called?

6   A    Yes.

7   Q    Okay.  And you answered the phone?

8   A    Yes, ma'am.

9   Q    And he says what?

10  A    Where the F is the little crackhead at?  My

11  house was raided.  Well, I thought he said thanks to you

12  all.  And I said what are you talking about?  He was like

13  I meant to say thanks to Rob, that little crackhead had my

14  house raided.

15  Q    Now are you saying anything to Rob while Mr.

16  Morales is calling you on the phone?

17  A    Rob could hear him because he's yelling so loud

18  on the cell phone.  If somebody is standing within three

19  or four feet of you, you can hear on a cell phone, ma'am.

20  Q    Okay.  And what was Rob's reaction?

21  A    He does that all the time.  He just waves his

22  arm.

23  Q    He waved his arm?

24  A    Yes.

25  Q    Did you tell Mr. Morales that Mr. Long was

DIRECT EXAMINATION OF WHITE

1    standing right there?

2        A    No, ma'am.

3        Q    Why not?

4        A    Because I didn't.  Because Rob -- I'm sure Rob

5    didn't want to argue with him.  Rob wasn't talking to him

6    too much.  And every time he called anyway, Rob was like

7    just tell him I'm not here.

8        Q    In the conversations about the search warrant,

9    you said that Mr. Morales mentioned the fact that his wife

10   was present?

11       A    Yes, ma'am.

12       Q    In that timeframe, did Mr. Morales ever talk to

13   you about the state of his relationship with his wife?

14       A    Yeah.  They was going through a little rough

15   time.

16       Q    And what did he say about that?

17       A    Just that they was on the outs.

18       Q    And was that before the search warrant was

19   executed?

20       A    Yes, ma'am.

21       Q    And so after the search warrant was executed,

22   what did Mr. Morales say --

23       A    It made it worse.

24       Q    And what did he say about that?

25       A    He said it made it worse.  He was like I had

310

**162**

DIRECT EXAMINATION OF WHITE

1    problems before now, I really got problems with her, with

2    his wife.  But they always argued.

3        Q    Did Mr. Morales say whether or not what the

4    police had found at the house?

5        A    Mr. Morales?

6        Q    Yes.

7        A    Just scaffold and tools I think.

8        Q    Had you seen that scaffolding and tools?

9        A    Yes.

10       Q    When had you seen it?

11       A    A while, a while before that.

12       Q    Where had you seen it?

13       A    Oh, in his yard.  I'm sorry.

14       Q    Where?

15       A    In his backyard.  When you went in his backyard,

16   it was just a large, large pile of scaffold to the left.

17       Q    I'm going to put up on that screen, Mr. White,

18   Government's Exhibit P-4.  Do you recognize that document?

19       A    Yes.

20       Q    Okay.  What are we looking at here?

21       A    One of my cell phone bills.

22       Q    Okay.  It's in your name?

23       A    Yes, ma'am.

24       Q    And this phone number ending in 2876, is that

25   your phone number?

DIRECT EXAMINATION OF WHITE

```
1        A    Yeah.  I'm pretty sure that's the one I had.
2        Q    And if I show you the front of Government's
3   Exhibit P-3 and I show you the phone number first ending
4   in 4241, but also in your name, whose phone was this?
5        A    I think that one is Mr. Long's.
6        Q    So I want to go to your phone if I can for a
7   second --
8        A    Yes, ma'am.
9        Q    -- Mr. White, and I want to go to the March 18th
10  timeframe in the afternoon.  And I'm going to go ahead and
11  put it up on the screen.  I'm show you page A-11 of
12  Government's Exhibit P-4.  And we'll go up here to the top
13  here and you recognize 4:54 here a call (443) 277-2961. Do
14  you see that there?
15       A    Yes.
16       Q    Is that Mr. Morales?
17       A    Could you slide your pencil over just a little?
18  Yes, ma'am.
19       Q    Sure.  It's kind of dark.  Let me see if I can
20  get it in here better.  Is that better?
21       A    5:07?
22       Q    Right here.  4:54.  See that 2961?
23       A    Yes, ma'am.
24       Q    Do you recognize that as Mr. Morales' phone
25  number?
```

312

**164**

DIRECT EXAMINATION OF WHITE

```
1        A    Yes, ma'am.

2        Q    And over here, it says four-minute call?

3        A    Okay.

4        Q    You see that there?  And then I'm just going to

5   go count with you down.  There's a call here, 2961 at 4:54

6   and then 5:07.  Do you see that there?

7        A    Yes.

8        Q    And if I go down below, there's one at 8:14.  Do

9   you see that there?

10       A    Yes, ma'am.

11       Q    And then there's one at 8:56.

12       A    Yes, ma'am.

13       Q    Do you see that there?  And then you call him

14   back at 9:00.  Do you see that there?

15       A    Yes, ma'am.

16       Q    And I go down below and there's a call at 9:31.

17   Do you see that there?

18       A    Yes, ma'am.

19       Q    And then 10:11.

20       A    Yes, ma'am.

21       Q    You see that there?  Is this consistent with

22   your recollection of talking to Mr. Morales on March 18th

23   of 2008?

24       A    I didn't know I talked to him that -- I don't

25   remember talking to him that many times.  But I did
```

313

**165**

DIRECT EXAMINATION OF WHITE

1   because it's right there in front of my face.

2       Q    Well, as best as you can recall, how many times

3   did you talk to him that day?

4       A    I thought I only talked to him maybe two or

5   three times, ma'am.  But evidently I talked a lot more

6   than that.

7       Q    And what was the subject matter of those two or

8   three times that you talked to him?

9       A    Mr. Long.  Wanting to see Mr. Long or talk to

10  Mr. Long.

11      Q    And what was the tenor of Mr. Morales' voice?

12      A    Very angry.

13      Q    And what type of language was he using about

14  Mr. Long?

15      A    Cuss words and calling him a crackhead.

16      Q    And what did, if anything, did Mr. Morales say

17  in connection with Mr. Long and the search at his house?

18      A    I'm sorry.  I didn't understand that.

19      Q    Did Mr. Morales make any connection between

20  Mr. Long and the search of his house?

21      A    He blamed Rob the first time he called and said

22  that his house was just raided.

23      Q    Was that the first thing out of his mouth?

24      A    Yes, ma'am.  No.  It was a few seconds into it.

25  But he called and was yelling and then he said that my

DIRECT EXAMINATION OF WHITE

```
 1    house was raided because of -- my house was raided because
 2    of Rob.  But he went on to say that his wife and children
 3    were in the home.
 4              MS. WILKINSON:  Your Honor, is this a good time
 5    to take the afternoon break or do you want me to continue?
 6              THE COURT:  How much more do you have with this
 7    witness?
 8              MS. WILKINSON:  Twenty minutes.
 9              THE COURT:  All right.  We'll take a recess now
10    for 20 minutes.
11              (Recess.)
12              THE COURT:  All right.  Ready for the jury?
13    Bring them in.
14              (Jury present.)
15              THE COURT:  Ladies and gentlemen, while you're
16    getting seated, I just want to give you one piece of
17    information that may be on your mind.  You know that
18    we're -- the folks on Capitol Hill are having some
19    discussions about whether to fund the government for the
20    future and I want you to put your mind at rest because of
21    the unique way that the judiciary is funded, part of which
22    is out of fees, that we will not shut down.  You are all
23    indispensable persons and we will continue this trial come
24    hell or high water.  So with that, don't worry about it.
25    You may proceed.
```

315

**167**

DIRECT EXAMINATION OF WHITE

1          MS. WILKINSON:  Thank you.  That's good news,

2     Judge Titus.

3          BY MS. WILKINSON:

4     Q    Mr. White, before the break, you were telling

5     the jury that you had been to Mr. Morales' home.  Do you

6     recognize the picture here on C-19?

7     A    Yes, ma'am.

8     Q    And what are we looking at here?

9     A    That's Mr. Morales' and his wife's home.

10    Q    I got to ask you to speak up again.

11    A    I'm sorry.

12    Q    And hopefully, I'm speaking loud enough for the

13    court reporter, too.  I'm going to show you Government's

14    Exhibit C-21.  Do you recognize that picture?

15    A    Yes, ma'am.

16    Q    What are we looking at here?

17    A    The scaffold sitting to the left when you go in

18    his gate.

19    Q    And where did you see the scaffolding?

20    A    In Mr. Morales' backyard.

21    Q    I'm showing you Government's Exhibit 23.  Do you

22    recognize this photograph?

23    A    The unfinished columns.  Yes, ma'am.

24    Q    And what do you know about the unfinished

25    columns?

DIRECT EXAMINATION OF WHITE

1      A    They've been setting like that for a long time.

2   If that picture is recent, they've been setting like that

3   for a long time.

4      Q    Did you do any work on this deck, these footers?

5      A    The columns.  Yes, ma'am.

6      Q    And what did you do?

7      A    Column number -- all the way to the right, I did

8   that column.  And half of the next column, just pitched in

9   on that one.

10     Q    Now we're talking about the date of the search

11  warrant.  Do you remember the day of the week March 18th

12  was?

13     A    No clue, ma'am.

14     Q    If I show you a calendar from 2008, Government's

15  Exhibit M-5, do you see March 18th right there?

16     A    Yes, ma'am.

17     Q    And if I go ahead and write search warrant,

18  would that be consistent with your recollection of the

19  time that you talked to Mr. Morales the day his search

20  warrant was executed?

21     A    It's either Tuesday or Wednesday -- Tuesday.

22  Yeah.  That should be right.

23     Q    Now I'm going to go further on to this calendar

24  to that weekend, March 21st, 22nd and 23rd.  We know, of

25  course, Mr. Long was murdered on the 24th.  Yes?

317

**169**

DIRECT EXAMINATION OF WHITE

1        A     Yes, ma'am.

2        Q     Do you remember what you were doing Friday,

3   Saturday, Sunday that weekend in March?

4        A     I traveled to West Virginia.

5        Q     And what were you going to West Virginia for?

6        A     To help fix my wife's grandmother's driveway.

7        Q     And what's your wife's grandmother's name?

8        A     Grace Anderson.

9        Q     And were you --

10       A     Her last name is different.

11       Q     But her first name is Grace?

12       A     Yes.  I'm sorry.

13       Q     And she lives in West Virginia?

14       A     Yes.

15       Q     Had you been to her house before?

16       A     Yes, ma'am.

17       Q     And were you going to visit her alone or with

18   people?

19       A     My wife, our children and Mr. Ramsay, his wife

20   and his little boy.

21       Q     Okay.  And who is Mr. Ramsay?

22       A     Shug's, my wife's cousin's husband.

23       Q     And who is he married to?

24       A     Vicki Ramsay.

25       Q     And Tommy and Vicki Ramsay, were they friends

318

**170**

DIRECT EXAMINATION OF WHITE

1   and family relations of you and Shug?

2       A    Yes.

3       Q    And how were they related to Grace in West

4   Virginia?

5       A    That's Vicki's and my wife's grandmother.

6       Q    Okay.  And so the purpose of going on this

7   weekend trip to West Virginia was to do what?

8       A    To fix her driveway.

9       Q    And how were you going to get there?

10      A    I borrowed Mr. Morales' truck.

11      Q    And how was it that you borrowed Mr. Morales'

12  truck?

13      A    I did three doorways, expanded three doorways

14  for the use of the truck.

15      Q    Okay.  And what kind of truck was it?

16      A    It's a dump truck.  But it's not like a large

17  dump truck.  It's a crew cab pickup truck.  Just the

18  average crew cab pickup truck, but it has a dump bed on

19  it.

20      Q    And when did you borrow that truck from Mr.

21  Morales?

22      A    I got it Friday right around lunchtime maybe.

23      Q    Could your whole family, that is your wife and

24  your daughters fit in that truck?

25      A    Yes.

DIRECT EXAMINATION OF WHITE

```
 1        Q     And is that how they traveled to West Virginia?

 2        A     Yes, ma'am.

 3        Q     And what about Mr. Ramsay?  How did he and his

 4   wife get there?

 5        A     In his truck.

 6        Q     And did you go, travel together to West

 7   Virginia?

 8        A     Yes.

 9        Q     And how did that work?

10        A     He knows a lot of different shortcuts.  So

11   always I follow behind him.

12        Q     So together, the two cars traveled --

13        A     Yes, ma'am.

14        Q     And would that have been that Friday night on

15   March 21st?

16        A     Yes, ma'am.

17        Q     So if I put on here West Virginia trip, would

18   that be correct?

19        A     Yes, ma'am.

20        Q     Now --

21        A     That was Easter weekend.  Correct?  I'm sorry.

22        Q     Pardon me?

23        A     That was Easter weekend.  Correct?

24        Q     Easter weekend.  Yes.

25        A     Yes, ma'am.
```

DIRECT EXAMINATION OF WHITE

1     Q    Is that how you remember it?

2     A    Yes.  Yeah.

3     Q    So when you go up to West Virginia, did you take

4  your cell phone with you?

5     A    Yes, ma'am.

6     Q    And were you able to get reception when you're

7  up there in West Virginia?

8     A    No.  When you get to Morfield, a town called

9  Morfield, you lose reception.  It might pick up here or

10 there for like a second.  You'll just hear the phone beep,

11 but you don't have no service up at her house.

12    Q    And what were you and Mr. Ramsay and the family

13 going to do when you got there?

14    A    Saturday morning, we got up to go get gravel to

15 fix the driveway.

16    Q    And did you work when you were up there?

17    A    Yes, ma'am.

18    Q    And what did you do?

19    A    Fix the driveway.

20    Q    Fix the driveway.

21    A    Spread and gravel.  Yes.

22    Q    I'm sorry if I didn't hear you before.  So I'm

23 going to show you an excerpt from your phone records

24 again, Government's Exhibit P-4, and I'm going to move it

25 up to the last entry where my post-it note is on 6:47 p.m.

321

**173**

DIRECT EXAMINATION OF WHITE

1   on March 21st.  And you're calling West Virginia.  Is that

2   your -- Grace's number?

3       A    Yes.  I know the area code.  Yes.

4       Q    If I look below March 21st, I see that there's a

5   call that went to voice mail on March 22nd and then the

6   first call again to voice mail at 3:47 on March 23rd.

7   That would be Easter Sunday.  Correct?  I'm going to go

8   back to M-5.  Do you see that, Easter Sunday Sunday.

9   Correct?

10      A    Yes, ma'am.

11      Q    Okay.  So you didn't really have phone reception

12  that weekend.  There were no phone calls?

13      A    No.  I checked my answer machine?  That's saying

14  that I checked my answer machine from my phone?

15      Q    No.  It just says what calls went to voice mail.

16      A    Oh, I thought -- okay.  I'm sorry.

17      Q    Does that make sense to you?

18      A    Yeah.  Because I don't get reception.

19      Q    So you're away.  You're in West Virginia.

20  You're with your family.  Who's staying at your house?

21      A    It was my wife's family's cousin or

22  sister-in-law was staying and her sister.

23      Q    Now did Rob stay there that weekend?

24      A    No.  He didn't stay that weekend.

25      Q    When is the last time you saw Rob before you

DIRECT EXAMINATION OF WHITE

```
 1    went to West Virginia?
 2         A    Friday.
 3         Q    Okay.  And to your knowledge, where was he going
 4    to stay?
 5         A    His sister's.
 6         Q    And do you know which sister?
 7         A    Carol.
 8         Q    Carol.  Does Carol live near you all?
 9         A    On the same street, but probably about maybe a
10    mile.  Close to -- maybe a half mile, a mile down the
11    street.
12         Q    So Mr. Morales loaned you his truck.  You went
13    off with your family and then come Sunday, did you return
14    from West Virginia to the Baltimore area?
15         A    Yes, ma'am.
16         Q    Okay.  And the best of your recollection, what
17    did you do when you came back into the Maryland area
18    knowing it was Easter Sunday?
19         A    Called my brother.
20         Q    Called your brother.  And why did you call your
21    brother?
22         A    Because we was supposed to be there earlier
23    Sunday for dinner and a Easter egg hunt while it was still
24    daylight for my children.
25         Q    I can't hear you very well.
```

323

**175**

DIRECT EXAMINATION OF WHITE

1     A     We were supposed to have an Easter egg hunt and

2  dinner with my brother that we were supposed to try to get

3  back a little earlier than what we actually got back.

4     Q     Did you and Shug and the girls make it over to

5  your brother's house?

6     A     Yes, ma'am.

7     Q     Okay.  And where does he live?

8     A     Pine Heights.  Pine Heights Avenue.  It's down

9  the street from my house.

10    Q     And what's his name?

11    A     Charles White.

12    Q     And did you stay there for a while and visit?

13    A     Yes.  Yes.

14    Q     And did there come a time when you and Shug and

15  the girls returned back home after your weekend away and

16  your Easter with your family?

17    A     Yes, ma'am.

18    Q     When you got home, where was Mr. Long?

19    A     He wasn't home.  He wasn't at my house.  He was

20  at his sister's house.

21    Q     And did you hear from him?

22    A     Yes.

23    Q     Okay.  Did you or Shug hear from him or do you

24  remember?

25    A     He called a couple times when we was coming back

DIRECT EXAMINATION OF WHITE

1   into Maryland.  He had called and asked if we can stop and

2   pick him up.  But I told him we had dinner at my

3   brother's.  We were supposed to go there and afterwards,

4   we would stop and get him.

5        Q    And eventually, was he picked up?

6        A    Yes.

7        Q    And who was he picked up by?

8        A    My wife and children.

9        Q    You didn't pick him up?

10       A    No.

11       Q    Tell us how that went.  You were at Easter

12  Sunday house with your brother.

13       A    Yes.

14       Q    Did you go home first or did you go pick up Mr.

15  Long?

16            (Counsel and the witness spoke

17  simultaneously.)

18            BY MS. WILKINSON:

19       Q    Let me ask it again because I think we talked

20  over one another.

21       A    Sorry.

22       Q    It's my fault, Mr. White.  You come home from

23  West Virginia.  You go have Easter with your brother,

24  Charles White.  And now I'm asking you did you pick up Rob

25  on the way home from your brother's or did something else

DIRECT EXAMINATION OF WHITE

1   happen?

2       A    I didn't want to take the truck down and swing a

3   u-turn on Wilkens Avenue.  So Shug said she would just run

4   down and pick Rob up because there was stuff she needed to

5   get from down the store anyway.  So she went and picked

6   Rob up and I took and parked the truck out back of my

7   house.

8       Q    And you're referring to Mr. Morales' truck?

9       A    Yes, ma'am.  I'm sorry.

10      Q    So if I go back up here to our calendar on the

11  evening of March 23rd, you're back home at your home on

12  Wilkens Avenue.  Correct?

13      A    Yes, ma'am.

14      Q    And what do you do when you get home?

15      A    I go right up the stairs after I empty the van

16  or whatever we drive, truck, whatever.  Empty it out and

17  go right upstairs.

18      Q    Did you see Mr. Long that night?

19      A    Yes.  Yes.

20      Q    And where did you see him?

21      A    He come out of my bedroom.

22      Q    And your bedroom on Wilkens Avenue?

23      A    Yes, ma'am.

24      Q    And what did he say about where he had been that

25  weekend?

**178**

DIRECT EXAMINATION OF WHITE

1      A    Well, I asked him, I said what did you do all

2  weekend and he said he worked all weekend.

3      Q    And did he say where he had been staying?

4      A    His sister's.  He did say because he seen his

5  daughter.

6      Q    His daughter?

7      A    Yes.

8      Q    And who would that be?

9      A    Hannah.

10     Q    Now if I go to your phone records again, I see a

11 call here at 9:11 p.m.  And I'm going to scoot up so the

12 jury can see it.  From your phone to the 4241 number,

13 Mr. Long's phone.  Do you see that there at 9:11?

14     A    Yes, ma'am.

15     Q    Do you recall what that was about?

16     A    Yes.

17     Q    Tell the jury what that was about.

18     A    He couldn't find his phone.  So I was calling

19 his phone to get it to ring so he could find his phone.

20     Q    So at 9:11 p.m., are you and Mr. Long together

21 with one another?

22     A    Yes.  Well, he was going downstairs when I

23 called the phone to find it.

24     Q    Now when if I go back down next to your phone

25 records, I see an incoming call here from Mr. Morales at

DIRECT EXAMINATION OF WHITE

1    10:14 p.m. on March 23rd.  Do you see that there?

2        A    Yes, ma'am.

3        Q    Okay.  Do you remember talking to Mr. Morales on

4    March 23rd?

5        A    Yes, ma'am.

6        Q    Okay.  What did you and Mr. Morales discuss on

7    March 23rd?

8        A    At first, just to make sure I made it back safe

9    with his truck and I started bickering because of the fuel

10   that it burned.  He said it wasn't bad on gas, on diesel.

11   So I started bickering because it was bad on diesel.

12       Q    Now when you were talking to Mr. Morales, was

13   Mr. Long there?

14       A    Yes.  Yes.

15       Q    So where was he?

16       A    He was standing there and walked into the

17   bathroom, used the bathroom and then he come back and the

18   bathroom is right next door to my bedroom.

19       Q    So do you have a specific recollection of

20   talking on the phone to Mr. Morales while Mr. Long was

21   standing there?

22       A    Yes.  Yes.

23       Q    Now at some point does Mr. Long leave the house?

24       A    Yes, he did.

25       Q    How do you know that?

DIRECT EXAMINATION OF WHITE

1       A    I heard him when he was leaving.  I heard him

2    talking to my wife and the kids downstairs.  He was loud.

3    He liked to joke.  He was always a jokester.

4       Q    And so you heard him downstairs?

5       A    Yes.

6       Q    And he said he was leaving?

7       A    Yes.

8       Q    Did you actually see him leave?

9       A    No, ma'am.

10      Q    You heard him leave?

11      A    Yes.  Yeah.

12      Q    When is the last time you saw your friend?

13      A    Right after 9 that night.

14      Q    I'm showing you Government's Exhibit T-18.  Do

15   you know who this man is?

16      A    Yes.

17      Q    Who is this man?

18      A    Troy Lucas.

19      Q    And how do you know Troy Lucas?

20      A    I've known him for quite a few years.  We lived

21   on the same block years ago.

22      Q    And what block would that be?

23      A    Pratt Street.

24      Q    And what neighborhood would that be?

25      A    Southwest Baltimore.

329

**181**

DIRECT EXAMINATION OF WHITE

```
1        Q    And back then, do you know what Mr. Lucas, Troy,
2   did for a living?
3        A    When --
4        Q    Back in March of 2008.
5        A    He would steal stuff.  Work or steal stuff.  If
6   he found work, he would do roofing and stuff like that,
7   but he would steal.
8        Q    Did you ever know him to work for Mr. Morales?
9        A    Yes.  He worked with Mr. Morales.
10       Q    And what kind of work would he do for Mr.
11  Morales?
12       A    Labor or roofing work.
13       Q    Showing you Government's Exhibit T-19.  Do you
14  know this man?
15       A    Yes.
16       Q    Who is this?
17       A    Clyde Lucas.
18       Q    And did you know him by any name other than
19  Clyde Lucas?
20       A    Junior.
21       Q    Did people call him Clyde or people call him
22  Junior?
23       A    Junior.
24       Q    And back in March of 2008, what was your
25  relationship with Junior?
```

330

**182**

DIRECT EXAMINATION OF WHITE

```
1         A     Friends.  Just friends.

2         Q     And how long had you known Junior?

3         A     As long as I had known Troy probably.

4         Q     Who were you closer in age to?

5         A     Closer in age to I think Junior -- I mean Troy.

6    I'm sorry.

7         Q     And who were you closer to in terms of

8    relationship?

9         A     I've known Troy a little bit longer.  I met Troy

10   and rode bikes with him for years, pedal bikes as we was

11   growing up.  Junior just always went off with the older

12   guys in the neighborhood.

13        Q     Okay.  And in March of 2008, describe your

14   relationship with the two of these men.

15        A     With both of them?

16        Q     Yes.

17        A     Just talk.  Junior would call a lot.  I talked

18   to Junior a lot on the phone.  Troy, you may hear from him

19   once a month.  He was always running around.  But he

20   started getting high.  So we didn't see Troy as much.

21        Q     And so Junior, you talked to a lot on the phone.

22   What would you and Junior talk about on the phone?

23        A     Mostly our relationships with our wives.  Junior

24   was going through rough patches with his wife.  He got

25   straight.  He got straight for almost a year off of drugs
```

DIRECT EXAMINATION OF WHITE

1    and started trying to get his own -- he had a roofing

2    company.  So he was trying to get that back going and then

3    he ended up relapsing and he was just talking about stuff

4    like that.

5        Q    Who was Junior's wife?

6        A    Ms. Shirley.

7        Q    And you call her Shirley?

8        A    Yes.  They call her Shirley, but her name is

9    Gypsy Shirley.  I don't know what her last name is.

10       Q    So you called her Gypsy Shirley?

11       A    Gypsy Shirley.  Yes.

12       Q    And who was Gypsy Shirley to you?

13       A    Nothing.

14       Q    In March of 2008, who was Gypsy Shirley to you?

15       A    Junior's wife.  Fiancee.

16       Q    Pardon me?

17       A    That was Junior's fiancee.

18       Q    Did you ever get drugs --

19       A    Oh, yes, ma'am.  Yes.

20       Q    Did you ever get drugs --

21       A    Yes, ma'am.

22       Q    You have to wait until I finish the question,

23   Mr. White.

24       A    I'm sorry.

25       Q    Did you ever get drugs from Gypsy Shirley?

332

**184**

DIRECT EXAMINATION OF WHITE

1      A    Yes, ma'am.

2      Q    And what kind of drugs would you get from Gypsy

3  Shirley?

4      A    Pills.

5      Q    Pills?

6      A    Yes, ma'am.

7      Q    What type of pills?

8      A    Percocets.

9      Q    In March of 2008, did Gypsy Shirley provide you

10  pills?

11     A    A couple of times, yes.

12     Q    And what about Junior?  Did he provide you

13  pills?

14     A    Yes.  A couple of times.

15     Q    On your phone records, Mr. White, there's a

16  number of references to a telephone number.  For the

17  record, (443) 869-8048.

18     A    Yes, ma'am.

19     Q    And do you know who that phone number --

20     A    No.  I don't know who that is, ma'am.

21     Q    And how would you describe yourself with knowing

22  or remembering telephone numbers?

23     A    Horrible.

24     Q    How would you know what your phone numbers of

25  the people you needed to call back in March of 2008?

DIRECT EXAMINATION OF WHITE

1          A    As long as they got their phone for a long time,

2     I'll eventually I'll remember it from calling it so much.

3     But other than that, I don't remember numbers, ma'am.  I

4     always ask my wife.  So does everybody else.  Ms. C & P.

5     That's what they call her, Ms. C & P.

6          Q    Would you agree with me that in March of 2008,

7     there's a number of calls between you and this 8048

8     number?

9          A    Yes, ma'am.

10         Q    Okay.  And do you know who you were speaking

11    with when you talked to the 8048 number?

12         A    I don't know whose phone number it was.  So at

13    that time I don't know -- I'm sure I knew who I was on the

14    phone with at that time.  But right now, I don't know.  I

15    can't recollect who it was.  The only person I can think

16    of is Ms. Shirley.

17         Q    In preparation for your testimony, did I show

18    you a document with that 8048 number on it?

19         A    Oh, yes, ma'am.  Yes, ma'am.

20         Q    And I'm going to put it up here as Government's

21    Exhibit T-13.  And I'm going to hone in on it here.  And

22    it has the phone number we were talking about, (443)

23    869-8048 and it's a reference to a Ms. Hubert about a

24    Mr. Lucas and down below, it says thank you, Clyde Madron.

25    Do you see that there?

DIRECT EXAMINATION OF WHITE

```
1        A    Yes, ma'am.
2        Q    Is that the first name of the person you know as
3   Junior?
4        A    Yeah.  His last name ain't Madron though.
5        Q    Pardon me?
6        A    His last name isn't Madron.  But that's -- yes.
7        Q    That's his first name?
8        A    Yes, ma'am.
9        Q    Correct?  And over here, is that the 8048 number
10  that we're talking about?
11       A    Yes, ma'am.
12       Q    Okay.  Apart from the fact that you don't
13  recognize the name, Madron, did you talk to Junior during
14  this timeframe period when we have this unexplained 8048
15  number on your phone records?
16       A    Yeah.  Back then, yes, yes.  That number was on
17  my phone numerous times.
18       Q    So there's a number of calls?
19       A    Yes.  Yes.
20       Q    Okay.  Is that consistent with your relationship
21  with Junior back in March 2008?  You would have a number
22  of calls --
23       A    Yes, ma'am.
24       Q    And in addition to having conversations with
25  Junior about the things that you described, would you also
```

DIRECT EXAMINATION OF WHITE

```
 1    get pills from Gypsy Shirley, his wife?
 2         A    Yes.
 3         Q    Were you getting pills from her around and about
 4    the time that Rob Long was murdered?
 5         A    The morning Rob Long was murdered, I seen her on
 6    my way back home and got pills from her, ma'am,
 7    unfortunately.
 8         Q    On the morning that Rob died, did you call his
 9    telephone number?
10         A    No, ma'am.
11         Q    Rob's telephone number?
12         A    Oh, Rob.  Yes, ma'am.
13         Q    I wasn't talking about anybody else.  Just
14    Rob's.
15         A    Yes, ma'am.
16         Q    Did you call Rob's telephone number?
17         A    Yes, ma'am.
18         Q    And do you recall what happened when you called
19    his telephone number?
20         A    Yes.
21         Q    What happened?
22         A    A gentleman answered the phone and he said I
23    found this phone on a dead man and hung up.
24         Q    Is that call how you learned about Mr. Long?
25         A    No.  I didn't believe it.
```

336

**188**

DIRECT EXAMINATION OF WHITE

1    Q    Is that call --

2    A    Yes.  Yes, ma'am.

3    Q    Let me just ask the question, Mr. White.  Is

4    that call how you learned about Mr. Long?

5    A    Yes.

6    Q    After you got that call, did you call

7    Mr. Ramsay?

8    A    Yes, ma'am.

9    Q    And why did you call Mr. Ramsay?

10   A    Because I thought it was someone just being

11   smart that Rob sold the phone to and I asked Mr. Ramsay to

12   call it to see if they was bullshitting me or Rob really

13   did sell the phone or the guy was telling the truth.

14   Q    To your knowledge, what was Mr. Ramsay's

15   relationship with Mr. Long?

16   A    They used to be good friends.

17   Q    Did there come a time in --

18        MS. WILKINSON:  Court's indulgence one second.

19        (Pause.)

20   BY MS. WILKINSON

21   Q    In 2011, specifically March of 2011, three years

22   have gone by now, when you continued to have conversations

23   with Mr. Morales?

24   A    Yes, ma'am.

25   Q    And was Mr. Morales in jail at that time?

DIRECT EXAMINATION OF WHITE

1      A    2011?  Yeah, I think he was.

2      Q    Would you get calls from him from jail?

3      A    Yes, ma'am.

4      Q    Did I ask you to listen to --

5      A    Yes, ma'am.

6      Q    -- one of those calls?

7      A    Yes, ma'am.

8      Q    And were you able to identify your voice on the

9  call?

10     A    Oh, yes, ma'am.

11     Q    And were you able to identify Mr. Morales' voice

12 on the call?

13     A    Yes, ma'am.

14     Q    If I could mark for -- it's in the laptop.  But

15 it's Government's Exhibit M-4.

16          MS. WILKINSON:  And, Your Honor, with the

17 Court's permission, I have a transcript prepared for the

18 jury.  May I pass it out?

19          THE COURT:  I'll permit it to be handed out.

20 The evidence is the recording itself.

21          MS. WILKINSON:  Yes.

22          THE COURT:  Ladies and gentlemen, the

23 prosecution has prepared a transcript of these recordings.

24 That is their understanding of what they believe is being

25 said during the conversations.  The evidence is the

**190**

1    recording itself.  The transcript is being given to you as

2    an aid to your understanding.

3         If you hear something different than what's in

4    that transcript, it's what you hear that's the evidence.

5    But this may be of some assistance to you in following the

6    recording.  As I said it's the government's version of

7    what they think is being said in the phone call.  But it's

8    up to you to decide what is said in the phone call.  You

9    may proceed.

10        MS. WILKINSON:  Thank you, Your Honor.  If I

11   could go ahead and -- first of all, before I have you play

12   it, Agent Royka, this is the -- I won't do that.

13        BY MS. WILKINSON:

14   Q    The transcript is marked as Exhibit M-4-A.  We

15   all have it in front of us.  You can go ahead and play it

16   and I'll ask you some questions afterwards and I'm going

17   to bring a copy up to you since I can't use the DOAR at

18   the same time.

19        (The call was played.)

20        BY MS. WILKINSON:

21   Q    Now before I give you this, I appreciate you may

22   have trouble reading this.  Is that fair to say?

23   A    Yes, ma'am.

24   Q    So I'm not going to ask you to read it.  But I'm

25   going to ask you some questions about it.  So will you

DIRECT EXAMINATION OF WHITE

1    keep it right there?  So you just go ahead and listen.

2    Okay, Mr. White?

3         A    Yes, ma'am.

4              (The call was played.)

5              BY MS. WILKINSON:

6         Q    And that's the first excerpt.  If I can have you

7    stop for a second there?  Do you recognize your voice on

8    that call?

9         A    Yes, ma'am.

10        Q    And who are you speaking to?

11        A    Mr. Morales.

12        Q    And you recognize his voice?

13        A    Yes, ma'am.

14        Q    In the first part of the conversation, you

15   referred to his wife living on Sargeant Street.  Who are

16   you talking about there?

17        A    He asked me about Troy, Troy's wife, Mr. Lucas'

18   wife.

19        Q    And when we talk about Troy, are we talking

20   about the man in Government's Exhibit T-18?

21        A    Yes, ma'am.

22        Q    Who is Troy's wife?

23        A    Rocky.

24        Q    Rocky?

25        A    I don't know what her real name is.  I just know

**192**

DIRECT EXAMINATION OF WHITE

1     her by Rocky.

2          Q     And when he talks about living on Sargeant, what

3     is that?

4          A     Sargeant Street.

5          Q     Where is Sargeant Street?

6          A     In Pigtown.

7          Q     In Pigtown?

8          A     Yes, ma'am.

9          Q     And how do you know -- had you ever been to

10    Rocky and Troy's house on Sargeant Street?

11         A     Oh, yeah.  Yes, ma'am.

12         Q     And is this Mr. Morales talking about his wife

13    on Sargeant Street?

14         A     Yes, ma'am.

15         Q     Now down below here on the next page and I know

16    you're not following along, but it talks about being at --

17    Mr. Morales says his sister's house.  And you say on

18    McHenry, yeah, on McHenry house.  Whose sister are you

19    referring to?

20         A     Troy and Junior's.

21         Q     And what's his sister's name?

22         A     Wanda.  Wanda.

23         Q     And where is McHenry Street?

24         A     Southwest Baltimore.  Right -- the next street

25    over from Pratt Street.  One block over from Pratt.

DIRECT EXAMINATION OF WHITE

1      Q     And had you been to Troy's sister's house on

2   McHenry Street?

3      A     Oh, yes, ma'am.

4      Q     And who lived there?

5      A     His mom and his sister and Grant Locklear and

6   Angie.

7      Q     Okay.  And you said two new names, Angie

8   Locklear and Grand?

9      A     Grant.

10     Q     Grant Locklear?

11     A     Yes.

12     Q     And who are Grant and Angie Locklear?

13     A     Angie is their niece and Grant is her husband.

14     Q     And what is your relationship with the

15  Locklears?

16     A     Me and Grant used to be good friends.

17     Q     And in March of 2008, were you friends?

18     A     I mean we talked, but not like -- nothing like

19  we used to, ma'am.

20     Q     And what are Grant and Angie's relationship with

21  Troy?

22     A     That's her uncle.

23     Q     And you said that his mom lived there.

24     A     Yes.

25     Q     What is her name?

**194**

DIRECT EXAMINATION OF WHITE

```
1      A    Laura.

2      Q    Laura?

3      A    Yes.

4      Q    Describe Laura back in 2008 to the jury.

5      A    Frail, older lady in a wheelchair.

6      Q    So Laura lived there --

7      A    Yes.

8      Q    -- Angie and Grant, Wanda.  Anybody else?

9      A    Dean.

10     Q    Dean --

11     A    Their other brother.

12     Q    The other brother?

13     A    Yes.

14     Q    And Troy.  Strike that.

15     A    Junior.

16     Q    And Junior?

17     A    Yes.  I think Junior did live there.  Yeah.

18          MS. WILKINSON:  Okay.  Can I have you play the

19     second part?

20          (The call was played.)

21     BY MS. WILKINSON

22     Q    That's the end of the second excerpt, Mr. White.

23     In that conversation, you talk about a tall building.  You

24     said that Troy said I got a couple of soldiers over there

25     and my boys, bro.  What were you referring to telling Mr.
```

343

**195**

DIRECT EXAMINATION OF WHITE

1    Morales that Troy was talking about his soldiers over

2    there?

3        A    His friends.  They're all -- they call everybody

4    that they know soldiers.  That's just their slang.

5        Q    And whose slang?

6        A    People in jail.  That's their slang when they

7    talk.

8        Q    And do you know who Mikey Quinn is?

9        A    No.

10       Q    Do you know who Jeremy is?

11       A    Yes.  I do know Jeremy.

12       Q    And who is Jeremy?

13       A    He was a shorter Philippino boy who grew up in

14   our neighborhood that went in the service and then was a

15   paramedic.

16       Q    And do you know who that dude, Rock, was?

17       A    I only know one Rock and that's Rock Wills and I

18   met him through Jose.  He's a contractor.

19            MS. WILKINSON:  You can play the third.

20            (The call was played.)

21            BY MS. WILKINSON:

22       Q    Now from these three excerpts of that call,

23   Mr. White, who is Mr. Morales trying to get in touch with?

24       A    Troy.  Troy Lucas.

25       Q    Is this the only conversation you had with Mr.

344

**196**

DIRECT EXAMINATION OF WHITE

1    Morales about trying to get in touch with Troy?

2         A    It was them few.

3         Q    Pardon me?

4         A    Yes.  Yes.

5         Q    Is this the only one?

6         A    Yes.

7         Q    Okay.  To your knowledge, based on -- and you've

8    listened to the whole call?

9         A    Yes, ma'am.

10        Q    Now why was Mr. Morales trying to get in touch

11   with Troy?

12        A    He said it was --

13             MR. ZUCKER:  Objection.

14             THE COURT:  Basis?

15             MR. ZUCKER:  From your knowledge.  Why -- it's

16   speculation, judge.

17             MS. WILKINSON:  I will re-ask the question, Your

18   Honor.

19             THE COURT:  All right.  Rephrase.

20             BY MS. WILKINSON:

21        Q    Mr. White, what was your understanding from what

22   Mr. Morales was telling you of why he wanted to get in

23   touch with Troy?

24        A    He said it was life and death.

25        Q    Did you talk with Mr. Morales after this

345

**197**

CROSS-EXAMINATION OF WHITE

1    March 2011 jail call?

2        A    Yes.  Yes.

3        Q    And do you remember when that was?

4        A    No.

5        Q    What was the subject matter of that

6    conversation?

7        A    Oh, I talked to him a couple different times.

8    But he called and said that the police had come and

9    questioned him about Rob's murder.

10       Q    Did he ever talk about Troy again?

11       A    I think he did.  I think he did ask me if Troy

12   got out of jail.

13       Q    And what did you tell him?

14       A    No.  Troy didn't get out of jail.

15       Q    Do you remember anything else Mr. Morales said

16   about Troy?

17       A    No.  I can't, ma'am.  Not to my recollection.

18   I'm sorry.

19       Q    When is the last time you spoke to Mr. Morales?

20       A    Last year.

21       Q    Is this the conversation you're recalling now?

22       A    No.  No.  It might have been this year, ma'am.

23   It's been a while.  It's been quite a few months.

24       Q    Since you spoke with him.

25       A    Yes.

                    *    *    *

```
 1            UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MARYLAND
 2                SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA       Criminal No. RWT-12-0480

 4        v.                        Greenbelt, Maryland

 5   JOSE JOAQUIN MORALES,          September 26, 2013

 6           Defendant.            9:00 a.m.

 7   -------------------------/

 8                   TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE ROGER W. TITUS
 9        UNITED STATES DISTRICT JUDGE, and a jury

10   APPEARANCES:

11   For the Government:     United States Attorney's Office
                            By: SANDRA WILKINSON, ESQUIRE
12                               MARTIN CLARKE, ESQUIRE
                            36 South Charles Street
13                          Fourth Floor
                            Baltimore, Maryland 21201
14

15   For the Defendant:     Law Offices of Gary E. Proctor, LLC
                            By:  GARY EDWARD PROCTOR, ESQUIRE
16                          Eight East Mulberry Street
                            Baltimore, Maryland 21202
17

18                          Law Office of Jonathan Zucker
                            By: JONATHAN SETH ZUCKER, ESQUIRE
19                          1350 Connecticut Avenue, NW
                            Suite 202
20                          Washington, D.C. 20036

21

22   Court Reporter         Lisa K. Bankins RMR
                            United States District Court
23                          6500 Cherrywood Lane
                            Greenbelt, Maryland 20770

24

25   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.
```

365

**199**

DIRECT EXAMINATION OF SUNDERLAND

```
                        *    *    *
 1       Q    So that, of course, would incorporate the
 2  timeframe of 2007 and 2008?
 3       A    That is correct.
 4       Q    And what types of cases did you investigate when
 5  you were working on the RATT unit?
 6       A    We handled everything from standard auto theft
 7  and motorcycle theft to construction theft, cargo theft,
 8  insurance fraud, title fraud.  Basically every type of
 9  crime you could commit to or about a motor vehicle.
10       Q    And did there come a time in that capacity when
11  you became involved in an investigation involving Rob Long
12  and subsequently Jose Morales?
13       A    Yes.
14       Q    And do you recognize Mr. Morales here in the
15  courtroom today?
16       A    Yes.
17       Q    And can you indicate by an item of clothing?
18       A    Yes.  He's wearing a dark suit, got the glasses
19  and the close-cropped hair.
20            MS. WILKINSON:  For the record, the defendant,
21  Your Honor.
22            THE COURT:  The record will so indicate.
23            BY MS. WILKINSON:
24       Q    And just generally, what type of investigation
25  were you doing?
```

386

**200**

DIRECT EXAMINATION OF SUNDERLAND

1      A    That investigation involved the theft of

2  scaffolding.

3      Q    And at some point, did you -- well, strike that.

4  Did you come on to the case with another detective who was

5  already working the matter?

6      A    Yes.  Detective Fields had been working that

7  case and had known about Jose Morales for many years.

8      Q    Okay.  And Detective Fields, what's his first

9  name?

10     A    Dale.

11     Q    D-A-L-E?

12     A    D-A-L-E.

13     Q    And were you and Detective Fields partners or

14  were you just working this case together?

15     A    We were generally working the case together.  I

16  was actually his supervisor.

17     Q    And at some point -- well, can you give us the

18  beginning of the story of your involvement in the

19  investigation?

20     A    Our involvement began when we got a call about a

21  theft of scaffolding.  We had received a tip that some of

22  the scaffolding that had been stolen during the summer of

23  2006 from Baltimore City was located on the various sites,

24  construction sites used by Jose Morales' company.

25     Q    And who were your victim businesses that you

**201**

DIRECT EXAMINATION OF SUNDERLAND

1   were investigating the crimes for?

2       A    I believe it was Hayward Baker Construction

3   Group and Loomis Systems.

4       Q    And when we talk about scaffolding for those of

5   us who aren't in the construction field or in the

6   investigation of the construction field, what is the value

7   of this type of scaffolding?

8       A    This report, the value on the report was

9   approximately $30,000.

10      Q    And just to again describe in words what

11  scaffolding is.

12      A    Scaffolding is the metal framing used to on the

13  exterior.  It's basically almost like a ladder structure.

14  So workers could work at higher heights on a firm

15  platform.

16      Q    And back in September of 2006, did that

17  investigation lead you to go on site somewhere?

18      A    Yes.

19      Q    Tell us a little bit about that.

20      A    We went to 2500 block of Fleet Street and I want

21  to say the 234 I believe it was North Chester.  I'm not

22  sure if South or North Chester regarding the recovery of

23  scaffolding.  We were instructed that it could be there.

24      Q    And did you make any observations when you

25  arrived at that address regarding the contractor that was

388

**202**

DIRECT EXAMINATION OF SUNDERLAND

1    doing business there?

2        A    Yeah.  I believe there was a banner that said

3    ABR Construction that was on the scaffolding on the

4    building that was being worked on.

5        Q    And did you come to associate ABR Construction

6    with any particular individual?

7        A    We knew that ABR Construction was operated and

8    owned by Jose Morales.

9        Q    And at some point did you obtain official

10   records related to the corporate structure of ABR?

11       A    Yes, we did.

12       Q    I'm just going to put up on the screen -- you

13   can see it there to the right -- Government's Exhibit C-5.

14   And what are we looking at here?

15       A    This is the articles of organization that you

16   get from the State Department of Tax and Assessments for

17   ABR Construction.

18       Q    And does it say the type of business ABR

19   Construction is?

20       A    Yes.  It says for home improvement.

21       Q    Does it say who the agent is for ABR

22   Construction?

23       A    It says Jean Morales.

24       Q    And do you know who that is?

25       A    I believe it's a family member of Jose.  Whether

389

**203**

DIRECT EXAMINATION OF SUNDERLAND

1    it's his mother, I'm not sure.  Wife, I'm not sure.

2        Q    I'm showing you Government's Exhibit C-6.  And

3    what are we looking at?  I'm not very good at this thing.

4    Hold on.  What are we looking at here?

5        A    This appears to be the articles of cancellation.

6        Q    And does it have the name of each member who was

7    designated to wind up the affairs of the company?

8        A    It does say Jose Morales, 1432 Grimm Road in

9    Severn, Maryland.

10       Q    And did that address become relevant to your

11   investigation?

12       A    Yes, it did.  We ended up offering a search

13   warrant for that address to recover much of the stolen

14   scaffolding.

15       Q    And I'm going to get there in a moment, but

16   whose address did you associate 1432 Grimm Road with?

17       A    Jose Morales.

18       Q    So you're back there in 2006.  You had to go to

19   a work site.  You see ABR Construction on the banner and

20   again I don't want to get into the whole investigation,

21   but what was your next step?

22       A    We contacted Loomis Systems.  The regional

23   representative I want to say his name is Mark Hill I

24   believe and we had him come out and identify Loomis

25   Systems and then run a business check on ABR to see if

390

**204**

DIRECT EXAMINATION OF SUNDERLAND

1    they had actually purchased or leased in any way the

2    scaffolding that was seen on that site.

3         Q    And were they able to do that?

4         A    They did perform a check and advised us that

5    they are the only distributor of Loomis Systems and they

6    had no sales contracts or leasing agreements with ABR or

7    Jose Morales?

8         Q    And how is that pertinent to you and your

9    investigation?

10         A    It was pertinent because, one, it corroborated

11    the tip.  Two, the scaffolding that we did find on site on

12    Fleet Street was a mixed set.  We found manufacturers,

13    other manufacturers of scaffolding mixed in with this

14    scaffolding which we at that point we believed was stolen.

15         Q    So at that point, specifically on

16    September 13th, did you have any interaction with Mr.

17    Morales?

18         A    I did.  As the scaffolding was being taken down,

19    Mr. Morales showed up on the scene.  We had spoken to him

20    and we had asked him about where he had gotten it from or

21    if he could prove any ownership of that scaffolding.

22         Q    Was he able to do that?

23         A    No, he was not.

24         Q    At some point did you learn about the

25    involvement of the murder victim in this case, Rob Long?

DIRECT EXAMINATION OF SUNDERLAND

1      A    Yes.

2      Q    And how did you learn about that?

3      A    Rob Long had been a close associate of Jose

4  Morales, was often on the job site.  Was kind of his

5  primary worker bee on a lot of these job sites.  So we had

6  become familiar with Rob Long over the course of this

7  investigation and others.

8      Q    What did you believe Mr. Long's role to be at

9  that time?

10     A    I'm sorry?

11     Q    What did you believe Mr. Long's role to be at

12  that time?

13     A    We viewed him as almost like a foreman, like a

14  right hand man of Jose.

15     Q    Now did there come a time -- again, I'm not

16  going to have you go through the whole investigation --

17  where you believe you had enough to arrest both Mr.

18  Morales and Mr. Long?

19     A    Yes.  During the course of the investigation as

20  we said, we attributed ABR, that construction site, to

21  Jose Morales.  Detective Fields had gone to another

22  address, recovered other scaffolding I believe on Carroll

23  Street in south Baltimore and had done photo shows with

24  two of the witnesses who advised that Rob Long had either

25  sold or rented that scaffolding which was also found to be

DIRECT EXAMINATION OF SUNDERLAND

1    the stolen scaffolding to them for about $150.

2        Q    So you've kind of just given us a capsule of

3    what you believed the evidence would show to support an

4    arrest?

5        A    Yes.

6        Q    And did you do any paperwork at that point to

7    obtain arrest warrants for both Mr. Morales and Mr. Long?

8        A    Yes.  We authored charging documents presented

9    to the Baltimore City court commissioner and were issued

10   warrants.

11       Q    Now at this point in your investigation we're in

12   about February of 2007.  Is that correct?

13       A    That's about right.  Yes.

14       Q    Were you working with any particular prosecutor?

15       A    We were working with Katie O'Hara it was her

16   name at the time.  I believe she has a married name now.

17       Q    And Ms. O'Hara, she was an Assistant State's

18   Attorney, a state prosecutor?

19       A    Yes.  For Baltimore City.

20       Q    Directing your attention to February 15th of

21   2007, is that the date when both men were arrested?

22       A    I believe so.  I'm not sure.

23       Q    And again, the date is not necessarily

24   important.

25       A    Yeah.

393

**207**

DIRECT EXAMINATION OF SUNDERLAND

1    Q    But it was at the beginning of --

2    A    It was on or about that date.  Yes.

3    Q    And at some point after that arrest, were there

4  court proceedings related to the scaffolding arrest?

5    A    Yes, there were.

6    Q    And did you attend some of them?

7    A    I attended many of the first several.  Yes.

8    Q    And where were they held?

9    A    They were down at the harbor court in Patapsco,

10  the southern district court.

11    Q    Is that a district court or a circuit court?

12    A    That is a district court.  Maryland and

13  Baltimore City.

14    Q    And are you able to explain the difference

15  between district court and circuit court?

16    A    District court is generally for the more minor

17  crimes.  Circuit court is for the larger crimes, more

18  serious.

19    Q    So at this point the case is in district court?

20    A    It is in district level.  Yes.  District court.

21    Q    And what was the reason that you would go to the

22  courthouse on this, on this case in Patapsco back in 2007?

23    A    One, we were summoned.  But we did have a lot of

24  witnesses that we want to make sure that were there and we

25  felt this case was important because the victims felt that

394

**208**

1   this was important.

2       Q    And so were you working both with Ms. O'Hara and

3   with Detective Fields to kind of get the case together?

4       A    Yes.  We would often call the witnesses and

5   insure they were getting there and they would be

6   available.

7       Q    Kind of like what we did in this case.  Correct?

8       A    A little bit.

9       Q    Now at some point when you were going to these

10  proceedings, did it ever go to trial?

11      A    No.

12      Q    And why not?

13      A    It was postponed over and over and over again,

14  more times than I've ever experienced in my 18 1/2 years.

15  Postponed for -- generally, Jose's attorney would come in

16  or have somebody come in and say there was a conflict with

17  another court or another case and he had to be somewhere

18  else and it just became kind of cliche, you know, like

19  it's postponed again.

20      Q    And your victims, the people that whose

21  scaffolding was stolen, how did they feel about these

22  continuing postponements?

23      A    They were as frustrated as we were.  And if you

24  take off from work -- we're getting paid to go to court.

25  They're not.  So they're getting a little frustrated time

395

**209**

DIRECT EXAMINATION OF SUNDERLAND

1    and time again.

2        Q    Now I'm going to direct your attention to

3    February 19th of 2008.  And at that point, was the case

4    still pending?

5        A    Still pending.

6        Q    And was it postponed on February 19, 2008?

7        A    I believe.  Yes.

8        Q    Directing your attention to March 10th of 2008,

9    did there have a development in the case that you were

10   working against Mr. Morales and Mr. Long?

11       A    Our office was contacted by Rob Long, the

12   co-defendant in this case.  I cannot remember how the call

13   came in.  I'm not sure if it went directly to me or

14   directly to Detective Fields or to the office.  But I

15   ended up making contact over the phone with Rob Long from

16   that point.  He expressed his interest to come clean and

17   he wanted to talk with the investigators about the case

18   that was going on against him.

19       Q    And did you have personal conversations with

20   Mr. Long on that date?

21       A    I did with -- via telephone.

22       Q    And one second.  I'm going to grab an exhibit.

23   In order to refresh your recollection about the times of

24   those calls, did I have you look at Mr. Long's cell phone

25   records?

**210**

DIRECT EXAMINATION OF SUNDERLAND

1      A     Yes.

2      Q     And were you able to see calls to yourself

3   between yourself and Mr. Long on March 10, 2008?

4      A     Yes.

5      Q     And I'm going to show you Government's Exhibit

6   P-3 and I'm going to put it up on the screen and try to

7   blow it up as big as I can.  And I'm showing you the cell

8   phone records for Mr. Long, Government's Exhibit P-3 and

9   I'm directing your attention toward March 10th, the bottom

10  of that record.  Do you see any phone numbers that are

11  attributed to you?

12     A     Yes.  The (443) 677-9462 was my work phone

13  number while assigned to the Auto Theft Task Force.

14     Q     So if I go to the bottom here -- and actually, I

15  meant to bring a highlighter.  I'm going to go ahead and

16  highlight it right here, these bottom two calls.

17     A     Yes.

18     Q     Are those the two calls that you were referring

19  to, March 10th?

20     A     Yes.  The 887 number, that's the office line to

21  the Auto Theft Task Force.

22     Q     Okay.  And that's the number right above it?

23     A     That is correct.  Yes.

24     Q     So these calls around noon, would that be

25  consistent with your recollection of when you're first

DIRECT EXAMINATION OF SUNDERLAND

1  hearing from Mr. Long?

2      A    Yes.  That is correct.

3      Q    And did you talk to him a couple times on

4  March 10, 2008?

5      A    Yes.

6      Q    And if I go to the second page, what we see

7  additional calls from the two numbers you just told the

8  jury about.  Direct your attention to the top there, the

9  6247 number.  Is that correct?

10     A    Yes.

11     Q    And then if we go down more, we are going to see

12 9462 --

13     A    Yes.

14     Q    And 9462.

15     A    Yes.

16     Q    And I'll highlight these later.  But those are

17 all with you?

18     A    Correct.

19     Q    Okay.  Now I want to talk to you about the

20 substance of those calls.  There's a number of calls on

21 that date.  There was a number of calls on that day.  What

22 do you recall talking about with Mr. Long?

23     A    Mr. Long had come forward and expressed his

24 interest to talk about the cases.  Specifically, he wanted

25 to talk about his role and Jose Morales' role.  He had

DIRECT EXAMINATION OF SUNDERLAND

1    become very frustrated, made it clear to me that he did

2    not want to go to jail.  He fully believed he was going to

3    go to jail for these charges and he did not want to go to

4    jail for crimes that Jose Morales had more of a part in,

5    had profited more from and he was pretty certain that Jose

6    was going to get off.  And he told me that he was trying

7    to get clean.  He was trying to make a new life and he was

8    tired of playing the games with Jose Morales and he wanted

9    to come clean and get this over with.

10        Q    Now based on your time as a detective, was it

11    usual or unusual in cases like this to have a cooperating

12    witness?

13        A    It's not uncommon, but I wouldn't say it's a

14    daily occurrence either.  He was very sincere and it

15    sounded urgent like he wanted -- he just wanted to get it

16    off his chest.  And for the amount of time that we had

17    spent on this investigation and in the past year going to

18    court and having it postponed over and over again, this

19    was certainly a notable point in that investigation.

20        Q    Can you address to the jury whether you thought

21    that this was important and material to your case or just

22    a minor thing in your case?

23        A    It was absolutely notable because during these,

24    all these investigations as I said earlier, we had

25    identified Jose as the ring leader.  He was the owner of

**213**

DIRECT EXAMINATION OF SUNDERLAND

1    the business.  He had employed these people that often we

2    alleged to have attributed to crimes.  For the right hand

3    man, the foreman of Jose Morales to step forward and say

4    enough is enough, I'm done, I'm ready to cooperate, it

5    certainly was noticeable.

6        Q    So as a result of getting that information from

7    Mr. Long in these conversations on March 10th, what

8    investigative or next step decision did you make?

9        A    I contacted the State's Attorney that we had

10   been working with, Katie O'Hara, and I explained to her

11   that Rob Long had come forward and wants to provide a

12   statement.  And in those situations, the State's Attorney

13   will set up a proffer agreement.  Police don't make

14   promises to defendants, witnesses, anybody.  We have to go

15   through the State's Attorney's Office.  So I contacted

16   Katie O'Hara to get that ball rolling.

17       Q    Now at this point, did you know one way or the

18   other whether or not Mr. Long had a lawyer?

19       A    We had known that.  Yeah.  He was represented by

20   Alex Leikus.  Rob Long had expressed on those phone calls

21   he didn't want his lawyer, he didn't like his lawyer, he

22   didn't trust his lawyer and he explained that the

23   situation was Jose not only paid for his attorney, Stanley

24   Needleman, but Jose was also paying for the legal

25   representation of Rob Long.  And that Alex Leikus was a

**214**

DIRECT EXAMINATION OF SUNDERLAND

1    close associate or business partner with Stanley Needleman

2    and his firm and he did not trust Alex Leikus to be there.

3        Q    When you spoke to Mr. Long on March 10th, did

4    you know whether or note he had spoken yet to Mr. Leikus

5    or had not spoken yet to Mr. Leikus?

6        A    I don't recall if that was ever brought out.  I

7    think it was assumed the way he was talking he did not do

8    that.  In fact when I told -- in one of those

9    conversations, I had told him that it was my understanding

10   that the State's Attorney would have to at least as a

11   courtesy contact Alex Leikus and let him know that this is

12   what you intend to do and he was not happy with that.  And

13   but he just said, you know what, whatever, it's whatever I

14   got to do, I'm going to talk.

15       Q    So did you have that conversation with

16   Ms. O'Hara expressing Mr. Long's concerns about having Mr.

17   Leikus present?

18       A    I did.  And she advised that we have to contact

19   Alex Leikus.

20       Q    Do you know whether or not Mr. Leikus was

21   contacted and became involved in this cooperation

22   situation with Mr. Long?

23       A    Yeah.  He was contacted presumably by

24   Ms. O'Hara.  I'm not -- I did not -- and we set up a

25   proffer agreement for March 11th.

401

**215**

DIRECT EXAMINATION OF SUNDERLAND

1    Q   Now just generally, what's your understanding of
2    a proffer?
3    A   A proffer is generally a -- basically, it's a
4    statement that we, you know, that is on paper.  It's an
5    agreement between the State's Attorney's Office whether or
6    not they would use that information to prosecute that
7    individual or another person.  It's basically a legal
8    agreement between the two parties, the defense and the
9    prosecution.
10   Q   And you're not a party to that agreement?
11   A   No.  I don't author that.  I don't draw it up
12   and that's -- no.  That's a legal thing.
13   Q   Is that Ms. O'Hara's job?
14   A   Yes.
15   Q   And the attorney for Mr. Long?
16   A   That is correct.
17   Q   Now but you said you were involved in the
18   scheduling.  And did you attend the proffer?
19   A   I did.  Our office was in Towson, 700 East Joppa
20   at the Baltimore County Police Headquarters and I
21   volunteered one of our interview rooms which is audio and
22   videotaped to hold the proffer.
23   Q   And to the best of your recollection, what time
24   was the proffer on March 11th?
25   A   I think it was scheduled to be around 6.  I

402

**216**

DIRECT EXAMINATION OF SUNDERLAND

1    think by the time we got everything rolling, it was closer

2    to 7.

3        Q    So here we are March 10th and March 11th.

4    You're going to do this proffer within a day.  Why the

5    quickness?

6        A    We had court coming up I believe.

7        Q    Meaning what?

8        A    We had court for that Jose Morales and Rob Long

9    were defendants in.  So we needed to get this done a

10   little quicker than -- you know, couldn't wait.

11       Q    So do you know or remember what day of the week

12   March 10th was?

13       A    Was it Thursday?

14       Q    Let's see.  Here's a calendar, Government's

15   Exhibit M-5.  March 10th, we look down it's a Monday.

16   Does that sound correct?

17       A    Sure.  Yes.

18       Q    I'm going to go ahead and write on here that

19   this is when Rob Long first contacts you?

20       A    That is correct.

21       Q    And then over here in the evening, March 11th,

22   that is when the proffer was held?

23       A    That is correct.

24       Q    So have I written that correctly there on

25   March 2008?

403

**217**

DIRECT EXAMINATION OF SUNDERLAND

1     A    Yes.

2     Q    So you've described the circumstances on which

3  you were going to have this proffer and you were going to

4  videotape it and audiotape it.  Is that correct?

5     A    Yes.

6     Q    And is that consistent with your policy at the

7  Baltimore County Police Department?

8     A    Yeah.  I mean that's the way I preferred it and

9  Ms. O'Hara preferred it.

10    Q    And do you know how Rob got to the proffer?

11    A    Honestly, I don't remember how he got there.

12 I'm not sure if one of my detectives or two of my

13 detectives had picked him up.  I personally don't remember

14 picking him up.  But I remember dropping him off that

15 night.  But I'm not sure.

16    Q    You mean taking him home?

17    A    Yes.

18    Q    So when you got there and everybody was set up,

19 who was present -- who was going to participate in the

20 debriefing or proffer of Mr. Long?

21    A    Myself, Detective Dale Fields, Ms. O'Hara, Rob

22 Long was there and he was there with the attorney, Alex

23 Leikus.

24    Q    So you related to the jury your conversations

25 with Mr. Long on March 10th.  What did you tell him?  Did

404

**218**

DIRECT EXAMINATION OF SUNDERLAND

1  you give him any instructions or advice?

2      A    I mean generally don't tell anybody you're

3  cooperating.  That's what we normally tell people that do

4  want to come forward.  Let it play its course.  Just don't

5  tell anybody.

6      Q    And did you tell Mr. Long that?

7      A    I did.

8      Q    And do you have specific recollections of

9  discussing that with him?

10     A    Previous, yeah.  On one of the phone calls

11  before.  Most certainly when the proffer was done when I

12  was dropping him off, I asked him point blank, you didn't

13  tell anybody, did you?  And he said I told my roommate.

14  And I kind of came like a dad to him.  I was like you know

15  better than that.  I don't know who your roommate is.  You

16  just don't do that.  Don't say anything to anybody.

17     Q    Do you remember whether he said the name of his

18  roommate one way or the other?

19     A    If he did, it went by me.  I wasn't familiar

20  with it as this case.

21     Q    And when you talked to him about that, when you

22  said don't tell your roommate or you shouldn't have told

23  your roommate, what was his response?

24     A    He said he trusts him and he's not worried about

25  it because he hates Jose, too.  I remember in the car we

405

**219**

DIRECT EXAMINATION OF SUNDERLAND

1    had pulled over right on Wilkens Avenue and I -- and the
2    car was parked and I was kind of -- I was admonishing him.
3    I was like what are you doing, dude, you know.
4         Q    Admonishing him?
5         A    Yeah.  You just don't tell people.  You know
6    better than that.  I told him I said you're better than
7    that, don't tell anybody.
8         Q    And what's the risk if you tell somebody?  Did
9    you talk to him --
10             MR. PROCTOR:  Objection.
11             BY MS. WILKINSON:
12        Q    Did you talk to him about the risk of telling
13   people?
14        A    It was more presumed than inferred.  I basically
15   told him you know better than that.  So I think we both
16   understood what that meant.
17        Q    So before the proffer began, did you have a
18   moment to talk to Mr. Long or was his attorney present at
19   that point?
20        A    I think his attorney was present the whole time.
21   We certainly didn't have any business conversations prior
22   to the actual proffer.
23        Q    Now we're going to play the proffer in a moment.
24   But what are your recollections about -- now did you know
25   Mr. Leikus before this?

406

**220**

DIRECT EXAMINATION OF SUNDERLAND

1    A    No.  I had never met him before.

2    Q    And this is your first time meeting him?

3    A    That is correct.

4    Q    Did you form any impressions of him at that

5    meeting?

6    A    He was noticeably nervous, stand-offish.  I want

7    to say Rob Long might have had some words with him

8    beforehand like he doesn't trust him, he doesn't want him

9    there, that kind of thing.  He did not -- it was clear to

10   me that he did not want to be there.  He was very tense.

11   Q    You're there.  Rob's there.  Was Detective

12   Fields there?

13   A    Yes.

14   Q    Mr. Leikus is there?

15   A    Yes.

16   Q    And were there any prosecutors there?

17   A    Ms. O'Hara.  Yes.

18   Q    And did Ms. O'Hara have any discussions in front

19   of you with Mr. Long and Mr. Leikus about the parameters

20   of the proffer?

21   A    Yeah.  As the proffer got going, yes, the

22   proffer, the actual written proffer agreement was provided

23   to Alex Leikus and Rob Long to author and Ms. O'Hara

24   handled that part of it.

25        MS. WILKINSON:  Okay.  Well, this is perfect

**221**

DIRECT EXAMINATION OF SUNDERLAND

1    timing because Agent Royka is back.  So maybe we can play

2    the proffer at this moment.  Your Honor, I have a

3    transcript prepared of the first part of this.

4            THE COURT:  All right.  Once again, ladies and

5    gentlemen, this transcript is being provided to you as an

6    aid to your listening to the recording.  The recording is

7    the evidence, not the transcript.  The transcript is the

8    government's view of what they believe the speakers in the

9    recordings are saying.  If your view is different, then

10   it's your view that prevails.

11           MS. WILKINSON:  Providing C-3 to the witness,

12   Your Honor.

13           BY MS. WILKINSON:

14   Q    Just to lay the foundation for this transcript

15   as we're reading it, Detective Sunderland, did you assist

16   in the preparation of this transcript?

17   A    Yes.  I've reviewed this.  Yes.

18   Q    And did you review it for what you believe was

19   being discussed and heard on the tape?

20   A    Yes.

21   Q    Did you make in fact some corrections to the

22   transcript and make sure the words are as you were hearing

23   them?

24   A    Yes.

25   Q    And are the people on the top here accurately

DIRECT EXAMINATION OF SUNDERLAND

1    attributed in terms of your recollection of who was there

2    and who was speaking?

3         A    Everybody but Rob Long is listed on the top.

4         Q    And Rob Long is indicated by R.L.?

5         A    Yes.  That is correct.

6         Q    Okay.  So down below, we have used the initials

7    of the participant in a conversation.  Is that correct?

8         A    That is correct.

9              (The video was played.)

10             BY MS. WILKINSON:

11        Q    Okay.  I'm going to have it paused it right now.

12   Okay.  So I am going to look at the man on the top left

13   that is bald.  Who is that?

14        A    That is Rob Long.

15        Q    And the man to his right that has papers in

16   front of him, who is that?

17        A    That's Detective Dale Fields.

18        Q    And the man the -- are you talking about the man

19   standing up?

20        A    The man standing up is Detective Dale Fields.

21   I'm sorry.

22        Q    And then the man sitting down to the right of

23   Mr. Long with the papers in front of him?

24        A    Alex Leikus.

25        Q    And then the man who is -- back of the head we

DIRECT EXAMINATION OF SUNDERLAND

1   can see?

2       A    That would be my bald spot.

3       Q    Right in the forefront.  And we saw a female in

4   there and who would that be?

5       A    That would be Katie O'Hara.

6       Q    And where was she sitting?

7       A    She is to my right in the corner just outside of

8   the camera view.  You can see her foot I believe on the --

9       Q    And based on -- you can see her shoe.  And based

10  on the where the participants are all sitting, in other

11  words, you're at the table with Mr. Leikus and Mr. Long,

12  who was going to be conducting the interview so to speak?

13      A    Primarily me at that time.

14           (The video was played.)

15           BY MS. WILKINSON:

16      Q    So just one question, detective.  We were

17  talking about the scaffolding case and now we've moved on

18  to a second case.  Was there a second case pending?

19      A    Yes.

20      Q    And what was that with regard to?

21      A    It was a stolen skid loader and I believe it was

22  a trailer associated with that.

23      Q    What is a skid loader for the jury?

24      A    A skid loader is a piece of a construction

25  equipment.  You see them often on the side of the road.

410

**224**

DIRECT EXAMINATION OF SUNDERLAND

1   They are laymen's term like a little mini bulldozer, a

2   small cab with usually like a bucket loader that can --

3   often, it's a bucket loader.  There's other attachments

4   you can put onto it.  But they're very valuable, very

5   valuable equipment.  Some of them go as high as a hundred

6   thousand dollars.

7             (The video was played.)

8             BY MS. WILKINSON:

9        Q    While Agent Royka is doing that, the

10   conversation that you were engaging in right now with Mr.

11   Long about the scaffolding and the skid loader, this was

12   all part of the cases that were pending at that point in

13   March of 2008?

14       A    Yes.

15       Q    Just as a segue, were things discussed that

16   weren't pertaining to these cases?

17       A    I understand.

18       Q    Okay.  And now we're going to turn to the last

19   case.  Was there a case -- well, strike that.  I'm just

20   going to have Agent Royka go ahead and play it for you.

21             (The video was played.)

22             BY MS. WILKINSON:

23       Q    I wanted to get the time.  Did you notice the

24   end of the time was about 7:34 p.m.?

25       A    Yes.

411

**225**

DIRECT EXAMINATION OF SUNDERLAND

1      Q    So was there a small, a shorter portion that
2  follows this that wasn't really about the scaffolding or
3  the skid loader and the theft of the construction
4  equipment?
5      A    Yeah.  I believe so.
6      Q    Now after this debriefing took place, you said
7  that you took Mr. Long home?
8      A    I did.
9      Q    Okay.  And do you have any recollections of what
10  you and he discussed on that ride home?  Was it just you
11  and Mr. Long?
12     A    It was just me and Mr. Long.  Yes.
13     Q    And tell us about that.
14     A    He just said over and over again how much he
15  hated him.  He was trying to come clean.  He told me he
16  had a kid.  I wanted to say it was a small daughter maybe.
17  I can't remember.  But he said he was trying to get his
18  life clean.  He was certain that if he didn't cooperate
19  that he was the one going to go to jail for a while and
20  Jose was going to walk and he was just fed up with that.
21     Q    And that's what he's saying to you.  And what
22  are you saying to him?
23     A    I told him that we were going to work on the
24  information that he provided us and that it sounded to me
25  that if we can corroborate what he told us particularly

412

**226**

DIRECT EXAMINATION OF SUNDERLAND

1    about the scaffolding that was on Grimm Road which we knew

2    that Jose was living out of, that we would -- we had more

3    than enough to do a search warrant and recover that and I

4    would let him know any updates that we had going on.

5        Q    And now that you're giving him information about

6    trying to get a search warrant for Jose's place, did you

7    give him any instructions about that information?

8        A    I just told him to lay low and that if Jose, you

9    know, talked to him or approached him, asked him about any

10   other jobs, to contact me first.

11       Q    So you dropped Mr. Long off.  And do you recall

12   where you dropped him off?

13       A    It was right around Wilkens Avenue at

14   Southwestern Boulevard.  It's a I want to say KFC maybe.

15   It was a restaurant.

16       Q    KFC.  Kentucky Fried Chicken?

17       A    Yeah.  Kentucky Fried Chicken.  Yeah.

18       Q    So what did you do next after you dropped Mr.

19   Long off investigatively with respect to this case?

20       A    I believe it was the very next day.  It was

21   within a day or two, we went down to Grimm Road.  I went

22   down to Grimm Road in Severn.  The 1432 Grimm Road.  I

23   believe it was Jose Morales'.  And the house is as he

24   described.  It was a white house.  It was on the right.

25   It was the last house on the right and there was a large

1    like a wooden stockade fence with sidewalk going around

2    it.

3        Q    And what was the purpose of going there?

4        A    One, to see if I could see the scaffolding and

5    from the outside or on the sidewalk, there were little

6    holes or gaps between the boards of the stockade fence and

7    you could clearly see scaffolding between the stockade,

8    the holes in the fencing.

9        Q    So at this point now that you've corroborated

10   Mr. Long's information, what did you do investigatively?

11       A    Myself and Detective Fields wrote a search

12   warrant to a judge and had it signed.

13       Q    Okay.  And who would sign the search warrant

14   that you and Detective Fields wrote?

15       A    That was the district court judge.  I'm not -- I

16   can't remember exactly who the judge was.  But we took it

17   to the district court because it was in Anne Arundel

18   County, District Court for Maryland.

19       Q    I'm just going to put up on the screen

20   Government's Exhibit C-17.  See that there?

21       A    Yes.

22       Q    And on the top, is this the actual search and

23   seizure warrant?

24       A    Yes.

25       Q    And down below, is that you, Detective Corporal

414

**228**

DIRECT EXAMINATION OF SUNDERLAND

1   Sunderland?

2        A    Yes.  That's me.

3        Q    And Fields, who would that be?

4        A    Baltimore City Detective Dale Fields.

5        Q    And does it say below the property that you're

6   entitled to search?

7        A    Yes.  1432 Grimm Road in Severn, Maryland.  The

8   exterior property.

9        Q    And does it have a description in words of the

10  house?

11       A    Yeah.  We identified it as a white single family

12  home with a wooden stockade privacy fence surrounding the

13  back and side yards and the numbers 1432 are prominently

14  displayed on the mailbox directly in front of the

15  residence.

16       Q    And down below, does it have the day and time of

17  the application that you made?

18       A    The judge signed that on March 18, 2008 at 9:47

19  a.m.

20       Q    And that's the time I have here down below

21  circling?

22       A    I believe that's Judge Purpura.

23       Q    And the time right there is 9:47?

24       A    Yes.

25       Q    So that's physically the time the judge gave you

415

**229**

DIRECT EXAMINATION OF SUNDERLAND

```
1    this authority --
2        A    Yes.  She signs that.  Yes.
3            MS. WILKINSON:  Your Honor, this might be a good
4    time for a break if the Court wants to take one.
5            THE COURT:  All right.  We'll take a morning
6    recess for 20 minutes.
7            (Recess.)
8            THE COURT:  Ready for the jury?  Bring them in.
9    Ms. Wilkinson, we do not have any meetings today.  So
10   we'll break at whatever seems like an appropriate break
11   point.  It doesn't have to be precisely timed to 1 or
12   12:30 or anything like that.
13           MS. WILKINSON:  Thank you, judge.
14           (Jury present.)
15           THE COURT:  You may proceed, Ms. Wilkinson.
16           MS. WILKINSON:  Thank you, Your Honor.
17           BY MS. WILKINSON:
18       Q    Detective Sunderland, during the break, did I
19   have you highlight your calls on Government's Exhibit P-3
20   for the March 10th contacts with Rob Long?
21       A    You did.
22       Q    So if I just put it up here and I indicate with
23   your name next to the two phone numbers we have here,
24   would that be correct?
25       A    That is correct.
```

416

**230**

DIRECT EXAMINATION OF SUNDERLAND

1        Q     And I neglected to ask you.  At the March 11th

2    debriefing, did you have Mr. Long look at a photo array of

3    Mr. Morales?

4        A     You did.  Yes.

5        Q     And I'm going to show you Government's Exhibit

6    C-12.  And do you recognize the front of this form?

7        A     Yes.  This is a Baltimore City Police form.

8    Yes.

9        Q     And do you recognize your handwriting on the

10    form?

11        A     That is my sloppy handwriting.  Yes.

12        Q     So you filled out this form?

13        A     Yes.

14        Q     And what was the purpose of this form?

15        A     Just as an evidentiary thing.  When we do photo

16    arrays, we document the case number, our case number, the

17    investigating detective and who we're providing the photos

18    to.  The witness information.

19        Q     And just to be clear, why were you asking

20    Mr. Long to identify a particular individual?

21        A     We certainly wanted to make sure that we had the

22    right Jose Morales.

23        Q     And I'm going to show you the second page of

24    that.  Was Mr. Long able to identify Mr. Morales?

25        A     That is his signature.  Robert Long's signature.

417

**231**

DIRECT EXAMINATION OF SUNDERLAND

1    Yes.  He circled the defendant.

2        Q    And does it have the date and the time as you

3    recall it back on March 11, 2008?

4        A    Yes.  March 11, 2008 at 200 hours or yes.  8:00.

5        Q    So before the break, we were talking about

6    obtaining the search warrant for Mr. Morales' home on

7    Grimm Road.  Do you recall those questions?

8        A    That's correct.

9        Q    At some point did you set up to execute that

10   search warrant?

11       A    Yes.

12       Q    And as a result of that, getting that together,

13   that operation together, do you fill out paperwork to help

14   you recall the details, date and time, stuff like that?

15       A    Yes, we do.

16       Q    And I'm going to show you Government's Exhibit

17   C-4.  Do you recognize this document?

18       A    Yes.

19       Q    What are we looking at here?

20       A    We're just looking at a checklist, something we

21   did in the Regional Auto Theft Task Force for moments like

22   this in court to reflect who was there, who was present,

23   how long we were there.  You'll see the date, the entry

24   time, was force required.  Sometimes we have to ram a door

25   or cut a lock or something like that.  So we document

DIRECT EXAMINATION OF SUNDERLAND

```
1    that.  Then we have the team officers who were there.
2        Q    And just to be clear, did you go actually inside
3    Mr. Morales' house during the search warrant?
4        A    No.
5        Q    Where did you search?
6        A    We searched the exterior, the backyard within
7    the fenced-in area of the property.
8        Q    And looking at Government's Exhibit C-4, are you
9    able to tell the jury what time you made entry into his
10   house?
11       A    At 11:25 in the morning.
12       Q    And if I point my pen to the right place, is
13   that the time that you executed the search warrant?
14       A    Yes.
15       Q    And if I go down below, does it have your
16   departure time?
17       A    Yes.  Our exit time is at 13:45 or 1:45 in the
18   afternoon.
19       Q    So how long approximately were you there
20   executing the warrant?
21       A    Two hours and 20 minutes I guess.
22       Q    And as part of your paperwork, do you also do
23   what's called a search warrant tracking form?
24       A    Yeah.  That's just a form for -- yes -- for
25   Baltimore County Police.
```

**233**

DIRECT EXAMINATION OF SUNDERLAND

1      Q    And I had it attached to Government's Exhibit
2  C-4.  But it's actually a separate form.  Correct?
3      A    Yes.
4      Q    And I'm looking at that there.  Do you recognize
5  that form?
6      A    Yes.
7      Q    And does it have on the tracking form what type
8  of evidence was seized as a result of the execution of the
9  search warrant?
10      A    On the bottom, it says property to be seized as
11  named in the search warrant, the scaffolding support
12  beams, scaffolding cleats as we named in the search
13  warrant and that is actually what we did seize.  So I have
14  written scaffolding support beams, bracings, scaffolding
15  cleats.
16      Q    So will you tell the jury what you recall about
17  when you came up to the house?  Was anybody home?
18      A    No.  Nobody was home at all.
19      Q    And how do you know that if you didn't go inside
20  the house?
21      A    We had knocked on the door.  We had also set
22  up -- I'm not sure who might be on that other exhibit you
23  just had.  We had somebody do lie a pre-raid surveillance.
24  So it would be an unmarked police car or somebody in the
25  area just to see who comes and goes.  But nobody answered

**234**

DIRECT EXAMINATION OF SUNDERLAND

1    the door and we didn't see anybody.  We didn't believe

2    anybody was present.

3        Q    And do you do that knock on the door to see if

4    anybody will answer before you execute the warrant?

5        A    Yes.  This is what we described as a

6    knock-and-announce search warrant.  So we're required by

7    law to knock and announce our presence in the presence

8    that we are there to serve a search warrant, which we did.

9        Q    And after nobody answered, did you go around to

10   the backyard?

11       A    Yes.  We went around to the backyard and I'm not

12   sure.  I guess the fence was unlocked and I can't really

13   remember how we got in.

14       Q    So did you take photographs of the house and

15   what you found?

16       A    Yes, we did.

17       Q    And did I have you look at some of them in

18   preparation for your testimony today?

19       A    Yes, you did.

20       Q    And I'm going to show you Government's Exhibit

21   C-19.  Do you recognize this photograph?

22       A    Yeah.  That's the residence we were at, 1432

23   Grimm Road.

24       Q    Now down in the right hand corner has a date on

25   it, October 14, 2007.  Can you explain that for the jury?

421

**235**

DIRECT EXAMINATION OF SUNDERLAND

1      A     Yeah.  We just never formatted our camera as to
2   the correct date.
3      Q     You didn't take this picture on October 14th?
4      A     No, we did not.
5      Q     When did you take this picture?
6      A     March 18th.
7      Q     I'm going to go ahead and correct it.
8      A     Yes.
9      Q     I'm going to put your name or your initials
10   right next to it.  Would that be correct?
11      A     That is correct.
12      Q     Showing you the same date stamp error on
13   Government's Exhibit C-21.  Do you see that there?
14      A     Yes.
15      Q     And what are we looking at in Government's
16   Exhibit C-21?
17      A     You are looking at much of the scaffolding that
18   we recovered that day and we found in the property of 1432
19   Grimm Road.
20      Q     And was this picture taken on March 18th?
21      A     Yes.
22      Q     And showing you Government's Exhibit C-23.  And
23   what are we looking at here?
24      A     That is the back of the house.  In the recorded
25   proffer, Mr. Long explains an incident where he was

**236**

DIRECT EXAMINATION OF SUNDERLAND

1    instructed to get brick from another construction site and

2    bring it back to this address.  And he explained that

3    there were pillars.  One was unfinished and he was using

4    that brick from that job site to build the pillars for

5    Jose's house.  And we took a picture of those to indicate

6    what he said in the proffer was correct.

7         Q    And Government's Exhibit C-20.  What is the jury

8    looking at here?

9         A    I believe that is the front entryway.  The

10   fencing on the property of 1432 Grimm Road.  I believe

11   it's the front.

12        Q    And was it as Mr. Long described it?

13        A    Yes.  Large stockade wooden fence, white house.

14        Q    And C-22, what are we looking at here?

15        A    We're looking at some of the scaffolding and

16   some of the brick that Rob Long alluded to in that

17   recorded statement that he provided and he took from I

18   believe Chester Street.

19        Q    The last picture, although it's not the last

20   picture you took, but the last picture I've marked is

21   Government's Exhibit C-24.

22        A    These are little bit closer-up of the

23   scaffolding and I think we took this picture to indicate

24   the labels.  It looked like it had been obliterated or

25   tried to be removed.

423

**237**

DIRECT EXAMINATION OF SUNDERLAND

1    Q    Are you talking about the scratched-out parts?

2    A    Yeah.  The scratched-out parts.

3    Q    After you execute the search warrant and you see

4    the items that you were looking for, do you actually seize

5    them?

6    A    We did not take them into custody.  We had -- I

7    believe it was Mark Hill again from Loomis Systems take

8    custody of them.  We just don't have the room to have that

9    kind of large bulk property.

10   Q    Did you have him come and pick it up?

11   A    Yes.

12   Q    And once you do that, do you have to complete

13   any paperwork for the Court to let them know that the

14   search warrant was executed?

15   A    Yeah.  We are required to do a property

16   inventory sheet and return it to the judge, telling the

17   judge what we did and what we recovered.

18   Q    And again I'm just going to show you what's been

19   attached to Government's Exhibit C-17.  That is the search

20   warrant.  And is that the inventory return that you do for

21   the court?

22   A    Yeah.  This is the standard inventory sheet that

23   we use while in the auto theft unit.  Again it shows entry

24   time, exit time, who was recorder, who was the supervisor,

25   the date and the items that were ultimately recovered.

**238**

DIRECT EXAMINATION OF SUNDERLAND

1    Q    So for purposes of the search warrant, you were

2    done at about 1:45 p.m.  Is that correct?

3    A    That is correct.

4    Q    And did you talk to Mr. Long after 1:45 p.m. on

5    March 18th and let him know what happened?

6    A    I did.  I called him shortly after the search

7    warrant and told him that we had done the search warrant

8    on Grimm Road.  He was not there.  Jose Morales was not

9    there and that we recovered what he told us we would find.

10   And that even though the search warrant was sealed and,

11   you know, the specific reasons of us being there were not

12   going to be disclosed to Jose immediately, he's probably

13   going to start putting two and two together soon and he's

14   going to find out that we took it and I would certainly

15   lay low and just watch your back.

16   Q    To lay low and watch your back?

17   A    Yes.

18   Q    And what was Mr. Long's response?

19   A    He was appreciative of that.

20   Q    And showing you again an excerpt from the phone

21   records of Mr. Long, Government's Exhibit P-3.  On the

22   break, did you identify the two calls that you had with

23   Mr. Long on that day?

24   A    Yeah.  I guess phone call 210 on March 18th at

25   3:54.  Yeah, I called him.

DIRECT EXAMINATION OF SUNDERLAND

1        Q    And over here, does it have the duration of the
2    call as about three minutes?
3        A    Yeah.  Approximately three minutes.
4        Q    So again if I write Sunderland next to those two
5    calls, that would accurately reflect the conversations you
6    had with Mr. Long?
7        A    Yes.  That is correct.
8        Q    Now you mentioned a moment ago that the search
9    warrant was sealed.  What does that mean?
10       A    We put sealing orders on search warrants to not
11   disclose the probable cause of why we got the search
12   warrant because the investigation is still ongoing because
13   safety reasons, you know, there are certain reasons at
14   times we don't want the suspect or defendant to know what
15   we know quite yet.
16       Q    Was Mr. Long's name mentioned in the search
17   warrant affidavit?
18       A    It was mentioned in the search warrant.
19       Q    And I'm not going to show you the whole thing.
20   I'm just going to show you the top of it.  Is that the top
21   part of the affidavit in support of the search warrant?
22       A    Yes.
23       Q    So the search warrant is sealed and you execute
24   it on March 18th.  You have the conversations with
25   Mr. Long.  Did there come a time when the case was

426

**240**

DIRECT EXAMINATION OF SUNDERLAND

1    supposed to come up for trial again?

2        A    Yes.

3        Q    And directing your attention to April 17, 2008,

4    did you go to court on April 17, 2008?

5        A    I don't believe I did.

6        Q    Why not?

7        A    I believe we had several discussions with Katie

8    O'Hara, the State's Attorney at the time and we just did

9    not believe that it was going to go because in light of

10   Rob Long's murder.  I don't believe it was going.

11       Q    So as a result, you didn't go to court?

12       A    I don't believe I went to court that day.

13       Q    And when was Mr. Long's murder?

14       A    His murder was March 24, 2008.

15       Q    So after the murder, did there come a time when

16   the search warrant and the affidavit were actually

17   provided as part of discovery, if you will, to the

18   defense?

19       A    Yes.  I knew that he was represented by Stanley

20   Needleman.  So I brought the search warrant to Mr.

21   Needleman's office personally.

22       Q    And I'm going to show you Government's Exhibit

23   N-12.  And is this a copy of the search and seizure

24   warrant?

25       A    Yes.

427

**241**

DIRECT EXAMINATION OF SUNDERLAND

1      Q    And do you recognize your handwriting anywhere

2  on that document?

3      A    The top right corner, it says unsigned copy for

4  Defendant Morales.

5      Q    Do you recognize that handwriting?

6      A    That is my handwriting.

7      Q    Did you provide a copy as we're looking at

8  Government's Exhibit N-12 to Mr. Needleman's office?

9      A    Yes.

10     Q    Was that after Rob Long was dead?

11     A    Yes.

12          MS. WILKINSON:  I have nothing further.

13          MR. PROCTOR:  Can I check one thing?

14          (Counsel conferred with his client.)

15          MR. PROCTOR:  I have no questions for this

16  witness.  Thank you, sir.

17          THE COURT:  All right.  Thank you very much.

18  You may step down.

19          THE WITNESS:  Thank you, Your Honor.

20          MR. CLARKE:  Your Honor, the government would

21  call Ed Ericson to the stand, please.

22          THE CLERK:  Please raise your right hand.

23  Thereupon,

24                        EDWARD ERICSON,

25  having been called as a witness on behalf of the

**242**

DIRECT EXAMINATION OF ERICSON

1    government and having been first duly sworn by the

2    Deputy Clerk, was examined and testified as follows:

3              THE CLERK:  You may have a seat at the witness

4    stand.  Please speak directly into the microphone and

5    please state your first and last name.

6              THE WITNESS:  Edward Ericson.

7              THE CLERK:  And please spell your first and last

8    name.

9              THE WITNESS:  First name is E-D-W-A-R-D.  Last

10   name is E-R-I-C-S-O-N.

11                   DIRECT EXAMINATION

12             BY MR. CLARKE:

13        Q    Good morning, Mr. Ericson.  Can you tell us who

14   you work for?

15        A    I work for the Baltimore City Paper.

16        Q    And what is your job with them?

17        A    I'm a staff writer.

18        Q    And what kind of paper is the Baltimore City

19   Paper?

20        A    We're a weekly news and arts paper.

21        Q    As distinguished from the Baltimore Sun which is

22   a daily paper.

23        A    Right.  We're not the Sun.

24        Q    And what kind of news and stories do you all

25   cover at the City Paper?

429

**243**

DIRECT EXAMINATION OF ERICSON

1      A    Do I cover?

2      Q    The paper, generally speaking.  What kind of

3   paper is it?

4      A    It does news stories about what's going on

5   around town.  Does stuff in city hall.  We do police

6   reporting and we do, you know, what concerts should you go

7   see this weekend and stuff like that.

8      Q    And how long have you worked for them?

9      A    Almost ten years.

10     Q    And what kind of stories have you been covering

11  for them over your tenure?

12     A    More towards the City Hall reporting, police

13  reporting, things like that.

14     Q    I want to draw your attention to March of 2008.

15  What was your job responsibility with the City Paper at

16  that time?

17     A    I was a general assignment reporter, going out

18  and looking at whatever was happening.

19     Q    Okay.  Like an old time beat reporter --

20     A    Well --

21     Q    -- is how you would characterize yourself?

22     A    I wish I could have had just city hall or just

23  the courts or whatever.  But yeah.

24     Q    All right.  Let's talk about the date of April

25  the 17th of 2008 which was about three weeks after Rob

DIRECT EXAMINATION OF ERICSON

```
1     Long's death.  Were you working that day?
2         A    Yes, I was.
3         Q    And what story were you covering?
4         A    I went to court to cover a story about charges
5     pending against Jose Morales.
6         Q    And do you recall approximately how many cases
7     were pending at that time against Jose Morales?
8         A    In that court, three.
9         Q    All right.  I'm showing you Government's Exhibit
10    Number N-3, N as in Nancy.  Do you recognize that
11    building, sir?
12        A    That's Courthouse East.
13        Q    And did you go to this particular building on
14    that day?
15        A    Yes, I did.
16        Q    And why did you go to that building?
17        A    That was where there was going to be a hearing.
18    He had a court date that day.
19        Q    He had a trial that day.  Correct?
20        A    It might have been scheduled for trial.  Yes.
21        Q    Okay.  And you went there to cover it?
22        A    I did.
23        Q    I'm showing you Government's Exhibit N-6.  And
24    what's reflected in that photograph?
25        A    That's the court.  That's Circuit Court,
```

DIRECT EXAMINATION OF ERICSON

1   Baltimore City.

2       Q   The same one I just showed before, but a

3   different angle?

4       A   I think so.

5       Q   I would note that there are some railings here

6   and some steps.  Is that correct?

7       A   Right.

8       Q   And going back to N-3, those same steps and the

9   railing and the brass doors are all depicted in that same

10  photograph.  Correct?

11      A   Correct.

12      Q   Did you see Mr. Morales and/or his attorney

13  prior to you going into the building that day?

14      A   I don't think I did before I first went in.

15      Q   All right.  When you went into the building, did

16  you see Mr. Morales and/or his attorney?

17      A   I did.

18      Q   Okay.  And do you see Mr. Morales in the

19  courtroom today?

20      A   I think I do.

21      Q   Would you please point to Mr. Morales?

22      A   (Indicating.)

23          MR. CLARKE:  For the record, identifying the

24  defendant to the left of counsel.

25          THE COURT:  The record will so indicate.

432

**246**

1          BY MR. CLARKE:

2      Q    And who was his attorney that day?

3      A    Stanley Needleman.

4      Q    All right.  And was Mr. Rob Long in court that

5  day?

6      A    Rob Long, no.

7      Q    How about his attorney, Alex Leikus, was he in

8  court that day?

9      A    I don't know.

10     Q    Do you recall watching a video clip of a

11 proceeding that day which is Government's Exhibit C-25?

12 You were asked to see if you were in that video.

13     A    Yes.

14     Q    And when you watched the video of that

15 proceeding in Government's C-25.  Did you see yourself?

16     A    I did.

17     Q    All right.  And so you went to cover the trial.

18 You went into the courthouse and you saw these

19 individuals.  Tell us what you recall happening when you

20 were in the courtroom.

21     A    There was a couple of hearings that day.  I

22 think there was one in which Mr. Needleman was in front of

23 the judge and they dropped or ended the case that was

24 against Rob Long because he was dead.

25     Q    Okay.

433

**247**

DIRECT EXAMINATION OF ERICSON

1      A      And at some point there, the judge asked where
2    Jose Morales was and Attorney Needleman said that he was
3    not there, but he could get to him.  I think he even
4    started tapping on his phone right there.  Okay.
5      Q      All right.  And did there come a time when
6    Mr. Morales came to the courthouse?
7      A      Yeah.  There did.  It wasn't too long after
8    that.
9      Q      And for that period of time before he arrived,
10   were the proceedings temporarily placed into recess while
11   waiting for him?
12     A      I believe so.  Yes.
13     Q      And what's the next thing you recall about the
14   proceedings that day or about any interactions you may
15   have had with Mr. Morales that day?
16     A      Okay.  What I did when I saw that Morales was
17   going to come back, I went outside and I called my art
18   director to get a photographer to stand outside the
19   courtroom so we could get a picture of Morales.  I think I
20   also talked to another witness that day.  I'm pretty sure
21   I did.
22            Anyway, I was waiting outside.  And Mr. Morales
23   actually came back to the court or came to the court then.
24   And I was on those steps or just in front of those steps
25   and I saw him.

434

**248**

DIRECT EXAMINATION OF ERICSON

```
1        Q    All right.  And did you engage in a conversation
2   with Mr. Morales?
3        A    I did.  I asked him what was happening.  I said
4   what's going on right now?  And he said to me words to the
5   effect of co-defendant ain't around no more.
6        Q    All right, sir.  Is that an exact quote?
7        A    Well, I wrote it down.  May I look at it?
8        Q    You may.
9        A    Yeah.  Co-defendant ain't around no more.
10  That's what he said.
11       Q    All right.  And how would you describe his
12  demeanor when he said that?
13       A    He was pretty flat.
14       Q    Didn't have any effect at that time?
15       A    I don't recall him having any.  That's how I
16  wrote it.
17       Q    All right.  And after he stated that, what
18  happened next if you remember?
19       A    I followed him back into the court.  The recess
20  was going to be over and he was going to -- they were
21  going to do whatever they were going to do.  And as I
22  recall it, we both went upstairs and we were waiting
23  outside the courtroom before it was called back in.  I'm
24  sitting on the bench or something inside the court, but
25  not in the courtroom and I asked him to tell me a little
```

**249**

DIRECT EXAMINATION OF ERICSON

```
1    more and he told me at that point that the case was

2    dropped, that it was all over with.

3        Q    Okay.  And what happened next?

4        A    We went into the courtroom and the case was

5    postponed.

6        Q    The trial was postponed?

7        A    Yeah.  It was not dropped.  It was just

8    postponed.

9        Q    So the case as to Robert Long was dropped.

10       A    Right.

11       Q    But the cases as to Mr. Morales were still on

12   the docket and the trial on those matters were postponed?

13       A    Right.

14       Q    And Mr. Morales was there at the time when they

15   declared the postponement of his trial?

16       A    Yeah.  He was there.  His lawyer was there.  It

17   didn't take very long as I recall it.

18       Q    All right.  And do you recall Katie O'Hara, the

19   Assistant State's Attorney, also being there?

20       A    She was the prosecutor in that case.  Yes, she

21   was there.

22       Q    And so after that proceeding happened, where did

23   you go and what happened?

24       A    It was all over and everybody was leaving.  So

25   we went out.  I went out and I was waiting for an elevator
```

436

DIRECT EXAMINATION OF ERICSON

```
 1   with Morales and his attorney and we --
 2        Q    Sir, who was that?  Who was that attorney?
 3        A    That was Stanley Needleman.  We all got into the
 4   same elevator and we were riding it down to the first
 5   floor and I asked Jose, I said I thought you said it was
 6   all over.  And he said words to the effect of, well,
 7   they're going to nol pros it, they just don't know it yet.
 8        Q    All right.  And is that an exact quote?
 9        A    His words were -- and I wrote that down, too.
10   They are going to nolle it.  They just don't know it yet.
11   That's what he said.
12        Q    And would you spell nolle for us?
13        A    N-O-L-L-E.
14        Q    And based upon your experience in the state
15   court system, what did you understand nolle to mean?
16        A    Nolle prosequi meaning they're not going to
17   pursue the case.
18        Q    And how far away were you standing from Mr.
19   Morales when he stated that to you?
20        A    We were in the elevator together.  We could have
21   touched each other.
22        Q    And how would you describe his demeanor when he
23   said those words?
24        A    At that point I think he gave me a little smirk,
25   a little smile that he sometimes gives.
```

DIRECT EXAMINATION OF ERICSON

1     Q    You said earlier that you called to try and get

2   a photographer.  Did a photographer from the City Paper

3   come that day?

4     A    Yes.  The photographer was outside when we were

5   riding down.  And so after we came out the front door, I

6   spotted my photographer and I pointed at Mr. Morales and

7   Mr. Needleman, I said those are the guys, I want a picture

8   of those guys and he took those pictures.

9     Q    I'm showing you Government's Exhibit C-27.  Have

10  you seen this photograph before, sir?

11    A    Yes.

12    Q    And can you identify who is in that photograph?

13    A    On the right is Jose Morales.  On the left is

14  Stanley Needleman.

15    Q    His attorney?

16    A    His attorney, yes, at that time.

17    Q    And can you tell us who took this photograph?

18    A    Ryan Stephenson also known as Rarah.

19    Q    Okay.  And he was the employee from the City

20  Paper that you had called?

21    A    Well, yeah.  He's a freelance photographer.

22    Q    All right.  So when was this picture taken, sir?

23    A    That was on April 17th.

24    Q    After you all got out of the elevator?

25    A    Right.  We got out of the elevator and went out

438

**252**

DIRECT EXAMINATION OF ERICSON

1    that door.

2        Q    That's the same front door that you've

3    identified as being on Government's M-3 and N-6 earlier?

4        A    I believe so.  Yes.

5        Q    I'm now showing you Government's C-28.  And can

6    you tell us who that is in that photograph?

7        A    That's Jose Morales.

8        Q    And who took that photograph?

9        A    Rarah took that picture.

10       Q    And when was that photograph taken?

11       A    Seconds after the one we just saw.

12       Q    And, sir, how would you compare the expression

13   Mr. Morales has in this photograph with the expression he

14   had when he stated those words to you in the elevator?

15       A    My recollection was that was his look, similar

16   to that.

17           MR. CLARKE:  I have no other questions, Your

18   Honor.

19           THE COURT:  Cross-examination.

20           MR. PROCTOR:  Can we approach, please?

21           THE COURT:  You may.

22           (Bench conference:)

23           MR. PROCTOR:  Judge, the short version is I have

24   an area of cross-examination I want to go into with this

25   witness.  It's complicated and convoluted factually to

439

**253**

DIRECT EXAMINATION OF ERICSON

1    explain it to the Court.  Rather than do it at the bench,

2    I imagine this would take five to ten minutes.  I would

3    suggest you send the jury back to the room briefly and

4    then I'll try and explain the context and the background

5    and where I want to go and how I plan to do it.

6         MR. CLARKE:  Let me just advise the Court

7    Mr. Ericson has written numerous stories about Mr. Morales

8    over the years.  Some of these stories go on for probably

9    10, 12 pages.  They are just riddled with details, riddled

10   with violent acts, claims of crimes, all kind of sordid

11   affairs --

12        THE COURT:  Classic City Paper stuff.

13        MR. CLARKE:  Yes, Your Honor.

14        MS. WILKINSON:  Very detailed.

15        MR. CLARKE:  Very, very detailed.  So I'm not

16   sure where we're going, but the Court should be aware.

17        THE COURT:  I don't understand.  You have --

18   direct examination has come in.  You are limited to that

19   on your cross.  What do you want to do?

20        MR. PROCTOR:  It's complicated, judge.  I'll do

21   it at the bench if you want.

22        THE COURT:  Why don't you uncomplicate it for

23   me?  I don't understand it.

24        MR. PROCTOR:  No good way to put it.  One of the

25   stories he wrote involves the trial of Demetrius Smith,

440

**254**

DIRECT EXAMINATION OF ERICSON

1    who was the person convicted of Rob Long's murder.  I want

2    to not talk about Demetrius Smith, but I need to talk

3    about that story.  So I was going to explain it to the

4    Court and understand the parameters with which I'm working

5    and let the government weigh in and make sure that

6    everyone is clear what I'm going to ask and the way I'm

7    going to ask it so as to not to fall afoul of several

8    things.

9            THE COURT:  Well, first of all, what does his

10   story writing about Demetrius Smith have to do with

11   anything in this case?

12           MR. PROCTOR:  I'm glad you asked that, judge.

13   What the story has to do with is there are at least two

14   jailhouse witnesses that are going to come in and say Jose

15   told me X, Jose told me Y.  The government in closing

16   argument will say how else could they have known it?  They

17   knew it because Mr. Morales told them.  That's not true.

18   They could have known it by reading the City Paper

19   stories.  And so I want, without getting into the context

20   of why he was in court, that he published stories

21   mentioning the caliber of the bullets, the location of the

22   body, the time of the killing, where Mr. Long was the

23   night before, whom he was with.  I think that's all fair

24   game for cross.

25           THE COURT:  How is it within the scope of the

*    *    *

441

**255**

```
1    witness.  You can step down.
2             THE CLERK:  Ma'am, if you can please raise your
3    right hand?
4    Thereupon,
5                       PATRICIA WHITE,
6    having been called as a witness on behalf of the
7    government and having been first duly sworn by the
8    Deputy Clerk, was examined and testified as follows:
9             THE CLERK:  You may take a seat at the witness
10   stand.  Please speak directly into the microphone and
11   please state your first and last name.
12            THE WITNESS:  Patricia White.
13            THE CLERK:  And please spell your first and last
14   name.
15            THE CLERK:  W-H-I-T-E.
16            MS. WILKINSON:  Court's indulgence one second,
17   Your Honor.
18            (Pause.)
19            MS. WILKINSON:  Sorry about that.  I was just
20   collecting my thoughts for the witness.
21                       DIRECT EXAMINATION
22            BY MS. WILKINSON:
23   Q    Ms. White, how old are you?
24   A    41.
25   Q    And are you currently employed?
```

499

**256**

```
 1        A    Yes, I am.

 2        Q    And what do you do for a living?

 3        A    I'm a housing inspector for the City of

 4   Baltimore.

 5        Q    I'm going to ask you to even scootch up closer

 6   to the microphone there and hopefully we can all hear you.

 7   And how long have you been working for the City of

 8   Baltimore?

 9        A    Sixteen years.

10        Q    And how far did you go in school?

11        A    I got my G.E.D.

12        Q    Are you married?

13        A    Yes, I am.

14        Q    And who is your husband?

15        A    Harry White.

16        Q    And how long have you and Harry been married?

17        A    We've been married for 13, together for 24.

18        Q    And in that 24 years of being together and 13

19   years of being married, did you have children together?

20        A    Yes, we have.

21        Q    And how many children do you have?

22        A    Six.

23        Q    And do you live together?

24        A    Yes, we do.

25        Q    Did you live together back in 2008.
```

500

**257**

DIRECT EXAMINATION OF WHITE

```
 1      A    Yes.

 2      Q    And where did you and Harry live?

 3      A    3831 Wilkens Avenue.

 4      Q    And did you live there with your children?

 5      A    Yes.

 6      Q    And who else lived there with you?

 7      A    My sister lived there and Robert Long.

 8      Q    Do you know this man over here, Jose Morales?

 9      A    Yes, I do.

10      Q    And how do you know Mr. Morales?

11      A    I met Mr. Morales through my husband.

12      Q    And who was he to your husband?

13      A    A friend.

14      Q    To your knowledge, how long had they known one

15 another?

16      A    Probably 20-plus years.

17      Q    And did you grow up in the Baltimore area?

18      A    Yes, I have.

19      Q    And what area did you grow up in Baltimore?

20      A    Mount Clare Junction area.

21      Q    And what is Mount Clare Junction in connection

22 to Wilkens Avenue?  Is it the same neighborhood or a

23 different one?

24      A    It's a different neighborhood.

25      Q    And is there a neighborhood by which Wilkens
```

501

**258**

DIRECT EXAMINATION OF WHITE

1   Avenue where you lived in March 2008 was known by?

2       A    Violetville.

3       Q    Violetville?

4       A    Yes, ma'am.

5       Q    Are you aware of towns such as Morrell Park?

6       A    Yes, I am.

7       Q    And how close is Morrell Park to Violetville?

8       A    Probably -- driving probably about five minutes

9   if that.

10      Q    So in the same kind of general area of

11  Baltimore?

12      A    Yes.

13      Q    And what about Pigtown?

14      A    Probably ten.

15      Q    So we're still talking about the same southwest

16  Baltimore area?

17      A    Yes.

18      Q    You said that Rob Long lived with you and your

19  husband.  How long did he live there with you?

20      A    He lived with us off and on approximately nine

21  years.  Nine or ten years.

22      Q    And where would he actually stay?  Did he have a

23  room there at your house?

24      A    He would sleep on our couch.

25      Q    Were there times when he didn't stay there?

**259**

DIRECT EXAMINATION OF WHITE

1        A     Yes.  There have been times when he hasn't.

2        Q     Did he keep his personal belongings and things

3    like that there with you?

4        A     At that time when he lived with us, his clothing

5    and stuff was there.

6        Q     How would you describe Rob's relationship with

7    Harry?

8        A     Good.

9        Q     Were they friends?

10       A     They were like best friends.

11       Q     Do you know whether or not they worked together?

12       A     Yes, they did.

13       Q     And what did they do for a living?

14       A     They were bricklayers.

15       Q     Pardon me?

16       A     Bricklayers.

17       Q     Did you know whether or not Harry and/or Rob

18   worked for Jose?

19       A     Yes.

20       Q     Both of them?

21       A     Both of them.  Yes.

22       Q     Did Harry work regularly for Jose or

23   periodically for Jose?

24       A     Periodically.

25       Q     Can you describe that for the jury?

**260**

DIRECT EXAMINATION OF WHITE

```
 1        A    He would work at times, stop working, work,
 2   continue to work.  He would work at other jobs and then it
 3   would go off and on.
 4        Q    We know that Rob was murdered on March 24th.  Do
 5   you remember what you were doing that weekend?
 6        A    Yes.
 7        Q    That was Easter weekend.  Yes?
 8        A    Yes, ma'am.
 9        Q    Tell the jury what you were doing that weekend.
10        A    Myself, my husband our children, my cousin,
11   Vicki Ramsay and Tommy Ramsay and their children went to
12   visit my grandmother in West Virginia.
13        Q    And what was the purpose of the visit?
14        A    Our purpose of the visit was to visit my
15   grandmother and we were going -- also they were fixing my
16   grandmother's, Tommy and Harry was fixing my grandmother's
17   gravel road.
18        Q    Her gravel road?
19        A    Yes, ma'am.
20        Q    And did they actually or let me just start with
21   Harry.  Did you see him working on that gravel road?
22        A    Yes.
23        Q    And what is your grandmother's name?
24        A    Grace Anderson.
25        Q    Have you visited West Virginia there before?
```

DIRECT EXAMINATION OF WHITE

```
1        A    Yes, ma'am.
2        Q    And do you get any cell phone service when
3   you're up there?
4        A    No.
5        Q    When is the last time you saw Rob before you
6   went to West Virginia?
7        A    The last time we saw him before was that Friday
8   evening before we were leaving.
9        Q    And where was he?
10       A    He was at my house, getting ready to leave.
11       Q    And where was he going?  Do you know?
12       A    I believe he was going to his sister's house.
13       Q    Did he tell you that?
14       A    Yes.
15       Q    Did he leave before you or you leave before him?
16       A    He left before us.
17       Q    And then you went to West Virginia?
18       A    Yes, ma'am.
19       Q    And how did you travel there?
20       A    My husband borrowed a dump truck from Jose
21   Morales.
22       Q    And could your family fit in that whole -- your
23   whole family fit in that dump truck?
24       A    Yes.
25       Q    And did you go with the Ramsays?
```

505

**262**

DIRECT EXAMINATION OF WHITE

1     A    They went, but they were in their own vehicle.

2     Q    And you stayed for the weekend?

3     A    Yes, ma'am.

4     Q    Okay.  Now approximately when did you return

5  home back into the Maryland area?

6     A    Sunday evening.

7     Q    And what was the purpose of coming home?

8     A    I had to work the next day and we were also

9  going to my brother-in-law's for a Easter egg hunt with my

10  children.

11     Q    And what is your brother-in-law's name?

12     A    Charles White, Jr.

13     Q    And were the Ramsays going to go to the Easter

14  egg hunt with you?

15     A    No.

16     Q    Who was going to the Easter egg hunt at Mr.

17  White's house?

18     A    My husband, myself and our children.

19     Q    And did in fact that happen?

20     A    Yes, it did.

21     Q    And where did Charles live?

22     A    He lived at 1025 Pine Heights Avenue and that's

23  also in Violetville.

24     Q    In Violetville?

25     A    Yes, ma'am.

506

**263**

DIRECT EXAMINATION OF WHITE

1      Q    So when we're talking about distances, was it
2   far or close to where you and Harry lived on Wilkens
3   Avenue?
4      A    Close.
5      Q    And in terms of -- did you know Rob's sister,
6   Carol?
7      A    Yes.
8      Q    And where did she live?
9      A    She lived the 2700 block of Wilkens Avenue.
10     Q    Okay.  And again is it in the same general area
11  that we're talking about here?
12     A    Yes.
13     Q    Now in the time before Rob was murdered, did you
14  know him to have a cell phone?
15     A    Yes.
16     Q    Okay.  And whose cell phone actually was it?
17     A    It was my husband -- on my husband's account.
18     Q    And did your husband also have a cell phone?
19     A    Yes.
20     Q    And do you recall the phone number for your
21  husband's cell phone?
22     A    The first three digits -- I mean this was like
23  five years ago.  So I don't know the exact number.
24     Q    And as you prepared for your testimony, were
25  there times, we actually looked at his cell phone records?

DIRECT EXAMINATION OF WHITE

```
 1        A    Yes.
 2        Q    And I'll show them to you in a moment, but were
 3   you able to identify them at that time?
 4        A    Yes, I was.
 5        Q    And the same thing with regard to Mr. Long?  Did
 6   we look at his cell phone records?
 7        A    Yes.
 8        Q    Do you have a cell phone or did you have one
 9   back in March of 2008?
10        A    Yes, I did.
11        Q    Okay.  And are you able to recall the number
12   here now today?
13        A    Yes.
14        Q    And what is it?
15        A    (443) 250-0658.
16        Q    So it ends in 0658?
17        A    Yes, ma'am.
18        Q    And were you also working at the -- for
19   Baltimore City the same place that you're working now back
20   in March of 2008?
21        A    Yes, I was.
22        Q    And did you have an office number as well?
23        A    Yes, I did.
24        Q    And just for the record, what is that number?
25        A    That number was (410) 545-6497.
```

DIRECT EXAMINATION OF WHITE

1       Q    And was there a home number that is a landline

2   associated with the house that you shared with Mr. White

3   on Wilkens Avenue?

4       A    Yes, ma'am.

5       Q    And can you tell us what that phone number was?

6       A    (410) 644-1740.

7       Q    And that ended in 1740?

8       A    Yes, ma'am.

9       Q    Those phone numbers that you've just told the

10  jury about, your cell phone, your home phone, your work

11  phone, are those the primary ways of getting in contact

12  with you back in March of 2008?

13      A    Yes.

14      Q    And then Harry had his own cell phone?

15      A    Yes, ma'am.

16      Q    And then Mr. Long had a cell phone in

17  Mr. White's name?

18      A    Yes.

19      Q    Do you know who paid for Rob's cell phone?

20      A    Rob would pay for his own bill.

21      Q    And how would he do that?

22      A    He would give Harry the money and Harry would

23  make the payment.

24      Q    I'm going to show you what's been previously

25  marked as Government's Exhibit P-4.  And first, we're

DIRECT EXAMINATION OF WHITE

1    going to look at the top.  You can turn to the side there.

2    But you're definitely going to have to be cognizant of the

3    microphone, Ms. White.

4        A    Okay.

5        Q    And you see up the top there, Harry White.

6    That's your husband?

7        A    Yes, ma'am.

8        Q    And over here, down here, we have a phone

9    number.  Is this phone number familiar to you, (443)

10   273-2876?

11       A    Yes, ma'am.

12       Q    And whose phone number was this one?

13       A    That's my husband's.

14       Q    If I go down here to the evening of March 23rd,

15   which is Easter -- trying to get to where I am on my notes

16   here.  I apologize.  Do you see this number right here at

17   4:54?

18       A    Yes, ma'am.

19       Q    That's (443) 744-2524.  Do you see that there?

20       A    Yes, ma'am.

21       Q    Okay.  Is that phone number recognizable to you?

22       A    That's my brother-in-law, Charles White.

23       Q    Okay.  So if I go right next to it, Charles

24   White, here.  By the fact that there is a call from

25   Harry's number to Charles' number at that time, what does

510

**267**

DIRECT EXAMINATION OF WHITE

1    that tell you was going on that Sunday, Easter Sunday?

2         A    That we were letting them know that we were on

3    our way.

4         Q    So does that give you an approximate time when

5    you're actually back in the Maryland area?

6         A    We wasn't back in the Maryland area.  That may

7    be when we got reception.

8         Q    So if I go down further to the calls that are on

9    Mr. White's cell phone, there's another call at 4:58.  Do

10   you see that there?

11        A    Yes.

12        Q    And is that also to Mr. White?

13        A    Yes, ma'am.

14        Q    And then there's a phone call here to your home

15   phone number.  Correct?

16        A    Yes, ma'am.

17        Q    Okay.  And what was the purpose of that call at

18   5:36?

19        A    I was probably calling my sister at that time

20   because she was still at my house.

21        Q    So you're getting kind of back in the area and

22   get in contact with the people that you know?

23        A    Yes.

24        Q    And as we go down further to the evening, do you

25   see a call here from 2524 at 6:19 p.m.?  Again that's

1    Mr. White?

2         A    Yes.

3         Q    So have you gotten to his house for dinner yet?

4         A    No, ma'am.

5         Q    When is your best estimate of when you actually

6    got to dinner at Mr. White's house?

7         A    It was probably around quarter to 8.

8         Q    Around 8:00 p.m.?

9         A    Close to it.

10        Q    So when you're there eating, there's a call that

11   Mr. White makes to 9872.  Do you see that here at about

12   8:55 p.m.?

13        A    Yes, ma'am.

14        Q    Do you know whose phone number is (410)

15   945-9872?

16        A    That's Rob Long's sister, Carol.

17        Q    Okay.  So if I put Carol's name right here, what

18   does that tell you what was going on at 8:55 p.m. on

19   Easter Sunday night?

20        A    Rob was calling my husband's phone so that we

21   can come pick him up from his sister's house.

22        Q    Okay.  Was that the plan?

23        A    Yes.

24        Q    So about what time did you leave Charles White's

25   house to go home?

DIRECT EXAMINATION OF WHITE

```
1        A    It was probably around that time.  We left about
2   I guess about 9:30.  I mean 8:30.  I'm sorry.  About 8:30,
3   8:40.
4        Q    So did you go to go pick up Mr. Long?
5        A    No.  We went back to our house.  So my husband
6   didn't want to drive Jose's truck down there.  And he
7   drove all the way from West Virginia.  So I went back and
8   got my vehicle and picked Rob Long up.
9        Q    So you left Charles' house.  You went back to
10  your home on Wilkens Avenue.  And who did you drop off
11  there?
12       A    My husband and our children.
13       Q    And the truck?
14       A    Yes.
15       Q    And then what did you do?
16       A    I got in my van and went down and picked Rob
17  Long up at his sister's house.
18       Q    How far is it from your house to Carol's house?
19       A    Probably about five minutes.
20       Q    And when you got there, did Mr. Long come out?
21       A    Yes.
22       Q    Okay.  Did you have any interaction with Carol?
23       A    No.
24       Q    And when Mr. Long got into the van, where did
25  you guys go?
```

513

**270**

DIRECT EXAMINATION OF WHITE

```
 1        A    We went back to my house.
 2        Q    So if we go down further here to a call here
 3   from your husband's phone number to Rob's phone number,
 4   4241, do you remember what that was about?
 5        A    Rob didn't take his phone with him and he
 6   couldn't find it.  So I believe he was calling his phone
 7   to try to find it at that time.
 8        Q    And did he find his phone at that time?
 9        A    Yes, he did.
10        Q    Okay.  So by that time, when that phone number
11   rings, are you and Mr. Long at home on Wilkens Avenue?
12        A    Yes.
13        Q    And is Mr. White home, too?
14        A    Yes, he is.
15        Q    And are your girls home as well?
16        A    Yes.
17        Q    So what happens inside the house once you and
18   Mr. Long get home?
19        A    When we get home, Rob had got a phone call and
20   it was probably about 9:30 and he said that he was going
21   out and helping somebody fix a door and he left out.
22        Q    Did he tell you who he got the call from?
23        A    No, ma'am.
24        Q    Did you hear who he got the call from?
25        A    No.
```

514

**271**

DIRECT EXAMINATION OF WHITE

1    Q    Did you see him leave out?

2    A    Yes.

3    Q    Okay.  And once he left, who was in the area

4    when he left?  Was it just you?

5    A    The whole family was home.  He was in our

6    bedroom.

7    Q    Who was in your bedroom?

8    A    Rob Long had come in and said that he was

9    leaving.

10   Q    And did you see him leave out?

11   A    Not actually going out my door.  But leaving out

12   of my house.

13   Q    Did you have any conversations with Mr. Long

14   besides when he got the call and he was going to leave

15   out?  Did you talk to him before he left?

16   A    I asked him how long was he going to be and he

17   said he wasn't going to be that long.

18   Q    And what does that mean to you, that he's not

19   going to be that long?

20   A    That he wasn't going to be like all night I

21   guess.

22   Q    Did he have a key to your house?

23   A    No, ma'am.

24   Q    And so if he -- what were you going to do about

25   him getting back inside the house?

515

**272**

DIRECT EXAMINATION OF WHITE

1      A     If he was -- if it wasn't real late, I would let

2  him back in.

3      Q     Did he come home that night?

4      A     No.

5      Q     And what time did you close things down and go

6  to bed yourself?

7      A     About 11:00.

8            MS. WILKINSON:  Your Honor, I'm just checking my

9  notes.

10           (Pause.)

11           BY MS. WILKINSON:

12     Q     Do you know who Gypsey Shirley is?

13     A     That was Junior Lucas' girlfriend at the time.

14     Q     And do you know where Gypsey Shirley lived?

15     A     I don't know the exact address, but it was off

16  of Caton Avenue.

17     Q     And what area of southwest Baltimore is Caton

18  Avenue or Baltimore I should say?

19     A     I'm not exactly sure what they call that area,

20  but it's not too far from my house.

21     Q     The next day, did you learn that Mr. Long had

22  been murdered?

23     A     Later on in that day I did.

24     Q     And did you go anywhere with Harry?

25     A     I was working at the time and I had met my

**273**

1    husband while I was working at Tammy Long's house which is

2    Rob's sister.

3        Q    And at some point did you talk to any detectives

4    with respect to the investigation?

5        A    No, ma'am, I didn't.

6            MS. WILKINSON:  Nothing further, Your Honor.

7            MR. PROCTOR:  May I have a moment?

8            THE COURT:  You may.

9            (Counsel conferred with his client.)

10           MR. PROCTOR:  We have no questions for this

11   witness, Your Honor.  Thank you, ma'am.

12           THE COURT:  You may step down, ma'am.  Thank you

13   very much.

14           MS. WILKINSON:  Your Honor, one second.  I just

15   want to ask --

16           THE COURT:  All right.  Hold it.

17           (Pause.)

18           MS. WILKINSON:  Okay.  Nothing further, Your

19   Honor.

20           THE COURT:  All right.  You may step down,

21   ma'am.  Thank you.

22           MS. WILKINSON:  Your Honor, this might be a good

23   time for us to take a break.  Just our next witness is in

24   custody.

25           THE COURT:  Okay.  We'll take a break until five

**274**

DIRECT EXAMINATION OF KEMPER

```
 1   minutes of 3.
 2             MS. WILKINSON:  Okay.  Thank you, Your Honor.
 3             (Recess.)
 4             (Jury present.)
 5             THE COURT:  You may proceed.
 6             MS. WILKINSON:  Thank you, Your Honor.  The
 7   government calls Mr. Robert Kemper.
 8             THE CLERK:  Sir, can you please stand and raise
 9   your right hand?
10   Thereupon,
11                         ROBERT KEMPER,
12   having been called as a witness on behalf of the
13   government and having been first duly sworn by the
14   Deputy Clerk, was examined and testified as follows:
15             THE CLERK:  You may have a seat.  Please speak
16   directly into the microphone and please state your first
17   and last name.
18             THE WITNESS:  Robert Kemper.
19             THE CLERK:  And please spell your first and last
20   name.
21             THE WITNESS:  R-O-B-E-R-T.  K-E-M-P-E-R.
22                       DIRECT EXAMINATION
23             BY MS. WILKINSON:
24        Q    Mr. Kemper, I'm going to ask you to speak up as
25   much as you can and get in as close to the microphone as
```

518

**275**

DIRECT EXAMINATION OF KEMPER

```
 1    you can because I'm kind of hard of hearing myself.
 2         A    All right.
 3         Q    You said your name is Robert Kemper.  Are you
 4    known by any nickname?
 5         A    Bobby.
 6         Q    And is that how most people call you, Bobby?
 7         A    Yes.
 8         Q    And how old are you, sir?
 9         A    61.
10         Q    And are you currently in jail?
11         A    Yes.
12         Q    And what are you serving time for?
13         A    Burglary and theft.
14         Q    And how long have you been locked up?
15         A    Five years.
16         Q    Have you had other run-ins with the law prior to
17    getting locked up on this occasion?  You ever have prior
18    convictions?
19         A    Yes.
20         Q    Where did you grow up?
21         A    Baltimore City.
22         Q    Your whole life?
23         A    Yeah.
24         Q    What part of Baltimore?
25         A    Southwest.
```

519

**276**

DIRECT EXAMINATION OF KEMPER

1    Q    And what do you consider southwest Baltimore?

2    A    Pratt, Monroe, Carey, Ramsey, Washington

3    Boulevard.

4    Q    And how far did you go in school?

5    A    I finished high school.

6    Q    And what high school was that?

7    A    Ma'am?

8    Q    What high school?

9    A    Hampstead Hill.  East Baltimore.

10   Q    And way back when?

11   A    Pretty much.

12   Q    And since that time since graduating from high

13   school, what was your profession or your chosen job in

14   your adult life?

15   A    Electrician.

16   Q    Pardon me?

17   A    Electrician.

18   Q    And have you worked as an electrician from time

19   to time since getting out of high school?

20   A    Yes.

21   Q    And what is the last job that you had prior to

22   getting locked up?

23   A    I was doing some renovation at Mount Winan.

24   Some houses were being renovated for the city.

25        MS. WILKINSON:  And is everybody hearing

520

**277**

DIRECT EXAMINATION OF KEMPER

1    Mr. Kemper all right?

2           BY MS. WILKINSON:

3      Q    And is that in Baltimore?

4      A    Yes.

5      Q    I'm putting a picture up on the screen there.

6  If you can take a minute to look at it?  Government's

7  Exhibit T-18.  Do you know this man?

8      A    Yes.

9      Q    And who are we looking at here?

10     A    Troy Lucas.

11     Q    And how long have you known Troy Lucas?

12     A    About all his life.

13     Q    Is he older or younger than you?

14     A    Younger.

15     Q    Did he grow up in the same area as you?

16     A    Pretty much.  Right around the corner.  Yes.

17     Q    Pardon me?

18     A    Right around the corner.

19     Q    And I'm going to show you T-19.  Do you know

20  this man?

21     A    Yes.

22     Q    Who is this?

23     A    Clyde.

24     Q    Clyde?

25     A    Clyde.  Junior.

**278**

DIRECT EXAMINATION OF KEMPER

```
1        Q    And how do you know Clyde?

2        A    That's Troy's brother.

3        Q    And do you know him by any other name other than

4   Clyde?

5        A    Junior.

6        Q    And which did you call him, Clyde or Junior?

7        A    Junior.

8        Q    Did you know their last names?

9        A    I didn't know his last name.  I think he's a

10  half brother.

11       Q    And Troy's last name is?

12       A    Lucas.

13       Q    Did Clyde and Troy also -- did Clyde also grow

14  up in the same area that you did?

15       A    Yes.

16       Q    Which one do you consider yourself closer to?

17       A    Troy.

18       Q    When you were growing up in Baltimore, what

19  neighborhoods did you and Troy used to hang out in?

20       A    Pretty much right there.

21       Q    And what's the name of it?

22       A    In Baltimore City.  Southwest.

23       Q    But are there names of the neighborhoods that we

24  have come to know?

25       A    Westport, Brooklyn, Pigtown.  They call that
```

522

DIRECT EXAMINATION OF KEMPER

1    Sandtown up there where we're from.  But I've never called

2    it that.

3         Q    What about Mount Clare?  Do you know that area?

4         A    Mount Clare.  Yes.

5         Q    And Morrell Park?

6         A    Morrell Park.

7         Q    And you said Pigtown?

8         A    Yes.

9         Q    And these are neighborhoods that are in that

10   southwest Baltimore area?

11        A    Yes.  They're all in that vicinity.

12        Q    Prior to getting locked up, were you a drug

13   user?

14        A    Yes.

15        Q    And what kind of drugs did you use?

16        A    Cocaine.

17        Q    And since being -- and anything in addition to

18   cocaine?

19        A    Once in a while, heroin or some barbiturates

20   maybe.

21        Q    And how long had you been using primarily

22   cocaine?

23        A    How long have I used it?

24        Q    Um-hum.

25        A    Pretty much all my life.

523

**280**

DIRECT EXAMINATION OF KEMPER

1        Q     Since being in -- you've been locked up since

2    2008.  Since being locked up, have you used any illegal

3    narcotics?

4        A     Occasionally.

5        Q     And what have you used?

6        A     Suboxone.

7        Q     And how did you get the Suboxone?

8        A     I'd rather not say.

9        Q     Did you get it through a nurse in a facility or

10   did you get it within the prison?

11       A     Within the prison.

12       Q     And when is the last time you got Suboxone

13   within the prison?

14       A     Oh, it's been a long time.

15       Q     Sitting here today, are you on any prescription

16   drugs?

17       A     Oh, no.  I've been clean for a while.

18       Q     And are you able to understand my questions?

19       A     Sure.

20       Q     In 2008, before you got locked up, did you used

21   to see Troy and Junior?

22       A     Yes.

23       Q     Okay.  And what area were you living in in say

24   March of 2008?

25       A     Right there around Mount Clare, Sandtown.

524

**281**

DIRECT EXAMINATION OF KEMPER

1       Q     Were you living in any particular location?

2       A     No.

3       Q     And what does that mean?

4       A     I wasn't.  I was pretty much on the fly.

5   Homeless.

6       Q     Did you say on the fly?

7       A     Homeless.

8       Q     Homeless.  And when is the last home you had

9   prior to getting locked up in July of 2008?

10      A     A recovery house on DeSoto Road.

11      Q     A recovery house on DeSoto Road?

12      A     Yes.

13      Q     How long had you been staying at that recovery

14  house?

15      A     Before I was arrested, maybe a few months.

16      Q     Do you know who ran that recovery house?

17      A     Yeah.  George.

18      Q     Do you know George's last name?

19      A     I can't remember.  It's a long -- Pappalis or

20  something like that.  Papalus or something.

21      Q     And when you said you used to be at the recovery

22  house, is that a place where you could sleep?

23      A     Yes.

24      Q     Were you getting high using cocaine back in

25  2008?

525

**282**

DIRECT EXAMINATION OF KEMPER

```
 1        A     Not there, I wasn't.  No.  Before that, I was.
 2        Q     And were there times even up until March of 2008
 3   where you were getting high and using cocaine?
 4        A     Oh, yeah.
 5        Q     Do you know if Troy used drugs?
 6        A     Oh, yeah.
 7        Q     Did you see Troy use drugs?
 8        A     Yes, ma'am.
 9        Q     And what kind of drugs did you see him use?
10        A     Pretty much the same thing.  Cocaine, heroin.
11   Barbiturates.
12        Q     What about -- I'm sorry?
13        A     Barbiturates.
14        Q     And what about Clyde?
15        A     Ma'am?
16        Q     What about Clyde?  Did he use drugs?
17        A     Yes.
18        Q     And what drugs did you see him --
19        A     We pretty much all did.
20        Q     In that area?
21        A     That was our connection.
22        Q     And did you see Clyde use drugs as well?
23        A     Yes.
24        Q     And what drugs did you see him use?
25        A     Pretty much the same.  Cocaine, heroin.
```

**283**

DIRECT EXAMINATION OF KEMPER

1      Q    Did you and Troy and Clyde ever get high

2  together?

3      A    Yes.

4      Q    Where would you get high?

5      A    Name them all?

6      Q    Give us a general area.

7      A    His mother's house, his house, his

8  grandmother's, Clyde's house, Troy's house.

9      Q    We're talking about when you say his house, his

10  mother's house, are you talking about Troy or Junior or

11  both?

12      A    Both.

13      Q    And did you know their mother's name?

14      A    We just called her mom.  Everybody called her

15  mom.

16      Q    And was that their blood mother or their

17  grandmother?

18      A    Yes.  That's their blood mother.

19      Q    And where did she live?

20      A    On McHenry Street.

21      Q    Do you know the address on McHenry Street?

22      A    No.  It's on the corner of McHenry and Calhoun.

23      Q    Are you able to see it when you see it?

24      A    Pretty much.  Yeah.

25      Q    And what is the other location you said that you

527

DIRECT EXAMINATION OF KEMPER

1    used to hang out besides the mother's house?

2        A    Troy's grandmother's down in Pigtown on Sargeant

3    Street.  Clyde's house out on Caton Avenue.

4        Q    Well, let's start first with the grandmother's

5    house.  Where did she live?

6        A    Down on Sargeant Street.  The 1300 block.

7        Q    Pardon me?

8        A    1300 block of Sargeant.

9        Q    Of Sargeant Street.  Again is this the same

10   general area?

11       A    Yes.

12       Q    And did you know Troy's grandmother's name?

13       A    No.

14       Q    Was Troy married?

15       A    I'm not sure if he was married or not.  But he

16   had a girlfriend there.  I don't know if they were

17   married.  They had kids.

18       Q    Did you know his girlfriend?

19       A    Yes.

20       Q    What's her name?

21       A    Rocky.

22       Q    Rocky?

23       A    (Indicating affirmatively.)

24       Q    What about Junior?  Did he have a girl?

25       A    Yes.

528

**285**

DIRECT EXAMINATION OF KEMPER

```
 1          Q    Back in March of 2008?

 2          A    Yes.

 3          Q    And what was her name?

 4          A    Shirley.

 5          Q    Did you know Shirley?

 6          A    Yes.

 7          Q    When you got high at Troy's mom's house, did you

 8     actually get high in the house?

 9          A    No.

10          Q    And why not?

11          A    I don't think she approved of it.  I mean we did

12     it once a while when she wasn't around.

13          Q    So where would you get high?

14          A    A lot of places.  Usually in the car.

15          Q    And what car are you talking about?

16          A    His mother's car.

17          Q    And what car was that?  Can you describe it?

18          A    It was like maybe a turquoise Buick.

19          Q    And where was it -- I'm sorry.

20          A    I think it was a Buick.

21          Q    And where was it parked?

22          A    Right out front.

23          Q    On what street?

24          A    On McHenry Street.  Everybody used it.

25          Q    What do you mean by that?
```

529

DIRECT EXAMINATION OF KEMPER

1    A    Pretty much if any of us needed to use it, we

2    did.

3    Q    And what do you mean needed to use it?

4    A    Run errands, whatever.  His sisters used it.  He

5    used it.  I used it.  Junior used it.

6    Q    Would you sometimes just sit in there?

7    A    Yes.

8    Q    And did you use it to get high?

9    A    Right.

10   Q    I'm going to direct your attention to March 23rd

11   of 2008.  And is it fair to say that prior to coming into

12   court today, you've talked about your recollections about

13   the evening of March 23rd, 2008.

14   A    Yes.

15   Q    And have you been interviewed by me?

16   A    Yes.

17   Q    And by the agents?

18   A    Yes.

19   Q    And I believe Mr. Zucker came to see you at one

20   point?

21   A    Yes.

22   Q    And did you testify in the grand jury?

23   A    Yes.

24   Q    And did you testify and give statements about

25   what you remembered about the evening of March 23, 2008?

530

**287**

DIRECT EXAMINATION OF KEMPER

1    A    Yes.

2    Q    Who were you with that night, Mr. Kemper?

3    A    Troy Lucas and Junior and Rob Long.

4    Q    And how is it that you hooked up -- I'm sorry.

5    A    And Rob Long.

6    Q    How is it that you hooked up with Troy Lucas and

7    Junior and Rob Long on Saturday night?

8    A    To get high.

9    Q    Hmm?

10    A    To get high.

11    Q    Who did you see first?  Do you remember how that

12    came about?

13    A    I went to his mother's house and we all showed

14    up.  I had some cocaine and then I ran out of what I had

15    and Troy got some more.  Troy had about an ounce I guess.

16    Q    Of cocaine?

17    A    Yeah.  Or maybe less.  Maybe three quarters of

18    an ounce.

19    Q    Did you see it?

20    A    Yes.

21    Q    Did you use it?

22    A    Yes.

23    Q    When you're talking about that you saw them at

24    the house, what house were you -- which house, what

25    location were you at?

DIRECT EXAMINATION OF KEMPER

```
1       A    His mother's house on McHenry Street.
2       Q    Did you get there first or did they get there
3   first?
4       A    No.  They were all there when I showed up.
5       Q    Who was all there?
6       A    Junior, Troy, Rob Long, his nephew, Van.
7       Q    And what were they doing?
8       A    Pretty much hanging out.
9       Q    Inside or outside?
10      A    Outside.
11      Q    And so then you came along?
12      A    Yes.
13      Q    And you had some cocaine?
14      A    Um-hum.
15      Q    Yes?
16      A    Yes.
17      Q    And did you guys start to get high?
18      A    Ma'am?
19      Q    Did you start to get high together?
20      A    Yes.
21      Q    Besides the cocaine you had brought and the
22  cocaine that Troy had, did anybody else bring drugs there
23  that you saw?
24      A    Not that I know of that particular night.  No.
25      Q    Okay.  How long did you stay there getting high
```

532

**289**

DIRECT EXAMINATION OF KEMPER

1    on McHenry Street?  Generally how long?

2        A    All night.

3        Q    All night long?

4        A    Yeah.

5        Q    Did you stay in that one location on McHenry

6    Street from the time you got there until the dawn?

7        A    The next morning?

8        Q    Yes.

9        A    Yeah.  Until the next morning.  Yes.

10       Q    So in that time period, however long it was that

11   you were there getting high, did Troy and Junior and Rob

12   all stay there with you as well?

13       A    No.  Van left.  He took some cocaine.  Said he

14   was going to make ready out of it and he left.  Junior

15   left.  They got into some type of argument.  I don't know

16   what it was about.  I wasn't paying much attention.  But

17   he left.

18           MR. ZUCKER:  Could you keep your voice up?  Move

19   the mic a little closer, please.

20           THE WITNESS:  Sir?

21           MR. ZUCKER:  I'm having trouble hearing you.

22           THE WITNESS:  Okay.  Fine.

23           MR. ZUCKER:  Thank you.

24           THE WITNESS:  Is that better?

25           MS. WILKINSON:  Yes.

533

**290**

```
 1              MR. ZUCKER:  Yes.
 2              MS. WILKINSON:  Perfect for me, too.  Thank you,
 3    Mr. Zucker.
 4              BY MS. WILKINSON:
 5       Q    So you said that Van had first left because he
 6    was going to take some of the cocaine and make ready?
 7       A    Yes.
 8       Q    And tell the jury what that meant to make ready.
 9       A    Oh, make crack.
10       Q    Is that what ready is?
11       A    Yes.
12       Q    When Van left to make ready, did he ever come
13    back?
14       A    No.
15       Q    So he left first?
16       A    Yes.
17       Q    And then at some point, you say Junior left?
18       A    Yes, ma'am.
19       Q    Do you have any sense of time as to when Junior
20    left?
21       A    Not really.  Maybe 10, 12:00.  It was late.
22       Q    Where were you guys physically gathered together
23    getting high?
24       A    In the car.
25       Q    The car you just described?
```

DIRECT EXAMINATION OF KEMPER

```
 1        A    Pretty much all night.  Yes.
 2        Q    And when you say pretty much all night, who was
 3   in the car?
 4        A    Me, Troy Lucas and Rob Long.
 5        Q    And where were you seated?
 6        A    In the back seat.
 7        Q    And where was Troy seated?
 8        A    In the driver's seat.
 9        Q    And where was Rob seated?
10        A    In the front passenger seat.
11        Q    And when Junior was there with you, was he ever
12   in the car with you or was he outside the car?
13        A    Junior never got in the car.  He left before we
14   got in the car.
15        Q    And you said there was some sort of argument.
16   Can you explain that a little bit more?
17        A    I didn't -- I didn't hear what it was.  I
18   just -- I don't know.  They left.  And they were
19   calling -- he was calling him on the phone.  I mean I
20   heard bits and pieces, but I can't recall what exactly
21   what it was.
22        Q    Who was calling on the phone?
23        A    Troy was calling Junior on the phone.  I assumed
24   it was him.  He was cussing at him and telling him to
25   bring his ass back and whatever.  Then he called his wife
```

535

**292**

DIRECT EXAMINATION OF KEMPER

```
 1   and asked her could she pick him up and she said no, it's

 2   his problem, whatever.  I don't know.

 3        Q    You're shaking your head and you're moving your

 4   hands.

 5        A    Because I don't remember.  You know, it's hard

 6   to -- it's hard to recall exactly what was said.

 7        Q    Well, let me ask you this one question.  Are you

 8   certain that Troy had a phone that night?

 9        A    Oh, yes.

10        Q    And you saw him talking on it?

11        A    Yeah.  He was calling Junior.  Yes.

12        Q    And so Junior left.  And did you see Junior

13   again that day?

14        A    No.

15        Q    And so you stayed there with Rob and Troy.  You

16   seated in the back seat.  Them in the front.

17        A    Yes.

18        Q    Now were there times that you yourself got out

19   of the car?

20        A    Yes.

21        Q    Okay.  Why did you get out of the car?

22        A    I went to an empty house to fire some coke

23   because I didn't want to sit there and do it in the car.

24        Q    Okay.  And so literally what would you do, get

25   out of the car and walk where?
```

**293**

DIRECT EXAMINATION OF KEMPER

```
1        A    Maybe a block, a block and a half away to an
2   empty house where I had syringes stored and stashed.
3        Q    And how would you ingest the cocaine?
4        A    With a syringe.
5        Q    And would you do that alone?
6        A    Yes.
7        Q    And then what would you do after you did that?
8        A    I would come back to the car and we sat there
9   and talked, you know, whatever --
10       Q    And --
11       A    -- until we got ready to do some more.
12       Q    And as you were doing this all night, were you
13  using Troy's cocaine or your cocaine?
14       A    Troy's.
15       Q    And did you see how much cocaine he had?
16       A    Yes.  It was in a baggie.  It was -- it was kind
17  of hard to judge.  But it was at least a half ounce or
18  three quarters of an ounce, maybe an ounce, somewhere in
19  that area.
20       Q    At the time, was that a lot of cocaine to you?
21       A    At that time, yeah.
22       Q    Were you interested in using some of that
23  cocaine that night?
24       A    Yes, we did.
25       Q    Was your intention to stay until it was done?
```

537

**294**

DIRECT EXAMINATION OF KEMPER

1    A    Pretty much.  Yes.

2    Q    As you were seated there in the back seat, were

3    there times when Mr. Long left the car?

4    A    Yeah.  Yes.  He would be gone when I came back

5    to the car.

6    Q    Tell us about that.

7    A    How he left?  When he left?

8    Q    Yes.  Why did he leave?

9    A    Oh, why did he leave?  I would go up to the

10   empty house and do my coke.  It makes you a little

11   paranoid, you know.  So I'd peek around for a minute I

12   guess.  And I would come back to the car and Troy was

13   there alone.  And I said where is Rob.  He said he got

14   hyper and ran.  And I said what do you mean?  He said he

15   got hyper and ran.  He fired the coke and jumped out the

16   car and ran.  Then a little while later, he would come

17   back.

18   Q    And when he'd come back in and get back in the

19   car?

20   A    Yes.  He did that on two or three occasions.

21   Q    Now did you make any observations about how Rob

22   Long was ingesting the cocaine?

23   A    With a syringe.  Same as myself.

24   Q    Pardon me?

25   A    Troy would hook him up.

538

**295**

DIRECT EXAMINATION OF KEMPER

```
1       Q    And explain that to the jury.
2       A    Well, he had a problem doing it himself.  So he
3   asked Troy to do it for him.
4       Q    So did you physically see Troy inject him?
5       A    Yes.
6       Q    On more than one occasion or one occasion?
7       A    More than one.
8       Q    Did you see how Troy ingested cocaine?
9       A    Yes.
10      Q    How did he do it?
11      A    We all did the same thing with a syringe.
12      Q    Now did you know Mr. Long prior to this night?
13      A    No, ma'am.
14      Q    Describe him in your words to the jury.
15      A    Ma'am?
16      Q    Describe him.  Give a description of how you
17   remember what he looked like.
18      A    I guess medium height, bald head, kind of a -- I
19   remember he had a large nose.  He wore a hat, but he had a
20   bald head because he did take it off occasionally and had
21   on work clothes, work boots and jeans and a brown leather
22   jacket, some type of brown leather jacket, a work coat.
23      Q    But he wasn't a friend of yours before that
24   night?
25      A    No, ma'am.  I never met him until that night.
```

539

DIRECT EXAMINATION OF KEMPER

1    Q    Who introduced you?

2    A    Troy.

3    Q    You talked about being there all night and at

4    some point presumably the sun started to come up.  Yes?

5    A    Ma'am?

6    Q    The sun started to come up the next morning?

7    A    Oh, yes.

8    Q    And what do you remember happening when the sun

9    came up?

10   A    We left there and went down to Troy's house on

11   Sargeant Street.  The three of us.

12   Q    And when you said we left there, who are you

13   talking about?

14   A    Myself, Troy and Rob.

15   Q    And went where?

16   A    To his house on Sargeant Street.

17   Q    And why did you do that?

18   A    Basically to get off the street.  Well, Troy and

19   I had been doing some work on the house.  Not Rob.  This

20   is the first time I had seen Rob.  But he came along with

21   us.  And I assumed we were just going back down there to

22   work on the house, putting up drywall, doing some pipe

23   work.  The house was a mess.

24   Q    Did you actually do work on the house that

25   morning?

540

**297**

DIRECT EXAMINATION OF KEMPER

1        A    Not that morning.  No.

2        Q    So you are outside McHenry Street.  The dawn

3    comes up and you decide you're going to go down to

4    Sargeant Street.  Whose idea is it to go down to Sargeant

5    Street?

6        A    I don't remember.

7        Q    How did you get there?

8        A    We walked.

9        Q    How did you walk, from where to where not

10   knowing the neighborhood?

11       A    Oh, I believe we walked down Calhoun to Ramsey

12   and then from Ramsey down to Carey and around Carey Street

13   to Sargeant.

14       Q    This is the house that you had been to before

15   with Troy?

16       A    That I had been to?

17       Q    Um-hum.

18       A    Oh, yes.  Many times.  Yes.

19       Q    And once you get to Sargeant Street, when the

20   three of you are in Sargeant Street, do you go inside the

21   house or do you stay outside the house?

22       A    We went inside.

23       Q    Okay.  What did you do inside the house?

24       A    Some more coke.

25       Q    At some point did the cocaine dry up?

DIRECT EXAMINATION OF KEMPER

1     A    Yeah.

2     Q    When you got inside the house, was anybody else

3   there?

4     A    Not that I recall.

5     Q    What observations did you make about what -- for

6   example, what was Troy doing while you were in Sargeant

7   Street?

8     A    We were all pretty much getting high again.

9     Q    Was anybody doing any work in the house?

10    A    Yeah.  I think Troy did a little bit.  I think

11  we did hang a couple pieces of drywall.

12    Q    Did you do any work?

13    A    I think I might have.  Now that you mention it,

14  I think I did.

15    Q    Did Rob do any work?

16    A    No.  He pretty much sat in the living room.

17    Q    Did there come a time when you left Sargeant

18  Street?

19    A    When I left?

20    Q    Um-hum.

21    A    Yes.

22    Q    Okay.  Tell us about why you left Sargeant

23  Street.

24    A    We were discussing how to get some more cocaine.

25  So Troy called this girl, Mary, that sold cocaine down in

DIRECT EXAMINATION OF KEMPER

```
1    Pigtown on a pretty much regular basis and somebody told
2    him that she was up top.
3         Q    What did up top mean to you?
4         A    Up above Carroll Park.  That area above --
5    there's an area above Carroll Park, Ramsey and McHenry and
6    Stricker, Calhoun, stuff like that.
7         Q    So troy thought he had another supplier of some
8    cocaine?
9         A    Right.
10        Q    So what happened?
11        A    He asked me would I walk around to Carey.
12   There's two ways to get up there.  You could go up through
13   the park and go up through the old lumber yard that burned
14   down years ago or you could walk around Carey Street.  So
15   he asked me if I would walk around the Carey Street way
16   and they would go the other way.
17        Q    Who would go the other way?
18        A    Troy and Rob.
19        Q    So did you guys decide that this is what you
20   were going to do?
21        A    Yes.  That's what we did.
22        Q    Was it daylight outside?
23        A    Yes.
24        Q    You come out of Sargeant Street.  And which
25   direction do you head, right or left?
```

1      A     Left.

2      Q     And what direction do Troy and Rob leave?

3      A     They went right.

4      Q     So you literally just split ways?

5      A     Right.

6      Q     How did you travel back up top once you took a

7   left out of Sargeant Street?  Where did you go?

8      A     Pretty much the same way we came down except I

9   didn't turn down Calhoun Street to go to his mother's.  I

10  walked straight up Ramsey to the park where we were

11  supposed to meet.

12     Q     And what is it you were supposed to be doing as

13  you were walking up top?

14     A     Looking for Mary.

15     Q     Did you do that?

16     A     Ma'am?

17     Q     Did you do that?  Did you look for Mary?

18     A     Yeah.

19     Q     Did you see Mary?

20     A     No.

21     Q     As you were walking up, did you say Calhoun

22  Street, is there a bridge there, some sort of overpass?

23     A     Oh, that's Carey Street.

24     Q     Did you go under that?

25     A     Yes.

DIRECT EXAMINATION OF KEMPER

1    Q    And as you were coming up, did you go up Ramsey
2    Street?
3    A    Yes.
4    Q    Once you got up Ramsey Street, did you see Mary?
5    A    No.
6    Q    Did you see Troy?
7    A    No.
8    Q    Did you see Rob?
9    A    No.
10   Q    So what did you do?
11   A    I waited for a minute I believe.  I can't
12   remember.  I think I waited for a minute, but I kept
13   looking down toward the park because that's where he was
14   supposed to come out and he didn't.  So I walked -- I
15   believe I walked down Stricker.  But I wound up in the B &
16   O Bar.
17   Q    And why did you go to the B & O Bar?
18   A    To get some beer.
19   Q    To drink?
20   A    Yes.
21   Q    Did you stay at the B & O Bar for a while?
22   A    For a while, yes.
23   Q    Now before you got there and as you were walking
24   up Ramsey, did you stop at any other place or location?
25   A    Not until later when I went in Bill's Bar.

545

**302**

DIRECT EXAMINATION OF KEMPER

1    Q    And what is Bill's Bar?

2    A    That's a bar on the corner of Calhoun and

3    Ramsey.  Yeah.

4    Q    Are you familiar with that bar?

5    A    Yes.

6    Q    And have you been there before?

7    A    Yes.

8    Q    As you were coming up from Sargeant Street and

9    going up top, why didn't you stop at Bill's Bar?

10   A    They were closed.  When I first came by, they

11   were closed.  They open up like 12:00, something like

12   that.

13   Q    After you were in B & O Bar, what did you do

14   next?

15   A    I believe I drank a few beers and I left.

16   Q    And what happened?

17   A    I was there a couple of hours I guess and I went

18   to Bill's Bar for a minute.

19   Q    So you never saw Troy again?

20   A    Not until later on that day.

21   Q    So when you get to Bill's Bar again a couple

22   hours later, anything happen when you were there?

23   A    Yeah.  I walked in and the barmaid and a couple

24   of other people started questioning me and asking me where

25   I been and I said why.  Because we just heard you got

546

**303**

1  killed.

2      Q     That you got killed?

3      A     Right.  And I said no, it wasn't me.  And they

4  said well, we just heard the guy got killed down the

5  tracks that was with Troy all night.  And I was with Troy

6  all night.  And it didn't dawn on me at the time that it

7  was, you know, Rob Long.

8      Q     So what did you do with that information?

9      A     When I saw Troy later on, I asked him, you know,

10  what happened.  He said I don't know, I think he must have

11  ran in somebody's backyard and got shot trying to steal

12  something.

13      Q     Now going back to the -- back to the bar, at

14  Bill's Bar and they're telling you that somebody got shot.

15  Did you talk to any police that day?

16      A     Oh, yes.  I stopped a police officer that I

17  knew.

18      Q     Tell us about that.

19      A     One of the narcotics officers that works the

20  neighborhood, I knew him personally and I stopped him and

21  asked him and he said yeah, I heard about it.  And I asked

22  him what the guy's name was and all that.  He says I'm not

23  sure.  They don't -- homicide don't tell us anything.

24  That was what he told me.  And I said well, can you

25  describe him?  And he did.  He described exactly what I

DIRECT EXAMINATION OF KEMPER

1    described.  Rob Long.

2         Q    And what did you say to the officer?

3         A    I told him I thought I knew him.

4         Q    Knew him how?

5         A    That I just met him the night before.

6         Q    Did anybody ever question you again that night?

7         A    No.

8         Q    Now I want to go back to after you turned left

9    out of Sargeant Street, who came out of Sargeant Street

10   and took right?  Troy and Rob?

11        A    Troy and Rob.  Yes.

12        Q    And when you take a right there, when is the

13   last time you physically had eyes on Troy and Rob?

14        A    Going toward Carroll Park.

15        Q    And well, let me stop for a second.  I'm going

16   to put up a map on the DOAR system.

17             MS. WILKINSON:  Your Honor, may I approach the

18   witness?

19             THE COURT:  You may.

20             BY MS. WILKINSON:

21        Q    Are you familiar generally with the area this

22   aerial map is showing?

23        A    Not really.

24        Q    I'm going to sneak it up closer so you can see

25   because I know it's hard.  You're familiar with Ramsey

DIRECT EXAMINATION OF KEMPER

```
 1   Street?
 2        A    Oh, yes.  Okay.
 3        Q    And I am going to go above and you're familiar
 4   with McHenry --
 5        A    Above is McHenry Street.  Yes.
 6        Q    And I'm going to go down.
 7        A    That's the old lumber yard.
 8        Q    And I'm going to go down to Sargeant Street.
 9        A    Right.
10        Q    Does that give you kind of your perspective of
11   what we're looking down on here?
12        A    Right.
13        Q    So let's go up here to Sargeant Street.  Okay.
14   So as I'm looking at Sargeant Street, you said you came
15   out and you took a left.  Is this the Carey Street road
16   that you traveled on?
17        A    Yes.
18        Q    And how were you traveling?  Were you walking or
19   riding?
20        A    Walking.
21        Q    Walking?
22        A    Walking.
23        Q    Now did there come a time when I asked you to
24   walk that walk with Agent Royka and another detective --
25        A    Yes.
```

549

**306**

DIRECT EXAMINATION OF KEMPER

1      Q      -- to give you a sense of how long it took you

2   to walk up top?

3      A      Yes.

4      Q      And do you remember how long it took you to walk

5   from Sargeant Street up to Ramsey Street?

6      A      I think it was about ten minutes, ten or fifteen

7   minutes.

8      Q      Now when you were walking with the agents up

9   that street, did you walk in the same way that you were

10  walking back on March 24th of 2008?

11     A      To my knowledge.  Yes.

12     Q      And did you follow the same path that you can

13  recall following?

14     A      I definitely followed the same path.  Yes.

15     Q      So you went down Sargeant Street and went up

16  Carey Street.  Yes?

17     A      Right.

18     Q      And then I'm going to follow with my pen up

19  here.  And here is Ramsey Street.  And what did you do

20  once you came to the corner of Carey and Ramsey?

21     A      I walked up to Ramsey to the right where your

22  pen is.  I went to the right and I walked up two blocks.

23     Q      And what was two blocks?

24     A      That's to where the little, there's a little

25  park there.  It's like a little kiddie pool and the

**307**

DIRECT EXAMINATION OF KEMPER

1    neighborhood kids go there.

2        Q    And you see this blue over here.  Is that the --

3        A    That's it.

4        Q    That's the little pool area?

5        A    Right.

6        Q    Okay.

7        A    And I walked up to that corner and I didn't see

8    Rob or Troy.  So I made a right.  That's where I made the

9    right and went down Stricker.

10       Q    Okay.  Now we see up here as I get closer,

11   McHenry Street.

12       A    Right.

13       Q    Do you see that right there?  Is that the street

14   that you and Rob and Junior and Troy started out on

15   March 23rd?

16       A    Yes.

17       Q    And that was the house of his mother?

18       A    Yes.

19       Q    So as you went by McHenry Street, I actually

20   have over here in the corner the B & O Bar.  Do you

21   recognize that picture there?

22       A    Yes.

23       Q    Is that the bar that you ended up on when you

24   left Troy and Rob?

25       A    Yes.

DIRECT EXAMINATION OF KEMPER

1      Q    And that's where you stayed for a little while

2   and had a few beers?

3      A    Yes.

4      Q    Now I'm going to go back to Sargeant Street

5   again if I might.  Do you see that here?  And as you were

6   walking this way, which way were Rob and Troy walking?

7      A    The opposite direction.

8      Q    So they were coming down Sargeant Street?

9      A    Right.

10     Q    And the last time you saw them, which way did

11  they go?

12     A    Right there where your pen is.

13     Q    Okay.  And did they go right or left?

14     A    Yeah.  Turned the corner.

15     Q    Up here on Bayard Street?

16     A    Well, I didn't see them go to Bayard Street.  I

17  couldn't see around the corner.  But I saw them at the end

18  of the block.

19     Q    Turn the corner?

20     A    Right.

21     Q    And is that the last time you saw Rob and Troy?

22     A    Yes.

23     Q    So whatever time you --

24     A    That day.

25     Q    Pardon me?

**309**

DIRECT EXAMINATION OF KEMPER

```
 1        A    Well, that morning.
 2        Q    That morning.  Well, is that the last time you
 3   saw Rob?
 4        A    Oh, yes.
 5        Q    And you saw Troy later?
 6        A    Yes.
 7        Q    Now you talked about another way to get up to
 8   Ramsey Street.  Let me go back here again.  And what would
 9   that be?
10        A    Right there where the railroad tracks is going.
11   Where your pen is, right above it.
12        Q    Uh-huh.  Right above it?
13        A    To your right.  Yeah.  Right through there.
14        Q    Okay.  What's there?
15        A    That's the old lumber yard, railroad tracks.
16   That's where Stricker Street dead ends.  And there's a
17   school at the bottom of the hill, like a trade school of
18   some kind.
19        Q    Now you spoke a moment ago about that you had
20   run into Troy later that afternoon and he had made some
21   comment about where Rob was.
22        A    Yes.
23        Q    Did you believe him?
24        A    Ma'am?
25        Q    Did you believe him?
```

**310**

DIRECT EXAMINATION OF KEMPER

1          MR. ZUCKER:  Objection.

2          THE COURT:  Sustained.

3          BY MS. WILKINSON:

4     Q    Did you see Troy again the next day?

5     A    The next day?

6     Q    Yes.

7     A    Oh, yeah.

8     Q    Tell us about that.

9     A    I saw Troy pretty much every day after that.

10    Maybe not every day, but on a regular basis as usual.

11        Q    Do you remember any particular conversation with

12    him the day after this happened?

13        A    Yeah.  We left the -- we left his house on

14    Sargeant Street which used to be his grandmother's house.

15    We left there and we were going up to the 1200 block of

16    Sargeant again to see Mary to get some coke.  And he

17    turned around and asked me have I ever killed anybody.

18        Q    And what did you say to the question have I ever

19    killed anybody?

20        A    I told him no.

21        Q    Had he ever asked you a question like that

22    before?

23        A    Not to my knowledge.

24        Q    Did there come a time in preparation for your

25    testimony, Mr. Kemper, where I asked you to review a pole

DIRECT EXAMINATION OF KEMPER

1     camera that was up in the area of that park that you just
2     described to the jury?
3         A    Yes.
4         Q    And when is the first time that you saw that
5     pole camera?
6         A    The camera or the video?
7         Q    The video.
8         A    I don't remember the date.  A couple of weeks
9     ago.
10        Q    Is that the first time you looked at it?
11        A    Yes.
12        Q    Did you see yourself on that video?
13        A    Yes.
14        Q    Were you able to identify yourself at what
15    location?  Where did you see yourself?
16        A    Right where I said I was.
17        Q    Which is where?
18        A    On Ramsey Street.  Walking up Ramsey Street
19    toward Stricker.
20             MS. WILKINSON:  If I could, I'm going to play it
21    for the jury, Your Honor?  Government's Exhibit L-4.  Can
22    we start from the beginning if we might?  Just for the
23    record, we know that it crops off the time, Agent Royka.
24    Can you state the time on the left hand corner?
25             AGENT ROYKA:  9:36:42.

DIRECT EXAMINATION OF KEMPER

1          MS. WILKINSON:  9:36 a.m. and 42 seconds?

2          AGENT ROYKA:  Correct.

3          MS. WILKINSON:  If we can go ahead and play it?

4          (Video was played.)

5          BY MS. WILKINSON:

6      Q    Take a minute to look at it.  Do you see

7    yourself there, Mr. Kemper?

8      A    Yes, ma'am.  That's me walking up on the right

9    hand side.

10     Q    You're looking at it on the right hand side?

11     A    I mean the left.  I'm sorry.  Right hand side of

12   the street coming up.

13         MS. WILKINSON:  If I could have you play it one

14   more time, Agent Royka?  It's just 16 seconds.

15         (Video was played.)

16         BY MS. WILKINSON:

17     Q    Now how do you know that's you, Mr. Kemper?

18     A    The way I walk and the coat that I had on was

19   one of those black puffy like insulated jackets.

20     Q    And this man did something with his hand?

21     A    I run my hand through my hair.

22     Q    Can you do it again for the jury?

23     A    (Indicating.)

24     Q    And you take your left hand and run it through

25   your hair.  Is that something that you do?

**313**

DIRECT EXAMINATION OF KEMPER

```
 1        A     Pretty much on a regular basis, yes, when it was
 2   long.
 3        Q     Any doubt in your mind that's you?
 4        A     No.  That's me.
 5        Q     Do you know Jose Morales?
 6        A     Ma'am?
 7        Q     Do you know Jose Morales?
 8        A     Not -- no.  I never -- I had seen him and
 9   someone had pointed him out to me before.  But as far as
10   personally know him, no.
11        Q     Do you recognize him here in the courtroom
12   today?
13        A     Yes.
14        Q     And can you do so now by an article of clothing?
15        A     He's sitting in a suit.
16        Q     Where have you seen him before?
17        A     At the construction site on DeSoto Road once and
18   at his brother's pool.  At his brother's house on the
19   weekend one day.  That's the only two times I ever saw
20   him.  I don't really know him.
21        Q     Let's talk about the time at his brother's pool.
22   Who's his brother?
23        A     George that run the recovery house I lived in.
24        Q     The one that ran the recovery house that you
25   lived in.  And what were you doing at George's house where
```

557

**314**

DIRECT EXAMINATION OF KEMPER

1    there was a pool?

2        A    Just partying.  We had parties on the weekend.

3        Q    Who did you go there with?

4        A    Most of the guys at the recovery house.

5        Q    And who did that include?

6        A    Buddy Johnson, a boy named -- Philippino boy

7    named Bahia.  Michael Bahia.

8        Q    And so this party that you went to was at

9    George's house, not at Jose's?

10        A    Oh, no.  It was George's house.

11        Q    And then you mentioned another occasion where

12    you saw Jose.  Where was that?

13        A    At the construction site down on DeSoto Road.

14        Q    How did you come to be on the construction site

15    on DeSoto Road?

16        A    Troy and I rode down there one day.

17        Q    For what purpose did you ride down there?

18        A    To look for Jose.

19        Q    And why were you looking for Jose?

20        A    I wasn't.  Troy was.

21        Q    Why was Troy looking for Jose?

22        A    He said he owed him some money.

23        Q    Did he say why he owed him some money?

24            MR. ZUCKER:  Objection.  Hearsay.

25            THE COURT:  Sustained.  Do not answer the

558

**315**

DIRECT EXAMINATION OF KEMPER

1    question.

2    BY MS. WILKINSON

3        Q    Did you see Jose on that occasion?

4        A    I just saw him walk by.  I didn't speak to him

5    or anything.

6        Q    To your knowledge, did Troy see Jose on that

7    occasion?

8        A    I don't think he did.  Someone told him he

9    wasn't there.  And Troy didn't see him.

10       Q    Did you point out Jose to Troy when you thought

11   you saw him?

12       A    No.

13       Q    Why not?

14       A    It wasn't none of my business.

15       Q    What did you say?

16       A    It wasn't any of my business.

17       Q    This time that you drove to DeSoto Road with

18   Troy looking for Jose, was it before or after Rob Long's

19   murder?

20       A    Before.

21       Q    Are you able to put in time how much before?

22       A    No.  I can't.

23       Q    Was it a year before?

24       A    Oh, no.  Maybe a couple of weeks at the most.

25       Q    I asked you previously whether you were ever

DIRECT EXAMINATION OF KEMPER

1    interviewed by the police back in 2008 about what

2    happened.  Do you remember me asking you that?

3        A    Yes.

4        Q    Did you ever go to the police station back in

5    2008 about this murder?

6        A    No.  I didn't.

7        Q    Do you know who did?

8        A    Yeah.

9        Q    Who did?

10       A    Junior.

11       Q    How do you know that Junior went down to the

12   police station?

13            MR. ZUCKER:  Objection.  Basis.

14            THE COURT:  Hold it.

15            BY MS. WILKINSON:

16       Q    Without answering the question completely, just

17   what is your basis of knowledge?  How do you know that

18   Junior went to the police station?

19            MR. ZUCKER:  It's going to be hearsay, judge.

20            THE COURT:  If he knows of his personal

21   knowledge, not because somebody told him.

22            MR. ZUCKER:  I'd ask that personal knowledge be

23   defined for the witness.

24            THE COURT:  Personal knowledge means you

25   observed him going there.  Not that somebody told you.  So

**317**

DIRECT EXAMINATION OF KEMPER

```
1     if you can answer by saying you personally observed him
2     going there, you can answer it.  Otherwise, you may not.
3     Do you understand that?
4              BY MS. WILKINSON:
5        Q    Did you personally observe any personal
6     observation about Clyde in the police station?
7        A    Yes.  I went with him.
8        Q    How did you get there?
9        A    He drove.
10       Q    And where did he drive to?
11       A    He drove to the Central Police District,
12    homicide division down in Baltimore City.
13       Q    Did you go inside with him?
14       A    No, ma'am.  He wanted me to watch his car.
15       Q    And did you agree to watch his car?
16       A    Yes.
17       Q    What kind of car was he driving at that time?
18       A    A Ford Explorer.
19       Q    And what did you do when you're in the Ford
20    Explorer?
21       A    I didn't stay in the Ford Explorer.  I got out.
22    He wanted me to drive down there and I told him I'm not
23    driving.  I'm not driving to the block which is the block
24    down Baltimore City where the police station is right
25    around the corner.
```

**318**

DIRECT EXAMINATION OF KEMPER

1    Q    And why didn't you want to drive?

2    A    I didn't have a driver's license.  I said I'm

3    not going down, number one, on the block where it's cops

4    every three feet and there's a police station right around

5    the corner and I don't have no driver's license and I'm

6    not driving down there.

7    Q    So were you a passenger in the car?

8    A    Yes.  I agreed to drive down and watch his car.

9    Q    So once he went inside, what did you do?

10   A    I just waited for him to come out and call me.

11   Q    And did he eventually come out?

12   A    Yes.

13   Q    Did you talk to him at that point?

14   A    Yeah.

15   Q    Did he tell you what he told the police?

16   A    Not -- not then.  Later.  Maybe a couple of days

17   later.

18   Q    And what happened a couple of days later?

19   A    Troy had got arrested.  We were all getting

20   drugs and the narcotics squad stopped us and they arrested

21   Troy and another boy that was in the car.  They jerked us

22   out of the car and strip searched us on the street and

23   took the drugs and arrested Troy and the other boy.  And I

24   didn't have anything on me and they took the handcuffs off

25   and let me go.

DIRECT EXAMINATION OF KEMPER

1    Q    They let you go at that point?

2    A    Yes.  And they arrested Troy.  And we got the

3  bail money together and we went and got Troy out on bail.

4  We wanted to get him out on bail before the parole

5  violation warrants dropped.  So we did that.

6    Q    And who is we?

7    A    Junior, his brother, Dean, and myself.

8    Q    And how did you get there?

9    A    We drove in the same Explorer.

10   Q    And did you see Troy?

11   A    Yes.

12   Q    And you were talking --

13   A    He came out.  We were right there when he was

14  released on bail.

15   Q    And did the subject matter of Rob Long's murder

16  come up?

17   A    Yes.

18   Q    What do you recall?

19        MR. ZUCKER:  Objection to any hearsay

20  statements.

21        MS. WILKINSON:  Your Honor, can we approach?

22        THE COURT:  Come to the bench.

23        (Bench conference:)

24        MS. WILKINSON:  Your Honor, Mr. Long is going

25  to -- I mean Mr. Kemper is going to say that Troy and

563

**320**

1    well, Clyde said that he lied to the police and the reason

2    why I think it comes in is because Mr. Kemper's reaction

3    was why -- did you tell them as to whether or not

4    Mr. Kemper had been there that night and Junior said no, I

5    didn't tell them that you were there, I didn't want to put

6    you in it. And he was mad. Mr. Kemper was mad. Now you

7    have to put me in it by not telling him that I saw him in

8    there and all that night. And so we're not offering it

9    for the truth of the matter asserted. We're offering it

10   to put into context Mr. Kemper's anger at them not telling

11   the police that he had been with Troy and Junior that

12   night.

13           MR. ZUCKER: But they are trying to put it in

14   for the truth of the matter asserted that he lied to the

15   police. And that is the truth of the matter asserted. If

16   he wants to say as a result of that conversation, what was

17   his emotional reaction, that was fine. But the basis is

18   they lied.

19           MS. WILKINSON: It doesn't put it in context if

20   they lied to the police --

21           MR. ZUCKER: If he wants to say that he was

22   annoyed or perturbed by what Troy said, that might be

23   something else. But the fact that he lied to the

24   police --

25           MS. WILKINSON: Because he lied to the police.

DIRECT EXAMINATION OF KEMPER

1     MR. ZUCKER:  Yes.  And so it's being offered for

2  the truth of the matter asserted that he lied to the

3  police.  That Troy lied to the police.  You're offering it

4  for the truth of what he said.

5     MR. CLARKE:  And it's also a statement against

6  interest to have him say that I just went in there and

7  lied to the police.  It's something that some other

8  witness said unless it was true --

9     MR. ZUCKER:  I can't say that a statement

10  against penal interest made to -- a statement against

11  penal interest is something that subjects him to criminal

12  liability.  Making a statement like that to somebody who

13  is not part of law enforcement would not expose him to any

14  criminal liability.

15     MR. CLARKE:  That exception is not limited to

16  just saying that to a police officer.  It's saying it to

17  anyone.  That would suggest that you're exposing yourself

18  to providing information about your own culpability.

19     MR. ZUCKER:  How does that expose you to

20  criminal liability?  There's no law against lying to the

21  police unless you're under oath.

22     MR. CLARKE:  It's just against his interest.  It

23  subjects him to possible prosecution for admitting

24  committing a crime to another individual.  People don't

25  normally do that.  That's why it's an exception.

565

**322**

DIRECT EXAMINATION OF KEMPER

```
 1              THE COURT:  All right.  The objection is
 2    overruled.
 3              (In open court:)
 4    BY MS. WILKINSON
 5         Q    In this conversation that you had with Junior
 6    and with Troy, did you get upset?
 7         A    Yes.
 8         Q    And why did you get upset?
 9         A    Well, Troy asked Junior what the cops asked him
10    and he told him.  I don't recall exactly what the
11    questions were or the answers.  But he did mention my
12    name.  He said what did you say about Bobby?  He said I
13    didn't say anything about Bobby.  And he said you didn't
14    tell him he was there.  He said no.  And I spoke up at
15    that point, I said why didn't you?  He said because I
16    didn't want to get you involved.  Well, I said you just
17    did.
18         Q    So you were angry?
19         A    Yes.  Because it made it look like I had
20    something to hide.
21         Q    Were you there that night?
22         A    Yes.
23         Q    Did you have anything to hide?
24         A    No.
25         Q    Are you familiar with a prison gang by the name
```

566

**323**

DIRECT EXAMINATION OF KEMPER

1   of D.M.I.?

2       A    Yes.

3       Q    And how are you familiar with it?

4       A    They're all through the prison system.

5       Q    And what does D.M.I. stand for?

6       A    Dead Man, Incorporated.

7       Q    And why are you laughing?

8       A    Because I think it's a joke.

9       Q    I assume you're not a member?

10      A    No, ma'am.  Not at all.

11      Q    Do you know whether or not -- first just yes or

12  no.  Do you know whether or not Troy was a member of

13  D.M.I.?

14      A    Troy is definitely a member of D.M.I.

15      Q    And based on -- where does your personal

16  knowledge come from?  How do you know it?

17      A    Because I know him and I know members of the

18  D.M.I. that he associates with and I know he's a main

19  leader.

20      Q    What about Junior?  Do you know whether or not

21  he's a member of D.M.I.?

22      A    No.  I've never known Junior to be a member.

23      Q    The times that you have seen Troy with other

24  members of D.M.I., first of all, how did you know the

25  other members were of D.M.I.?

**324**

CROSS-EXAMINATION OF KEMPER

1    A    I'm in jail with them.

2    Q    Do they hold themselves out to be any particular

3    way in jail?

4    A    Pretty much.  They got tattoos all over them.

5    They got -- they have a D.M.I. tattoo, yes, a pyramid and

6    most of them have it in a noticeable place and they have

7    that.  They have the letters D.M.I. in a noticeable place.

8    Q    Are you familiar with any other tattoos that

9    D.M.I. gang members have?

10    A    The letters they use for the numbers for D.M.I.

11    through the alphabet like A, B, C, D.  That's four.  And

12    you got -- I think it's 14 and 9.

13    Q    You mean so D is a fourth letter in the

14    alphabet.

15    A    Right.

16    Q    So they use 4 and then so on for M and so on for

17    I?

18    A    Right.

19    Q    Now have you ever been locked up with Troy at

20    the same time?

21    A    Yes.

22    Q    And is this where you made your observations

23    about D.M.I.?

24    A    Yes.  No.  Not about D.M.I. in particular, but

25    him being a member of D.M.I.

CROSS-EXAMINATION OF KEMPER

```
 1        Q    Is that who he associated himself with in
 2   prison?
 3        A    Pretty much.
 4        Q    Do you remember -- well, withdrawn.
 5             MS. WILKINSON:  One second, Your Honor.
 6             (Pause.)
 7             MS. WILKINSON:  I think that's all I have, Your
 8   Honor.  I just want to check my notes.  That's all I have,
 9   Your Honor.  Thank you.
10             THE COURT:  Cross-examination.
11                     CROSS-EXAMINATION
12             BY MR. ZUCKER:
13        Q    Good afternoon, Mr. Kemper.
14        A    How you doing?
15        Q    Mr. Kemper, you said D.M.I. is a joke?
16        A    To me, it is.  Not to them.
17        Q    Why do you consider them a joke?
18        A    Because they're a bunch of clowns.
19        Q    You refer of them as punks?
20        A    At least.
21        Q    At best?
22        A    Yes.
23        Q    You don't take them particularly serious though,
24   do you?
25        A    Not at all.
                        *    *    *
```

569

**326**

1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
2                SOUTHERN DIVISION

3   UNITED STATES OF AMERICA     Criminal No.  RWT-12-0480

4       v.             Greenbelt, Maryland

5   JOSE JOAQUIN MORALES,      September 27, 2013

6        Defendant.      9:00 a.m.

7   ------------------------/

8                TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE ROGER W. TITUS
9      UNITED STATES DISTRICT JUDGE, and a jury

10  APPEARANCES:

11  For the Government:    United States Attorney's Office
                    By: SANDRA WILKINSON, ESQUIRE
12                   MARTIN CLARKE, ESQUIRE
                    36 South Charles Street
13                 Fourth Floor
                    Baltimore, Maryland 21201
14

15  For the Defendant:    Law Offices of Gary Edward Proctor
                    By:  GARY EDWARD PROCTOR, ESQUIRE
16                 Eight East Mulberry Street
                    Baltimore, Maryland 21202
17
                    Law Office of Jonathan Zucker
18                 By:  JONATHAN SETH ZUCKER, ESQUIRE
                    1350 Connecticut Avenue NW
19                 Suite 202
                    Washington, D.C. 20036
20
   Court Reporter        Lisa K. Bankins RMR
21                 United States District Court
                    6500 Cherrywood Lane
22                 Greenbelt, Maryland 20770

23

24  Proceedings recorded by mechanical stenography,
   transcript produced by notereading.
25

1   called Dustin Ray to the stand.  Sir, would you please

2   stand?

3           THE CLERK:  If you would raise your right hand

4   for me, please?

5   Thereupon,

6                       DUSTIN RAY,

7   having been called as a witness on behalf of the

8   government and having been first duly sworn by the

9   Deputy Clerk, was examined and testified as follows:

10          THE CLERK:  All right.  Thank you.  Please be

11  seated.  I just need you to begin -- you can slide up to

12  the microphone for me, please.  And you can adjust it.

13  And begin by stating your name for the record.

14          THE WITNESS:  I'm Dustin Ray.

15                  DIRECT EXAMINATION

16          BY MR. CLARKE:

17  Q    And, sir, would you spell your name, please?

18  A    D-U-S-T-I-N.  R-A-Y.

19  Q    And sir, how old are you?

20  A    I'm 30.

21  Q    And where did you grow up?

22  A    In a south Baltimore neighborhood called

23  Lakeland.

24  Q    And what are some other neighborhoods around

25  Lakeland?

DIRECT EXAMINATION OF RAY

1       A    There's Morrell Park about two miles away.

2   Cherry Hill.  There's lumber yard about five miles away.

3   There's Lansdowne.

4       Q    How about Pigtown?

5       A    Pigtown is about five miles away.

6       Q    And is all that pretty much in the area of

7   southwest Baltimore?

8       A    Yeah.  Pretty much.

9       Q    And sir, how far did you go in school?

10      A    I went to the 12th grade.

11      Q    And are you married?

12      A    No.

13      Q    Do you have any children?

14      A    No children.

15      Q    Are you currently incarcerated?

16      A    Yes, I am.

17      Q    And where are you incarcerated?

18      A    I'm at the Chesapeake Detention Facility,

19   Baltimore City.

20      Q    And how long have you been there?

21      A    About 22 months.

22      Q    When we talk about the Chesapeake Detention

23   Facility, we'll be using the abbreviation CDF.  Okay?

24      A    Okay.

25      Q    And again how long have you been there?

**329**

DIRECT EXAMINATION OF RAY

1      A    About 22 months.  Since November 2011.

2      Q    All right.  And so the math would be about 22

3   months?

4      A    22 months.

5      Q    And why are you at the Chesapeake Detention

6   Facility?

7      A    I'm currently pending sentencing for a drug

8   case, conspiracy case.

9      Q    All right.  And do you have an attorney?

10      A    Yes, I do.  His name is Gerald Ruter.  I don't

11   see him here today.

12      Q    You spell his last name R-U-T-E-R.  Correct?

13      A    Yes.

14          MR. CLARKE:  May I approach?

15          THE COURT:  You may.

16          BY MR. CLARKE:

17      Q    Mr. Ray, I'm showing you what is marked for

18   identification purposes only R-1, which purports to be a

19   proffer agreement.  Do you see that, sir?

20      A    Yes.

21      Q    It's addressed to whom?

22      A    To Gerald Ruter.

23      Q    You need to pull the microphone over when you're

24   talking.  Okay?  Who is it addressed to?

25      A    To Gerald Ruter.

**330**

DIRECT EXAMINATION OF RAY

1      Q    And it's in reference to a criminal case with

2   your name in it?

3      A    Yes.

4      Q    And does your signature appear on the back?

5      A    Yes, sir.

6      Q    I'm showing you Government's Exhibit Number R-2

7   for identification purposes only.  And do you recognize

8   your signature on the back of that document as well?

9      A    Yes.  Yes, I do.

10      Q    And again that's addressed to your attorney, Mr.

11   Gerald Ruter?

12      A    Yes, it is.

13      Q    And this is also a document concerning your

14   pending case in federal court, is it?

15      A    Yes.

16      Q    And what is this agreement, R-2?

17      A    That's basically my cooperation agreement.

18      Q    And you pled guilty pursuant to this agreement?

19      A    Yes, I did.

20      Q    So let's refer to it as the written plea

21   agreement.  All right?

22      A    Yes.

23      Q    And when did you plead guilty pursuant to your

24   plea agreement?

25      A    I believe it was in August 2012.

660

**331**

```
 1        Q    So that's a little more than a year ago?
 2        A    Yeah.
 3        Q    And have you been sentenced for that case yet?
 4        A    I haven't been sentenced.
 5        Q    And what did you plead guilty to?
 6        A    Conspiracy to possess with intent to distribute
 7   drugs, cocaine.
 8        Q    And how about a second count of attempted
 9   possession with intent?
10        A    Yes.  And attempt to possess.
11        Q    And both of those are felony offenses.  Correct?
12        A    Yes, they are.
13        Q    Who is your judge in that case?
14        A    His name is Judge William Quarles.
15        Q    What is your understanding of the sentence that
16   you're facing under your plea agreement?
17        A    I'm a career offender.  So a possible life
18   sentence.
19        Q    And what is your understanding of what your
20   obligations are under this plea agreement?
21        A    Everything that I say and testify to has to be
22   truthful or else my agreement is void.
23        Q    And what is your understanding of the
24   government's obligations and responsibilities under the
25   plea agreement if you fulfill your obligations?
```

661

**332**

DIRECT EXAMINATION OF RAY

```
 1      A    They'll simply make a suggestion to my judge for
 2   a lesser sentence.
 3      Q    So you're providing as you said truthful
 4   information in return for a reduced sentence.  Is that the
 5   short of it?
 6      A    Basically.
 7      Q    Who will ultimately decide what your sentence
 8   will be?
 9      A    My judge.
10      Q    Pursuant to your plea agreement, have you
11   provided information in other cases?
12      A    Yes, I have.
13      Q    And have you provided information in other
14   investigations?
15      A    Yes, I have.
16      Q    And have you testified in other cases?
17      A    Yes, I have.
18      Q    Let's talk a little bit more about your
19   involvement in the criminal justice system.  Can you tell
20   us how many other convictions you've had for felony drug
21   offenses?
22      A    I have had three prior convictions for felony
23   drugs.  Two in 2011 and one in 2005.
24      Q    Well, you said 2011.  Was that a misstatement?
25      A    I'm sorry.
```

662

**333**

DIRECT EXAMINATION OF RAY

1    Q    That's okay.

2    A    They were in 2002.  Two of them.

3    Q    All right.

4    A    One was in 2005.  This one is 2011.

5    Q    Just so we're clear, two felony drug convictions

6  in 2003?

7    A    2002.

8    Q    All right.  And how old were you then?

9    A    I was 19 then.

10    Q    And then you had another one in 2005?

11    A    Yeah.  I was -- I believe I was 22 in 2005.

12    Q    And in what jurisdiction, what court?

13    A    They were all from Baltimore City convictions.

14    Q    And, sir, have you also been convicted of giving

15  a false statement to a police officer?

16    A    Yes.  That was --

17    Q    How old were you then?

18    A    I was -- I believe I was 18 or 19 then.

19    Q    So that was also back in 2002?

20    A    Yes, sir.

21    Q    Regarding your detention at the Chesapeake

22  Detention Center, can you tell us what cell number you've

23  had there since arriving?

24    A    When I first arrived, I was in Cell A-20.

25    Q    All right.  And after you were in that cell,

**334**

DIRECT EXAMINATION OF RAY

1    what cell were you moved to?

2        A    I don't recall.  I recall the I was -- they

3    moved me to E pod.

4        Q    So was there a time you were on A pod?

5        A    Yes.

6        Q    So ultimately you arrived in a section of the

7    prison called A pod?

8        A    Yes.

9        Q    A as in apple?

10       A    Yes, sir.

11       Q    And do you know the defendant in this case?

12       A    Yes, I do.

13       Q    Mr. Morales?

14       A    Yes.

15       Q    And how do you know the defendant in this case?

16       A    Well, we were in A pod together for five to six

17   months.

18       Q    All right.

19            MR. CLARKE:  Your Honor, at this time I'd like

20   to read into the record Stipulation 3 and also move into

21   evidence R-5, which are the prison's traffic history.

22            THE COURT:  Why don't you read the stipulation

23   into the record?

24            Ladies and gentlemen, as I've told you before,

25   stipulations are an agreement between the parties that

DIRECT EXAMINATION OF RAY

1    certain facts are true.  You should regard these facts as

2    true.

3            MR. CLARKE:  It is agreed and stipulated between

4    the parties that during the period of November 29, 2011

5    and March 28th of 2012, Dustin Ray and Jose Morales were

6    both residing at the Chesapeake Detention Facility in

7    Baltimore, Maryland in Pod A also known as A pod in Cells

8    20-A and 21-A respectively, which are located next to each

9    other.

10           BY MR. CLARKE:

11      Q    So according to the stipulation, sir, you and

12   Mr. Morales were in A pod together beginning in November

13   of 2011.  Correct?

14      A    Correct.

15      Q    And also according to the stipulation, you were

16   in cells right next to each other?

17      A    Yes.  I was in Cell 20, A-20.  He was in 21.

18      Q    I need you to keep your voice up.  Okay?

19      A    Okay.

20      Q    And were these double-bunked cells or did you

21   have them by yourselves?

22      A    No.  They are double bunked.

23      Q    And was his cell to the right or left of yours?

24      A    If you're facing the cell, it's to the right.

25      Q    Okay.  And had you ever met Mr. Morales before

665

**336**

DIRECT EXAMINATION OF RAY

1    November of 2011 when he was also brought to the A pod

2    section?

3        A    No, I haven't.

4        Q    When he arrived and he became your next door

5    neighbor, did you guys engage in any conversations?

6        A    The next day, we started to speak to each other.

7        Q    And upon speaking with him, did you find that

8    you all had some mutual acquaintances?

9        A    Yes.

10       Q    Can you tell us about that?

11       A    Some of the acquaintances that we had were Harry

12    White, Freddy Kaiser, Nicky Kreps, and there was a few

13    others I can't recall.

14       Q    Okay.  So and what did you understand from Mr.

15    Morales about where he lived with respect to where you

16    grew up?

17       A    He lived in the neighborhood next to mine,

18    Morrell Park.  It's about two miles away.

19       Q    Notwithstanding the fact that you guys were a

20    couple miles away from each other growing up, you had

21    never met each other?

22       A    Right.

23       Q    And once you started talking with him, how did

24    you guys get along?

25       A    We got along pretty good since we knew all the

666

**337**

DIRECT EXAMINATION OF RAY

1   same people, we were from the same area, we had the same

2   drug charges.

3        Q    And can you tell us a little bit about your days

4   there and how much time you and Mr. Morales would spend

5   together on a given day?

6        A    Pretty much, every day is the same.  It's just

7   we're stuck next to each other on the tier.  So we spend

8   all day next to each other.

9        Q    Can I ask you some details about how it's set up

10  and how you spend your day?  Can you tell the ladies and

11  gentlemen of the jury how the A pod is set up?  How many

12  cells are there, how many inmates are in the A pod

13  section?

14       A    Well, there are 12 cells to each pod.  There's

15  six downstairs and six upstairs with steps in between and

16  it accommodates anywhere to 24 inmates at a time.  And we

17  have the day room is a common area where everyone shares.

18  It's not very big.  There's a yard connected about

19  50 feet, a caged-in yard.  It's not very big and that's

20  pretty much it.  There's a television, some plastic

21  chairs.

22       Q    All right.  So it's a two-tiered cell block

23  area?

24       A    It's two tiered.

25       Q    And if you come out, you're on the bottom or the

667

**338**

DIRECT EXAMINATION OF RAY

1   top?

2       A    The bottom.

3       Q    So you both were on the bottom side by side?

4       A    Yes.

5       Q    If you walked out of your cells, were you in the

6   common area?

7       A    Yes.  As soon as you come out.

8       Q    How about the guys upstairs?  If they walked out

9   of their cells, were they in the common area, too?

10      A    It's just a hallway to walk down the steps into

11  the common area.

12      Q    So if they want to be a part of the common area,

13  they have to leave their cells, then come down --

14      A    Yes, sir.

15      Q    -- to the first floor?  All right.  And about

16  how large is the common area?

17      A    About as big as this space in front of us I'd

18  say.

19      Q    All right.  And what kind of furniture is in the

20  common area?

21      A    There's about three to five circle moveable

22  wooden tables and just our plastic chairs that we get,

23  each inmate gets.  There's a microwave.  One T.V. on the

24  wall and that's about it.

25      Q    And if you want to sit on the chairs, you have

**339**

DIRECT EXAMINATION OF RAY

1    to bring a chair out from your cell?

2        A    Yes.

3        Q    All right.  And how often do you all get a

4    chance to get out of your cells and be in the common area

5    together?

6        A    From 9 in the morning until 9:45 at night and

7    then they lock the door.  We have to lock back in from 2

8    to 4 for count time.  But pretty much all day.

9        Q    So all day except for a two-hour period in the

10   middle of the day when they do a count?

11       A    Yeah.

12       Q    And is there any restrictions on where you can

13   go within the common area or on the upstairs landing or on

14   the downstairs area or in and out of each other's cells?

15       A    We're not supposed -- the only restriction is

16   we're not supposed to go in each other's cells, but

17   everyone does.  But no, there's no restrictions to answer

18   your question.

19       Q    And you mentioned a recreation area.  What kind

20   of area was available for you guys to exercise and/or walk

21   around in?

22       A    Basically, a caged in area about 50 feet down a

23   hallway connected to our unit.  It's about the same size

24   as this in front of us also.  Maybe two of these.

25       Q    All right.  And would you all go there and

669

**340**

DIRECT EXAMINATION OF RAY

```
 1   recreate together?

 2        A    Whoever wants to go outside is allowed to go

 3   outside.

 4        Q    There's no restrictions on that?

 5        A    No.  There's no restriction.

 6        Q    And how about meals?

 7        A    Meals are brought to us in the common area three

 8   times a day.

 9        Q    And so three times a day, you all eat in that

10   common area?

11        A    Yes, sir.

12        Q    And when you guys were together in one of these

13   areas during one of these times during the days, can you

14   tell us just generally what kind of things you guys talked

15   about?

16        A    Basically, we talked about home, people we knew,

17   acquaintances.  We talked about filing motions out of a

18   lot of cases, case work, what we were going to do, what we

19   planned to do.  That's basically it.  Not really much.

20        Q    All right.  And did there come a time when Mr.

21   Morales approached you about an idea that he had?

22        A    Yes.

23        Q    And how did that come about?  How did that

24   start?

25        A    Well, he knows I'm in a bad situation and I was
```

**341**

DIRECT EXAMINATION OF RAY

1    always upset, getting to tears because I'm facing so much

2    time.  And he told me he had a way that I could get out of

3    jail a lot sooner.

4        Q    And did he share that idea with you?

5        A    Yes, he did.

6        Q    Okay.  And what did he say?

7        A    It was basically to tell the government about a

8    murder in exchange for a reduced sentence.

9        Q    And let me stop you there.  He wanted you to

10    tell the government about a murder?

11        A    Yes.  Come to the government and tell them I had

12    information about a murder to exchange it for a favorable

13    plea or sentence.

14        Q    All right.  And what was your response?

15        A    Naturally, I was interested because I want to

16    come home.

17        Q    All right.  So what happened next?  Did you have

18    a murder to tell them about?

19        A    I didn't have a murder.  But he told me he had a

20    plan to use two people, a Troy Lucas and a Rob Long and I

21    was to remember certain details put together in a story to

22    tell the government and I was supposed to remember these

23    key details.

24        Q    All right.  And how did this murder supposedly

25    happen?

DIRECT EXAMINATION OF RAY

1        A    Well, supposedly the story that I was suppose to

2    tell to the government was this guy, Troy Long was a

3    customer of mine, drug customer and he drove to my house

4    one day in his red truck.

5        Q    Let me stop you there.  You said earlier Troy

6    Lucas and Rob Long.

7        A    Rob Long.

8        Q    Well, you just said there Troy Long.  You

9    conflated the two names.

10       A    Oh.

11       Q    That's okay.

12       A    Troy Lucas drove to my truck -- I'm sorry --

13   drove to my house in his red truck.  And when I came out

14   of my house to get in his truck, I noticed a small silver

15   handgun, a small caliber automatic.  And I asked Troy and

16   I said that's a nice gun, I want to know, I want to know

17   if you will sell it to me.  And Troy began to brag and say

18   you don't want that gun, that gun has a body on it.  And

19   he goes on to tell me the story about how he used this gun

20   to kill Rob Long.

21       Q    Story who killed Rob Long with that gun?

22       A    The story is that Troy Lucas shot Rob Long with

23   the gun.

24       Q    All right.  So up until this point, everything

25   you just told us, the story you narrated is not something

**343**

DIRECT EXAMINATION OF RAY

1   that actually happened?

2       A    No.  This is the make-believe story that I'm

3   supposed to come forth for the government.

4       Q    All right.  And at that time did you know

5   anybody named Troy Lucas?

6       A    No.

7       Q    At that time did you know anybody named Rob

8   Long?

9       A    No.

10      Q    And if and when you were to tell this account of

11  how this murder happened, how were you to be able to show

12  that you knew Rob Long or Troy Lucas?

13      A    I was shown a picture to remember his face in

14  case the government were to ask me what this guy looked

15  like.

16      Q    Which guy?

17      A    This guy, Rob Long, that was murdered.

18      Q    So he showed you a picture?

19      A    Yes.

20      Q    And how about Troy Lucas?

21      A    No.  We never -- couldn't locate a picture of

22  Troy Lucas.

23      Q    I'm showing you what is marked as Government's

24  Exhibit R-3.  Do you recognize what's in this photograph,

25  sir?

**344**

DIRECT EXAMINATION OF RAY

1      A     I believe the woman in the back name is Sharon.

2      Q     Let me ask you this first.  Do you recognize

3  this photograph?

4      A     Oh, yeah.  This is the picture I was shown.

5      Q     This was the picture you were shown where?

6      A     On the A tier.

7      Q     By whom?

8      A     Jose.

9      Q     And why did Jose say he would show you this

10  picture?

11     A     So I could remember what Rob Long looked like in

12  case I was shown pictures of him by the government when

13  telling my story.

14     Q     When you were shown this picture, did you

15  recognize the person in there, the person within the

16  photograph -- in the photograph?

17     A     No.

18     Q     All right.  And did you recognize anybody in

19  this photograph?

20     A     The woman in the back standing in the doorway, I

21  believe her name is Sharon.

22     Q     And how is it that you recognize her?

23     A     I used to sell PCP to her.

24     Q     After you received this, did there come a time

25  when you had a proffer with the government about what Mr.

674

**345**

```
1    Morales had told you?

2         A    After.

3         Q    Okay.  And did you provide this photograph to

4    the authorities at that proffer?

5         A    Yes.

6         Q    And I notice that there's some handwriting on

7    the back.  Is that your handwriting, sir?

8         A    Yes, it is.

9         Q    And the name there, is that related to this case

10   at all?

11        A    The top phone number was a cell phone.

12        Q    All right.  Listen to me.

13        A    No.  It's not related to the case.  Sorry.

14        Q    All right.  Thank you.  Was it just this one

15   time that he discussed this murder story with you and if

16   not, how many times and were there more details that were

17   added?

18        A    It's not the only time.  We discussed it quite a

19   few times.  More than five times.  I don't recall the

20   exact number.  But yeah, I was supposed to remember more

21   details of how Troy actually killed Rob.  That he said he

22   did it down on the train tracks next to a neighborhood

23   called lumber yard.  He said but before he shot him with

24   the gun, he tried to inject him with drugs to make him

25   overdose.  When that didn't work, he, Troy, pulled that
```

1    same silver gun out and shot him once in the back of the

2    head and when he spun around, they shot him again in the

3    face.  These were key details that I was supposed to

4    remember.

5        Q    All right.  And did you at any point during

6    these conversations about this story and the details that

7    he is providing, did you ever ask Mr. Morales how he knew

8    these details or why he's telling you these details?

9        A    Well, towards the end, I was curious like is

10   this thing, is this going to work, is this even real and

11   he assured me that it was going to work, it was big, it

12   was a real murder.  That he in fact actually had the

13   murder done, but only he knows these key details and which

14   he could be convicted for it.  He also planned on coming

15   to the government with his side.

16       Q    What do you mean by that?

17       A    Later on, he planned on coming and telling his

18   version with his key details of this murder.  It was

19   supposed to go along with my story and he was going to try

20   to get a favorable plea or sentence.

21       Q    I'm sorry.  He was to get what?

22       A    A favorable sentence in exchange for the

23   information that he --

24       Q    Well, which details were you supposed to tell

25   and which details was he supposed to share?

676

**347**

DIRECT EXAMINATION OF RAY

1     A    The details that is about the story about Troy

2    Lucas killing Rob Long.  I don't recall him ever telling

3    me what he planned on actually telling the government.

4        Q    Did he have a name or a term for this idea that

5    he had?

6        A    Yeah.  The elephant.  If we talk about, if we

7    mentioned it, we call it the elephant.

8        Q    Did he say why he called it the elephant?

9        A    It was so big of a plan.  It was big pretty

10    much.

11        Q    And did you consider following this plan?

12        A    Yes, I did considering going through with this,

13    this plan.  I'm desperate seeking something.  Yes, I

14    thought about actually using the plan.

15        Q    At that proffer that you -- where you provided

16    this photograph, did you tell the authorities about the

17    details of this elephant plan?

18        A    Yes.

19        Q    All right.  And sir, do you know an individual

20    by the name of Stanley Needleman?

21        A    Yes, I do.

22        Q    And how do you know him?

23        A    I know him -- I went to retain him for a drug

24    charge one time.

25        Q    And did you retain him?

677

**348**

DIRECT EXAMINATION OF RAY

1      A    No.  I never actually retained him.

2      Q    So did you physically meet him?

3      A    Yeah.  I physically went to his office and met

4    him.

5      Q    How many times?

6      A    I believe once.

7      Q    All right.  And beyond that one time, did he

8    represent you?  Did you talk to him on the phone?  Did you

9    ever meet him again?

10     A    I don't recall actually.

11     Q    You don't recall what?

12     A    I don't recall ever meeting him again or talking

13    to him.

14     Q    So are you saying that you're sure that it was

15    only one time that you met Mr. Needleman?

16     A    I'm not sure.  It might have been once or twice,

17    but not many more than twice.

18     Q    All right.  And are you sure about whether or

19    not he represented you in any prior case?

20     A    Yes.  I'm sure he didn't represent me.

21     Q    And approximately when would this have happened?

22     A    When did I go for --

23     Q    When would you have met Mr. Needleman that one

24    or two times?

25     A    I was facing one of my drug charges.  I believe

1    it was in 2005 or 2004.  I'm not sure.

2        Q    All right.  And how about Richard Ingram?  You

3    ever heard of a person named Richard Ingram?

4        A    Yes.

5        Q    Where have you met an individual named Richard

6    Ingram?

7        A    We were locked up together in Jessup.

8        Q    Is Jessup a state prison facility?

9        A    A state prison facility.

10       Q    All right.  And how about an individual by the

11   name of Marshawn Stokes?

12       A    No.  That doesn't sound familiar.

13       Q    And, sir, who is the name of the prosecutor in

14   your pending drug case?

15       A    Christopher Romano.

16       Q    All right.  And did you meet with Mr. Romano on

17   more than one occasion?

18       A    I believe so.

19       Q    All right.  And those were for proffer sessions

20   where you provided information about your pending case?

21       A    Yes.  It's an unrelated case.

22       Q    And have you met with other prosecutors as well?

23       A    Yes.

24       Q    And did there come a time when you sent

25   Mr. Romano some personal correspondence?

679

**350**

1     A    Yes.

2     Q    And what did you send him, sir?

3     A    I sent him a Father's Day card.

4     Q    Why did you send the prosecutor a Father's Day
5  card?

6     A    It was just a nice gesture to try to -- he's a
7  hard prosecutor.  So I was trying to like soften him up.
8  I didn't expect to be in the middle of a courtroom.  It
9  was just a nice gesture.

10     Q    Well, you pointed out, sir, to soften him up.
11  Is that one of the reasons why you did it?

12     A    Yes.  Yes, it is.

13     Q    What does it mean to soften up a prosecutor?
14  What were you hoping for, sir?

15     A    He's recommending a reduced sentence.  So I was
16  just trying to be nice hopefully.  Any chance in hell if
17  that would even make a difference.

18     Q    Did you send myself or Ms. Wilkinson any
19  personal correspondence?

20     A    No.

21          MR. CLARKE:  Your Honor, I have no further
22  questions of this witness.

23          THE COURT:  Counsel, come to the bench.

24          (Bench conference:)

25          THE COURT:  This is the witness about whom there

CROSS-EXAMINATION OF RAY

```
 1    was some discussions before trial.

 2            MR. PROCTOR:  I'm not going there.

 3            THE COURT:  All right.  Thank you.

 4            (In open court:)

 5            THE COURT:  You may inquire.

 6                        CROSS-EXAMINATION

 7            BY MR. PROCTOR:

 8       Q    Good morning, sir.  How are you?

 9       A    Good morning.

10       Q    May name is Gary Proctor and I represent Mr.

11    Morales.  We haven't met before, have we?

12       A    No, sir.

13       Q    Let's start off talking about CDF, Chesapeake

14    Detention Facility, where you're housed.  Okay?

15       A    Okay.

16       Q    A couple of hundred inmates in there at least?

17       A    Yes, sir.

18       Q    Is it fair to say that on any given day, half of

19    them are telling?

20       A    I wouldn't know that, sir.

21       Q    Well, you talked about your cases.  Right?  You

22    have to answer yes or no --

23       A    Oh, I'm sorry.  Yes.

24       Q    And you're aware, are you not, that a lot of

25    other people took the same route you did?
                        *    *    *
```

**352**

DIRECT EXAMINATION OF O'HARA

```
 1    government and having been first duly sworn by the
 2    Deputy Clerk, was examined and testified as follows:
 3            THE CLERK:  Please be seated.  I just need you
 4    to speak into the microphone in front of you and begin by
 5    stating your name for the record.
 6            THE WITNESS:  My name is Katie O'Hara.
 7                       DIRECT EXAMINATION
 8            BY MR. CLARKE:
 9        Q   Ms. O'Hara, I'm going to ask you to scoot up in
10    your chair.
11        A   Um-hum.
12        Q   The microphone is moveable.  You can move the
13    whole base toward you and it's moveable up and down.
14    Okay.  Would you spell your first and last name?
15        A   Katie is K-A-T-I-E.  O'Hara, O, apostrophe,
16    H-A-R-A.
17        Q   Ms. O'Hara, where did you grow up?
18        A   In Towson, Maryland.
19        Q   And do you have a college degree?
20        A   I do.
21        Q   Where did you go to school?
22        A   I went to the University of Delaware.
23        Q   And do you have any post-graduate degrees?
24        A   I do.  I went to the University of Baltimore Law
25    School.
```

DIRECT EXAMINATION OF O'HARA

1   Q    And what did you do after law school?

2   A    Following law school, I was -- well, during law

3   school, I was clerking in the homicide division at the

4   Baltimore City State's Attorney's Office.  I had a few

5   jobs with private firms before that.  Just law clerk

6   positions while I was in law school.  And after law

7   school, I studied for the bar continuing to work at the

8   Baltimore City State's Attorney's Office.  And then when I

9   passed the Bar and was barred in the State of Maryland, I

10  became an A.S.A., an Assistant State's Attorney in

11  Baltimore City and I've been there since then.

12  Q    So do the math for us.  How long have you been

13  employed with the State's Attorney's Office?

14  A    Let's see.  As an A.S.A. since -- 2002, I

15  graduated from college.  In 2005, I graduated from law

16  school.  I was barred in December 2005.  So I became an

17  A.S.A. in the winter of 2006.  And let's see.  I probably

18  started working there though about two years before that.

19  So probably coming on ten years.

20  Q    All right.  And at least about six of these

21  years as an attorney?

22  A    Yes.

23  Q    And so what is your official title currently?

24  A    I'm an Assistant State's Attorney for Baltimore

25  City.  And specifically, I'm the community prosecutor for

**354**

1    Zone 3.  Our office is broken into three zones, which

2    means that I am a liaison between the community, the

3    police department and the State's Attorney's Office for

4    the northwest and southwest districts.

5        Q    I going to ask you to slow down a little bit for

6    the court reporter.

7        A    Um-hum.

8        Q    And what type of cases do you prosecute in your

9    present position?

10       A    In my present position, I have a real variety of

11   cases which is interesting.  Something from a misdemeanor

12   all the way up to a nonfatal shooting.  A lot of drug

13   cases as we look to target particularly violent

14   individuals in my districts or reactive cases such as

15   robberies, carjackings, assaults, shootings, something

16   that would happen in my district that would be of a

17   significant nature.

18       Q    And what other assignments other than being a

19   law clerk way back when have you performed as a Assistant

20   State's Attorney at that office?

21       A    I began my career in the juvenile division and

22   in the juvenile division handled as it pertains to

23   juvenile cases anything ranging from a theft or a petty

24   larceny, trespass, things like that, all the way up to

25   about robberies involving juveniles.  And then I moved

DIRECT EXAMINATION OF O'HARA

1    from juvenile to the district court.  In the district

2    court handled anything ranging from a trespass all the way

3    up to something like this, a more complicated theft

4    scheme, car accident cases involving criminal charges,

5    D.U.I.'s, things like that.

6        Q    And in your current position, what kind of cases

7    are you handling?

8        A    Again, in my current position, handling a

9    variety of cases.  The most significant cases tend to be

10   the nonfatal shootings, the more violent robberies,

11   carjackings and the more involved drug cases.

12       Q    Drawing your attention to March 2008, what was

13   your position?

14       A    In March of 2008, I was in the misdemeanor unit.

15   So I was in circuit court in the misdemeanor unit and I

16   had been there for a couple of months.

17       Q    And that's located on Calvert Street?

18       A    Yes, it is.

19       Q    And at the circuit court level, what type of

20   trials can a defendant have at that level?

21       A    At the circuit court level, the types of cases I

22   would have handled could have been anything that allowed a

23   jury trial.  So with a penalty, I believe it was one year

24   or more.  So some D.U.I.'s would come up, driving under

25   the influence or driving while intoxicated would come up

DIRECT EXAMINATION OF O'HARA

1    as a jury trial prayer.  Sometimes cases like these, a

2    theft case because of the penalty was higher obviously

3    than a year would come up.  Sometimes drug cases would

4    come up for a jury trial prayer, car theft, things like

5    that.

6        Q    All right.  Are you familiar with the victim who

7    was murdered in this case, Robert Long?

8        A    Yes.

9        Q    And how are you familiar with him, ma'am?

10       A    Mr. Long was charged as a defendant in these

11   cases when I handled them at the district court level and

12   then he continued as a defendant in the circuit court

13   level until he agreed to testify against Mr. Morales and

14   then he was a witness for a short period of time before he

15   was killed.

16       Q    All right.  And did he have a co-defendant with

17   any of the cases that you were prosecuting?

18       A    Yes.  Mr. Long was charged only with the theft

19   cases and his co-defendant was Mr. Morales.

20       Q    And do you see him in the courtroom today?

21       A    Yes.

22            MR. CLARKE:  For the record, gesturing towards

23   the defendant, Jose Morales, to the left of counsel.

24            BY MR. CLARKE:

25       Q    I'm showing you Government's Exhibits C-7, C-8,

**357**

DIRECT EXAMINATION OF O'HARA

1   C-9, C-10 and C-11.  What are these, ma'am?

2       A    So these are the charging documents for Jose

3   Morales and Robert Long.

4           MR. PROCTOR:  Judge, I have an objection.

5           THE COURT:  Excuse me?

6           MR. PROCTOR:  Can we approach?

7           THE COURT:  Yes.  Come to the bench.

8           MR. PROCTOR:  And if Mr. Clarke could bring the

9   exhibits with him, please.

10          THE COURT:  Bring the exhibits here so I can see

11  what you're talking about.

12          (Bench conference:)

13          THE COURT:  What is the objection?

14          MR. PROCTOR:  Charging documents.

15          THE COURT:  They're what?

16          MR. PROCTOR:  The charging documents are a

17  narration of the facts.  The fact that he was charged with

18  these things.  And I get the Court has already ruled that

19  he was facing time for them, all of that.  But the

20  underlying facts don't come in.  It's akin to a police

21  report.  So if it's for identification purposes only, I

22  got nothing.  If the government wants to send the

23  underlying facts in black and white on a charging

24  document --

25          THE COURT:  What is underneath the documents?

1          MR. PROCTOR:  Yeah.  Exactly.

2          MR. CLARKE:  What it is is the court document,

3    then it's the actual charging document.  In the state

4    court, as Your Honor knows, there's a statement of

5    probable cause which lists the sworn statement of

6    individuals who are taking out the charges.  In this case,

7    it's Sunderland or Detective Fields.  Sunderland has

8    already testified and as we have made a point of in the

9    past, because this is a witness murder, these documents

10   including the probable cause statements establish the

11   motivation whether true or not, these are being submitted

12   not for the truth of the matter asserted, but to establish

13   what Mr. Morales knew, what he was charged with, what

14   Mr. Long knew, what all the parties knew and more

15   importantly, what was at stake and what was the evidence

16   against them on the record.

17          Now if Your Honor wants to make a -- give an

18   instruction to the jury that these, just like the

19   indictment in this case is just a charging document,

20   that's fine.  They are to use this only for whatever you

21   want to say.

22          MR. PROCTOR:  The statement of probable cause

23   does not come in.  Witnesses come in and they can testify

24   to underlying facts and that's 404(b).  But again, judge,

25   if you just pull any one out at random and look at the

738

**359**

1    statement of facts, the jury is back there and he's not

2    charged with any of these crimes lest we forget --

3            MR. CLARKE:  Your Honor, it lists the --

4            MR. PROCTOR:  Right there.

5            MR. CLARKE:  It's all the things that we've

6    talked about.  It's already in evidence.

7            THE COURT:  This is the scaffolding case.

8            MR. PROCTOR:  And right behind that is the

9    baseball bat case and right behind that is the skid loader

10   case.

11           MR. CLARKE:  And there's already been testimony

12   about that.

13           MR. PROCTOR:  Testimony is fine, judge.  But for

14   example, the officers that are going to testify about

15   Mr. Long's murder, they don't get to submit their DEA-6's.

16           MR. CLARKE:  Well, no.  If he's going to kill

17   somebody, this is the reason why he kills them and these

18   are the facts that are alleged sufficient enough to kill

19   somebody and we've already had testimony about the facts

20   that are listed there.

21           THE COURT:  What kind of limiting instruction

22   would you propose I give?

23           MR. CLARKE:  Your Honor, I would say that these

24   documents are being admitted not for the truth of the

25   allegations that are contained therein, but for the fact

DIRECT EXAMINATION OF O'HARA

1   that they were filed in the manner they were filed.  Just

2   like the indictment in this case, I'm instructing you that

3   these are charging documents only.  You are to draw no

4   inference of guilt from the mere fact that these charges

5   were filed.  You may look at the filing of these charges

6   and the circumstances surrounding the charges and the

7   contents of the charging documents for determining other

8   questions and issues in this case.  But you can't use it

9   for any determination of guilt as to Mr. Morales.

10          MR. PROCTOR:  What I just heard Mr. Clarke say

11  these documents are irrelevant, but we're giving them to

12  you anyway.

13          MR. CLARKE:  No.

14          THE COURT:  No, no.  He is saying they are very

15  relevant.

16          MR. CLARKE:  Exactly.

17          THE COURT:  These are documents that involve Mr.

18  Morales and that he understood as result of this what were

19  the allegations.  It's only for the purpose of the

20  allegations he was facing and not for the purpose --

21          MR. PROCTOR:  The allegations have been

22  testified to.  But to give them a police report that they

23  can wave around in the jury room, look at all this other

24  stuff he did, that never comes in.

25          THE COURT:  Not look at what he did.  Look at

DIRECT EXAMINATION OF O'HARA

1   what he was facing.

2        MR. PROCTOR:  Again the first page tells you

3   that.  It tells you what the charge is.  It tells you what

4   the maximum penalty is or the second page.

5        MR. CLARKE:  And we've redacted anything in

6   there about bail, the prior criminal histories or

7   anything.  It's already been sanitized.  It's just the

8   alleged facts.

9        MR. PROCTOR:  I can show it to you, judge, if

10  you flip through.

11       MR. CLARKE:  That's just the docket, Your Honor.

12       THE COURT:  It's the docket.

13       MR. PROCTOR:  Right.  And I don't have a problem

14  with the docket.  And right here, judge, if you look

15  penalty, it's right there.  I don't have a problem with

16  that page coming in.

17       MR. CLARKE:  Your Honor, if we are going to go

18  through every single fact that's listed in the alleged

19  probable cause, all of those facts about the -- for

20  example, Your Honor, the fact that -- she's going to talk

21  about that in the charging documents it's not alleged that

22  Mr. Morales was at the scene on the scaffolding working.

23  Okay.  So this is the state of her case.  This is all she

24  has.  It's what contained in here.  And the jury has the

25  right to see that.  And the importance of Mr. Long who was

DIRECT EXAMINATION OF O'HARA

1    mentioned all throughout here, he's the one who's named in

2    here.  And the Court has already heard testimony that

3    Mr. Long was going to take the rap for this and Mr.

4    Morales is behind the scenes.  They get to see all that in

5    these charging documents to understand that all they had

6    was a recent possession case and that's why it was so

7    important to have Mr. Long cooperate and that's why the

8    motivation was so high to kill him.

9         MR. PROCTOR:  And I disagree, judge.  I saw

10   Judge Titus driving by in a red BMW.  Everyone can come

11   into court and say that and Ms. O'Hara can say that.  What

12   she can't then do is introduce the police report that

13   Judge Titus drove by in a BMW.  That's what the underlying

14   facts are.  The penalty is in there without giving it.

15        MR. CLARKE:  But the difference is this is not a

16   police report.  This is the death of a witness in a state

17   court proceeding where these charges were filed and they

18   have a right to see it.

19        THE COURT:  I overrule the objection and I'll

20   give a cautionary instruction that the purpose of which

21   these are being admitted is not to show his guilt of

22   anything.  It's not evidence in the sense of evidence of

23   guilt.  It's not to be taken as guilt of him as to the

24   matters charged, but merely the fact that these charges

25   were pending against him.

**363**

DIRECT EXAMINATION OF O'HARA

```
1          MR. CLARKE:  In the manner in which they were.
2          MR. PROCTOR:  And, judge, can you scout's honor
3   if I find some contrary case law over the weekend agree to
4   revisit it?
5          THE COURT:  It ain't over until the fat lady
6   sings.
7          MR. PROCTOR:  It's under the local rule, you
8   know.
9          THE COURT:  I'll always reconsider it.
10         MR. PROCTOR:  Thank you.
11         (In open court:)
12         THE COURT:  All right.  Ladies and gentlemen,
13  there are some documents that the prosecutor is going to
14  be handing to the witness that pertain to prosecutions in
15  the Circuit Court for Baltimore City.  These documents
16  contain charges.  They are being admitted for a very
17  limited purpose and it is not the purpose to show or
18  demonstrate that Mr. Morales or anybody else is guilty of
19  the crimes charged in these documents.  It's not for that
20  purpose.  It's for the more limited purpose of showing
21  what were the charges that were extant against Mr. Morales
22  and the nature of the charges only in the overall context
23  of this case.  But you're not to infer his guilt of these
24  charges or of the charges in this case from these
25  documents.  They are just to show you what was pending
```

743

**364**

DIRECT EXAMINATION OF O'HARA

1    against him and the nature of the charges that were

2    pending.  You may proceed.

3           MR. CLARKE:  Thank you, Your Honor.

4           BY MR. CLARKE:

5       Q    So again what are these five documents, C-7

6    through C-11?

7       A    C-7 through C-11, each contain a packet of

8    documents -- there are two packets of documents.  The

9    first packet is Judicial Information System or J.I.S.

10   printouts that show the nature of the charges and also the

11   history of the case in the court as well as the

12   defendant's information.  The second packet is the

13   charging document from the District Court of Maryland and

14   this is as to each of the charges.

15      Q    So each one of these represents a separate,

16   individual or case.  Is that correct?

17      A    Correct.

18      Q    So we have five here?

19      A    Yes.

20      Q    So how many total cases does this represent?

21      A    This represents two theft cases -- two theft

22   cases and one assault case.

23      Q    And how many co-defendants in each theft case?

24      A    In each theft case, it was Mr. Morales and

25   Mr. Long.

744

**365**

DIRECT EXAMINATION OF O'HARA

1      Q    So two for one theft, two for the other and one

2   for the assault?

3      A    Correct.

4      Q    All right.  How was it that you were the

5   prosecutor on these cases?

6      A    They became assigned to me in the district court

7   at the time my boss, Dave Mabrey, had been approached by

8   Detective Fields about the cases and wanted someone who

9   was a little bit more senior in district court to handle

10  them because of the nature of them and Dave assigned them

11  to me in district court.

12     Q    And do you recall the penalties that Mr. Morales

13  and Mr. Long were facing as a result of the charges set

14  forth in these charging documents?

15     A    As to the theft cases, felony theft carried 15

16  years, $25,000.  Because there's two of them, a court

17  could run those sentences consecutively.  So a total for

18  the theft cases would be 30 years and/or a $50,000 fine

19  and then as to the assault case, it would be a ten-year

20  punishment for Mr. Morales.

21     Q    Those would be maximums?

22     A    Those are the maximums.

23     Q    All right.  And can you tell us -- so the first

24  theft case, can we call that the scaffolding case?

25     A    Sure.

745

**366**

1     Q    And just a couple of sentences, what is the gist

2  of the charges against Mr. Long and Mr. Morales as to the

3  scaffolding case?

4     A    Some scaffolding which is a construction

5  equipment used in the types of buildings and the types of

6  construction areas that Mr. Morales was in charge of

7  appeared at a site that was run by Mr. Morales.  It was

8  investigated.  It was determined that the scaffolding had

9  been stolen recently from another construction site.  It

10  belonged to a company called Loomis.  And so the nature of

11  the charges against Mr. Morales was recent possession of

12  stolen property and as to Mr. Long, it was that he had

13  been seen either as I recall, either putting up the

14  scaffolding or carrying the scaffolding and he was part

15  and parcel of the scaffolding being there.

16     Q    So Mr. Long was in actual possession of the

17  stolen scaffolding Mr. Morales was in --

18     A    Constructive position.

19     Q    And can you tell us approximately how much was

20  the alleged value of the scaffolding that was stolen?

21     A    As I recall, I think it was about $30,000.

22     Q    And this referred to the second case as the skid

23  loader case or the caterpillar skid loader case?

24     A    Um-hum.

25     Q    And again in just a few sentences, what was the

DIRECT EXAMINATION OF O'HARA

```
 1    gist of the charges as alleged in these charging

 2    documents?

 3              MR. PROCTOR:  Objection.

 4              THE COURT:  Basis?

 5              MR. PROCTOR:  Calls for hearsay.

 6              MR. CLARKE:  It's in evidence.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  The nature of the caterpillar, the

 9    skid loader case was that this huge piece of construction

10    equipment was on one of Mr. Morales' sites in south

11    Baltimore.  He was in charge of the site.  Therefore, he

12    was charged as being in possession of recently stolen

13    property.  And as I recall, Mr. Long made a statement to

14    one of the officers who arrived at the scene saying that

15    he had bought the caterpillar at some point.  And so there

16    was some ownership there as well.

17         Q    All right.  And what was the alleged value of

18    the caterpillar skid loader?

19         A    As I recall, it was about $40,000 or so.  It was

20    a big piece of equipment.

21         Q    And there was the third case, the assault case.

22    And just in one sentence, what was that about?

23         A    That Mr. Morales had threatened and chased

24    Warren Lumpkin with a bat.

25         Q    And what was the maximum penalty in that case?
```

747

DIRECT EXAMINATION OF O'HARA

```
 1        A    Ten years.  And probably $25,000 fine.  But I
 2   don't recall.
 3        Q    And these were all charged at what court level
 4   in the state system?
 5        A    They were charged at the district court level.
 6        Q    And you ended up having all three?
 7        A    Yes.
 8        Q    So in court parlance, they were consolidated?
 9        A    Yes.
10        Q    And did you follow them from that point on?
11        A    Yes.  I followed them through the circuit court
12   level.
13        Q    Did Mr. Morales have counsel representing him in
14   the three cases?
15        A    Yes.  Mr. Stanley Needleman.
16        Q    And was Mr. Needleman, did he enter his
17   appearance as to all three of the cases from the very
18   beginning?
19        A    As I recall, yes.
20        Q    And were you familiar with Mr. Needleman before
21   he entered his appearance in these cases?
22        A    Yes.
23        Q    And how were you familiar with Mr. Needleman?
24        A    He had a lot of cases in district court.  I was
25   in district court at the time and he represented numerous
```

DIRECT EXAMINATION OF O'HARA

1    defendants.  We had many cases together before Mr.

2    Morales' case.

3        Q    And how would you describe your professional

4    relationship with Mr. Needleman?

5        A    Very friendly.

6        Q    Were you on a first name basis if you saw him

7    near the courthouse?

8        A    Out of deference to his age and how long he had

9    been around, I always called him Mr. Needleman.  But yes,

10    he always said call me Stanley and he called me Kate.

11        Q    And how about Robert Long?  Did he have an

12    attorney for his two theft cases?

13        A    He did.  It was Alex Leikus.

14        Q    And can you spell his last name?

15        A    L-E-I-K-U-S.

16        Q    When did Mr. Leikus enter his appearance?  Was

17    it from the very beginning or at some point thereafter?

18        A    You know, I don't recall.  I think -- I believe

19    it was right around the beginning.  If not, at the very

20    beginning.

21        Q    Were you familiar with Mr. Liekus the same way

22    you were with Mr. Needleman?

23        A    Yes.  More probably more casual relationship

24    because he was closer to my age.

25        Q    Were you aware of their office arrangements?

749

**370**

DIRECT EXAMINATION OF O'HARA

```
 1        A    Yes.

 2        Q    That is where their law offices were, any

 3   arrangements they had with each other?

 4        A    Yes.  As I was aware, they shared office space

 5   on Calvert Street.

 6        Q    Okay.  And had Mr. Leikus ever stood in for Mr.

 7   Needleman in any of your other criminal cases?

 8        A    Yes.  Quite frequently.

 9        Q    So if Mr. Needleman couldn't make it, Mr. Leikus

10   would show up in his stead?

11        A    He would either show up in his stead or I would

12   turn to Alex in the courtroom and say this is one of

13   Stanley's cases, are you standing in for him and he would

14   say okay, sure, I'll stand in for him.

15        Q    And were there times when Mr. Leikus stood in

16   for Mr. Needleman when you had these three cases scheduled

17   for trial?

18        A    Quite often.

19        Q    So on those occasions, Mr. Needleman didn't even

20   show up, Mr. Leikus was representing both parties for the

21   purposes of that proceeding?

22        A    Right.

23        Q    Did it concern you that two attorneys who share

24   office space were representing co-defendants in a criminal

25   case and if so, why?
```

**371**

DIRECT EXAMINATION OF O'HARA

1     A    Yes, it did.  I spoke to my supervisors about it

2   and as I recall, I did some preliminary research on a

3   motion to have either Alex or Stanley removed from the

4   case because they would be in conflict.  In this

5   particular case, it concerned me because I knew that Alex

6   stood in for Stanley so much, they really kind of acted as

7   one law firm or one lawyer.  So I didn't think it

8   appropriate under the circumstances that they should

9   represent co-defendants.

10     Q    That's on them.  Right?  They have to decide

11   between themselves?

12     A    Yes.  That's on them.  But I remember talking to

13   a supervisor and doing some preliminary research about

14   asking the Court once we got to that point which we never

15   got there, but asking the Court to require one of them to

16   step out.

17     Q    Do you recall approximately how long these three

18   cases were in the district court system?

19     A    As I recall, they were filed in the district

20   court in the winter of 2007 and then prayed to a jury

21   trial in the summer of 2007.

22     Q    All right.

23     A    Six, seven, eight months.

24     Q    And then after they prayed a jury trial, where

25   did they go?  Remind us again.

DIRECT EXAMINATION OF O'HARA

1        A    Down to circuit court on Calvert Street.

2        Q    And I think you've already testified that they

3    were eligible for a jury trial at that point.  Were you

4    the prosecutor at the circuit court level as well?

5        A    Yes.  So the case actually corresponded with my

6    movement up to the circuit court level as a prosecutor

7    there.

8        Q    And just so we have a point of reference, it's

9    already in evidence as N-6.  And can you just tell us what

10   that is?

11       A    That's a picture of the circuit court.

12       Q    And when someone prays a jury trial from the

13   district court system, they end up in this building?

14       A    Either this building or the building across the

15   street.  We have the Mitchell Courthouse and this is

16   Courthouse East.

17       Q    So beginning in August of 2007, this was going

18   to be the level where the case was going to be tried?

19       A    Correct.

20       Q    And how long was it at the -- you do the math

21   for us.  How long was it at this level before Mr. Long was

22   murdered?

23       A    So from the summer of 2007 until March of 2008.

24   So maybe another nine months, eight or nine months.

25       Q    When was the last scheduled trial date before

1   Mr. Long's death when both Mr. Long and Mr. Morales were

2   going to be tried together for these theft cases?

3       A    It was scheduled for trial April 17, 2008.

4       Q    Right.  And what was the previous trial date

5   that was scheduled where they both were going to be tried

6   on these theft charges?

7       A    I knew it was in February of 2008.  I don't

8   recall the date.

9       Q    So again if you'd help us do the math?  If he

10  was murdered on March 23, 2008, approximately how many

11  weeks was that before the --

12      A    Maybe three weeks or so.  Probably about three

13  and a half weeks.

14      Q    March 24th.  I'm sorry.  Okay.  About three

15  weeks?

16      A    Um-hum.

17      Q    Relative to the other types of cases that are

18  prosecuted normally in the district court and that are

19  generally prosecuted in the circuit court, how would you

20  describe the significance of these three cases for your

21  office?

22      A    From my perspective, these were more significant

23  than most -- well, they were definitely more significant

24  than anything I had handled in district court.  Being

25  commercial thefts, first of all, always sort of increases

DIRECT EXAMINATION OF O'HARA

1   the significance.  The value certainly was far more

2   significant than anything I had tried or that I had ever

3   charged or seen charged really in district court.  A

4   $70,000 theft scheme.  The fact that there was really a

5   scheme here or looking like a scheme, that there was --

6   these were construction sites.  They were very similar and

7   it seemed that the property ended up on these construction

8   sites.

9           In 2006, 2007, Federal Hill was obviously going

10  through a lot of re-development.  It was an area in south

11  Baltimore that people are putting a lot of money into and

12  so it was I think important for the city to maintain that

13  area.  So in my opinion, they were much more significant

14  than most of the cases I was dealing with at the time.

15      Q    And you've already told us about the potential

16  sentences.  Was there anything about their histories that

17  also factored into how you viewed the significance of

18  those prosecutions?

19          MR. PROCTOR:  Objection.

20          THE COURT:  Basis?

21          MR. CLARKE:  Your Honor, I'll withdraw the

22  question.

23          MR. PROCTOR:  Thank you.

24          MR. CLARKE:  Sure.

25          BY MR. CLARKE:

**375**

DIRECT EXAMINATION OF O'HARA

1     Q    In March of 2008, just before the last trial

2  date, up until that point in time, had you attempted to

3  enter into plea negotiations with Mr. Leikus and Mr.

4  Needleman?

5     A    We had offered both Mr. Long and Mr. Morales

6  plea deals in each case.

7     Q    And were they accepted?

8     A    No.

9     Q    And what kind of plea offers were you making to

10 them?

11    A    At district court, I don't remember Mr. Morales'

12 plea -- I should first say sometimes the plea offers are a

13 little bit fluid.  You find out more information.  The

14 case gets better or worse and sometimes they are a little

15 bit more fluid.

16         As to Mr. Morales, I know at one point we had

17 offered him ten years suspending all but five years with a

18 period of probation to follow.  So he would have to go to

19 jail for five years.  He would be on probation for

20 probably three to four years following his release.

21 During that probationary time, he would be exposed to the

22 additional five years of prison time.

23         As to Mr. Long, I believe that we had offered

24 him ten, suspend all but 18 months with a period of

25 probation to follow.  So similarly, he would have to do a

DIRECT EXAMINATION OF O'HARA

1    period of incarceration which in his case was a little bit

2    less or significantly less and then back up the rest of

3    the ten years while he was on probation.

4        Q    So as to Mr. Morales, the plea offer was ten

5    suspend all but four or five and that's if he didn't go to

6    trial.

7        A    That is right.

8        Q    And what was your thinking in terms of a

9    sentence that you might request if he had gone to trial

10   and been successful?

11       A    That it would be greater than the ten suspend

12   all but five years for sure.

13       Q    And generally, what's the rule of thumb there?

14   What would you have been recommending?

15       A    At the time I remember discussing with my

16   bosses, we would have been asking for a straight ten to

17   twelve years.

18       Q    All right.  And as to Mr. Morales, did you have

19   any eyewitnesses?

20       A    No.

21       Q    As to Mr. Morales, did you have all of the

22   scaffolding that had been stolen from the other

23   construction site?

24       A    No.  We only had some of it.

25       Q    So even though there were charges pending, was

DIRECT EXAMINATION OF O'HARA

1    the investigation into Mr. Morales, Mr. Long and the

2    missing scaffolding still underway?

3        A    Yes.

4        Q    And who were the detectives on your case?

5        A    So it was Detective Dale Fields and Detective

6    Steve Sunderland.

7        Q    Did there come a time when the case was pending

8    around March of 2008 when you were approached about the

9    possibility of Mr. Long cooperating?

10       A    Yes.  By Detective Sunderland.

11       Q    And how were you contacted?

12       A    I believe Detective Sunderland called me, I

13   don't know if it was at the office or on my cell phone and

14   indicated that Mr. Long had reached out to him about

15   coming in to give us a statement and cooperate in the

16   theft cases.

17       Q    And do you recall what day that was?

18       A    The day that Steve called me -- I don't recall

19   exactly what day Steve called me.  It would have been --

20   it was right around March the 10th which was the day we

21   did the proffer because we did it all very quickly.

22       Q    Let me show you a couple of things.  Maybe it

23   will help you remember.  I'm showing you Government's

24   Exhibit --

25            MR. CLARKE:  May I approach, Your Honor?

**378**

DIRECT EXAMINATION OF O'HARA

1          THE COURT:  You may.

2          BY MR. CLARKE:

3      Q    C-13.  Can you tell us what that is?

4      A    C 13 is an email from Monday, March 10, 2008 at

5   4:12 p.m. from me to Alex Leikus indicating the location,

6   et cetera, of the proffer which was going to be at

7   Baltimore County headquarters.

8      Q    So what is the date that you were advising --

9   what day did you tell Leikus that you were going to have a

10  proffer?

11     A    March 10th.

12     Q    And so when in reference to this did you learn

13  that Mr. Long was going to cooperate?

14     A    From Detective Sunderland?  Either the day

15  before or that day.  I have a feeling it was that morning

16  though.  I think it was.

17     Q    So the morning of the 10th or the day before?

18     A    Um-hum.

19     Q    And I'm showing you Government's Exhibit C-1.

20  What is this, ma'am?

21     A    This is a signed proffer agreement.

22     Q    And what's the date of that?

23     A    This is March 11th.

24     Q    So what date did the proffer take place?

25     A    The proffer actually took place on the 11th.

**379**

DIRECT EXAMINATION OF O'HARA

1      Q    So does that refresh your memory?

2      A    Yes, it does.  So I probably spoke with

3  Sunderland on the 10th and we did the proffer on the 11th.

4      Q    You were in a hurry to get it done?

5      A    Yes.

6           MR. CLARKE:  For the jury's edification, this is

7  Government's C-13.

8           BY MR. CLARKE:

9      Q    That's what you just testified to about

10 providing the location?

11     A    Um-hum.  Yes.

12     Q    And the location is in Baltimore County.  That's

13 the address for Baltimore County headquarters?

14     A    That is right.

15     Q    Do you also recall calling Mr. Leikus or him

16 calling you to discuss the fact that you wanted to have

17 this proffer?

18     A    Yes.

19     Q    Can you tell us what a proffer is?

20     A    So a proffer is an off-the-record statement that

21 someone who's charged comes in with their attorney and

22 gives to the investigators and the prosecution.  We take

23 that information and we can make derivative use of the

24 investigation, we can investigate other crimes or the

25 crime that that person is charged with based on the

1    information.  But the statement that they give us and any

2    information that they give us in the proffer session

3    cannot be used against that person.

4        Q    When can it be used against him?

5        A    Only if investigation reveals that the person

6    was untruthful or dishonest about the information that

7    they gave.  So if they tried to mislead investigators by

8    giving false information in a proffer, then the

9    information can be used against them and actually

10   additional charges could be brought.

11       Q    And why do you do proffers in your line of work?

12       A    In our line of work, it gives us invaluable

13   information, especially in cases such as this where you

14   have -- where you have an eyewitness who might be charged

15   with the case, but who can say hey, I was there and here's

16   what I saw or in drug cases where you have someone who is

17   part of a drug organization who can actually break open

18   the organization and give you information about the inner

19   workings of an organization.

20       Q    Did you consider the fact that Mr. Long had

21   reached out to Detective Sunderland to be a significant

22   development in the case?

23       A    Absolutely.

24       Q    And you stated earlier that there was some

25   urgency in getting this done?  What was the urgency?

1       A   Under our discovery rules, we provide the

2  defense with our entire case.  So before trial, the

3  defense has all of the evidence that we are going to use

4  against their client.  But we also have an obligation to

5  do that in a timely manner.

6       So if the proffer happened March the 11th, I

7  would have had to disclose it thirty days before trial.

8  So knowing maybe about March the 10th that Mr. Long was

9  interested in cooperating, I knew I only had about maybe a

10  week to get it to Stanley.

11       If we were going to use him, we would have to

12  give him the statement.  We would have to give him the

13  terms of any cooperation agreement we made with him and

14  that all takes some time.  So it would have been -- it

15  would have been really important to get everything to him

16  thirty days in advance of the April 17th date because the

17  case had been postponed so many times.  If we hadn't done

18  that, there would have been a chance that a judge could

19  say you're not going to use this because you dragged your

20  feet in giving it to the defense.

21      Q   Do you recall when you were able to get through

22  to Mr. Leikus and tell him that you were going to have the

23  proffer, that his client had called the detectives to say

24  that he wanted to cooperate, do you recall what his

25  response was when you told him about that on a phone call?

DIRECT EXAMINATION OF O'HARA

```
 1        A    He was very hesitant to do it.  He didn't want
 2   to do it.  And at one point, I do remember he said
 3   something to the effect of what is Stanley going to say,
 4   meaning what is Stanley Needleman going to say.
 5        Q    And what was your response to whether --
 6        A    That he can't --
 7        Q    Pardon me.  Whether Needleman had a thought
 8   about it or not?
 9        A    That he can't tell Stanley about this.
10        Q    Showing Government's C-1, which is already in
11   evidence and you've identified as being a proffer
12   agreement.  I want to draw your attention to if I can, I
13   think paragraph 1 discusses what you just got finished
14   testifying to that no statements would be made or other
15   information provided by you during the proffer will be
16   used against him.  Is that correct?
17        A    That is right.
18        Q    And Number 3, would you please read that there,
19   ma'am?
20        A    "Your complete truthfulness and candor are
21   express material conditions to the" -- I'm sorry.  It's
22   cutting off.
23        Q    Am I messing up this way?
24        A    I think if you just back out a little bit.
25        Q    I'm sorry.  Is that better?
```

DIRECT EXAMINATION OF O'HARA

```
 1        A    Yes.  So paragraph 3 reads "your complete
 2   truthfulness and candor are express material conditions to
 3   the undertaking of the state set forth in this letter.
 4   Therefore, the state may use statements made or other
 5   information provided by you or your attorney during the
 6   proffer under the following circumstances."
 7        Q    All right.  And then in the event that something
 8   were to happen differently, it talks about how you can use
 9   that information.  Correct?
10        A    That is right.
11        Q    And so forth.  All right.  So the proffer did in
12   fact take place?
13        A    Yes, it did.
14        Q    Did Mr. Leikus say he'd go?
15        A    Yes.
16        Q    And approximately, what time of day did it
17   happen?
18        A    It happened in the evening, maybe 6 or 7:00.
19        Q    What are your normal work hours, ma'am?
20        A    At the time, you know, 8:30 to 5:30 or so.
21        Q    All right.  So this was after work hours?
22        A    Um-hum.  Yes.
23        Q    And approximately how long did the proffer take
24   place at the Baltimore County Police Department that
25   evening?
```

**384**

DIRECT EXAMINATION OF O'HARA

1        A      Maybe we were talking with Mr. Long for an hour

2   or two and we were probably talking beforehand for a half

3   an hour.  We probably were at Baltimore County for three,

4   three and a half hours.

5        Q      Already in evidence is Government's Exhibit C-3

6   which is a transcript of an interview or proffer with Rob

7   Long.

8        A      Um-hum.

9        Q      Have you had an occasion to read that

10  transcript?

11       A      Yes.

12       Q      Does that transcript a fairly and reasonably

13  represent your recollection of what took place during the

14  interview or proffer of Mr. Long on August the -- I'm

15  sorry -- March the 11th of 2008?

16       A      Yes, it does.

17       Q      And already in evidence is Government's C-25 --

18  already in evidence is C-2, which is a compact disc of the

19  video of the proffer out of the Baltimore County

20  headquarters.  Have you had an occasion to review that

21  video?

22       A      Yes, I have.

23       Q      And does it fairly and accurately represent what

24  transpired on that day at that time?

25       A      It does.

DIRECT EXAMINATION OF O'HARA

1    Q    Was there a period of time out at the
2  headquarters when Mr. Leikus had not yet arrived and you
3  were in the company of his client, Mr. Long?
4    A    Yes.
5    Q    And did you have discussions with Mr. Long or
6  should I say did Mr. Long have discussions with you prior
7  to the time that his attorney arrived?
8    A    Yes.  I wasn't trying to initiate any
9  discussions with Mr. Long about the cases.  But I remember
10  him talking to me about why he was there, that he had
11  started to change his life.  I think that he had a new
12  baby on the way.  He had decided to go back to church.  He
13  was trying to get clean from his drug habit, things like
14  that.  He was kind of giving me a little bit of background
15  as to why he was motivated to now come forward.
16    Q    Okay.  And do you know or did he discuss whether
17  or not a portion or any portion of his attorney's fees had
18  been paid up until that point?
19    A    Yes.  He mentioned that Jose was paying for
20  Alex.
21    Q    And do you know how much the fee arrangement
22  was?
23    A    No.
24    Q    Do you know how much had been paid up until that
25  point?

765

**386**

DIRECT EXAMINATION OF O'HARA

1    A    No.

2    Q    And did you note his demeanor at that time?

3    A    Mr. Long's?

4    Q    Yes.

5    A    Yeah.

6    Q    And what was it?

7    A    He was nervous.

8    Q    And did he discuss anything about his safety or

9    any concerns for his safety?

10   A    Yes.

11   Q    What did he say?

12   A    In talking about the fact that he was there, the

13   fact that he would potentially testify against Jose

14   Morales, he said that Jose would kill him if he knew he

15   was there.

16   Q    After having the proffer, did you find in light

17   of your awareness of the case and working with the

18   detectives, did you find the information he provided to be

19   helpful?

20   A    Oh, yes.

21   Q    And what was your assessment, your assessment

22   for your job of the usefulness of the testimony that he

23   was willing to provide to you all?

24   A    Well, he became an eyewitness and he broke the

25   case open on the scaffolding case.  We now had a location

766

**387**

DIRECT EXAMINATION OF O'HARA

```
 1    where the remaining scaffolding was located.  We had how
 2    the crime happened, when it happened, how much everyone
 3    was getting paid to help.  As to the cat case, similar
 4    information, how it had happened, when it had happened.
 5    So it was -- it really brought the cases full circle.
 6         Q    And how about Mr. Leikus?  How would you
 7    describe his appearance and his demeanor during the
 8    proffer?
 9         A    I would say that he was incredibly nervous.  He
10    seemed -- he was hesitant to be there in the beginning.
11    He didn't want to be there.  Very jittery, nervous,
12    uncomfortable.
13         Q    Did you all discuss before the interview started
14    the scope of the topics that you all would be discussing
15    during that proffer?
16         A    As I recall, we -- the detectives and I said
17    we're going to let Mr. Long talk about whatever it is he
18    wants to talk about and Alex kept saying let's just focus
19    on what Mr. Long wants to confess to and what he did.
20    Let's not talk about Jose.
21         Q    At the conclusion of the proffer and after you
22    had made your assessments of the worthiness and
23    credibility of the information that had been provided, did
24    you express to Mr. Leikus your willingness to use Mr. Long
25    as a cooperator and as a witness to testify at the trial
```

767

**388**

DIRECT EXAMINATION OF O'HARA

```
1    of Jose Morales?

2         A    Yes.

3         Q    And do you recall what his response was?

4         A    He was trying to talk me out of using him.  He

5    said no one is going to believe this guy, he's a junkie,

6    he's a liar, I can't even believe you believe him.

7         Q    Do you recall what his wording was as close as

8    you can remember?

9         A    No.

10        Q    All right.  And what kind of things was he

11   saying about Mr. Long?

12        A    He's a junkie, who is going to believe him,

13   you're not really going to use this guy, are you?

14        Q    And this is his own client?

15        A    Right.

16        Q    Ultimately though, did he agree that his client

17   would cooperate?

18        A    Ultimately, it wasn't even up to him.  His

19   client had already said I'm in, I want to do this and we

20   agreed that, you know, moving forward he was going to be a

21   witness.

22        Q    Well, did Mr. Long want you to call Mr. Leikus

23   and have him present at the proffer?

24        A    No.  Mr. Long wanted Mr. Leikus to not know

25   about the proffer.  But I had a legal obligation to have
```

1    Mr. Leikus there because he was representing Mr. Long.

2        Q    At the conclusion of the proffer and after

3    talking to Mr. Leikus, did you all enter into a formal

4    plea agreement for the cooperation?

5        A    No.  Not that night.

6        Q    Would that be something that would happen later

7    on?

8        A    It would have happened later on.  We would have

9    come back as a group to discuss exactly what the plea

10   agreement would be, to what counts and all of that, but

11   not at 8 or 9:00, whatever time it was in Baltimore

12   County.

13       Q    At some point with Mr. Long, did you address his

14   concerns about his safety?

15       A    Yes.

16       Q    And what did you do?

17       A    I believe it was in leaving the proffer.  I told

18   Mr. Long that, you know, I'll reach out to our resources

19   in our office to see if we can have some housing provided,

20   some witness protection, things like that.  And Mr. Long

21   at Baltimore County basically expressed that he was going

22   to take care of it himself, that he could look out for

23   himself, watch his own back, kind of thing.

24           Leaving the proffer though I knew that I would

25   still make those requests and make the effort to at least

DIRECT EXAMINATION OF O'HARA

1    offer it to him and it's up to him whether or not he

2    wanted to take it.

3        Q    All right.  I'm showing you Government's Exhibit

4    C-14.  And do you recognize that email?

5        A    Yes.  This is an email that I wrote on

6    March 12th to Pam Widgeon and Heather Courtney who are in

7    the Baltimore City State's Attorney's Office

8    Victim/Witness Units.  So those would be the folks who we

9    contact for witness assistance, protective housing, any

10   kind of concern like that.

11       Q    So would you please read that out loud for us?

12       A    Sure.  It's from Katie O'Hara.  Sent Wednesday,

13   March 12, 2008, 4:12 p.m. to Pam Widgeon, cc'ed Heather

14   Courtney and the subject was the safety concern.  And it

15   reads "Hi, Pam.  Redaction.  This case is coming in

16   4-17-08, Part 13.  We now have made contact with a charged

17   co-defendant, Robert Long.  We met with him and his

18   attorney last night in Baltimore County for a proffer

19   session.

20           His attorney, Alex Leikus, works with Jose

21   Morales' attorney, Stanley Needleman.  I'm afraid that Mr.

22   Leikus is going to slip this information to Mr. Needleman

23   and thus to Jose Morales because they share office space

24   and cases, although they insist that they are not working

25   together.

DIRECT EXAMINATION OF O'HARA

1           I am hoping to flip this defendant as a state's

2    witness before the trial date.  He indicated that if Jose

3    Morales knew that he was talking to us, he would kill him

4    and I believe he would potentially do that."

5        Q    And showing you C-15.  At some point, did the

6    victim/witness unit respond to your concerns and also your

7    request for assistance?

8        A    Yes.

9        Q    And without reading the whole thing, essentially

10   what was their response?

11       A    So basically that as long as Mr. Long was a

12   co-defendant, they couldn't assist him.  We had to make

13   him officially a state's witness for them to assist him.

14   That would be with all of the technical assistance.  They

15   weren't saying that we're turning a blind eye to him, but

16   saying go ahead and make him a state's witness and we'll

17   get working on it.

18       Q    What does that mean, make him a state witness?

19       A    That we would pull his cases in and plea him out

20   and there would be -- there would be an agreed upon

21   sentence.  But that sentence wouldn't be issued until

22   after he had the opportunity to testify in the case.  So

23   long as he agreed to testify in the same manner that he

24   gave the statement in and he testified truthfully, then

25   the agreed upon statement, the agreed upon sentence would

```
 1     be imposed.  If he took the stand and lied, then we would
 2     have a different sentence.
 3         Q    Actually, my question is more basic.
 4         A    Oh, I'm sorry.
 5         Q    You were asking the victim/witness unit for some
 6     resources.  Correct?
 7         A    Right.
 8         Q    You wanted resources to help protect Mr. Long.
 9     Correct?
10         A    Yes.
11         Q    And your victim/witness unit requires you to do
12     what first before they could provide you with the
13     resources you were asking for?
14         A    They require us to make him officially a state
15     witness.
16         Q    Because right now on the record, he's still a
17     charged defendant?
18         A    Right.
19         Q    And if you were to provide him money directly,
20     you're providing money to a co-defendant?
21         A    Yes.
22         Q    And if he didn't plead guilty --
23              MR. ZUCKER:  Objection.  Leading.
24              THE COURT:  Sustained.
25              MR. CLARKE:  I can back it up.
```

**393**

DIRECT EXAMINATION OF O'HARA

```
 1            BY MR. CLARKE:
 2       Q    So what would happen if you gave him money and
 3   he decided not to plead guilty?
 4       A    Well, then we would have been providing money to
 5   a defendant.
 6       Q    All right.  So is that part of the reason why
 7   you were trying to hurry it up?
 8       A    Yes.
 9       Q    Nonetheless, were there some resources that your
10   office and the police department could afford him?
11       A    Yes.  It was discussed with him the night of the
12   proffer.  More so, the police resources because those are
13   more immediate as far as witness protection.
14       Q    And in line with that, I'm showing you
15   Government's Exhibit C-16.  This is another email from you
16   on Wednesday, March the 12th.  Is that correct?
17       A    Yes.
18       Q    So again like the other two emails, this is the
19   day after you had the or the day after that you had the
20   proffer session.
21       A    Right.
22       Q    So it's the day after the evening session.  And
23   would you read that -- can you read that?
24       A    So it's from me on Wednesday, March 12, 2008 at
25   4:39 p.m. to Leikuslaw@gmail.com, which is Alex's email
```

**394**

1   address.  The subject was housing.  And it reads "Alex, in
2   an abundance of caution, if your client would like to look
3   into some housing options, I have spoken with victim
4   witness and that is a possibility.  I gather that he's an
5   I'll take care of myself type, but the option is open for
6   him.  I would be more than happy to let him review the
7   options as soon as possible.  Please pass that along to
8   him and contact me if he's interested."
9        Q    As to the information that he provided
10  concerning the commission of the crime by he and Mr.
11  Morales, did you put that information to use to further
12  your investigation?
13       A    Yes.
14       Q    I'm showing you Government's Exhibit C-12, which
15  is a photo array.  Are you familiar with that, ma'am?
16       A    Yes.
17       Q    And who picked out Mr. Morales on that photo
18  array?
19       A    Rob Long did.
20       Q    And was a search warrant ultimately issued?
21       A    Yes, it was.
22       Q    Already in evidence is the search warrant as
23  C-17.  Was there a request made of you by the agents to
24  prevent the disclosure of the issuance of this search
25  warrant?

DIRECT EXAMINATION OF O'HARA

1    A    Yes.  Detective Fields and Detective Sunderland

2  asked me to file something that would keep the search and

3  seizure warrant and the affidavit closed to the public so

4  that no one could see it for a period of time.

5    Q    And did you in fact do that?

6    A    Yes, we did.

7    Q    I'm showing you Government's Exhibit C-18.  Is

8  that the motion you filed?

9    A    Yes.  It's a state's motion to seal the

10  affidavit.

11    Q    And I want to draw your attention to one of the

12  reasons that you gave for the filing of that motion to

13  seal.  Would you read the second paragraph please, Number

14  2?

15    A    Number 2 reads that "Failure to maintain the

16  confidentiality of the investigation would jeopardize the

17  use of information already obtained in the investigation,

18  impair the continuation of the investigation and/or

19  jeopardize the safety of a source of the information.

20    Q    And do you recall when the search warrant was

21  executed?

22    A    It was a few days before Mr. Long was killed.  I

23  know that.

24    Q    Does the 18th sound about right, March 18th?

25    A    That sounds about right.

DIRECT EXAMINATION OF O'HARA

1       Q    So if it was March the 18th, 2008 that the

2   search warrant was executed, that was how many days after

3   the proffer?

4       A    The proffer was done on the 11th.  So about a

5   week later.

6       Q    And how many days before his death was the

7   search warrant?

8       A    He was killed on the 24th.  So about a week.

9       Q    So combining those two time periods from the

10  time that he told you and the agents that he wanted to

11  cooperate on March the 10th until the date that he was

12  murdered, March the 24th, is 14 days?

13      A    Um-hum.

14      Q    During those 14 days, ma'am, did you or any of

15  the agents disclose the fact that Mr. Long had sat down

16  with you all and proffered information?

17          MR. PROCTOR:  Objection.  Did you is a fair

18  question.  Did any of the agents is 602.

19          MR. CLARKE:  I can rephrase.

20          THE COURT:  Rephrase.

21          BY MR. CLARKE:

22      Q    Ma'am, did you provide any information, disclose

23  any information that Mr. Long had agreed to cooperate and

24  was now a testifier for Mr. Morales at trial?

25      A    No.

**397**

DIRECT EXAMINATION OF O'HARA

1      Q    To your knowledge, did anybody in your office or
2   any of the agents that you were working with disclose it?
3      A    No.
4      Q    Did you have an opportunity to see the results
5   of a search warrant that was executed on October the
6   18th -- March the 18th of 2008?
7      A    Detective Sunderland sent me some pictures that
8   he took on his phone.
9      Q    I'm just showing you one of the ones that are in
10   evidence.  C-21.  Is that an example of the kind of
11   photographs that you saw?
12      A    Yes.
13      Q    And ma'am, how did you view the value and
14   significance of the evidence that you obtained through the
15   search warrant using Mr. Long's information?
16      A    As it pertained to the scaffolding case, it was
17   particularly relevant and was incredibly valuable because
18   Mark Hill, who was our witness who owned the scaffolding
19   or worked for the company that owned the scaffolding was
20   able to say that the scaffolding found at Mr. Morales'
21   residence was the same lot as the scaffolding found at his
22   construction site.  It was all stolen out of the same
23   place.
24      Q    So between the two individuals, Mr. Long and Mr.
25   Morales, who did this -- which of the defendants did this

DIRECT EXAMINATION OF O'HARA

1    evidence provide more weight against?

2        A    Mr. Morales.

3        Q    And was there a time when you had planned to

4    disclose this search warrant as well as Mr. Long's

5    cooperation?  If so, when?

6        A    It would have been closer to the April 17th

7    trial date.  So we would have -- let's see.  If they

8    executed the search and seizure warrant on March 18th, it

9    probably would have been within about a week after that.

10   I think the sealing order probably lasted about 15 days,

11   probably until the end of March.

12       Q    And at some point prior to the trial, you would

13   have had also say that Mr. Long was going to be a witness?

14       A    Correct.

15       Q    But you could control when you would disclose

16   that information?

17       A    Correct.

18       Q    And according to your earlier testimony, you

19   never had that opportunity?

20            MR. PROCTOR:  Objection.

21            THE WITNESS:  No.

22            MR. PROCTOR:  If it's according to her earlier

23   testimony, it's by definition asked and answered.

24            THE COURT:  Just rephrase it.

25            MR. CLARKE:  I'll withdraw the question.

**399**

DIRECT EXAMINATION OF O'HARA

```
1            BY MR. CLARKE:
2       Q    So you've testified that March the 18th was the
3   day that the search warrant was executed.  Did there come
4   a time when you received a call from Mr. Needleman
5   inquiring about Mr. Long?
6       A    Yes.
7       Q    And where did he call you?
8       A    As I recall, it was at the misdemeanor office
9   which is in circuit court.
10      Q    I'm showing you a page from --
11           MR. CLARKE:  May I approach, Your Honor?
12           THE COURT:  You may.
13           MR. CLARKE:  Thank you.
14           BY MR. CLARKE:
15      Q    I'm showing you a page from Government's P-5
16  which are cellular phone records for Stanley Needleman and
17  I'm referring to a page that begins with the date of March
18  the 20th.  I'm going to ask you to look at -- have I shown
19  you this before?
20      A    Yes.
21      Q    Do you see that right there, ma'am?
22      A    Yes.
23      Q    This is what you've seen before?
24      A    Um-hum.
25      Q    Let me put it up on the DOAR system.
```

**400**

DIRECT EXAMINATION OF O'HARA

1    MR. PROCTOR:  Judge, I have an objection.  Can
2    we approach, please?
3         THE COURT:  Come to the bench.
4         (Bench conference:)
5         THE COURT:  Yes.
6         MR. PROCTOR:  Mr. Needleman hasn't testified.  I
7    am showing you a page of Mr. Needleman's phone records.
8    There's no certification attached to them.  They haven't
9    come in yet.  Mr. Needleman hasn't testified.  This
10   witness cannot testify absent those records first being
11   authenticated.
12        MR. CLARKE:  Are you saying you want to bring
13   back a nursing mom who's on maternity leave to have her
14   testify again?  Your Honor, we're going to hook these up.
15   These are the records for Stanley Needleman.  He's going
16   to identify them.  We are going to certify them.  Rather
17   than bringing her back, his name is on it.  We are going
18   to have her identify her phone number on this.
19        THE COURT:  Why don't you show her the records
20   for identification only?  Those will not be admitted until
21   Mr. Needleman testifies.
22        MR. CLARKE:  All right.
23        THE COURT:  So it's for identification only.
24        MR. PROCTOR:  And, judge, while we're here --
25   I'm sorry.

**401**

DIRECT EXAMINATION OF O'HARA

1          MR. CLARKE:  May I display it at least?

2          MR. PROCTOR:  No.  It's for identification.

3          THE COURT:  I'll turn off the jury box.  So they

4    won't see it.

5          MR. CLARKE:  She's already seen it then, Your

6    Honor.  Don't worry about that.

7          MR. PROCTOR:  Judge, one more thing.  While

8    we're here, I was just going to -- it's not time

9    sensitive, but we're here.  Mr. Clarke when he's

10   questioning the witness said I'm showing you C-3, which is

11   in evidence which is a transcript of Rob Long's interview.

12   I just wanted to clear up, the tape's in evidence.  The

13   transcript is for identification purposes only.  I just

14   want to make sure we're clear on that.

15         MR. CLARKE:  We agree.

16         (In open court:)

17         BY MR. CLARKE:

18   Q    So I'm showing you Government's Exhibit P-5 for

19   identification purposes only.  And first, can you identify

20   the number that's highlighted there?

21   A    (410) 396-5029.

22   Q    And ma'am, do you recognize that number?

23   A    Yes.

24   Q    And how do you recognize it?

25   A    That's one of the lines for the misdemeanor

**402**

DIRECT EXAMINATION OF O'HARA

1    office at the Baltimore City Circuit Court.

2        Q    And what is the date and time of that call?

3        A    March the 20th at 2:03 p.m.

4        Q    And do you recall that being the date that you

5    received the call from Mr. Needleman?

6        A    I recall that it was shortly after the proffer

7    and the execution of the search and seizure warrant.

8        Q    This would be two days after?

9        A    Um-hum.

10       Q    You have to say yes.

11       A    Yes.

12       Q    All right.  And do you recognize the number

13   which is already in evidence in this case just above it,

14   443) 277-2961?

15       A    No.

16       Q    Why was he calling?  Why did Mr. Needleman call

17   you?

18            MR. PROCTOR:  Objection.

19            THE COURT:  Sustained.

20            BY MR. CLARKE:

21       Q    Did you and Mr. Needleman have a conversation?

22       A    Yes, we did.

23       Q    Without telling us what he said, what was he

24   attempting to do?

25            MR. PROCTOR:  Objection.

**403**

DIRECT EXAMINATION OF O'HARA

```
 1          THE COURT:  Overruled.  Just don't say what he
 2    said.
 3          THE WITNESS:  He was attempting to identify
 4    whether or not Mr. Long was going to cooperate and testify
 5    against Jose Morales.
 6          BY MR. CLARKE:
 7      Q    What was your reaction to the inquiry?
 8      A    It upset me and it concerned me and I told him
 9    only that he'll receive any disclosure that would be
10    required in the period of time that he needs it.
11      Q    And how would you compare your banter on this
12    call with the normal banter you might have had with Mr.
13    Needleman on any other day?
14      A    It was very tense.  It was very tense.  It was a
15    very brief conversation.  But it was a very pointed, very
16    tense conversation.  Not like we usually have.
17      Q    Ms. O'Hara, I want to ask you when you learned
18    about the death of Rob Long?
19      A    The morning after he was killed, my boss at the
20    time, Haven Kodack called me into his office to explain
21    that he had been killed.
22      Q    And what did he say?
23          MR. PROCTOR:  Objection.
24          THE COURT:  Sustained.
25          MR. CLARKE:  I'll withdraw.
```

**404**

DIRECT EXAMINATION OF O'HARA

1          BY MR. CLARKE:

2      Q    And what was your reaction?

3      A    I was horrified.  I was really upset.  I was in

4    tears.  I was angry.  To date, it's still one of the worst

5    moments that I've had as a prosecutor.

6          MR. ZUCKER:  Objection.  Relevance.

7          MR. CLARKE:  Could she just finish her answer?

8          THE COURT:  Overruled.

9          BY MR. CLARKE:

10     Q    If you could repeat that, ma'am?

11     A    I was upset.  I was horrified.  I was angry.  I

12   was sad.  I was crying.  And Haven was obviously trying to

13   comfort me, but it was -- as a prosecutor, it was the most

14   horrifying thing that can happen professionally.

15     Q    And what's the first thing you did after that,

16   ma'am?

17     A    I called Alex.

18     Q    Rob Long's attorney?

19     A    Yes.

20     Q    And do you know where he was at the time that

21   you called him?

22     A    As I recall, he was either in Disney World or

23   going to Disney World or something.  There was something

24   about Disney World.  I know that.  But I called him on his

25   cell phone.  So I'm not sure.

**405**

DIRECT EXAMINATION OF O'HARA

1      Q    And what did you say to him on the cell phone?

2      A    I told him about Rob Long and he hadn't known

3   yet.

4      Q    And when you told him about it, what was his

5   response?

6           MR. ZUCKER:  Objection.

7           THE COURT:  Sustained.

8           MR. CLARKE:  Your Honor, may we approach on that

9   point?

10          THE COURT:  You may.

11          MR. ZUCKER:  Withdrawn.  Objection withdrawn.

12          THE COURT:  Objection withdrawn.  All right.

13   You may answer the question.

14          THE WITNESS:  He said to me what did we do.

15          BY MR. CLARKE:

16      Q    What did we do?

17      A    What did we do.

18      Q    And what was your response?

19      A    That I did nothing.  That this is on him and I

20   was really upset with him.

21      Q    All right.  So you had the news.  You called Mr.

22   Leikus.  What happens next with the case?

23      A    So let's see.  This was March 24th.  As it

24   pertained to the cases, they were set for April 17th.  On

25   April 17th, we went in.  The cases were abated by death.

**406**

1    I did the disclosure I think to Stanley with Rob's

2    statement and everything after he had been killed with the

3    search and seizure warrant affidavit with the pictures

4    sometime between probably the 25th and the 17th.  Did

5    that.

6            And then on the 17th, we went into court.  Rob's

7    case was abated by death.  So it was closed.  And I asked

8    for a postponement I believe on Mr. Morales' cases because

9    I was going to still continue the prosecution against him.

10    Q    As best you could?

11    A    Yes.

12            MR. CLARKE:  If we could play Government's

13    Exhibit C-25 which is only four minutes long, Your Honor?

14            THE COURT:  You may.

15            MR. CLARKE:  Thank you.

16            BY MR. CLARKE:

17    Q    And where is this taking place, ma'am, this

18    video, this court proceeding?

19    A    This took place, let's see, in Courthouse East

20    in front of Judge Watts I believe.  And when I see it,

21    I'll know for sure.  She has a courtroom on the -- we had

22    a courtroom on the fourth floor of Courthouse East.

23    Q    And what is the date of this proceeding?

24    A    This was the April 17th date.  April 17, 2008.

25    Q    And what was supposed to happen on April 17,

DIRECT EXAMINATION OF O'HARA

1    2008?

2       A    Rob Long and Jose Morales were set as

3    co-defendants for trial in the theft cases and then Jose's

4    assault cases set the same day.  They were all

5    consolidated.

6           MR. CLARKE:  All right.  If we could play it?

7           (The video was played.)

8           BY MR. CLARKE:

9       Q    Now when we see the camera moving back and

10   forth, what's happening here?  Why is this so jittery?

11   Why does it go back and forth?

12      A    The cameras in the Baltimore City Courthouses

13   are actually voiced based.  So whoever is talking, the

14   camera is on them.

15      Q    That was obviously just you talking.  Correct?

16      A    Yes.

17      Q    And can you identify the people in the frame

18   now?

19      A    So that's me on the far right, Stan Needleman in

20   the middle and Jose Morales on the left.

21          (The video was played.)

22          BY MR. CLARKE:

23      Q    Now someone asked if he could be excused.  Was

24   Mr. Leikus there?

25      A    Yes.  That was he who asked.

DIRECT EXAMINATION OF O'HARA

1              (The video was played.)

2              BY MR. CLARKE:

3       Q    So what's about to happen here briefly?

4       A    A bench conference with Judge Watts.

5       Q    With respect to what?

6       A    I don't remember.

7              (The video was played.)

8              BY MR. CLARKE:

9       Q    What did you understand the judge to mean when

10   she said there was no longer a co-defendant case?

11      A    That Mr. Long's cases were no longer relevant.

12      Q    And how significant was the loss of Mr. Long to

13   your case against Mr. Morales?

14      A    Very, very significant.

15      Q    So you didn't dismiss it that day.  Correct?

16      A    No.

17      Q    Did there come a time when you made the decision

18   to dismiss all three cases?

19      A    Yes.

20      Q    And approximately when?

21      A    Gosh.  I know it was a long time after.  It was

22   right I think before Ms. Jessamy's administration left.

23      Q    So it was more than a year later?

24      A    Oh, yeah.  It was more than a year later.  It

25   was maybe 18 months later.

CROSS-EXAMINATION OF O'HARA

```
 1        Q     There's a number of factors that factored into
 2   your decision to dismiss it at that point.  Correct?
 3        A     Several.
 4        Q     Including the absence of Mr. Long?
 5              MR. ZUCKER:  Objection.
 6              BY MR. CLARKE:
 7        Q     Was Mr. Long's absence a part of the calculus
 8   for dismissing the case ultimately?
 9        A     Yes.
10              MR. CLARKE:  I have no other questions, Your
11   Honor.  Thank you.
12              THE COURT:  Cross.
13              MR. PROCTOR:  Thank you.
14                          CROSS-EXAMINATION
15              BY MR. PROCTOR:
16        Q     How are you, Ms. O'Hara?
17        A     Hi, Mr. Proctor.  How are you?
18        Q     It is more fun standing here than it is sitting
19   there.  Right?
20        A     Far.
21        Q     Just a few questions, ma'am.  I won't be long.
22   You testified that at one point, the plea offer to Mr.
23   Morales was ten, suspend all but five, something like
24   that?
25        A     Something like that.
```

**\*   \*   \***

**410**

DIRECT EXAMINATION OF PABON

1  designations, would they have had an opportunity to

2  interact with each other as part of the general population

3  for the majority of the time while they were together?

4        A    Yes.

5        Q    And that includes meals and recreation time?

6        A    Yes.

7             MR. CLARKE:  I have no other questions, Your

8  Honor.

9             THE COURT:  Cross.

10             MR. PROCTOR:  No, sir.

11             MR. CLARKE:  Thank you, ma'am.  May she be

12  excused?  Thank you.

13             THE COURT:  Thank you, ma'am.  You are excused.

14  Thank you very much.

15             MS. WILKINSON:  Your Honor, our last witness for

16  the day is Enrique Pabon.

17             THE CLERK:  You can just step up here and raise

18  your right hand for me, please?

19  Thereupon,

20                      ENRIQUE PABON,

21  Having been called as a witness on behalf of the

22  government and having been first duly sworn by the

23  Deputy Clerk, was examined and testified as follows:

24             THE CLERK:  Thank you.  Please be seated.  Just

25  need you to speak into the microphone in front of you and

DIRECT EXAMINATION OF PABON

```
 1    begin by stating your name for the record and spell your
 2    last name for me.
 3              THE WITNESS:  My name is Enrique Pabon.
 4    P-A-B-O-N.
 5                        DIRECT EXAMINATION
 6              BY MS. WILKINSON:
 7         Q    Good afternoon, Mr. Pabon.
 8         A    Good afternoon.
 9         Q    I call you mister now.  Was there a time when
10    you had a different title?
11         A    Yes.  I was the special investigative agent with
12    the Federal Bureau of Prisons at the United States
13    Penitentiary, Canaan.
14         Q    And where is Canaan?
15         A    In Pennsylvania.  In Waymart, P.A.
16         Q    It's late in the day and I have to slow down as
17    well, Mr. Pabon.  So you worked at USP Canaan in
18    Pennsylvania for the Bureau of Prisons.  How long were you
19    in that job?
20         A    I was there from January 2010 until I retired
21    last month on August 31st.
22         Q    Did you have previous law enforcement experience
23    prior to 2010?
24         A    Oh, yes.  I've been in with the bureau since
25    1993.
```

**412**

DIRECT EXAMINATION OF PABON

1    Q    And so you've since retired and living elsewhere
2    I assume.  Is that correct?
3    A    That is correct.
4    Q    And in connection with your testimony today, did
5    I bring you down to court from your retirement?
6    A    Yes.
7    Q    I'm going to direct your attention to a
8    timeframe of 2011, specifically January of 2011.  And were
9    you working at USP Canaan at that time?
10    A    Yes, I was.
11    Q    In your capacity as a special investigative
12    agent?
13    A    Yes.
14    Q    And just briefly describe for the jury what that
15    job entailed within the prison system up there?
16    A    As a special investigative agent, I was in
17    charge of the special investigative department.  I did
18    staff misconduct investigation, duty or off duty, inmate
19    investigations, gang activity, drug or and or contraband
20    introduction and urinalysis and the alcohol program.
21    Q    You've used the acronym, USP.  What does USP
22    stand for?
23    A    United States Penitentiary.
24    Q    And when you were there in January of 2011, did
25    you come across an inmate by the name of Jose Joaquin

DIRECT EXAMINATION OF PABON

1    Morales?

2         A    Yes, I did.

3         Q    And --

4              MR. ZUCKER:  Judge, could we approach for one

5    very brief matter?

6              THE COURT:  Come to the bench.

7              (Bench conference:)

8              MR. ZUCKER:  I meant to do this before and just

9    forgot.  You've already ruled.  We've objected to this

10   witness' -- this is the witness who was contacted and said

11   I want to be under proffer still.  He was present at the

12   first proffer session.  Our position was that this should

13   have been covered by the first proffer.  It's a subsequent

14   conversation.  You've already ruled against us on that

15   issue.  I just wanted to make sure the record is clear we

16   are objecting and asserting the proffer.  The rule that

17   should have still controlled.  That's all.

18             MS. WILKINSON:  And that's fine.  I just want to

19   establish the chronology of it, Your Honor, just so it's

20   clear for the record.

21             In October of 2010, myself and Agent O'Keefe

22   went to USP Canaan to interview Mr. Morales.  That

23   statement and that lengthy interview was covered by a

24   handwritten agreement that I made with Mr. Morales that if

25   he was truthful and didn't lie, that I would not use the

**414**

DIRECT EXAMINATION OF PABON

1    information against him.  And of course, I have abided by

2    that agreement.

3          In November of 2010, Agent O'Keefe went back up

4    to interview Mr. Morales about drug activity.  There was

5    no proffer agreement at that time.  But more importantly,

6    Agent O'Keefe asked a question about the Long murder and

7    Mr. Morales denied any knowledge about it.

8          As a result of that, this note that Mr. Zucker

9    just referenced was sent through the prison system to

10    Agent O'Keefe and I indicating that Mr. Morales wanted to

11    see the agent.  He had information about the murder of Rob

12    Long and he wanted to be under proffer.  He was not under

13    proffer at that time.  He had lied about the information

14    related to Long.

15          As a result of that note, Agent O'Keefe

16    instructed Agent Pabon to engage in a conversation with

17    Mr. Morales in order not to waste his time.  And that's

18    when Mr. Morales made substantially incriminating

19    statements to Agent Pabon that were then related to Agent

20    O'Keefe that then resulted in a February 2011 meeting with

21    Mr. Morales and me where there was a typewritten,

22    well-known boilerplate proffer agreement that I provide to

23    everybody who comes in for a proffer.  So that's the

24    sequence of events that Mr. Zucker is referring to.

25          MR. ZUCKER:  Agreed.

**415**

DIRECT EXAMINATION OF PABON

```
1              THE COURT:  All right.  The objection is noted
2    and overruled.
3              MS. WILKINSON:  Thank you, Your Honor.
4              (In open court:)
5              MR. ZUCKER:  Thank you, judge.
6              BY MS. WILKINSON:
7         Q    So in your time there, particularly directing
8    your attention to January of 2011, you came across a
9    inmate there by the name of Jose Morales.  Is that
10   correct?
11        A    Correct.
12        Q    And do you recognize Mr. Morales here in the
13   courtroom today?
14        A    Yes.
15        Q    And can you so indicate by a item of clothing or
16   simply by pointing?
17        A    He's wearing the dark glasses right there.
18             MS. WILKINSON:  And for the record, Your Honor,
19   the defendant, Mr. Morales.
20             THE COURT:  The record will so indicate.
21             BY MS. WILKINSON:
22        Q    Before we talk about your interactions with Mr.
23   Morales specifically, can you let the jury know how big
24   USP Canaan is?
25        A    It's a max institution and it holds usually
```

834

**416**

DIRECT EXAMINATION OF PABON

1    average around 1300 inmates.

2        Q    And that's at full capacity?

3        A    That is correct.

4        Q    And were you the only investigative agent?  Were

5    there other people like you that worked within the Bureau

6    of Prisons at USP Canaan?

7        A    Yeah.  I have special investigative lieutenants.

8        Q    And did you work under -- in the Office of the

9    Warden or report to the warden?

10       A    Yeah.  I worked under the custody.

11       Q    Now did there come a time when you were provided

12   what I will call Government's Exhibit M-1 here.  It's kind

13   of hard to see.  So let me know if you want a copy of it.

14   First of all, do you recognize Government's Exhibit M-1?

15       A    Yes, I do.

16       Q    And how do you recognize it?

17       A    Well, this note was given to then S.I.S.

18   Lieutenant Compton who then forwarded the mail to me.  In

19   January 2011, I contacted Agent Joseph O'Keefe.

20       Q    Okay.  Let me stop you there for a second.  So

21   you got custody of this note from Mr. Compton.  And who is

22   Mr. Compton?

23       A    He's now a counselor.  But he was working in my

24   department at the time.

25       Q    So he was a colleague of yours?

**417**

DIRECT EXAMINATION OF PABON

1    A    Yes.  He was a S.I.S. lieutenant at the time,
2    acting as a lieutenant.
3    Q    And once Mr. Compton provided you the note,
4    let's go ahead and read it for the record first.
5    A    Sure.
6    Q    Can you read it?
7    A    "Can you please get in contact with the agent
8    who came up to see me?  Please tell him that I can tell
9    him who the two people who killed Rob Long.  But I want to
10    be under proffer."
11    Q    The reference there, it says can you please get
12    in contact with the agent who came up to see me.  Who did
13    you understand that to be?
14    A    Agent Joseph O'Keefe.
15    Q    And who provided this note to Mr. Compton?
16    A    Jose Morales.
17    Q    Once Mr. Morales provided the note to
18    Mr. Compton and Mr. Compton gave it to you, did you reach
19    out to Agent O'Keefe?
20    A    Yes.  I reached out to see if he had spoken to
21    Compton with the information about the note.
22    Q    Now to your knowledge, prior to January 4th of
23    2011, had Agent O'Keefe been in fact up to USP Canaan and
24    seen Mr. Morales?
25    A    Yes, they did.

**418**

DIRECT EXAMINATION OF PABON

1    Q    So you knew the agent that was referred to in

2    this note?

3    A    Yes.

4    Q    Well, first of all, how did you contact Agent

5    O'Keefe?

6    A    I called him.

7    Q    And presumably, he was down here in this area

8    and you're up in Canaan.  Can give us an idea how far USP

9    Canaan is from Maryland?

10   A    I think it's about a four, four-and-a-half-hour

11   drive.

12   Q    Did you discuss with or did you disclose to

13   Agent O'Keefe that you had received this note from Mr.

14   Morales?

15   A    Well, Compton received it from Morales.

16   Q    Of course.  Did you discuss that you -- the

17   prison had gotten it from Mr. Morales with Agent O'Keefe?

18   A    Yes.  Yes.

19   Q    Did you read the note to him?

20   A    Yes.

21   Q    And as a result of what -- did Agent O'Keefe

22   respond, without saying what he responded to you, did he

23   respond to you?

24   A    He said that he did speak to --

25        MR. PROCTOR:  Objection.

DIRECT EXAMINATION OF PABON

```
 1              BY MS. WILKINSON:
 2       Q    Let's go to what you did as a result.  What did
 3   you do as a result of talking to Agent O'Keefe?
 4       A    I called him and I wanted to know if he knew
 5   about the note.  He said he did speak to Compton and knew
 6   about the note --
 7              MR. ZUCKER:  Objection.  It's hearsay.
 8              THE COURT:  Sustained.
 9              BY MS. WILKINSON:
10       Q    Were you the first person that told him the
11   note?  When you talked to Agent O'Keefe, were you the
12   first person -- was he aware of the note?
13       A    I called him in reference to it to make sure
14   that that information was relayed to him.
15       Q    And did he seem to indicate he knew about it
16   already?
17       A    Yes, he did.
18       Q    So are you having this conversation with Agent
19   O'Keefe at this point?
20       A    Yes.
21       Q    On the telephone?
22       A    Yes.
23       Q    And did there come a point when Agent O'Keefe
24   asked you to do something?
25       A    Well, he said that he wanted to ask Compton if
```

**420**

DIRECT EXAMINATION OF PABON

1   he can ask Jose Morales some questions.

2       Q   Okay.  And so he wanted Agent Compton to go ask

3   some questions of Mr. Morales?

4       A   Yes.

5       Q   And what was your response to that?

6       A   Well, I believe Compton wasn't available at the

7   time.  But I came out and I said well, I can do that right

8   now, I'm available.

9       Q   So you agreed to do it?

10       A   Yes.

11       Q   And did Agent O'Keefe provide you the questions

12   he wanted you to ask of Mr. Morales?

13       A   Yes, he did.

14       Q   And how did he do that?

15       A   He told me the questions over the phone.  I

16   wrote it on -- jot it on a piece of paper.

17       Q   So you physically wrote down the questions that

18   Agent O'Keefe wanted to ask on a piece of paper?

19       A   Yes.

20       Q   Now up until this point, had you had any

21   knowledge about the two people who killed Rob Long?

22       A   No idea.

23       Q   Did you know anything about Rob Long?

24       A   No idea.

25       Q   Did you know the specifics of what Agent O'Keefe

839

**421**

DIRECT EXAMINATION OF PABON

```
 1   was investigating?
 2        A    No, I did not.
 3        Q    So Agent O'Keefe gave you some questions and you
 4   wrote them down on a piece of paper.  Correct?
 5        A    Yes.
 6        Q    Now what did you do with the piece of paper that
 7   you were writing the questions down on?
 8        A    After I called him back with the answers to
 9   those questions, I just -- I shredded the paperwork.
10        Q    So after speaking with Agent O'Keefe and getting
11   these questions and writing them down, what did you do?
12        A    Oh, I went inside the institution to speak with
13   Morales.
14        Q    Did you speak with him the same day and at the
15   same time you talked to Agent O'Keefe?
16        A    Right after I got off the phone with him, I went
17   inside to talk to him.  Yes.
18        Q    And how is it that you established contact with
19   Mr. Morales?  How is it that you came to see him?
20        A    I made a phone call to health services and had
21   him brought up to health services.
22        Q    Okay.  And why did you have him brought up to
23   health services?
24        A    Normally, in an environment like an institution,
25   whenever they see any inmate come and talk to me, then
```

**422**

DIRECT EXAMINATION OF PABON

```
1    other inmates are going to assume that he's ratting or
2    he's cooperating with me because they know I'm the special
3    investigative agent.  So I didn't want to see him in the
4    visiting room because other inmates would see him going in
5    there.
6             So I had health services call him up like
7    basically a doctor's appointment or a medical appointment.
8    And once they brought him inside, I was waiting for him
9    inside one of the offices in the back.  This way no other
10   inmates saw him come and get in contact with me.
11        Q    Is that area within health services more private
12   than the visiting area where --
13        A    Well, no inmates are going to see him going in
14   there with me.
15        Q    So did in fact Mr. Morales, was he brought up to
16   the health services room?
17        A    Yes.
18        Q    And who was present in the health services room
19   besides you and Mr. Morales?
20        A    Just us.
21        Q    Did you tell him why you were there?
22        A    Yes.
23        Q    Did you have a copy of Government's Exhibit M-1
24   with you?
25        A    No, I don't.
```

**423**

DIRECT EXAMINATION OF PABON

1      Q     No. With you when you were interviewing Mr.

2   Morales. Did you take the note with you?

3      A     The note, I took with me. Yes.

4      Q     And did you take your handwritten notes that

5   Agent O'Keefe --

6      A     That is correct.

7      Q     -- had provided you?

8      A     Yes.

9      Q     Now give us the layout in the room there. Is it

10   a conference room?

11      A     NO. It's a small cubical. Typical. Maybe 5 x

12   6 room.

13      Q     And was Mr. Morales brought there in handcuffs?

14      A     No.

15      Q     Was he shackled in any way?

16      A     No.

17      Q     Could he have left at any time?

18      A     Once I told him what I was there for, yes, he

19   could have left.

20      Q     So what did you tell him you were there?

21      A     I told him that I forwarded the information that

22   he put on the note to Agent O'Keefe and that the agent

23   came back and said that to tell him that he was not

24   entirely truthful with the information he gave him the

25   previous time that he was up there.

DIRECT EXAMINATION OF PABON

```
 1              So therefore, at this time he needed to go ahead
 2     and give him some proof that he had evidence or
 3     information about who murdered Long.
 4        Q     And did you relate that to Mr. Morales?
 5        A     Yes.
 6        Q     And what did Mr. Morales say?
 7        A     Well, at that time then he went ahead to tell me
 8     that tell him, meaning O'Keefe, that the previous time he
 9     was here, he told me -- I told him that the person's name
10     was Theodore.  But it wasn't.  It was Tory, Junior's
11     brother.  And then he went and told me that Long used
12     coke.  But he didn't, he didn't inject it.  He didn't use
13     needles.
14        Q     Did he know what Troy or Junior's last name was?
15        A     He didn't tell me the last name.
16              MR. ZUCKER:  The witness said Tory.
17              MS. WILKINSON:  Pardon me?
18              MR. ZUCKER:  The witness said Tory, not Troy.
19              BY MS. WILKINSON:
20        Q     Is it Tory or Troy?
21        A     Troy.  Troy.
22        Q     T-R-O-Y?
23        A     Yes.
24        Q     Did you ask him any questions about a gun?
25        A     No.  I didn't ask him no question about gun.  He
```

843

**425**

1    said that Troy and Junior killed or shot I should say Long

2    twice in the head by the railroad tracks and that they got

3    paid for it and that they used a small caliber weapon and

4    that Troy kept that weapon.

5        Q    Did he say and indicate the location where Troy

6    and Junior shot Long?

7        A    He just said by the railroad tracks.

8        Q    At that point, did you ask him any additional

9    questions?

10       A    Well, at that time, I'm like that's very

11   detailed information.  So I said how do you know this?

12   And he said Troy called me minutes after they shot Long.

13       Q    That Troy called who?

14       A    That Troy called Morales.

15       Q    Upon receiving this information from Mr.

16   Morales, what did you do?

17       A    That was the end of the interview.  I sent him

18   back to his unit, went back to my office and I contacted

19   Agent O'Keefe and I told him the answers to those

20   questions.

21       Q    In preparation for your testimony, did you see a

22   report that Agent O'Keefe made of the statements that you

23   had provided to him that day?

24       A    Yes, I did.

25       Q    In your job as an investigative agent at United

DIRECT EXAMINATION OF PABON

1    States Penitentiary, do prison officials have access to

2    inmate phone calls?

3        A    Yes.

4        Q    Do they have access to inmate mail?

5        A    Yes.

6        Q    And are they permitted to open mail that is sent

7    out from an inmate?

8        A    Yes.

9        Q    I'm going to show you Government's Exhibit M-2.

10   And are you familiar with the stamp that's on Government's

11   Exhibit M-2?

12       A    Yes.

13       Q    And what does it say?

14       A    This correspondence is from an inmate currently

15   in the custody of the Bureau of Prisons.

16       Q    And why does the prison put that on an envelope?

17       A    That's a general warning to whoever the

18   recipient is to advise them that this is a person, an

19   inmate that's incarcerated at the Bureau of Prisons

20   because inmates can write to anybody.

21       Q    At some point as part of working with Agent

22   O'Keefe, were you asked -- strike that -- did you read

23   mail that was sent from Mr. Morales?

24       A    Well, I'm sure Compton did and some of the other

25   staff because I think he was on the list because we were

**427**

DIRECT EXAMINATION OF PABON

```
1    anticipating he might be trying to --
2              MR. ZUCKER:  Objection.  Objection.
3              THE COURT:  Sustained.
4              THE WITNESS:  -- trying to introduce
5    contraband --
6              MR. ZUCKER:  Objection.
7              MS. WILKINSON:  Sustained.
8              THE COURT:  Sustained.
9              BY MS. WILKINSON:
10   Q     Simply was the mail read of Mr. Morales?
11   A     Yes.  Yes.  The mail was read.  Yes.
12   Q     Now this particular letter, Government's Exhibit
13   M-2, does it indicate who it was from?
14   A     Jose Morales.
15   Q     And are you familiar with the P.O. box --
16   A     P.O Box 300.  Waymart, PA.  18472.  Yes.
17   Q     And what is that address?
18   A     That's the P.O. box, the inmate box where they
19   receive all the correspondence.
20   Q     And does it indicate to whom this letter is
21   addressed?
22   A     George and I'll pronounce it, Psathas.
23   Q     I'll spell it.  P-S-A-T-H-A-S.  Is that correct?
24   A     Yes.
25   Q     And --
```

846

**428**

```
1              MR. ZUCKER:  Objection.  Approach, please,
2    judge.
3              THE COURT:  I can't hear you, sir.
4              MR. ZUCKER:  Objection.  We wish to approach for
5    an objection at the bench.
6              THE COURT:  Come to the bench.
7              (Bench conference:)
8              MR. ZUCKER:  I believe the witness says it was
9    read, it was read by somebody else, possibly Compton.  So
10   I don't know how this witness gets to identify it if
11   another officer is the one that intercepted it and read
12   it.  We don't know what the chain of custody is.  We don't
13   know if it's the same letter.  We don't know how you get
14   from A to B.  So I'm objecting on that basis.
15             MS. WILKINSON:  Do you really want me to call
16   Lieutenant Compton down here from another prison in New
17   York to read what is clearly a prison email that you've
18   had for a year, Mr. Zucker?
19             MR. ZUCKER:  Well, I frankly was surprised by
20   the answer when he says he wasn't the one who intercepted
21   it.  So you know --
22             MS. WILKINSON:  He can act as a custodian of
23   records.
24             THE COURT:  Do you want to call Compton?  You
25   can call Compton if you want.
```

**429**

DIRECT EXAMINATION OF PABON

```
 1           MS. WILKINSON:  Or I'll bring another prison
 2    official down to read it.
 3           THE COURT:  I assume with further questions that
 4    he can establish that this is --
 5           MR. ZUCKER:  I don't know that --
 6           THE COURT:  -- that it was mailed out by --
 7           MS. WILKINSON:  Your Honor, perhaps Mr. Zucker
 8    can talk to his client.  But my other option is I can call
 9    Mr. Psathas.  He's certainly testified in grand jury.  He
10    has authenticated this letter as coming from Mr. Morales
11    and I'm happy to bring him into the courtroom and testify
12    against his brother.
13           MR. ZUCKER:  Hold on one second.
14           MS. WILKINSON:  Would you like to talk to him
15    about it?
16           MR. ZUCKER:  Let me just look.  Hold on.  Moment
17    to consult.
18           (In open court:)
19           MR. ZUCKER:  Moment to consult, please, judge.
20           (Mr. Zucker consulted with his client.)
21           (Bench conference:)
22           MR. ZUCKER:  I cannot withdraw the objection.
23           THE COURT:  It's overruled.  Subject however to
24    a motion to strike it if it's not tied up in some way.  I
25    think this is admissible as it is.
```

**430**

DIRECT EXAMINATION OF PABON

1           MS. WILKINSON:  I think it is, too, Your Honor.

2           THE COURT:  I think the government can inquire

3    where he got that letter, where he got it from.  They can

4    also call the person who received it.  One or the other.

5    Overruled.

6           (In open court:)

7           BY MS. WILKINSON:

8      Q    I'm going to ask you to read this letter if I

9    could, Mr. Pabon.  But I'm going to bring it up to you

10   just because it's kind of a hard copy to read.

11     A    Sure.

12     Q    And if you could for the court reporter, read it

13   slower?  How about if I read it over your -- and you

14   correct me over your shoulder?

15     A    Sure.

16     Q    Or you go ahead and go do it.  Just nice and

17   slow.

18     A    "What's up?  Not much on my end.  Same shit

19   every day.  How is everyone doing?  Hopefully everyone is

20   doing good.  How has work been?  I got some things I need

21   to tell you.  I hope you don't think no less of me.  I

22   decided to tell -- to talk to the feds.  I took a lot of

23   what staff said and I figured it would be best if I did.

24   I know deep down inside that everyone would turn and drop

25   everything on me.

**431**

CROSS-EXAMINATION OF PABON

1    They came up to the jail and talked to me today.

2  That's one of the main reason I needed to see you.  I

3  wanted to tell you myself.  The feds told me it was --

4  there was -- it was an article in the paper about Stanley

5  and me."

6    Q    What is the date of the letter on top?

7    A    May 12, 2011.

8    Q    And is it written to a man named George?

9    A    George -- I'll spell last name -- P-S-A-T-H-A-S.

10   Q    If I can turn to -- is it fair to say I've

11 redacted portions of the letter?

12   A    Yes.

13   Q    On the second page as well?

14   A    Yes.

15   Q    And on the third page?

16   A    Yes.

17   Q    And then I'll just have you read that last

18 provision for the jury.

19   A    "Now for the big thing.  How sure are you that

20 that old dude -- you" -- I can't read that.

21   Q    Recovery.

22   A    "Recovery because was on the track --"

23   Q    That night.

24   A    "Track that night."

25   Q    And how is it signed?

850

**432**

CROSS-EXAMINATION OF PABON

1       A    Signed, love you, Bro.

2       Q    Down below here on the letter, is there a

3  reference to a woman's name, Terry?

4       A    Oh, it says Terry.

5       Q    And then a phone number?

6       A    Yes.

7       Q    And then over here on the left where it says

8  P.S. tell Terry she needs to have my daughter write me.

9  Do you see that there?

10      A    Yes.

11      Q    Is that kind of one of those P.S. things?  It

12 says P.S.?

13      A    Yes.  It's typical.

14      Q    You don't know who Terry is, do you?

15      A    No.

16      Q    Do you know who George is?

17      A    No.

18           MS. WILKINSON:  That's all I have.

19           THE COURT:  Cross.

20           MR. ZUCKER:  Thank you, judge.

21                   CROSS-EXAMINATION

22           BY MR. ZUCKER:

23      Q    How's retirement?

24      A    So far so good.

25      Q    You were an investigator there for a couple of

**433**

CROSS-EXAMINATION OF PABON

1    years.  Right?

2        A    Yes.

3        Q    And as part of S.I.S. you said part of your job

4    was to investigate criminal activity and contraband within

5    the institution.  Right?

6        A    That's correct.

7        Q    And then to coordinate with outside law

8    enforcement.  Correct?

9        A    That is correct.

10       Q    And it was in context of that, that you got

11   involved in this case.  Correct?

12       A    That is correct.

13       Q    That was not an uncommon event.  That was part

14   of your job.  Correct?

15       A    That is correct.

16       Q    Because it's not uncommon for prisoners to want

17   to communicate through you with outside law enforcement

18   regarding information about criminal activity they have.

19   Right?

20       A    That is correct.

21       Q    Because that's how they get benefits.  Right?

22       A    Perhaps.

23       Q    The fact that an inmate communicating through

24   you to the Department of Justice, law enforcement,

25   involvement of somebody else's criminal activity, that was

**434**

CROSS-EXAMINATION OF PABON

1    pretty much an every day occurrence?

2        A    Sure.

3        Q    And because it was an everyday occurrence, it

4    was something you did on a fairly routine regular basis.

5    Right?

6        A    Routinely.

7        Q    You said you made notes for your conversation

8    with Mr. Morales based on your conversation I think it was

9    with Agent O'Keefe?

10       A    That is correct.

11       Q    And did you prepare any reports about that

12   conversation?

13       A    No because it wasn't my investigation.

14       Q    But it was an ongoing criminal investigation.

15   Correct?

16       A    D.E.A.'s criminal investigation.

17       Q    D.E.A. law enforcement investigation.  Right?

18       A    Right.

19       Q    And you wrote down Mr. Morales' answers to the

20   questions that Mr. O'Keefe had given you.  Right?

21       A    Yes.

22       Q    And that was a statement given within the

23   context of a criminal investigation.  Right?

24       A    Yes.

25       Q    From Mr. Morales to you to be communicated to

853

**435**

CROSS-EXAMINATION OF PABON

1       Agent O'Keefe.  Right?

2          A    Yes.

3          Q    And you've been involved in, well, law

4       enforcement for how many years?

5          A    Well, 31 years government time.

6          Q    And you know that you are required to keep

7       statements of witnesses, aren't you, sir?

8          A    If that's my investigation.  But this wasn't.  I

9       was doing the favor to the law enforcement to just get

10      that information, the answers to those questions.

11         Q    Okay.  So you're saying if it's somebody else's

12      investigation, if all you are is a conduit of that

13      information, you're not required to keep those notes as an

14      accurate record of what the witness said?

15         A    That is correct.  Like you said, it was an

16      everyday occurrence.  So this happens all the time.  We

17      don't save those.  If you want me to find out, I'll find

18      out and I'll give you the answers and that was it.

19         Q    Okay.  But the question was you're not under a

20      duty as law enforcement to preserve a witness statements

21      as part of the criminal investigation?

22         A    Not with the Bureau of Prisons.

23         Q    And recalling some years later -- this all

24      happened more than two years later.  Right?

25         A    Two and a half years ago.  Yes.

**436**

CROSS-EXAMINATION OF PABON

1    Q    And in order to refresh your recollection, you
2    reviewed a report.  Right?
3    A    That is correct.
4    Q    And the report you reviewed was O'Keefe's
5    statement of what you had recounted him -- recounted to
6    him in your conversation.  Right?
7    A    Yes.
8    Q    And you reviewed it, well, today as a matter of
9    fact.  Right?
10   A    Yes.
11   Q    And when you reviewed it, was it accurate?
12   A    To the best of my knowledge and my recollection.
13   Yes.
14   Q    Morales had said somebody had paid Troy to do
15   the hit or words to that effect.  Right?
16   A    Yes, sir.
17   Q    And do you recall that from reviewing the report
18   or do you have an independent recollection of this?
19   A    I remember him telling me that also.  Yes.
20   Q    Well, you reviewed the report that O'Keefe
21   prepared shortly after he spoke with you.  Right?
22   A    Yes.
23   Q    And nowhere in that report does it say that you
24   told O'Keefe that Morales said Troy had been killed -- had
25   been paid to do the killing, does it?  And if you're not

CROSS-EXAMINATION OF PABON

1   sure --

2       A    No.  Morales said that Troy and Junior were paid

3   to do it.

4       Q    My question is this.  You're recalling this some

5   three years later.  Right?

6       A    Correct.

7       Q    But you reviewed the report earlier today and

8   having reviewed the report, you're aware that nowhere in

9   that report did O'Keefe write down that you told him

10  Morales said they were paid to do the murder, did you?

11  And if you need to look at the report, you can look at it

12  again.

13      A    Please.

14           MR. ZUCKER:  I stand corrected.

15           BY MR. ZUCKER:

16      Q    Nowhere -- all right.  Morales didn't say who

17  paid them to do it, did he?

18      A    No, he didn't.

19           MR. ZUCKER:  Moment to consult.

20           (Counsel conferred with his client.)

21           BY MR. ZUCKER:

22      Q    There's some additional stuff about -- all

23  right.  You said Morales told you that he received a call

24  from Lucas after the murder?

25      A    From Troy.

CROSS-EXAMINATION OF PABON

1     Q     Troy Lucas.  You don't know Lucas' last name?

2     A     No.

3     Q     But he said it was after the murder.  Right?

4     A     A few minutes after.

5     Q     Not the day before.  Well, you don't know the

6    dates of the murder.  Right?

7     A     No.  I don't know the dates.

8           MR. ZUCKER:  Moment to consult.

9           (Counsel conferred with his client.)

10          BY MR. ZUCKER:

11    Q     And you were aware that Morales had met with

12   O'Keefe seeking benefits regarding his incarceration, his

13   sentence.  Correct?

14    A     I don't know if that's what it was.  But I know

15   that O'Keefe did come to see Morales on a previous time.

16    Q     And that after you communicated this information

17   to O'Keefe from Morales, sometime after that, Morales was

18   brought back to Baltimore --

19    A     Yes.

20    Q     -- to meet with O'Keefe and law enforcement?

21          MS. WILKINSON:  If you know?

22          THE WITNESS:  No.  I do know that he came back.

23   Yes.

24          BY MR. ZUCKER:

25    Q     To meet with law enforcement?

857

**439**

CROSS-EXAMINATION OF PABON

```
 1        A    Yes.
 2        Q    As a consequence of your communicating this
 3   information to O'Keefe?
 4        A    I don't know if that's the consequence.  But
 5   yeah.  I would imagine so.
 6             MR. ZUCKER:  Thank you?
 7             THE COURT:  Any redirect?
 8                         REDIRECT EXAMINATION
 9             BY MS. WILKINSON:
10        Q    Mr. Pabon, Mr. Zucker asked you questions about
11   the fact that it was --
12             MR. ZUCKER:  I apologize, judge.  I skipped a
13   whole line.
14             MS. WILKINSON:  Sure.  Go ahead.
15             MR. ZUCKER:  That's what happens when you have
16   two different things going on.
17                      CONTINUED CROSS-EXAMINATION
18             BY MR. ZUCKER:
19        Q    Regarding the letter, the handwritten letter,
20   you said -- where did that come from, if you know?
21        A    What written letter?
22        Q    The written letter that you read to the jury.
23   You said it came from Compton or somebody else intercepted
24   it?
25        A    Oh, yes, yes.  It was given to Compton.
```

858

**440**

REDIRECT EXAMINATION OF PABON

1      Q    Do you know who gave it to Compton?

2      A    Yes.  Jose Morales.

3      Q    The letter itself?

4      A    Yes.

5      Q    Was given to an officer?

6      A    He was the S.I.S. lieutenant at the time,

7    special investigative lieutenant.

8      Q    I see.  So as part of the special investigation

9    section in his duty -- Morales gave it to the

10   investigation section officer as part of the officer's

11   duty to investigate.  Right?

12     A    Yes.

13          THE COURT:  Mr. Zucker, I'm not clear from your

14   question whether you are talking about the letter, the

15   yellow letter --

16          MR. ZUCKER:  I'm talking about the letter.

17          THE WITNESS:  I'm talking about this one here.

18          THE COURT:  -- or the letter to the gentleman in

19   Baltimore or in Halethorpe.

20          BY MR. ZUCKER:

21     Q    The letter that you read to the jury about -- to

22   George.  That was given from Morales to Compton?

23     A    Oh, no, no, no, no.

24     Q    Where did that one come from?

25     A    He was because of the possible introduction, he

859

**441**

REDIRECT EXAMINATION OF PABON

1    was on our mailing list so that we could receive his mail

2    and we made copies of that.  That is how we got that copy.

3        Q    who -- okay.

4        A    SIS Department.

5        Q    And who was in the SIS Department opened that

6    letter from Morales?

7        A    Compton.

8        Q    And how do you know that?

9        A    Because he's the one that was handling the

10   particular case with Jose Morales.

11       Q    So he opened all of Morales' letters?

12       A    Yes.

13       Q    And you got it from Compton?

14       A    Well, Compton forwarded it to Agent O'Keefe.

15            MR. ZUCKER:  Thank you.

16            THE WITNESS:  Yeah.

17            THE COURT:  Redirect.

18            MS. WILKINSON:  Just one area, Your Honor.

19                     REDIRECT EXAMINATION

20            BY MS. WILKINSON:

21       Q    Mr. Pabon, Mr. Zucker asked you questions about

22   the fact that your job is back then at least a daily

23   occurrence to talk to inmates and do investigations of

24   what was going on in the prison.  Do you recall those

25   questions?

860

**442**

```
1          A     Yes.

2          Q     And you did speak to inmates numerous occasions

3    in the time that you worked there.  Is that correct?

4          A     Of course.  Yes.

5          Q     This was about a murder and an investigation by

6    D.E.A.  Was that a daily occurrence?

7          A     No.

8                MS. WILKINSON:  Nothing further, Your Honor.

9                MR. ZUCKER:  Could we approach, judge, for a

10   second?

11               THE COURT:  Pardon me?

12               MR. ZUCKER:  I want to approach for a second.

13               THE COURT:  Come to the bench.

14               (Bench conference:)

15               MR. ZUCKER:  Judge, I am going to make a motion

16   for sanctions.  This is a Jencks Act violation.  He's law

17   enforcement.  He's part of the investigative team and he

18   didn't keep the verbatim notes that he made of the

19   interview of a witness and he's testifying without that.

20   So I believe it's a violation of Jencks.  Even though he's

21   not part of D.E.A., he is part of law enforcement and the

22   Bureau of Prisons I believe is covered.  It was a

23   statement within the possession of the government that

24   should have been disclosed to us.  There was a duty to

25   preserve that attached before.
```

861

**443**

1          MS. WILKINSON:  Well, I don't know of any duty

2     that Mr. Zucker is talking about.  He certainly had no

3     obligation to keep handwritten notes that he did.  He

4     relayed the information to a law enforcement officer and

5     incorporated it in a report.

6          THE COURT:  So it's in O'Keefe's report?

7          MS. WILKINSON:  Yes.  Exactly, Your Honor.  And

8     the bottom line is I have asked Mr. Pabon to search the

9     files of the records to see if there are any handwritten

10    notes.  He did not keep them.  It is exactly as he

11    indicated he did.  And I don't see a Jencks Act violation

12    here.  They don't exist.

13         MR. ZUCKER:  I believe they don't exist and --

14         MS. WILKINSON:  Where does it say he has to keep

15    them in the Jencks Act, Mr. Zucker?

16         MR. ZUCKER:  There is a duty to preserve

17    statements.  But I'll have to research it --

18         THE COURT:  I'm not aware that there's any

19    obligation under the Jencks Act to keep the statements

20    that's been oral and may have been reduced to writing and

21    then thrown away.  I don't see a Jencks violation at all.

22    The best they can do was to keep writing down what he told

23    him on the telephone after he talked to law enforcement.

24    I don't see any Jencks violations.

25         MR. ZUCKER:  All right.  I make the motion.

862

**444**

```
 1          THE COURT:  I mean if the government doesn't

 2   have something, they can't give it to you.

 3          MS. WILKINSON:  Certainly, if we had it, we

 4   would have turned it over.

 5          MR. ZUCKER:  I'm sure they would have.  But I

 6   guess the issue is whether or not the Jencks Act applies

 7   to Bureau of Prisons Criminal Investigations as well as --

 8          THE COURT:  Jencks isn't limited to law

 9   enforcement personnel.  It's a statement of a witness.  If

10   there's a statement made by the witness who testified,

11   they will give it after direct.  That's the Jencks Act.

12          MR. ZUCKER:  This witness has just testified.

13          THE COURT:  If they have a statement, they would

14   give it to you.  If they don't have it, they don't give it

15   to you and they do not have it.

16          MS. WILKINSON:  We do not have it.

17          THE COURT:  What they got is the next best thing

18   which is he's writing down what he was told after he

19   talked to Morales.  I don't see a Jencks violation.  The

20   objection is overruled.  Are we ready to send them home?

21          MS. WILKINSON:  We are done, Your Honor.

22          MR. PROCTOR:  Judge, I have one request.

23   There's been a lot of testimony today about Mr. Morales

24   being in prison, USP Canaan, at Chesapeake Detention

25   Facility.  I think it's -- given we go to all this trouble
```

863

**445**

```
1    to dress him in clothes and sneak him in the back door

2    when the jury aren't here, I think it's appropriate for

3    you to tell the jury some sort of cautionary -- the fact

4    that Mr. Morales -- there's testimony today that

5    Mr. Morales has been in prison is -- you know, you're not

6    to speculate a reason, you're not to infer it against --

7              THE COURT:  The jury has heard that Mr. Morales

8    is not a choir boy, that he's been in prison and --

9              MR. PROCTOR:  Agreed.  But I just -- given the

10   testimony today, it's worthy of reiteration and I

11   understand the government not to object.

12             MS. WILKINSON:  I don't object.

13             THE COURT:  All right.  I'll tell them.  Okay.

14             MR. CLARKE:  And, Your Honor, so we don't have

15   to come back, this will be the last witness and we're done

16   for the week.

17             MS. WILKINSON:  I already said that.

18             MR. PROCTOR:  She already said that.

19             MR. ZUCKER:  You were sleeping up here.  She

20   already said that.

21             (In open court:)

22             THE COURT:  Ladies and gentlemen of the jury,

23   your prayers have been answered.  We are going to recess

24   before 5.  I have two things I want to tell you.  One is

25   you have heard testimony from various people today about
                          *     *     *
```

**446**